**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SAMUEL HOUSTON,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| **v.** | ) | **CV 06-243-MEF** |
| | ) | |
| **ARMY FLEET SERVICES, LLC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT ARMY FLEET SUPPORT, LLC'S  BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Army Fleet Support, LLC ("AFS") respectfully files the following Brief in Support of its Motion for Summary Judgment.

## INTRODUCTION

The plaintiff, Samuel Houston ("Houston") was actively employed by AFS as an Aircraft Mechanic until August 2004, when he injured his back.  After 26 weeks of paid short-term disability leave, Houston's doctor assigned permanent medical restrictions that rendered Houston unable to perform the essential functions of the Aircraft Mechanic position.  AFS encouraged Houston to seek another position, but he failed to cooperate with AFS's efforts.  Specifically, he did not submit a status change request form or verification of his qualifications, as required by the governing collective bargaining agreement ("CBA").  Because Houston could not return to the Aircraft Mechanic position and failed to cooperate with AFS's efforts to reclassify him, he was placed on administrative leave.  He also claims AFS violated the Americans with Disabilities Act ("ADA") because it failed to accommodate his alleged disability, violated the Family and Medical Leave Act ("FMLA") by failing to give him notice that a portion of his

leave would be counted as covered leave under that Act, and retaliated against him in violation of both statutes by opposing his application for unemployment compensation benefits. However, among other things, Houston was not a qualified individual with a disability, he was not denied an accommodation or FMLA leave, and AFS did not oppose his unemployment claim in retaliation for protected activity. AFS's motion for summary judgment is due to be granted.

## STATEMENT OF UNDISPUTED FACTS

### I.    GENERAL

AFS is a government contractor that supplies aircraft maintenance services and personnel to the U.S. Government, with operations located at Fort Rucker in Ozark, Alabama. (Ex. A, Whelan aff. at ¶ 2.) AFS hired Houston as an Aircraft Mechanic on December 1, 2003[1]. Houston's employment and position were subject to a collective bargaining agreement ("CBA") between AFS and the International Association of Machinists and Aerospace Workers, AFL-CIO, Local Lodge No. 2003 ("the IAM" or "union"). (Ex. A, Whelan aff. at ¶ 3).

AFS is an equal opportunity affirmative action employer that maintains comprehensive personnel policies, including anti-harassment and anti-discrimination policies. (Ex. A, Whelan aff. at ¶ 4; Ex. B, Houston dep. at Ex. 17, §2.3.) Under the CBA, AFS and the union agree to make every effort to make reasonable accommodations for disabled employees, "**seniority permitting**." (Ex. B, Houston dep. at Ex. 17, §17.14)(emphasis added.) AFS also routinely employs and accommodates disabled individuals. (Ex. A, Whelan aff. at ¶ 4.)

### II.    HOUSTON'S EMPLOYMENT AND BACK INJURY

---

[1] Prior to that date, Houston had worked as an Aircraft Mechanic for AFS's predecessor on the Fort Rucker maintenance contract, Computer Science Corporation f/k/a DynCorp Technical Service, LLC. (Ex. B, Houston dep. at 46:9.) When AFS assumed the maintenance contract at Fort Rucker, effective December 1, 2003, it agreed to abide by the CBA between DynCorp and the union through May 2005 when AFS negotiated a new contract with the union, effective May 2005. (Ex. A, Whelan aff. at ¶ 3.)

On December 1, 2003, Houston was hired by AFS into the Aircraft Mechanic position. (Ex. B, Houston dep. at 46:9.)  An Aircraft Mechanic is primarily responsible for performing necessary repairs and maintenance on Army aircraft.  (Ex. B, Houston dep. at Ex. 5.)  Houston does not dispute that in order to carry out the duties of an Aircraft Mechanic position, he must be able to climb, lift more than twenty-five pounds, sit and stand for prolonged periods, and bend at the waist. (Ex. B, Houston dep. at 177:14-178:12; 57:19.)

Houston injured his back in August 2004.  (Ex. C, Compl. at ¶ 5.)  Houston continued working after his injury until September 2, 2004, when his doctor removed him from work for surgery and subsequent recovery.  (Ex. B, Houston dep. at 63:9-14.)  Houston applied for FMLA leave, which was approved and commenced on September 3, 2004.  (Ex. B, Houston dep. at Ex. 18; Ex. D, Whitney aff. at ¶ 8.)  Houston did not attempt to return to work when his FMLA leave expired in December 2004.  (Ex. D, Whitney aff. at ¶ 8.)  Houston acknowledges he could not have returned on that date.  (Ex. B, Houston dep. at 69:14-17.)

Houston also received short-term disability ("STD") benefits during his period of recovery.  (Ex. C, Compl. at ¶ 6.)  Pursuant to the CBA, starting on the eighth day of medical leave, an employee may receive STD leave and benefits (70% of pay) for up to 26 weeks.  (Ex. B, Houston dep. at Ex. 17 at §25.8.)  Houston was on STD leave for the full 26 weeks, from September 11, 2004 to March 14, 2005.  (Ex. B, Houston dep. at 41:12-15.)  Under the CBA, an employee who fails to return to work after the conclusion of the 26-week STD leave is deemed "inactive."   This change is important because an inactive employee cannot seek a job reclassification under the CBA (See Ex. B, Houston dep. at 17 §35.1 [limiting reclassification to active employees].)  Instead, the employee must first be able to return to his old job before reclassifying.  Thus, on March 14, 2005, the date his short-term disability leave expired, Houston

was required to either return to his previous classification as an Aircraft Mechanic, seek reclassification to another position, or be placed on administrative leave. (Ex. E, Whitney dep. at 90:13-19.)

## III.  HOUSTON FAILS TO SEEK RECLASSIFICATION AND REFUSES ACCOMMODATION

With the March 14 deadline looming, on March 7, 2005, Houston visited AFS's personnel office and presented a return-to-work slip from his physician, Dr. Thomas Manski. (Ex. B, Houston dep. at 72:22.)  Dr. Manski's note did not indicate the specific date that Houston was authorized to return to work.  (Id.; Ex. C, Compl. at ¶ 6.)  As a result, Houston was advised that his return to work could not be processed until he submitted a dated authorization from his doctor. (Id.)

On March 14, 2005, Houston returned to the personnel office with a new note from his doctor, with a return-to-work date of March 14, 2005, subject to certain permanent restrictions. (Ex. B, Houston dep. at 73:4 and Ex. 14 thereto.)   Specifically, Houston was permanently restricted from lifting more than 25 pounds, climbing, standing or sitting for more than 1 ½ hours, and bending at the waist to lift, pull, twist or push.  (Ex. B, Houston dep. at Ex. 14.) Houston also presented a letter from Dr. Manski dated January 13, 2005, stating as follows:

> I would recommend that Mr. Houston **not return to doing heavy mechanical aircraft work** as he has had two disc herniations at L4-5 requiring surgery and he would be at increased risk for recurrent disc herniations if he were to perform strenuous, heavy physical activates that might strain or injure the lower back.
>
> . . .  I would recommend Mr. Houston be retrained for a position that would allow him a more sedentary job so as to avoid any additional stresses and strains that might re-injure his lower back or cause further injury to other degenerative disc levels.

(Ex. B, Houston dep. at Ex. 14.) (emphasis added).

In response to Dr. Manski's letters, Cathy Jeffers, a human resources representative, called Houston's field manager to determine if Houston could, consistent with his medical restrictions, continue to perform the essential functions of the Aircraft Mechanic position. (Ex. F, Jeffers aff. ¶ 3; Ex. B, Houston dep. at Ex 15.)  The field manager, who has extensive knowledge of the essential functions of the Aircraft Mechanic position, advised that Houston would not be able to perform the essential functions of the position within his restrictions. (Ex. F, Jeffers aff. ¶ 3; Ex. E, Whitney dep. at 43:6-10.)  Three other field managers were contacted for their opinions on whether Houston could return to the Aircraft Mechanic position at their fields given his permanent medical restrictions.  (Id.)  All three managers agreed that because the ability to climb, lift over 25 pounds, sit/stand for prolonged periods, and bend at the waist were necessary to perform the essential functions of the position, Houston could not be retained as an Aircraft Mechanic at AFS.  (Id.)  Houston was upset that he could not return to the Aircraft Mechanic position. (Ex. E, Whitney aff. ¶ 9.)

After it became clear that Houston would not be able to return to the Aircraft Mechanic position, several HR representatives discussed a job reclassification with Houston.  (See Ex. E, Whitney aff. ¶ 9; Ex. H, Beasley aff. ¶ 3; Ex. F, Jeffers aff. ¶ 4; Ex. G, Camarata aff. ¶¶ 3 & 4.) It was suggested that Houston consider an Aircraft Scheduler position, a job that is clerical in nature, but requires extensive knowledge of aircraft maintenance principles.  (Id.)  Jo Ann Camarata, the HR Specialist responsible for reclassifications advised Houston that under the CBA, in order to reclassify, he must be on active payroll, submit a status change request form, be qualified for the desired position, and have seniority over any other bidders.[2]  (Ex G, Camarata

---

[2] An employee who is unable to perform his current classification may compete for other classifications subject to the layoff and reclassification mandates of the CBA.  Specifically, the CBA provides: "when a vacancy occurs within a bargaining unit classification, other than as a result of a layoff, it will be assigned to employees on active payroll . . . by seniority who have

aff. ¶ 3.) Camarata also advised Houston that he would need to supplement his personnel file with certification of his ability to type thirty words per minute, which is an essential function of the Aircraft Scheduler position. (Ex. G, Camarata aff. 4; Ex. B, Houston dep. 127:16-19 and Ex. 9 thereto.) Houston asked if he would make the same pay as an Aircraft Mechanic if he reclassified. (Ex. F, Jeffers aff. ¶ 4.) When he was advised that he would not, Houston became upset. (Ex. F, Jeffers aff. ¶ 4.)

At some point in the meeting, because Houston was so upset, Camarata asked Bob Whitney, AFS's Compliance Manager to speak to Houston. (Ex. G, Camarata aff. ¶ 5; Ex. D, Whitney aff. ¶ 9.) Houston was upset that he would not be returned to his Aircraft Mechanic position and that his pay would decrease if he reclassified. (Ex. D, Whitney aff. ¶ 9.) Whitney discussed the Aircraft Scheduler position with Houston. (Ex. D, Whitney aff. ¶ 9.) Whitney advised Houston that he would not able to reclassify after his short-term disability leave expired because Houston would become an inactive employee at that point.[3] (Ex. D, Whitney aff. ¶ 9.) Recognizing that Houston's active employment status would expire that day, Whitney agreed to allow Houston until the end of the week, March 19, 2005, to submit reclassification paperwork and verification of his qualifications, if he was interested. (Ex. D, Whitney aff. ¶ 9.) Houston

the qualifications to perform the work involved and who have valid status change request forms on file in the Personnel section." (Ex. B, Houston dep. at Ex. 17, §35.1.)

[3] This interpretation of "active" employment under the CBA may be incorrect. (See Ex D, Whitney aff. ¶ 7.) Although the predominate interpretation in the personnel office in March 2005 was that active employment status continued through the duration of any paid leave, such as short-term disability leave, it has subsequently been discovered that there is an alternative interpretation that provides an employee becomes inactive and, therefore, ineligible for reclassification, after thirty days of continuous leave. (See Ex. D, Whitney aff. ¶ 7.) Nonetheless, AFS's arguments are confined to the interpretation that was applied to Houston in March 2005, albeit potentially erroneously. Needless to say, this interpretation is more favorable to Houston as it gave him a longer term of active employment. Under the alternative interpretation, his active employment status would have ended on October 3, 2004, not March 14, 2005.

did not express interest in an alternative position and again demanded that he be returned to the Aircraft Mechanic position.  (Ex. D, Whitney aff. ¶ 9.)  Whitney told Houston to take some time to think about his reclassification options.  (Ex. D, Whitney aff. ¶ 9.)  Houston left the personnel office at this time.  (Ex. B, Houston dep. at 175:12; Ex. D, Whitney aff. ¶ 10.)

On the following day, Houston returned to the personnel office with his wife to process out of his STD leave.  (Ex. C, Compl. at ¶ 9; Ex. D, Whitney aff. ¶ 10.)  Accordingly, the HR representatives concluded that Houston had decided to take extended leave rather than seek reclassification.  (Ex. D, Whitney aff. ¶ 10.)  At no time did Houston submit a reclassification form or typing verification.  (Ex. B, Houston dep. at 52:23; 80:1-3; 84:20-23.)

## IV.    HOUSTON'S CONFUSION ABOUT HIS EMPLOYMENT STATUS

When Houston processed out of his STD leave, he received documents that listed his status as an "administrative termination" and "involuntary termination."  (Ex. A, Whelan aff. ¶ 6 & Ex. 1,2 & 3 thereto.)  This is the terminology AFS used at the time to indicate an extended leave of absence that did not result in complete separation from the company.  (Ex. A, Whelan aff. at ¶ 6; Ex. B, Houston dep. at Ex. 16.)  Employees on administrative termination status retain recall rights, continue to accrue seniority and have an absolute right to reinstatement in their last classification so long as they are capable of performing the job for the lesser of five years or the length of seniority.  (Ex. E, Whitney dep. at 32:2-5; 38:5-17.)  Employees on such an extended leave also are allowed to continue to participate in employer sponsored benefits at a premium rate that is less than the COBRA rates charged to fully separated individuals.  (Ex. E, Whitney dep. at 33:1-3.)

Houston expressed confusion about the meaning of "administrative termination" and "involuntary termination."  In response, on numerous occasions, Houston was advised that the terminology simply meant he was on as extended medical leave of absence, not fired.  (Ex. B,

Houston dep. at 103:1-5 and Exs. 16 & 42 thereto.) Houston eventually acknowledged his understanding that he had not been fired and was still an AFS employee, albeit inactive. (Ex. B, Houston dep. at 103:1-5; 103:22; Ex. A, Whelan aff. ¶ 7; Ex. D, Whitney aff. at Ex. 2.)

## V.     HOUSTON FILES FOR UNEMPLOYMENT COMPENSATION BENEFITS

On March 13, 2005[4], Houston filed a claim for unemployment compensation with the Alabama Department of Industrial Relations ("DIR"). (Ex. J, Brown aff. at Ex. 1.) AFS filed its initial response to Houston's application for benefits on March 22, 2005. (Id.) Liz Legieza, AFS's Staffing and Recruiting Coordinator, completed the initial response. (Id. at 3; Ex. I, Legieza aff. ¶ 3.) At the time, Legieza had worked for AFS for only a few months and was still learning her position. (Ex. I, Legieza aff. at ¶ 2.) Legieza mistakenly advised the Alabama Department of Industrial Relations ("DIR") that Houston had voluntarily quit his job due to health reasons. (Id. at 3.) DIR approved Houston's application on April 8, 2005. (Ex. J, Brown aff. at Ex. 4.) On April 22, 2005, AFS appealed this initial determination explaining that Houston should be disqualified because he was still employed by AFS. (Ex. J, Brown aff. ¶ 5 & Ex. 3 thereto.) AFS inadvertently missed the May 5, 2005 hearing of its appeal because Legieza was out on military leave and did not receive timely notice of the appeal. (Ex. I, Legieza aff. ¶ 5; Ex. J, Brown aff. ¶ 6.) As a result, the Administrative Hearing Officer ("AHO") denied AFS's appeal on May 12, 2005. (Ex. J, Brown aff. ¶ 6 & at Ex. 5.) AFS appealed the AHO's decision on May 23, 2005. (Ex. J, Brown aff. ¶ 6 & Ex. 6 thereto.) Legieza and Brown both had conflicts with the hearing date for the appeal, so Bob Whitney, AFS's HR Compliance Manager, was asked to attend as the company representative. (Ex. J, Brown aff. ¶ 6; Ex. I, Legieza aff. ¶ 7.)

---

[4] Interestingly, Houston filed for unemployment compensation benefits one day before he presented his dated return-to-work note to HR personnel. This timing seems to indicate his understanding that he could not return to the Aircraft Mechanic position with his restrictions and his disinterest in any other position.

AFS's appeal was heard by the Board of Appeals on July 13, 2005.  (Ex. B, Houston's dep. at Ex. 24.)  On August 5, 2005, the DIR deemed Houston ineligible for benefits because his failure to seek reclassification prior to the expiration of his active employment constituted a failure on Houston's part to meet the availability requirements of the Alabama Workers' Compensation Act.  (Ex. B, Houston's dep. at Ex. 24.)  In other words, the Board determined that because Houston refused AFS's good faith efforts to assist him in reclassification, he had refused available work and, therefore, was not eligible for unemployment compensation.  (Id.)

At the time the response and appeals letters were prepared, the HR personnel involved—Legieza and Brown—had no knowledge of any complaints made by Houston regarding alleged disability discrimination.  (Ex. I, Legieza aff. at ¶ 8; Ex. J. Brown aff. ¶ 7.)  Around the time AFS's second appeal, well after AFS's opposition to Houston's unemployment compensation claim was in motion, Brown received an unsolicited telephone call purportedly from an employee at the Veterans Administration, giving him a "heads up" that Houston had filed a claim against AFS.  (Ex. J, Brown aff. at ¶ 7.)  The VA employee advised Brown that Houston had complained of wrongful termination based on his Veteran's status.  (Id.)  Brown was not advised that Houston had made any allegations of disability – based discrimination. (Id.)

## VI.    HOUSTON APPLIES FOR DISABILITY BENEFITS

Sometime prior to February 2005, Houston applied for disability benefits from the Veterans Administration.  (Ex. B, Houston dep. at Ex. 47; [letter dated February 2, 2005 to Dr. Chen seeking support for VA benefits claim].)  In connection with his application for benefits, Houston requested supporting letters from his doctors.  (Ex. B, Houston dep. at Exs. 46 & 47.)  Houston specifically asked his doctors to certify that he should be removed from the workforce.  (Ex. B, Houston dep. at Ex. 47.)  In December 2005, the VA granted Houston's application for benefits, deeming him unemployable and 100% totally and permanently disabled.  (Ex. B,

Houston dep. at 36:9-16.)  Houston continues to receive VA benefits monthly.  (Ex. B, Houston dep. at 42:10.)

In the Summer of 2006, Houston applied for disability benefits from the Social Security Administration ("SSA").  (Ex. B, Houston dep. at 17:5.)  SSA denied his application on March 2, 2007.  (Ex. K, Excerpt Certified SSA Records at 1999.)

## VII.    HOUSTON'S CLAIMS

Subsequent to his placement on administrative leave, Houston sent letters to various agencies and public officials, including the Department of Labor (OFCCP), the National Labor Relations Board and the EEOC describing his belief that AFS treated him unfairly by "terminating" his employment because of his medical restrictions and refusing to transfer him to an alternative position.  (Ex. B, Houston dep. at Exs. 30, 31, 41 & 43.)  There was no mention whatsoever of alleged retaliation by AFS in the charges Houston filed with various governmental agencies.

On May 23, 2005, the same day AFS appealed Houston's unemployment compensation claim to the Board of Appeals, Houston filed an unsigned, unverified complaint with the OFCCP alleging he was "wrongfully terminated based on [his] disabilities."  (Ex. B, Houston dep. at Ex. 30) [charge]; Ex. 33 [determination letter noting charge filed on May 23, 2005].)   In his complaint Houston further alleged that AFS should have accommodated him by placing him in another position.  (Ex. B, Houston dep. at Ex. 30 )  AFS received notice of this charge on June 6, 2005.  (Ex. A, Whelan aff. ¶ 9 &  Ex. 5 thereto.)  On June 6, 2005, Houston wrote a follow-up letter to Donald Cirino, Director of Regional Operations of the OFCCP, seeking redress for alleged discriminatory termination based on his alleged disability.  (Ex. B, Houston dep. at Ex. 44)  Retaliation is not mentioned in the letter to Director Cirino.  (Id.)  On June 21, 2005, AFS received notice from the OFCCP that Houston had re-filed his original charge. (Ex. A, Whelan

aff. ¶ 9 at Ex. 6.)  The re-filed charge had not been amended in any way, had not been signed or verified and did not include a claim of retaliation based on AFS's opposition to Houston's unemployment compensation.  (Ex. A, Whelan aff. at Ex. 6.)

The OFCCP issued a "Notification of Results of Investigation" and "Notice of Dismissal and Right to Sue" letter on December 22, 2005.  (Ex. B, Houston dep. at Ex. 33.)  In the determination letter, the OFCCP determined that there was "not sufficient evidence to conclude the company refused to provide a reasonable accommodation."  (Ex. B, Houston dep. at Ex. 33.)  The OFCCP determination letter does not indicate that retaliation was ever a part of the Agency's investigation.  (Id.)

On June 16, 2005, Houston also filed a nearly identical charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Ex. B, Houston dep. at Ex. 32.)  Retaliation is not alleged in his EEOC charge either.  (Id.)  There is no evidence a signed and verified charge was ever filed with the EEOC.  (See Ex. L, Certified EEOC Records at 2042.)  On March 30, 2006, fifteen days after Houston filed this lawsuit, the EEOC found "no cause" and issued a "Right to Sue" letter. (Ex. B, Houston dep. at Ex. 36.)

On June 29, 2005, Houston filed a charge with the National Labor Relations Board.  (Ex. B, Houston dep. at Ex. 31.)  No claim of alleged retaliation is raised in this charge, either.  (Id.)  This charge was voluntarily withdrawn on August 22, 2005.  (Ex. B, Houston dep. at Ex. 34.)

Houston initiated this action on March 15, 2006.  His complaint alleges that, (1) in violation of the Americans with Disabilities Act, AFS wrongfully "terminated" him, denied accommodation of his alleged disability [Count One]; and (2) in violation of the Family and Medical Leave Act, AFS failed to give him notice that his leave would be counted as FMLA leave [Count Two].  Houston also claims that AFS retaliated against him in violation of the ADA

and FMLA by interfering with his receipt of unemployment compensation benefits.    The undisputed, material facts of this case demonstrate that Houston's claims are without merit.

## ARGUMENT

### I.        SUMMARY JUDGMENT STANDARD.

Summary judgment is a favored means of disposing of litigation.  See Celotex Corp. v. Catrett, 477 U.S. 317, 327; Brown v. City of Clewiston, 848 F.2d 1534, 1542 (11th Cir. 1988). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Celotex, 477 U.S. at 317.  There is no genuine issue of material fact as to any of Houston's claims and summary judgment is due to be granted.

### II.       HOUSTON'S ADMINISTRATIVE CHARGES ARE UNSIGNED AND UNVERIFIED

Houston's claims are procedurally barred because his underlying administrative charges to the EEOC[5] and the OFCCP are not signed or verified.  "Charges shall be in writing **under oath or affirmation** and shall contain such information and be in such form as the Commission requires."   42 U.S.C. § 2000e-5(b) (enforcement requirements for Title VII claims.)[6]   The Eleventh Circuit has held that the oath or affirmation requirement is mandatory.  See e.g., Vason v. City of Montgomery, 240 F.3d 905 (11th Cir. 2001).   Accordingly, this lawsuit cannot be maintained because Houston's underlying charges are not signed or verified.   (See Ex. B Houston dep. at Exs. 30 [OFCCP charge] and 32 [EEOC charge].)

_____

[5] During the course of this lawsuit, Houston produced a signed and verified copy of his EEOC charge.  Nonetheless, this version of the charge was not a part of the documents produced by the EEOC to counsel for AFS in response to AFS's Section 83 request to that Agency.  See Ex. L, Certified EEOC Records.

[6] Congress has adopted the enforcement procedures set out in Title VII for ADA claims. See 42 U.S.C. § 12117(a).  Accordingly, a charge of discrimination alleging a violation of Title I of the ADA must also be "under oath or affirmation."

III.          **HOUSTON'S DISABILITY DISCRIMINATION CLAIMS CANNOT SURVIVE SUMMARY JUDGMENT.**

Houston alleges AFS discriminated against him based on alleged disability by (1) "terminating" him; and (2) refusing to accommodate him.  See Ex. C, Compl. at ¶ 17.  Houston's claims fail because he is not a qualified individual with a disability and, therefore, is not protected by the ADA.

A.     **Houston's Representations in Support of His Successful Application for Disability Benefits Estop Him From Claiming That He Was "Qualified" to Work for Purposes of his ADA Claim**

To prove his ADA case against AFS, Houston must establish he was an "otherwise qualified individual with a disability. . . ."  42 U.S.C. § 12112(b)(5)(A).  In other words, the protection of the ADA only extends to disabled individuals who can, nonetheless, work.  The statements of the plaintiff and his doctors (including his own) in support of his successful application to the Veteran's Administration ("VA")[7]for disability benefits estop him from claiming he was a "qualified individual with a disability" under the ADA. In December 2005, the VA deemed Houston 100% disabled.  (Ex. B, Houston dep. at 36:9-16.)

Houston has also applied for disability benefits from the Social Security Administration ("SSA").  To deem an applicant eligible for benefits, the SSA requires a certification that the individual is not only unable to do his work but cannot, "considering [his] age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy . . . "  42 U.S.C. § 423(d)(2)(A).  SSA denied Houston's claim.

---

[7] AFS has requested documents from the Veterans Administration related to Houston's application for and receipt of disability benefits.  To date, no documents regarding Houston's benefits application and determination have been produced.  It is anticipated that the VA may possess additional documentation that would support AFS's estoppel argument.  AFS reserves the right to supplement this argument with any additional supporting evidence contained in the VA file.

On February 2, 2005, one month prior to the date Houston attempted to return to active employment at AFS, Houston wrote to one of his doctors and requested support for his disability claim with the VA. (Ex. B, Houston dep. at Ex. 46.) Houston followed this letter up with a second letter to Dr. Chen on September 5, 2005, as follows:

> I'm writing this letter **to help you write your letter for my Veterans Administration (VA) Claim for my Left Shoulder.**
>
> • The history of my left shoulder starting with my first surgery dated June 15, 2000 . . .
>
> • Your history of my last two surgeries the Operative Reports.
>
> • Any permanent physical restrictions you deemed appropriate for my left shoulder.
>
> • "in my professional opinion. . . ." Knowing the Medical background of Mr. Houston and the many Medical restrictions placed on him "**I recommend that Samuel P. Houston be removed from the work force**."
>
> • In any letter to the VA from any doctor there are two phrases that are required in a Letter "In my professional opinion" and the other required phrase is "The natural progression of the disease."
>
> • **I've [sic] can not [sic] perform my duties as an aircraft mechanic any more and with the permanent physical restrictions that Dr. Manski put me on, due to my last back surgery, nobody will hire me for any kind of job.** My former employer put me on long term medical leave status so I may pay for my dental and vision benefits. **I've accepted my fate as Mr. Mom around the house.**
>
> With your letter and Dr. Cruz's letter, **I should be granted my unemployability [sic] status from the VA.** Your copy of Dr. Manski's letter explains the history of my back with your letter explaining the history of my left shoulder and **your recommendation to remove me from the workforce. I should have a favorable outcome with the VA.**

Ex. B, Houston dep. at Ex. 47.

In his application for SSDI benefits, Houston described the impact of his back injury on his ability to function as follows:

> Lift max 10 lbs, can't sit or kneel, try not to bend—causes pain in my back, can only stand in one place for about 10 min, can't reach over my head, can only walk about 15 ft – max would be walking the dog up the block, can only sit about 15 min, . . . avoid stairs.[8]
>
> . . .
>
> Everyday movements such as bending over at the waist or from my side will produce a very sharp pain from the lower back region that breaks through any medications. The same is true about walking, must be kept to a minimum due to sharp increase of pain from the lower back. Any standing over a short period of time increase the amount of pain felt in my lower back the longer I stand the longer the pain increases. Reaching for anything above my shoulders is not possible this position stresses my lower back and increases pressure on my left shoulder. Sitting too long in one position will multiply the amount of pain due to the pressure on my spine column. Any increase in movement or pressure which is applied to . . . my spinal region results in increased pain radiating through my body.[9] . . .

In response to a question about the frequency of pain, Houston responded that he experienced pain, "[f]rom the very moment I wake in the morning I'm feeling pain until I am forced to sleep by the sleeping pill at night. . . . I've been told by my doctors I will never be pain free." Ex. K, Excerpt Certified SSA Records at 1912. He went on to state, [e]very aspect of my life is affected by my constant pain **it impairs all functions of my physical body**. My mental well being and my spirit have been causality too, since I've become disabled." Id. During his psychological evaluation by SSA, he proclaimed, "I'm permanently disabled and have no plans to ever go back to work." (Id. at 1956.)

---

[8] Ex. K, Excerpt Certified SSA Records at 1880.

[9] Id. at 1912.

In <u>Cleveland v. Policy Management Sys. Corp.</u>, 526 U.S. 795 (1999), the United States Supreme Court addressed the impact of statements made in the disability benefits context that contradict a plaintiff's claims that he can work in the ADA context.  While the Court rejected automatic estoppel of an ADA claim that is in conflict with statements regarding an ability to work in the disability benefits context, it did impose a heightened summary judgment standard that requires an ADA plaintiff to provide a "sufficient explanation" of contradictory statements that have a bearing on the individual's ability to work.  <u>Id.</u> at 797-798.  The Court also held that courts must "assume[e] the truth" of the factual representations made by the employee to the [agency] that persuaded it to grant [disability] benefits."  <u>Id.</u> at 807.

As demonstrated above, for purposes of his disability applications, Houston unequivocally represented that he was unable to work **"in any job"** and "**should be removed from the work force**" that his condition **"impairs all functions of [his] body"** and he is "**permanently disabled and [has] no plans to ever go back to work**."   Under <u>Cleveland</u>, the court must assume those statements to be true.  Consequently, Houston's statements estop him from arguing that he was fully employable unless he can offer a sufficient explanation for the contradictions.  <u>See</u>, <u>e.g.</u>, <u>Holtzclaw v. DSC Comm. Corp.</u>, 255 F.3d 254, 257 (5th Cir. 2001) (rejecting plaintiffs explanation of contradiction between statements he could work in ADA case and statements to SSA and in long term disability application that he is "unable to work at all" and "illness is chronic and will never go away."); <u>Motley v. New Jersey State Police</u>, 196 F.3d 160, 164-67 (3d Cir. 1999)(plaintiff's prior statements regarding his disability, plus prior medical board diagnosis of total incapacitation, are assumed to be true and are thus inconsistent with claims that plaintiff was a "qualified" individual for ADA purposes; summary judgment on ADA claim affirmed), <u>cert.</u> <u>denied</u>, 529 U.S. 1087 (2000); <u>Mitchell v. Washingtonville Central School</u>

Dist., 190 F.3d 1(2d Cir. 1999) (representations to SSA of severe functional limitations that render plaintiff unable to work cannot be reconciled with claims in ADA case.); Stedman v. Bizmark, Inc., 219 F.Supp.2d 12/2 (N.D. Ala. 2002)(explanation of contradiction rejected); Jammer v. The Sch. Dist of Palm Beach Co., 1999 WL 1073688, *3-4 (S.D. Fl. Nov. 19, 1999) (plaintiffs and his doctors' statements made to help him to get SSDI, to the effect he was entirely unable to work, are inconsistent with his claim in ADA case that he can work; he is thus not a "qualified" individual for ADA purposes).

Houston's own testimony makes clear that he cannot sufficiently explain the contradictions between the statements made with respect to his disability applications and his claim that he is a qualified individual with a disability in this case.  In fact, he continues to speak out of both sides of his mouth when he describes his ability to work.  At one point he states there is no job he can perform:

> Q:     And do you consider yourself unemployable at this stage?
>
> A:     Yes, I do.
>
> Q:     So we're clear on the record, is it your position that there is no job that you can perform at this point in time?
>
> A:     That's correct.

(Ex. B, Houston dep. at 36:14-20.)  Yet, he claims he would still be working if he had been transferred to the Aircraft Scheduler position:

> Q:     And you are claiming that if the company had accommodated you in some way, you would have had the aircraft scheduler position, up until December 2005, when you became eligible for VA benefits?
>
> A:     **I would still be working there if I had been allowed to have the aircraft scheduler job.**

Q:     Today you would?

A:     Yes.

Q:     I thought you testified earlier that you were completely disabled, as of –

A:     Yes, I am disabled.  But because of this incident that I was thrown into, I applied through the VA for disability and was granted, for I saw no job offer coming from Army Fleet Support at the time.[10]

      And I said, Well, I've got to have an income coming into my family, so I'll go to the VA and see what they can do for me.

Q:     Now, as part of your application to the VA, haven't you told them that you were unable to perform any job?

A:     That was up to the VA's determination; that wasn't up to me.  I just handed them the medical evidence.[11]

Q:     So as we sit here today, you think you are physically capable of performing the aircraft scheduler position?

A:     **If I was not already rated 100 percent permanent and total by the VA, I would be able and qualified to perform the job as an aircraft scheduler, yes, sir.**

      . . .

Q:     You don't want your job?  You don't want the aircraft scheduler position now, do you?

A:     No.  Because I am totally out of the workforce now.

Q:     And you are content with that?

---

[10] Houston's suggestion that he was forced to apply for disability benefits because he was not able to continue his active employment with AFS should be disregarded.  On February 2, 2005, over one month **before** he was advised by AFS that he could not return to the Aircraft Mechanic position, Houston wrote one of his doctors seeking support for his pending VA disability claim.  See Ex. B, Houston dep. at Ex. 46.  Thus, Houston's VA claim predates his attempt to return to active employment at AFS.

[11] Houston's attempt to hide behind the "medical evidence" is disingenuous in light of his letter to Dr. Chen actively seeking specific certification that he can no longer work and should be "removed from the workforce." See Ex. B, Houston dep. at Ex. 47.

A:    Yes, I am.

(Ex. B, Houston dep. at 139:16-141:3; 143:27.)

Houston's non-explanation of the contradiction between his claims that he cannot work for purposes of disability benefits, yet can perform work for purposes of this lawsuit, is woefully short of what is required to survive summary judgment.  Cleveland, 526 U.S. at 807; Mussarra v. Vineyards Dev. Corp. 343 F. Supp. 2d 1116, 1123 (M.D. Fla. 2004); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting statements of the plaintiff[] ... is correct").  It is clear that Houston's prior statements were intended to create a sham.[12]  In fact, Houston even identified the inconvenience of paperwork as the reason he would not now accept a position at AFS, despite his admission that he believes he could physically perform the Aircraft Scheduler position.  (Ex. B, Houston dep. at 164:8-18.)  Houston clearly directed his physician to certify that he was totally disabled from work of any kind.  Nonetheless, he now asserts that for ADA purposes he could have worked (and still could work) in the Aircraft Scheduler position and in other sedentary jobs.  The undisputed material facts do not show a person who simply has credibility problems, but a situation where he deliberately and clearly claimed disability, asserted specific facts in support of the claimed disability in order to obtain disability benefits from two sources, and now wants to change his story in order to defeat a summary judgment motion as to his ADA claim.[13]  The law does not allow this.  See Stedman v. Bizmart, Inc., 219 F.Supp.2d

_____

[12]  The psychologist that evaluated Houston for the SSA recognized Houston may have been perpetrating a scam when he opined:  "There is also the possibility of Somatoform Pain Disorder and perhaps some secondary gain by remaining disabled as he has a good retirement from the VA and financially does not have to go back to work." (Ex. K, Excerpt of certified SSA Records at 1956.)

[13]  Houston's willingness to assert whatever is required, regardless of the truth, for personal gain is further highlighted by his claim to the Alabama Department of Industrial

1212, 1223-24 (N.D. Ala. 2002) (granting summary judgment and holding plaintiff's contradictory testimony he could work in support of ADA claim did not explain contradictory assertions in SS claim); <u>McClaren v. Morrison Mgmt.</u>, 2005 U.S. App. LEXIS 16565, *25-26 (5th Cir. 2005) (applying Cleveland to an ADEA case and estopping plaintiff from claiming to be qualified based on specific factual representations inconsistent with her ability to perform her job); <u>Reed v. Petroleum Helicopters, Inc.</u>, 218 F.3d 477 (5th Cir. 2000) (same for ADA plaintiff).

### B.    Alternatively, Houston's ADA Discrimination Claim Fails on the Merits

Alternatively, Houston's ADA discrimination claim fails on the merits. The Americans with Disabilities Act of 1990, as amended by 42 U.S.C. § 12101 <u>et</u> <u>seq.</u>, prohibits covered employers from discriminating against an employee based upon known physical or mental impairments, **provided that the employee is a qualified individual with a disability**. 5 U.S.C. ¶ 12112(a); <u>LaChance v. Duffy's Draft House, Inc.</u>, 146 F.3d 835 (11th Cir. 1998).

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must establish that (1) he has a disability, (2) he is a qualified individual and (3) he was subjected to unlawful discrimination because of his disability. <u>Morisky v. Broward County</u>, 80 F.3d 445, 447 (11th Cir. 1996). A qualified individual with a disability must satisfy "the requisite skill, experience, education and other job-related requirements of the employment position," and "with or without reasonable accommodation, the individual must be able to perform the "essential functions of the position." <u>LaChance</u>, 146 F.3d at 835; 7 U.S.C. § 12112(a); 29 C.F.R.

---

Relations that he was "ready, able and willing" to work during the same time period he was seeking a determination from the VA that he should be deemed unemployable. (<u>See</u> Ex. B, Houston dep. at Ex. 25.) He even stated he could perform the duties of his last classification at AFS as of March 13, 2005. (Ex. D, Whitney aff. at Ex. 1.) Incredibly, just one month prior to the date Houston asked Dr. Chen to remove him from the workforce, Houston and his lawyer advised the Board of Appeals that Houston could work and wanted to work. (Ex. B, Houston dep. at Ex. 25, 10:6 - 7; 23:21 - 24:2; 29:10 - 12; 36:4 - 7.)

§1630.2(m). <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102 (3d Cir. 1996). Houston has the burden on the merits to show that he is "qualified with a disability." See <u>Jackson v. Veterans Admin.</u>, 22 F.3d 277, 278 (11th Cir. 1994); <u>Anderson</u>, 477 U.S. at 252, 255.

      **1.    Houston is not disabled.**

A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12111(8). Houston cannot demonstrate he is "disabled" under any prong[14].

      **a.    Houston is not "disabled" because he is not substantially limited in a major life activity.**

Houston cannot establish disability under the first prong because he has no physical or mental impairment that substantially limits a major life activity. EEOC regulations implementing the ADA define the term "major life activity" to mean: "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Because an impairment, standing alone, is not necessarily a disability as contemplated by the ADA, Houston must present sufficient evidence that his impairment substantially limits a major life activity. See <u>Swain v. Hillsborough County School Board</u>, 146 F.3d 855 (11th Cir. 1998) ("[T]o establish a prima facie case and survive summary judgment, Swain must present sufficient evidence to create a genuine issue of material fact as to whether her physical impairments substantially limit [a major life activity]."). As climbing, lifting, sitting or standing for prolonged periods and bending at the waist are not "major life activities" such as breathing, walking, seeing, etc., Houston is not disabled with respect to a

---

[14] Houston does not allege AFS regarded him as disabled. Therefore, this prong of the disability definition will not be addressed.

major life activity.  See generally, Humphrey v. Cleveland, 34 NDLR 38 (N.D. Ohio 2007), 34 NDLR 38 (N.D. Ohio 2007) (lifting, stooping, bending and twisting do not constitute major life activities.)

Houston agrees that at the relevant time, his restrictions (lifting, climbing, bending, sitting or standing for prolonged periods) were the only limitations he had as a result of his back condition.  (Ex. B, Houston dep. at 94:3.)  He confirmed his back injury does not substantially limit any major life activity:

> Q:     What other problems did you have, other than what's listed in the restrictions?  You couldn't do heavy mechanical work, right?
>
> A:     Yes, sir.
>
> Q:     You could still walk?
>
> A:     Yes, sir.
>
> Q:     And breathe?
>
> A:     Yes, sir.
>
> Q:     Eat?
>
> A:     Yes, sir.
>
> Q:     See?
>
> A:     Yes, sir.
>
> Q:     Hear?
>
> A:     Yes, sir.
>
> Q:     Speak?
>
> A:     Yes, sir.
>
> Q:     So you could take care of yourself, in terms of bathing and getting dressed, those types of things?
>
> A:     Yes, sir.

Q:    Did you have any mental problems at that point in time?

A:    No, sir.

Q:    At this point in time, you believed you could work as a scheduler?

A:    Yes, sir.

. . .

Q:    You believed you could do any sedentary-type work for which you were qualified to do?

A:    Yes, sir.

Q:    You just couldn't do the things that were prohibited by these restrictions?

A:    Correct.

(Ex. B, Houston dep. at 92:6 - 93:20.)  Houston also continues to be a physically active person, who enjoys target shooting and deep-sea fishing.  (Ex. B, Houston dep. at 146:10 -147:1).

As Houston was not substantially limited in any major life activity, he is not disabled and cannot claim protection under the ADA.

**b.      Houston was not "regarded as" disabled.[15]**

Houston cannot establish disability under the perceived disability prong either.  To fall within the "perceived" disability category, the employee must be perceived or regarded as having a physical or mental impairment that substantially limits a major life activity.  Houston apparently believes that AFS perceived him as being substantially limited in the major life activity of working, because it concluded he could not perform all essential functions of the Aircraft Mechanic position.  However, "to be regarded as substantially limited in the major life

---

[15]      His own doctor, Dr. Manski, stated that Houston's medical condition is not a disability.  (Ex. B, Houston dep. at Ex. 8:2 [doctor checks "no" to questions regarding whether Houston is disabled and whether his condition impacts his ability to work in jobs other than the Aircraft Mechanic position]).

activity of working, one must be regarded as **precluded from more than a particular job**."
Murphy v. United Parcel Service, Inc., 119 S. Ct. 2133, 2138 (1999) (emphasis added); Witter v.
Delta Air Lines, Inc., 138 F.3d 1366 (11th Cir. 1998) (in order for an employee to be regarded as
disabled, the employer must believe that the employee is unable to perform a class of jobs, not
just a single job); Sutton, 119 S. Ct. at 2151 (quoting 29 C.F.R. § 1630.2(j)(3)(i) ("The inability
to perform a single, particular job does not constitute a substantial limitation in the major life
activity of working."")).[16]

AFS did not believe Houston was unable to perform a broad class of jobs, or even other
AFS jobs other than the Aircraft Mechanic position.[17]  In fact, at the time Houston tried to return
to work in March 2005, several human resources personnel suggested that he should submit a
reclassification request form for an open Aircraft Scheduler position and supplement his
personnel file to verify he had the requisite typing skills.  (Ex. F, Jeffers aff. ¶ 4; Ex. G,
Camarata aff. ¶ 4; Ex. D, Whitney aff. ¶ 9.)  This suggestion of an alternative position, shows
AFS did not perceive Houston as disabled and, in fact, believed he could perform jobs other than
the Aircraft Mechanic position.

AFS's placement of Houston on administrative leave because of his inability to perform
his job also does not prove that AFS regarded him as disabled because AFS's decision was made

---

[16]    See Mullins v. Craven Crowell, 228 F.3d 1305, 1314 (11th Cir. 2000) ("The ability
to work is substantially limited (among other indicia) if the plaintiff is 'significantly restricted in
the ability to perform either a class of jobs or a broad range of jobs in various classes as compared
to the average person having comparable training, skills and abilities.'  29 C.F.R. § 1630.2(j)(3)(i).
Thus, whether a plaintiff is substantially limited in the major life activity of working is determined
by comparing his ability to perform jobs with the ability of a person without physical limitations
who has comparable education, job skills, and talent.  But the regulations also make clear that
'[t]he inability to perform a single, particular job does not constitute a substantial limitation in the
major life activity of working.'").

[17] After his placement on administrative leave, Houston even applied for and believed he
could perform an aircraft mechanic position at another company.  (Ex. B, Houston dep. at 36:1-
4.)

in reliance on the letters from Houston's doctor.  As a number of courts have held, an employer is not deemed to have regarded an employee as disabled simply by relying on the employee's own physician's letter imposing restrictions.  See Rinehimer, 2002 U.S. App. Lexis 10300 at *3; Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995) (employer did not regard plaintiff as being disabled where employer's perceptions were based on doctor's written restrictions, not "speculation, stereotype, or myth"); Minor v. Stanford Univ., 1999 U.S. Dist. LEXIS 9135 (N.D. Cal. June 14, 1999) ("Stanford's decision to terminate Minor based on restrictions imposed by her doctor does not indicate that the University regarded her as having a substantially limiting impairment.").  Houston's own physician, Dr. Manski, recognized that Houston could work so long as he was restricted from climbing, lifting more than twenty-five pounds, standing or sitting for more than 1½ hours and bending at the waist to lift, twist, push or pull.  See Ex. B, Houston dep. at Ex. 13.  There is no evidence that AFS considered Houston unable to perform any job that did not require the restricted activities.  In other words, there is no evidence that AFS regarded Houston as disabled.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1327 (11th Cir. 1998)(rejecting plaintiff's "regarded as" claim because he did not prove the employer perceived him as unable to perform jobs other than his own).

### 2. Houston was not qualified for the Aircraft Mechanic position.

Even assuming, *arguendo*, that Houston is deemed to be disabled, he cannot prevail on his ADA claim because he was not qualified for the Aircraft Mechanic position, with or without a reasonable accommodation.  First, Houston does not dispute that the essential functions of the Aircraft Mechanic position required performance of the activities he was permanently restricted from doing:

> Q:    Does the aircraft mechanic job require you to lift more than
>        25 pounds?

. . .

A:    Yes, it does.

Q:    What about climbing?

A:    Yes, You have to climb on the helicopter.

Q:    Okay.  What about standing more than an hour and a half?

A:    True.  I would say yes.  You've got to do a lot of standing.

Q:    What about prolonged sitting for more than an hour and a half?

A:    If you are working inside the cockpit, yes.

Q:    You've got to do that?

A:    Yes, sir.

Q:    Do you have to be able to bend at the waist to lift, pull, twist, or push?

A:    Yes, sir.

(Ex. B, Houston dep. at 177:14-178:12.)  AFS, Houston, and Houston's physicians all agree that

Houston could not perform the Aircraft Mechanic position within his permanent restrictions.

(Ex. B, Houston dep. at 76:14-15; 77:2 and Exs. 12, 13, & 14 thereto.)  Thus, by Houston's own

admission, even if he is deemed to be disabled, he was not qualified to perform the essential

functions of the Aircraft Mechanic position.

Houston also does not allege that AFS could have accommodated the essential functions

of the Aircraft Mechanic position in a manner that would have enabled him to perform them.

(See Ex. C, Compl. at ¶ 7; Ex. B, Houston dep. at 77:2, 90:15.)  The reason for his failure to do

so is obvious.  The ability to lift, climb, sit, stand and bend is indispensable criteria for the job.

Houston argues instead, that AFS discriminated against him by not placing him in another

position at AFS.  (Ex. C, Compl. at ¶ 7; Ex. B, Houston dep. 124:19-21; 125:18-20;130:19-23.)

Thus, what is really at issue is whether a transfer to another position was a reasonable accommodation of Houston's alleged disability.

### D. Reclassification to the Aircraft Scheduler Position Was Not Reasonable

#### 1. Houston never requested an accommodation

Houston never requested any type of accommodation, and therefore, AFS could not have been obligated to provide him with a reasonable accommodation. (Ex. E, Whitney dep. at 75:11-19 [AFS suggested reclassification; Houston rejected this option]; Ex. D, Whitney aff. ¶ 9 [same].)  It is undisputed he never submitted a reclassification form or the requisite evidence of typing skills necessary to qualify for the Aircraft Scheduler position.  See Gaston v. Bellingraph Gardens & Home, Inc., 167 F.3d 1361 (11th Cir. 1999) ("Thus, both our precedent and the EEOC's interpretive guidelines clearly provide that the initial burden of requesting an accommodation is on the employee. Only after the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has discriminated against her."); Willis v. Conoco, 108 F.3d 282, 284 (11th Cir. 1997)("Establishing that a reasonable accommodation exists is part of an ADA plaintiff's case.")

#### 2. Reclassification was unreasonable accommodation because it would have violated the CBA

Assuming, *arguendo*, Houston requested a transfer to the Aircraft Scheduler position, Houston's failure to comply with the reclassification requirements of the CBA renders the request unreasonable.  The governing CBA provides that in ordered to reclassify an employee must:  (1) be active[18]; (2)  be qualified for the desired position, as evidenced by the personnel

---

[18] To the extent Houston is arguing he should have been reclassified after his active employment ended, this argument fails.  (Ex. B, Houston dep. at Ex. 17, 35.1.)  As the United States Supreme Court has held, AFS is not required to violate its collective bargaining agreement or ignore seniority in order to accommodate Houston.  U.S. Airways, Inc. v. Barnett, 122 S. Ct. 1516 (2002); See also, Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1225 (11th Cir. 1997). In Barnett,

file; (3) be the most senior bidder; and (4) have a valid reclassification request form on file.  (Ex. E, Whitney dep. at 62:7-13; Ex. B, Houston dep. at Ex. 17, §35.1.)  Houston could not be reclassified to the Aircraft Scheduler position because he did not satisfy these CBA directives.

### a.    Houston was not qualified for the Aircraft Scheduler position

Houston was not qualified for the Aircraft Scheduler.  It is undisputed that the Aircraft Scheduler position requires a typing acuity of 30 words per minute.  (Ex. B, Houston dep. at 127:16-19 and Ex. 9 thereto.)  In order to reclassify an employee must supplement his personnel file to verify that he meets all requirements of the position on the date reclassification is sought.  (Ex. B, Houston dep. at 127:14-17.)  It is undisputed that Houston never submitted verification of his typing ability.  (Ex. B, Houston dep. at 51:3; 51:21; 53:23; 54:11; 80:1-3.)  This is particularly damning given that he was granted a one-week extension of his active employment status to give him time to obtain a typing certification.  (Ex. D, Whitney aff. ¶ 9.)  Accordingly, AFS had no duty to reclassify Houston to a position he was not qualified to perform.  See Willis v. Conoco, Inc., 108 F.3d 282, 284 (11th Cir. 1997) (assignment to another position is a required accommodation only if there is a vacant position available **for which the employee is otherwise qualified**.")(emphasis added.)

---

the Court held that only in special, narrow circumstances not applicable here, will an accommodation that conflicts with a seniority system be deemed reasonable under the ADA. Barnett, 122 S. Ct. at 1525.  The fact that there may be an internal dispute at AFS regarding when active employment ceases does not change this analysis.  Under one interpretation, his active employment ended on October 3, 2004.  Under the prevailing interpretation at the time, his active employment ended, with a one-week extension, on March 19, 2005.  Therefore, under Barnett, at the very least, any reclassification after March 19, 2005 would have violated the seniority provisions of the CBA and was, therefore, an unreasonable accommodation. Nonetheless, as discussed herein, even with the expanded period to reclassify—albeit erroneous—Houston did not comply with the other requirements of reclassification outlined in the CBA.  Houston did not seek reclassification nor submit verification interpretation changed to inactive.

**b.    Houston never submitted a request for reclassification**

Pursuant to the CBA, a verbal request for reclassification cannot be honored.  (Ex. B, Houston dep. at Ex. 17, §35.1.)  Rather, an employee seeking reclassification must have a status change request form on file.  (Id.)  Houston does not dispute that he never submitted a status change request form seeking reclassification to the Aircraft Scheduler position.  Houston seeks to excuse this failure to submit the required form by claiming he was refused a copy of the form.  (Ex. B, Houston dep. at Ex. 9, 75:4-8.)  AFS denies Houston was refused a copy of the form.  (Ex. D, Whitney aff. ¶ 9; Ex. F, Jeffers aff. ¶ 4; Ex. G, Camarata aff. ¶ 4)  Nonetheless, the CBA clearly provides that the form is available in multiple locations, including each work area. (Ex. B, Houston dep. at Ex. 17, §35(a)(2).)  Houston acknowledges that he never sought out the form from any other location or source, including the union.[19]  (Ex. B, Houston dep. at 107:15.) Based on the foregoing, Houston's failure to accommodate claim fails.

**IV.    HOUSTON'S ADA RETALIATION CLAIM FAILS**

Houston alleges in his complaint that "Fleet Services unlawfully retaliated against Houston for pursuing his rights under the Americans with Disabilities Act following his termination from employment by interference with his right to qualify for and receive benefits earned and due him, and otherwise."  (Ex. C, Compl. at ¶ 18.)  In his deposition, Houston explained, without elaboration, that the benefits he is referring to in his Complaint are unemployment compensation benefits.  (Ex. B, Houston dep. at 136:3.)

**A.    The Claim Is Outside the Scope of His Administrative Charges**

---

[19] In fact, Houston did not seek assistance from the Union until months after he was placed on administrative leave.  At that time, the Union representative verified that AFS had correctly applied the CBA and advised Houston that it could not help him because he was "outside the contract."  (Ex. B, Houston dep. at 106:3-5 and Ex. 44 thereto.)

"A plaintiff's judicial complaint is limited by the scope of the [Agency] investigation which can reasonably be expected to grow out of the charge of discrimination." <u>Mulhall v. Advance Security, Inc.</u>, 19 F.3d 586, 589 n.8 (11th Cir. 1994). Houston's retaliation claim is procedurally barred because it is not within the scope of his underlying administrative charges. (<u>See</u> Ex. B, Houston dep. at Exs. 30 & 32.)  Neither his EEOC charge nor his OFCCP complaint refers in any way to alleged retaliation via "interference with benefits" as alleged in Paragraph 18 of the Complaint.  Moreover, retaliation was not encompassed by the OFCCP's investigation of Houston's charge, as evidenced by its detailed "Notice of Results of Investigation."  (<u>See</u> Ex. B, Houston dep. at Ex. 33.)

This case is distinguishable from the cases in this Circuit that have held a plaintiff is not required to amend a charge or file a separate charge for retaliatory conduct that occurs after an original charge was filed and that naturally grows out of the original charge.  <u>See</u> <u>Gupta v. East Texas State Univ.</u>, 654 F.2d 411 (5th Cir. 1981); <u>Baker v. Buckeye Cellulose Corp.</u>, 856 F.2d 167 (11th Cir. 1988).  The rationale in those cases is premised on the idea that a second charge is not required when the retaliatory conduct occurs *after* the charge because:

> "[i]t is the nature of retaliation claims that they arise after the filing of the EEOC charge.  Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case, a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII."

<u>Gupta</u>, 654 F.2d at 414.  In this case, the alleged retaliation—AFS's opposition to unemployment compensation—began before he filed his charges of discrimination with the OFCCP or the EEOC.  Specifically, AFS made its initial response to his unemployment compensation

application on March 22, 2005 (before any charge was filed[20]), filed its first level appeal on April 22, 2005 (before any charge was filed), and filed its second-level appeal on May 23, 2005 (the same day Houston's OFCCP charge was filed). Thus, the rationale in <u>Gupta</u> and <u>Baker</u> is inapplicable here. <u>Ang v. Proctor and Gamble, Co.</u>, 932 F.2d 540, 548 (retaliation that occurs before charge is filed will be outside the scope of the original charge if not included); <u>Williamson v. Int'l Paper Co.</u>, 85 F. Supp 2d (S.D. Ala. 1999) (If retaliation occurs before charge filed, allegations must be included in original charge.); <u>Hull v. Case Corp.</u>, 1993 WL 603554 (S.D. Fla.)(same).

Moreover, useless double filing would not occur because at least some of the allegedly retaliatory conduct occurred prior to the time Houston filed his charges. Further, even after his original charges were filed, Houston had opportunities to expand on his claims. Undisputedly, he sent a follow-up letter to the Regional Director of the OFCCP, filed an EEOC charge and re-filed his OFCCP charge <u>after</u> AFS appealed his unemployment compensation. (Ex. B, Houston dep. at Exs. 30, 32, 44; Ex. J, Brown aff. ¶¶ 3, 4, 5, 6 & Exs. 3, 4, 5, 6.) On each occasion, his claims were articulated in terms of discrimination only, despite the fact that the alleged retaliation had already occurred. Houston should not be allowed to bring a retaliation claim that he did not place before the underlying administrative agencies when he had such clear opportunities to do so.

### B.    <u>Houston's Retaliation Claim Fails on the Merits</u>

---

[20] Houston filed his OFCCP charge on May 23, 2005 [<u>See</u> Ex. B, Houston dep. at Ex. 33.], his EEOC charge on June 16, 2005 [Ex. B, Houston dep. at Ex. 32.], and his re-filed OFCCP charge in July 2005 [Ex. A, Whelan dep. at Ex 6.].

Assuming, *arguendo*, that Houston's retaliation claim is not procedurally barred, the retaliation claim fails on the merits.

### 1.     Houston cannot establish a *prima facie* case of retaliation

To establish a *prima facie* case of retaliation, Houston must show that he engaged in statutorily protected conduct; that he suffered an adverse employment action; and that there was a casual connection between his conduct and the adverse action.  Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th Cir. 2002).  Houston cannot establish a *prima facie* case of retaliation because he cannot show the necessary casual connection between his charges of discrimination and AFS's opposition of his unemployment compensation.

AFS initiated its opposition to Houston's unemployment compensation on March 22, 2005, initiated its first level appeal on April 22, 2005, and its second level appeal on May 23, 2005.  AFS did not receive notice of Houston's OFCCP charge until June 6, 2005, via letter to General Manager Tom Green.  (Ex. A, Whelan aff. at ¶ 9 & Ex. 5 thereto.)  AFS received notice of Houston's EEOC charge by letter dated June 30, 2005**.**  (Id. at ¶ 10 & Ex. 7 thereto)  AFS received notice and a copy of Houston's re-filed OFCCP charge on July 21, 2005.  (Id. at ¶ 9 & Ex. 6.)   Thus, even though AFS's opposition to Houston's unemployment compensation continued after he engaged in protected activity, the timeline above shows AFS's opposition was in motion well before it had any knowledge of Houston's allegations of disability discrimination.  Accord Cotton v. Cracker Barrel Old Country Stores, 434 F.3d 1227, 1232 (11th Cir. 2006) ("When an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation.").

No doubt, Houston will argue the temporal proximity between his OFCCP charge and AFS's opposition to his unemployment compensation claim shows the two events are related. However, "temporal proximity is insufficient to create a genuine issue of material fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Brungart v. Bellsouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000). Stated differently, "[I]n order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time "of the adverse employment action." Id. at 799(citations omitted). As noted by the Circuit in Brungart, "[t]hat requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." Id.

Here, it is undisputed that the individuals involved in the unemployment compensation proceedings had no knowledge of any complaint by Houston of disability discrimination at the time the initial response and appeals documents were prepared. (Ex. I, Legieza aff. ¶ 8; Ex. J. Brown aff. ¶ 7.) This analysis does not change because Brown received a telephone call regarding alleged claims of Veterans Administration. (Ex. J, Brown aff. ¶ 7.) It is undisputed, Brown received the call after the appeals decisions were made. (Id.) Moreover, Brown understood from this conversation that Houston was alleging veterans–based discrimination. (Id.). Therefore, he had no knowledge of a disability–based claim (i.e. protected conduct under the ADA at this time.) Thus, no causal connection exists between Houston's charges of discrimination and AFS's opposition to his unemployment compensation..

> **2.    AFS's legitimate, non-discrimination reasons are not a pretext for discrimination**

Assuming*, arguendo,* that Houston can establish a *prima facie* case of retaliation, his claim still fails because AFS had a legitimate, non-discriminatory, non-pretextual reasons for its opposition to Houston's unemployment compensation.   Specifically, AFS did not believe Houston was entitled to the benefits because he was still employed, albeit as an inactive employee. (Ex. J. Brown aff. ¶ 5.)

> **3.    No evidence of retaliation**

Houston's claim that AFS's engaged in retaliation is simply unsupported by the evidence. Houston has not presented any evidence that AFS was out to get him.  To the contrary, AFS's actions after his protected conduct show the opposite of retaliatory motive.)  On September 6, 2005, Houston emailed Whitney and advised him that the VA had denied his claim based on information that AFS provided that Houston was still employed, albeit inactive.  See Ex. B, Houston dep. at Ex 19.  Houston asked for a revised statement from the company to be sent to the VA clarifying.  See Ex. B, Houston dep. at Ex. 19.  In his request, Houston acknowledged that he was still technically an employee of AFS, but on extended medical leave.  Id.   In response, AFS sent a letter verifying that Houston had not engaged in active work for the company since September 2, 2004.  (Ex. A, Whelan aff. at Ex.  4.)

Moreover, Houston acknowledged that AFS was very helpful in his efforts to receive benefits. (Ex. B, Houston dep. at 133:23 - 134:1.)  Houston expressed his appreciation for AFS's help in an email to Bob Whitney:

> Dear Bob,
>
> I got some good news from the VA.  I was granted my 100% total and permanent disability from the VA, after two years of fighting.
>
> Thanks for your help.  I will never forget you

> Merry Christmas.  Just two more days until Jesus birthday.
>
> Thanks, Sam

(Ex. D, Whitney aff. at Ex. 2)  It defies logic that the same AFS personnel that were allegedly involved in retaliating against Houston by "interfering" with his receipt of unemployment compensation benefits would assist in his application for disability benefits if they were out to retaliate against him.

### V.    HOUSTON'S FMLA CLAIMS CANNOT SURVIVE SUMMARY JUDGMENT.

Count Two of the Complaint is entitled "FMLA Interference."  The allegations are vague, but seem to address two distinct alleged violations of the Act:  (1) failure to notify Houston that his leave would be designated as FMLA-covered leave [Paragraph 25]; and (2) interference with his receipt of unemployment compensation benefits in retaliation for Houston's "efforts to redress [AFS's] discrimination against him."  Both claims are baffling, particularly in light of the fact that Houston received twenty-six weeks of paid leave for his recovery from back surgery, significantly more than is required by the FMLA, and he never complained prior to this lawsuit about any alleged FMLA violation.  In his deposition, Houston had trouble explaining how he believes AFS violated the FMLA:

> Q:    Do you understand what your FMLA claim is in this case?
>
> A:    No.
>
> Q:    You don't have any idea what violation of the FMLA you are claiming in this lawsuit?
>
> A:    I left that up to my attorney.
>
> Q:    So you don't know then?
>
> A:    I just know what the meaning of the abbreviation is.  As for the details, no, sir, I don't know the details.

(Ex. B, Houston dep. at 134:18-135:5.)

    **A.**    **Houston's Interference Claim Fails**

    Houston does not claim he was denied twelve full weeks of leave, the maximum benefit allowed under the FMLA.  Rather, his interference claim ties to AFS's alleged failure to notify him that his FMLA-leave entitlement would run concurrent with the first twelve weeks of his STD leave.  See Ex. C, Compl. at ¶ 25.

    First, as a threshold matter, it should be noted that Houston was in fact notified that his application for FMLA leave had been approved.  See Ex. B, Houston dep. at Ex. 18; [approval of application; "employee" is copied].  Houston acknowledges that he simply cannot recall if he was ever advised of the designation of FMLA leave.  (Ex. B, Houston dep. at 134:17.) Houston's bad memory is not enough to create a genuine issue of material fact on summary judgment.

    The issue of actual notice is irrelevant, however.  In Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002), the United States Supreme Court struck down the DOL notice regulation as invalid. The Court held that an employee is only entitled to twelve weeks of FMLA leave, and an employer's failure to give notice does not extend the twelve weeks. Once the employee has been off for more than twelve weeks, FMLA does not prohibit the employee's discharge. Id. at 96.  As Houston was on leave for a full twenty-six weeks, it matters not whether he was actually notified that a portion of his leave would be designated as FMLA leave because he received all he was entitled too under the Act.  Id. at 95 (regardless of whether the notice regulation was followed, Ragsdale has not been harmed because she received the full leave entitlement of twelve weeks).  Thus, Houston's FMLA interference claim is due to be dismissed.

B.     <u>Houston's Retaliation Claim Under the FMLA Fails</u>

1.     **No protected activity**

Although Houston's FMLA claim is entitled "FMLA Interference," Paragraph 29 of the Complaint seems to raise a retaliation claim as well.  Specifically, Houston makes a vague allegation that AFS somehow interfered with his receipt of unemployment compensation benefits in retaliation for his exercise of his rights under the FMLA.  (Ex. C, Compl. ¶ 29.)  First, at no point prior to this lawsuit was AFS aware of any complaint by Houston regarding alleged violation of the FMLA.  Therefore, he has not engaged in any protected activity.

2.     **No causal connection**

To the extent Houston is claiming retaliation based on the fact that he requested and received FMLA leave, there is no evidence that AFS's response to his unemployment compensation benefits application had anything to do with such a request. To establish a prima facie case Houston must demonstrate some causal connection[21] between his request for FMLA leave and AFS's response.  In other words, he must demonstrate that the two events are not "wholly unrelated."  <u>Brungart v. Bellsouth Telecommunications, Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000) (citation omitted).  Houston made his request for FMLA leave in September 2004 and AFS participated in DIR proceedings March through July 2005.  This timing does not support an inference of causation and there is no other evidence AFS was motivated by Houston's FMLA request.  <u>See</u>   <u>Clark County Sch. District v. Breeden</u>, 532 U.S. 268, 273 (2001) (temporal proximity must be "very close");  <u>Higdon v. Jackson</u>, 393 F.3d 1211 (11th Cir. 2004) (three

---

[21] To state a prima facie case of retaliation under the FMLA, "an employee must allege that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity."  <u>Walker v. Elmore County Bd. of Ed.</u>, 379 F.3d 1249, 1252 (11th Cir. 2004), <u>citing</u> <u>Strickland v. Water Works & Sewer Bd.</u>, 239 F.3d 1199, 1207 (11th Cir. 2001).

month gap fails to show causation); Wascura v. City of South Miami, 257 F.3d 1238 (11th Cir. 2001) (3 1/2 months gap too remote).

> **3.    AFS has articulated a legitimate, non-discriminatory reason for its response to Houston's unemployment compensation application.**

"When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, [courts] apply the same burden-shifting framework established by the Supreme Court . . . for evaluating Title VII discrimination claims." Strickland, 239 F.3d at 1207. Thus, even assuming that Houston has made out a *prima facie* case of retaliation under the FMLA, summary judgment would still be proper if AFS offers a legitimate, non-discriminatory reason that is not shown to be pretextual. For the reasons stated in Section IV.B. 2. above, AFS has articulated a legitimate, non-discriminatory reason for its opposition to Houston's unemployment compensation application: Houston was still employed.

> **4.    Houston Cannot Show That AFS's Articulated Reason is Pretextual.**

With respect to the pretext prong, AFS incorporates the legal standards and arguments set out in Sections IV.B.2 & 3. above.

## CONCLUSION

Based on the foregoing, AFS requests that this Court grant its motion for summary judgment as to all counts in plaintiff's complaint.


Respectfully submitted this  2nd  day of April, 2007.


s/ Monica G. Graveline
One of the Attorneys for Defendant
Army Fleet Support, LLC

**OF COUNSEL:**
M. Jefferson Starling (STA062)
Monica G. Graveline (GRA100)
Brent T. Cobb (COB020)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2nd, 2007, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Jimmy Jacobs(JAC051)
4137 Carmichael Road, Suite 100
Montgomery, Alabama 36106

s/ Monica G. Graveline
OF COUNSEL