# Exhibit B

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CASE NUMBER:  1:06-cv-243-MEF


SAMUEL HOUSTON,

     Plaintiff,

vs.

ARMY FLEET SERVICES, L.L.C.,

     Defendant.


BEFORE:

     Cynthia M. Noakes, Commissioner

     and Court Reporter




DEPOSITION TESTIMONY OF SAMUEL HOUSTON



     *****************************

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 2

1    S T I P U L A T I O N
2
3        IT IS STIPULATED AND AGREED by and
4    between the parties through their respective
5    counsel, that the deposition of SAMUEL HOUSTON
6    may be taken before Cynthia M. Noakes, Court
7    Reporter, at the Offices of HOLIDAY INN EXPRESS,
8    1006 Boll Weevil Circle, Enterprise, Alabama
9    36330, on the 20th day of February, 2007.
10        IT IS FURTHER STIPULATED AND AGREED
11    that the signature to and the reading of the
12    deposition by the witness is waived, the
13    deposition to have the same force and effect as
14    if full compliance had been had with all laws and
15    rules of Court relating to the taking of
16    depositions.
17        IT IS FURTHER STIPULATED AND AGREED
18    that it shall not be necessary for any objections
19    to be made by counsel to any questions except as
20    to the form or leading questions, and that
21    counsel for the parties may make objections and
22    assign grounds at the time of the trial, or at
23    the time said deposition is offered in evidence,

Page 3

1    or prior thereto.
2        IT IS FURTHER STIPULATED AND AGREED
3    that the notice of filing of the deposition by
4    the Court Reporter is waived.
5
6
7
8
9
10
11
12
13
14
15
16    *********************************************
17
18
19
20
21
22
23

Page 4

1                    INDEX
2    EXAMINATION BY:                    PAGE NUMBER:
3    MR. STARLING              8-167, 176-179
4    MR. JACOBS                     167-176
5
6    EXHIBITS:
7    Defendant's Exhibit No. 1          12
8    Defendant's Exhibit No. 2          29
9    Defendant's Exhibit No. 3          47
10   Defendant's Exhibit No. 4          50
11   Defendant's Exhibit No. 5          57
12   Defendant's Exhibit No. 6          61
13   Defendant's Exhibit No. 7          65
14   Defendant's Exhibit No. 8          67
15   Defendant's Exhibit No. 9          77
16   Defendant's Exhibit No. 10         81
17   Defendant's Exhibit No. 11         82
18   Defendant's Exhibit No. 12         85
19   Defendant's Exhibit No. 13         87
20   Defendant's Exhibit No. 14         90
21   Defendant's Exhibit No. 15         96
22   Defendant's Exhibit No. 16        103
23   Defendant's Exhibit No. 17        107

Page 5

1              INDEX (continued)
2
3    Defendant's Exhibit No. 18        109
4    Defendant's Exhibit No. 19        112
5    Defendant's Exhibit No. 20        113
6    Defendant's Exhibit No. 21        114
7    Defendant's Exhibit No. 22        115
8    Defendant's Exhibit No. 23        116
9    Defendant's Exhibit No. 24        118
10   Defendant's Exhibit No. 25        119
11   Defendant's Exhibit No. 26        131
12   Defendant's Exhibit No. 27        132
13   Defendant's Exhibit No. 28        136
14   Defendant's Exhibit No. 29        149
15   Defendant's Exhibit No. 30        150
16   Defendant's Exhibit No. 31        151
17   Defendant's Exhibit No. 32        153
18   Defendant's Exhibit No. 33        154
19   Defendant's Exhibit No. 34        154
20   Defendant's Exhibit No. 35        155
21   Defendant's Exhibit No. 36        156
22   Defendant's Exhibit No. 37        156
23   Defendant's Exhibit No. 38        156

2  (Pages 2 to 5)

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

Page 6

1        INDEX (continued)
2
3    Defendant's Exhibit No. 39        158
4    Defendant's Exhibit No. 40        160
5    Defendant's Exhibit No. 41        160
6    Defendant's Exhibit No. 42        161
7    Defendant's Exhibit No. 43        161
8    Defendant's Exhibit No. 44        162
9    Defendant's Exhibit No. 45        163
10   Defendant's Exhibit No. 46        176
11   Defendant's Exhibit No. 47        177
12   Reporter's Certificate           180
13
14
15
16
17
18
19
20   ***************************************
21
22
23

---

Page 7

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
    JIMMY JACOBS, Esquire
    4137 Carmichael Road
    Suite 100
    Montgomery, Alabama  36106
    (334) 215-1788

ON BEHALF OF THE DEFENDANT:
    M. JEFFERSON STARLING, III, Esquire
    MONICA B. GRAVELINE, Esquire
    BALCH & BINGHAM, LLP
    1710 Sixth Avenue North
    Birmingham, Alabama  35203
    (205) 226-3406

ALSO PRESENT:
    KEN DEMARKO, Army Fleet Support
    Representative

***************************************

---

Page 8

1        I, CYNTHIA M. NOAKES, a Court Reporter
2    of Eufaula, Alabama, acting as Commissioner,
3    certify that on this date, as provided by the
4    Alabama Rules of Civil Procedure and the
5    foregoing stipulation of counsel, there came
6    before me at the Offices of HOLIDAY INN EXPRESS,
7    1006 Boll Weevil Circle, Enterprise, Alabama
8    36330, beginning at 9 a.m., SAMUEL HOUSTON,
9    witness in the above cause, for oral examination,
10   whereupon the following proceedings were had:
11
12        SAMUEL HOUSTON,
13   being first duly sworn, was examined and
14       testified as follows:
15
16        THE COURT REPORTER:  Usual
17   stipulations?
18       MR. JACOBS:  Yes.
19       MR. STARLING:  Sure.
20
21        EXAMINATION
22   BY MR. STARLING:
23   Q.   Mr. Houston, have you ever been deposed

---

Page 9

1    before?
2    A.   (No response.)
3    Q.   We're in a deposition today.  Have you ever
4    been in this setting before?
5    A.   No, I haven't.
6    Q.   Okay.  Just some kind of background
7    information:  I'm going to be asking questions
8    today for you to answer.  You're sworn under oath
9    at this point in time.  Do you understand that?
10   A.   Yes, I do.
11   Q.   If you don't understand the question, please
12   ask me to rephrase it; I'll be happy to.
13   A.   I will.
14   Q.   We've got a court reporter here who is
15   taking a transcript of this.  That requires you
16   answer verbally, so head nods and uh-huhs will not
17   work.  It's a natural human reaction to do that.
18       So at times I may ask you, "Was that a yes
19   or a no?" just so it will be clear.  So if you'll
20   try to do that, that will help us move along
21   quicker today.
22       Is there anything that would prevent you
23   from testifying truthfully today?

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 10

1  A.  No.
2  Q.  Anything that would prevent you from
3  testifying to the fullest extent of your knowledge
4  today?
5  A.  No.
6  Q.  Are you taking any drugs or alcohol
7  currently that would affect your ability to
8  testify truthfully and to the fullest extent of
9  your knowledge?
10  A.  No.
11  Q.  Any mental problems that would prevent you
12  from testifying truthfully today and to the
13  fullest extent of your knowledge?
14  A.  No.
15  Q.  Any physical problems that would prevent you
16  from testifying truthfully today or to the fullest
17  extent of your knowledge?
18  A.  No.
19  Q.  Have any trouble sleeping last night?
20  A.  Yes.
21  Q.  What happened last night?
22  A.  Just didn't get a good night's sleep.
23  Q.  Because of the deposition or anything else?

Page 11

1  A.  Strange environment, different bed.
2  Q.  You stayed in a hotel last night?
3  A.  Upstairs.
4  Q.  Oh, here at this hotel?
5  A.  Yes, sir.
6  Q.  Okay.  Suffering from schizophrenia?
7  A.  No.
8  Q.  Manic depression?
9  A.  No.
10  Q.  Do you have any bipolar disorder?
11  A.  No.
12  Q.  In good mental health?
13  A.  Yes.
14  Q.  Any history of any of those mental disorders
15  -- schizophrenia, bipolar disorder, anything of
16  that nature?
17  A.  No.
18  Q.  Are you currently taking any medications?
19  A.  Yes, I am.
20  Q.  What medications are you taking?
21  A.  I have a list here.
22  Q.  Okay.  Okay.  I think what we'll do is mark
23  that as Defendant's Exhibit 1 to this deposition,

Page 12

1  and when we get an opportunity we can make a copy
2  of it.
3        (Defendant's Exhibit No. 1 was
4        marked for identification and a
5        copy of the same is attached
6        hereto.)
7  Q.  Okay.  Mr. Houston, I've got in front of me
8  what we've marked as Defendant's Exhibit No. 1,
9  and this appears to be a list of drugs that you
10  are currently taking; is that correct?
11  A.  Yes.
12  Q.  And I see you have them broken down into
13  what looks like four categories.  The first one
14  has 13 different drugs on it.  What are those
15  drugs for?
16  A.  Okay.  Number one is Glucophage.  I'm a
17  diabetic, type 2.  Number two is Lexapro.  That is
18  for my anxiety and depression.  Number three is
19  Tricor.  That's for -- I'm thinking here -- the
20  high blood pressure.  It's a statin drug.  Keeps
21  cholesterol down.  Cymbalta is for my pain
22  management for my spinal problem.  Lyrica is pain
23  management for my spinal problem.  Ecotrin is a

Page 13

1  baby aspirin for heart attack prevention.
2  Prinivil is for my blood pressure.  Ambien is for
3  getting a good night's sleep.  The Doryx is for an
4  infection of my scalp.  The Zyrtec-D is for a
5  sinus problem.  The Robinul is for my scalp
6  problem.  The Lidoderm patches are for my lower
7  back -- muscular problems.  And I'm going to
8  slaughter the pronunciation of this; it's --
9  Q.  Why don't you just spell it?
10  A.  C-L-O-B-E-T-A-S-O-L P-R-O-P-I-O-N-A-T-E.
11  And that is topical solution for the itch in my
12  scalp.  Pain medications taken as needed:  Lortab,
13  which I no longer take because it makes me itch.
14  I have a reaction to it.  The Vicodin, which I no
15  longer take because it doesn't work; and the
16  OxyContin, which I very rarely take, maybe once a
17  month, due to the highly addictive nature of the
18  drug and that I am very aware of this medicine's
19  problems.
20  Q.  Which pain is that for?
21  A.  Lower back.  And I also have a pain in my
22  shoulder.
23        Dietary supplements taken daily:

4  (Pages 10 to 13)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

**Page 14**

1  Glucosamine and Chondroitin with MSM; Evening Prim
2  Rose Oil; Cinnamon; and a diabetic health pack by
3  Nature Made.
4      And I also take this medication for stomach
5  pain as needed: Phenergan.
6  Q.   What is the stomach problem?
7  A.   I had a GERD, a hiatal hernia with a reflex.
8  And I had that for 14 years and I was on
9  medication for it.  And back about '97, I had a
10 surgery to fix it.  And if, say, I was to get sick
11 and I needed to vomit, well I cannot vomit because
12 of the Lap Nissen knot.  What they do is they take
13 your stomach and wrap it around your esophagus and
14 tie a knot there.  Well, if I was to try to vomit,
15 I'd break the knot and end up back in surgery.  So
16 the Phenergan takes care of any need for me to ...
17 Q.   Okay.  Had you been taking any of the pain
18 medications prior to the back surgery you had in,
19 what was it, 2004?
20 A.   No.
21 Q.   Was it 2004 or '-5 that you had the back
22 surgery?
23 A.   I can't remember exactly.

---

**Page 15**

1  Q.   But you were not taking any of the pain
2  medications before that?
3  A.   Right.  I was not on any medication prior to
4  that -- pain medications.
5  Q.   Pain medications, correct.  You had some
6  medications for some other problems you've had;
7  but the pain medications, not until you had the
8  back surgery that you started taking those?
9  A.   Right.  Afterwards.
10 Q.   And none of these drugs affect your ability
11 to remember anything or testify truthfully today?
12 A.   Remember?  Well, no, I can remember.
13 Q.   And nothing would affect your ability to
14 testify truthfully?
15 A.   That's correct.
16 Q.   Have you -- in the past, have you taken
17 Zoloft and other drugs of that nature?
18 A.   I was on Zoloft; and I got off it and I went
19 to the Lexapro.
20 Q.   How often do you take the -- I see out here,
21 just so I can be clear, on this Defendant's
22 Exhibit 1, you've got beside each drug a
23 milligrams and what appears to be the time you

---

**Page 16**

1  take it each day; is that correct?
2  A.   That's correct.
3  Q.   So, for example, on the first one --
4  A.   The Glucophage.
5  Q.   You take 850 milligrams twice daily?
6  A.   That's correct.  Once in the morning and
7  once in the evening.
8  Q.   Have you ever been involved in any other
9  type of litigation, other than this case?
10 A.   I hired Bender & Bender to represent me for
11 my Social Security Disability.
12 Q.   When was that?
13 A.   Last year.
14 Q.   Okay.  And did you apply for Social Security
15 Disability?
16 A.   Yes.
17 Q.   And what did you hire them to do?
18 A.   Represent me.
19 Q.   And what was the result of your application
20 for Social Security Disability?
21 A.   It's in progress right now.
22 Q.   The claim has not been resolved one way or
23 the other?

---

**Page 17**

1  A.   This is true.
2  Q.   Was there any initial denial of the claim?
3  A.   No, not yet.
4  Q.   When did you end up filing the application?
5  A.   This past summer.
6  Q.   Do you know if that is a document that you
7  have produced to us already?
8  A.   I believe not.  I don't believe I've
9  produced any documents to that.
10 Q.   Did you complete an application for Social
11 Security Disability?
12 A.   Yes, I have.
13 Q.   What is your claim for Social Security
14 Disability based on?
15 A.   My lower back and my shoulder, and my feet
16 and my diabetes and my neuropathy.
17 Q.   What is neuropathy?
18 A.   A lack of sense of feeling due to diabetes.
19 Q.   It's a result of the diabetes?
20 A.   Yes.
21 Q.   Where do you have the lack of sensations or
22 feelings?
23 A.   From my tips of my toes all the way up to my

---

5  (Pages 14 to 17)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 18

1   hips.
2   Q.   So in making your Social Security Disability
3   claim, it was the back, the shoulder -- you had,
4   what, rotator cuff surgery on the shoulder?
5   A.   Yes.
6   Q.   And your diabetes?
7   A.   Yes.
8   Q.   And they have not responded to you?
9   A.   No, they have not.
10  Q.   Did they give you any type of deadline of
11  when they will respond?
12  A.   No.
13  Q.   Other than your application for your Social
14  Security Disability, have you been involved in any
15  other type of litigation?  For example, as a
16  witness?
17  A.   No.
18  Q.   As a party to any other type of litigation?
19  A.   No.
20  Q.   Have you ever been charged with any crimes
21  or arrested?
22  A.   No.  Excuse me.  When you say "crimes," do
23  you mean felonies?

Page 19

1   Q.   Felonies or misdemeanors.  I wouldn't
2   include speeding tickets.
3   A.   No.
4   Q.   For example, have you been arrested for DUI
5   before?
6   A.   No, I have not.
7   Q.   Where did you grow up?
8   A.   Where did I grow up?  I was a military brat;
9   I grew up all over the world.
10  Q.   Where did you attend high school?
11  A.   I attended high school -- the first high
12  school I went to was Clearwater Central Catholic,
13  then I went to Boca Ciega, and then I went to
14  Seminole, all in Pinellas County, Florida, the St.
15  Petersburg area down there.
16  Q.   Which one did you graduate from?
17  A.   Seminole.
18  Q.   Was your father in the military?
19  A.   Yes, he was.
20  Q.   What did he do?
21  A.   He was in the Coast Guard for 31 years.
22  Q.   After you graduated from high school, what
23  did you do?

Page 20

1   A.   I went to Pinellas Vocational Technical
2   Institute to be an auto mechanic.
3   Q.   What year did you graduate high school?
4   A.   '75.
5   Q.   And you studied to be an auto mechanic at
6   Pinellas Vocation Technical School?
7   A.   Yes.
8   Q.   How long did you do that?
9   A.   About two years.
10  Q.   Did you end up with any degree or graduate?
11  A.   Yeah, I graduated.
12  Q.   What was your degree in?
13  A.   Oh, I didn't get a degree; it was just a
14  diploma type.
15  Q.   What did you do after that?
16  A.   Joined the Air Force.
17  Q.   Where were you stationed first in the Air
18  Force?
19  A.   Kadena Air Base, Okinawa, Japan.
20  Q.   How long were you there?
21  A.   About two and a half years.
22  Q.   How long did you stay in the Air Force all
23  together?

Page 21

1   A.   24 years, two months, 16 days.
2   Q.   What was the highest rank you achieved?
3   A.   E-7, Master Sergeant.
4   Q.   And what was your specialty?
5   A.   I was an aircraft maintenance technician.
6   Q.   What did you do as an aircraft maintenance
7   technician?
8   A.   I did aircraft maintenance; all phases of
9   aircraft maintenance, from minor maintenance to
10  major maintenance to anything that needed to be
11  done in the way of my career field.
12  Q.   Any particular type of aircraft?
13  A.   Yes.  I worked F-4s, and then I worked
14  A-10s, then I worked F-16s.  That's about it.
15  Q.   When you reached the level of E-7, is that
16  what you were before you retired, or is that the
17  highest level?
18  A.   That's the highest level, yes.
19  Q.   How long were you an E-7?
20  A.   From '97 to '01.
21  Q.   Those years that you just described, '97 to
22  '01, what were your duties when you were an E-7
23  then?

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 22

1    For example, did you have any supervisory
2  responsibilities?
3  A.   Oh, yes.  I was in management.
4  Q.   Can you generally describe what your duties
5  were?
6  A.   I ran a phase dock -- phase inspection.
7  Q.   And what does that mean?
8  A.   We have aircraft that are required for
9  "periodical" maintenance to come into a hangar;
10  and they get dismantled, inspected, serviced, ops
11  check all the necessary operational checks,
12  reassembled and test flown.  And I oversaw all of
13  that.
14  Q.   How many people did you supervise in that
15  position?
16  A.   On the books, I was authorized 35.  I was
17  authorized 35 people.
18  Q.   Is that typically how many you ended up
19  having?
20  A.   No.  What you're authorized and what you
21  have assigned are ...
22  Q.   How many did you have assigned?
23  A.   About 18.

Page 23

1  Q.   I assume, in the Air Force, you received
2  certification in certain technical areas.  I don't
3  need an unlimited list, but, in general, what type
4  of certifications or special training did you
5  receive?
6  A.   Like social action training, EOT, human
7  relations training, management, or I would call
8  supervisor leadership courses, official Air Force
9  management courses, NCO what they call
10  professional military education courses,
11  leadership courses, the NCO Academy courses.
12    All these courses are there to polish up the
13  skills you already have.
14  Q.   And just for the benefit of our record here,
15  NCO is noncommissioned officer?
16  A.   That's correct.
17  Q.   And all of those training courses were in
18  addition to, I assume, the technical aircraft
19  maintenance training you had received years
20  before?
21  A.   Yes, sir.
22  Q.   Are you currently married?
23  A.   Yes, I am.

Page 24

1  Q.   And what is your spouse's name?
2  A.   Brigitte.  It's spelled the French way:
3  B-R-I-G-I-T-T-E.
4  Q.   How long have you been married?
5  A.   Since '83.
6  Q.   Were you married previously?
7  A.   No, I have not been married previously.
8  Q.   This is your first and only marriage?
9  A.   Yes.
10  Q.   Do you have any children?
11  A.   Yes, I do.
12  Q.   How old are they?
13  A.   20 and 22.
14  Q.   Do they live in Alabama?
15  A.   No, they don't.
16  Q.   Do you have any relatives living in Alabama?
17  A.   I have one relative that lives up in a Arab,
18  Alabama, the north part of Alabama; but nobody in
19  the southern part of Alabama.
20  Q.   Does your wife currently work?
21  A.   Yes, she does.
22  Q.   What does she do?
23  A.   She is an office manager/biller and coder

Page 25

1  for three doctors.
2  Q.   What is the name of the practice group?
3  A.   (No response.)
4  Q.   Or do you know the name of the three
5  doctors?
6  A.   Oh, I know the name of the three doctors.
7  Q.   Can you tell me them?
8  A.   Dr. Alec Schmidt.
9  Q.   S-C-H-M-I-D-T?
10  A.   Yes.  Dr. Wayne Justice, and Dr. Kit Kuss.
11  Q.   What type of practice is it?
12  A.   General.
13  Q.   And where are they located?
14  A.   Niceville.  Twin City Hospitals complex.
15  Q.   Where do you currently reside?
16  A.             Crestview, Florida
17
18  Q.   How long have you been at that address?
19  A.   Since '97.
20  Q.   Are you a member of any church?
21  A.   Yes, I am.
22  Q.   What church is that?
23  A.   Our Lady of Victory.

**REDACTED**

7  (Pages 22 to 25)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
## Court Reporting * Legal Videography * Trial Services

**Page 26**

1  Q.  And where is that located?
2  A.  Crestview, Florida.
3  Q.  A member of any civic or social groups?
4  A.  Does a shooting club be considered a social
5  group?
6  Q.  Sure.
7  A.  The Herbert Field Shooting Club.
8  Q.  Is that like skeet shooting?
9  A.  No, it's no skeet; it's just a rifle and
10  pistol range.
11  Q.  Is that something you participate in?
12  A.  When I can.
13  Q.  Are you still doing it now?
14  A.  I haven't currently done it in about a year.
15  Q.  Any particular reason?
16  A.  No.
17  Q.  Did you do anything to prepare for your
18  deposition today?
19  A.  Define "prepare."
20  Q.  Did you review any documents to prepare for
21  today?
22  A.  Yes.
23  Q.  What all did you review?

**Page 27**

1  A.  Documents supplied by my attorney.
2  Q.  And were those documents you had previously
3  given your attorney?
4  A.  Yes.
5  Q.  Do you know if you have produced all of
6  those documents to us, if we have been given
7  copies of those documents?
8  A.  You would have to ask my attorney.
9      MR. STARLING:  Do you want to go off
10  the record just for a second?
11      (An off-the-record discussion
12      was held.)
13      MR. STARLING:  Counsel confirmed that
14  Plaintiff has not reviewed any documents that have
15  not been produced by the defendant to the
16  plaintiff or by the plaintiff to the defendant.
17  (BY MR. STARLING)
18  Q.  Did you meet with your attorney prior to
19  today to prepare for this deposition?
20  A.  Yes.
21  Q.  Approximately how long did you meet with
22  him?
23  A.  About two and a half hours yesterday.

**Page 28**

1  Q.  What year did you get out of the military?
2  A.  '01.
3  Q.  What was your reason for leaving?
4  A.  High year tenure.
5  Q.  What does that mean?
6  A.  That means if you stay in one rank long
7  enough, you have reached what the military calls,
8  "high year tenure."  If you do not progress to the
9  next rank, you have to get out at that year of
10  grade, year in grade and time.
11      So that means if I spent 24 years as a
12  Master Sergeant E-7 in the Air Force, I had
13  reached my high year tenure and I could not stay
14  in the Air Force any longer.
15  Q.  What would be the next grade after E-7?
16  A.  Senior Master Sergeant, E-8.
17  Q.  Is that something you applied for?
18  A.  No.  It's testable.
19  Q.  Like a written test?
20  A.  Yes, sir.
21  Q.  Did you attempt to test it?
22  A.  Yes.
23  Q.  And did not pass, I take it?

**Page 29**

1  A.  That's right.
2  Q.  What did you do after you retired from the
3  Air Force?
4  A.  I went to work for Discount Auto Parts as a
5  cashier and counterman.
6  Q.  Where was that?
7  A.  At Fort Walton Beach.
8  Q.  Let me hand you what I'm going to mark as
9  Exhibit 2.
10      (Defendant's Exhibit No. 2 was
11      marked for identification and a
12      copy of the same is attached
13      hereto.)
14  Q.  I will tell you that this is a copy of your
15  response to interrogatories that the defendant may
16  have had served on you.
17      If you will look on page 9, you'll see a
18  signature blank for your name.  Is that your
19  signature?
20  A.  Yes, it is.
21  Q.  And is all the information provided in your
22  responses to these interrogatories true and
23  correct?

8  (Pages 26 to 29)

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 30

1  A.  Yes, it is.
2  Q.  Starting on the first page, Question No. 2
3  says to identify all employers you've worked with
4  in the past ten years.  I see the Air Force, then
5  Discount Auto Parts, Chromalloy Gas Turbin, Army
6  Fleet Support Fort Rucker.
7       Are those all the employers you've worked
8  for since you retired from the Air Force?
9  A.  Yes.
10 Q.  Not any additional ones?
11 A.  No.
12 Q.  Do you recall your last day of work with the
13 defendant, AFS, the date of it?
14 A.  It's September --
15 Q.  Let me ask you this question:  What I'd like
16 you to do is list all your earnings that you have
17 had since the time your employment with AFS ended.
18 A.  Could you rephrase that question, please?
19 Q.  Can you tell me all of your earnings that
20 you've had since your employment with AFS
21 terminated?
22 A.  After my employment?
23 Q.  Correct.

Page 31

1  A.  Okay.  All my earnings.  The sources of my
2  earnings?
3  Q.  Correct.  And maybe we can start with:  Have
4  you been employed anywhere else since your
5  employment with AFS terminated?
6  A.  No, I haven't.
7  Q.  Have you sought employment anywhere else?
8  A.  Yes, I have.
9  Q.  Where all have you sought employment?
10 A.  I've gone to JobsPlus in Crestview, Florida.
11 Q.  And what is JobsPlus?
12 A.  It's the employment agency that's run by the
13 State of Florida.
14 Q.  Did you complete an application there?
15 A.  Yes.  I filled out an application online to
16 their computer system.
17 Q.  And have they submitted your application to
18 any employers?
19 A.  Not that I know of.
20 Q.  Have you interviewed with any employers?
21 A.  No.
22 Q.  What type of job were you seeking through
23 JobsPlus?

Page 32

1  A.  Aviation related jobs.
2  Q.  So in the aviation industry?
3  A.  Yes.
4  Q.  Are there any --
5       MR. STARLING:  Hold on just a second.
6       (An off-the-record discussion
7       was held.)
8  (BY MR. STARLING)
9  Q.  Are you aware of any aviation jobs near the
10 area where you live?
11 A.  Yes.  I was contacted by the Veterans Center
12 in JobsPlus and referred to Crestview Aerospace
13 for a possible hiring on a CH-47 program that
14 Crestview Aerospace was spinning up.
15 Q.  And did you interview for that job?
16 A.  No, I didn't.
17 Q.  Did you submit an application for it?
18 A.  Yes, I did.
19 Q.  And am I to assume that you did not get that
20 job?
21 A.  Correct.
22 Q.  Did they provide you with any reason?
23 A.  No.

Page 33

1  Q.  How did you learn that you did not get it?
2  A.  I made inquiries of Crestview Aerospace.
3  Q.  And they simply said they were not hiring?
4  A.  They hired somebody a week before my
5  application made it to their desk.
6  Q.  Are you aware of your application being
7  submitted by JobsPlus to any other employers?
8  A.  Just the Crestview Aerospace.  Because they
9  are the only aviation -- well, they're not the
10 only aviation industry there, but the primary one.
11 Q.  What other ones are there?
12 A.  A few.
13 Q.  Have you -- how far away are you from Fort
14 Rucker?
15 A.  It was 96 miles from my front door to the
16 time clock at Cairns ATTC.
17 Q.  Would you seek employment at Fort Rucker
18 now, or are you?
19 A.  No.
20 Q.  Because of distance or other reasons?
21 A.  Other reasons.
22 Q.  And what reasons are those?
23 A.  May I speak to my lawyer?

9  (Pages 30 to 33)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 34

1  Q.  I mean, unless it's some privileged
2  conversation, I would ask that you answer the
3  question.
4       MR. JACOBS: Would you repeat the
5  question?
6       MR. STARLING: I said: Is there some
7  reason you're not seeking employment at somewhere
8  in Fort Rucker?
9       MR. JACOBS: If you can answer, go
10 ahead and answer.
11 A.  I no longer can work in the workforce.
12 Q.  In any capacity?
13 A.  In any capacity; that's correct.
14 Q.  Was there a job you could have performed at
15 the company you named earlier that you submitted
16 an application to?
17 A.  Yes.  Prior to this decision being made.
18 Q.  What job were you seeking at that company?
19 I'm sorry.  What was the name of it, the one in
20 Crestview?
21 A.  Crestview Aerospace.
22 Q.  What type of job were you seeking there?
23 A.  It was a job to work with the CH-47 program.

Page 35

1  Q.  An aircraft mechanic job?
2  A.  Yes.
3  Q.  When did you seek that job?
4  A.  During the summer of '05, I believe.
5  Somewhere thereabouts.  No.  I can't remember.  I
6  take that back.
7  Q.  Just to refresh your memory, in your
8  Complaint, you allege that in August of '04 is
9  when you went out from work from AFS with the back
10 injury.
11 A.  Uh-huh.
12 Q.  And then you had surgery in November of
13 2004?
14 A.  Yes.
15 Q.  And then in March of 2005 is when you were
16 placed on a form of administrative leave from AFS;
17 no longer an active employee, I guess?
18 A.  That's correct.
19 Q.  So given those dates, when is it that you
20 think you applied with Crestview Aerospace?
21 A.  Later on that year.
22 Q.  In 2005?
23 A.  Yes.

Page 36

1  Q.  And at the time that you applied then, did
2  you think that you could perform an aircraft
3  maintenance job?
4  A.  Yes.
5  Q.  Was I understanding your testimony a little
6  while ago, you no longer believe you're capable of
7  performing that aircraft maintenance job?
8  A.  That's true.
9  Q.  When was that change in your position?
10 A.  When the Veterans Administration -- I filed
11 a claim to the Veterans Administration, and I was
12 deemed totally and permanently disabled by them,
13 and unemployable.
14 Q.  And do you consider yourself unemployable at
15 this stage?
16 A.  Yes, I do.
17 Q.  So we're clear on the record, is it your
18 position that there is no job that you can perform
19 at this point in time?
20 A.  That's correct.
21 Q.  And that's because of your varying ailments,
22 or is it because of one in particular?
23 A.  Varying ailments.

Page 37

1  Q.  And the reason I asked that: Earlier you
2  listed you have the back problem and a shoulder
3  problem as well as diabetes.
4       Is it your position -- does your diabetes
5  prevent you from performing any job at this point
6  in time?
7  A.  No.
8  Q.  Does your back prevent you from performing
9  any job at this time?
10 A.  The restrictions based upon my back do, yes.
11 Q.  What are the restrictions currently?
12 A.  I can't lift anything more than 25 pounds; I
13 can no longer stand -- I can't stand for more than
14 an hour and a half; I can't sit for more than an
15 hour and a half; no bending or twisting at the
16 waist; no pushing or pulling; no climbing; no
17 crawling.
18      To the best of my knowledge, that's the crux
19 of it.
20 Q.  So is it your position that the diabetes, in
21 conjunction with the back problem, is what
22 prohibits you from being --
23 A.  There's a lot of people in the world who

10  (Pages 34 to 37)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

Page 38

1  have diabetes and they are very productive members
2  of society. If diabetes was the only problem I
3  had, I would be a productive member of the
4  workforce.
5  Q.   Does your shoulder cause you to have
6  limitations on your ability to work?
7  A.   Yes, it does.
8  Q.   What type of limitations does it create?
9  A.   Physical limitations; carrying limitations,
10 in the way of being able to carry any kind of
11 loads.
12 Q.   Are those in addition to the limitations you
13 were just listing for me related to your back?
14 A.   Yes. Separate from my back.
15 Q.   Can you give me specifically the limitations
16 you have from your shoulder?
17 A.   Certain movements I can't do.
18 Q.   For example?
19 A.   Lifting anything above my shoulders,
20 reaching behind my back, carrying any substantial
21 weight or anything more than 25 pounds in my hand
22 or in my arm, anything that has to do with
23 supporting my body or my body weight.

---

Page 39

1  Q.   For example, climbing?
2  A.   Yes.
3  Q.   Which shoulder is it, by the way?
4  A.   My left shoulder.
5  Q.   How did you injure that?
6  A.   I've got four torn rotator cuffs to my
7  credit.
8  Q.   How long ago was your first one?
9  A.   I don't remember. It was at the time I was
10 in the service.
11 Q.   Was the Crestview Aerospace job the last one
12 that you are aware that you submitted application
13 for?
14 A.   Yes.
15 Q.   Did you stop searching after that point in
16 time?
17 A.   No.
18 Q.   How much longer did you search for another
19 job?
20 A.   I don't remember.
21 Q.   Until you received the --
22 A.   The determination from the VA that I was
23 permanently and totally disabled.

---

Page 40

1  Q.   At that point in time, you stopped your job
2  search?
3  A.   Yes, sir.
4  Q.   Do you recall when that was?
5  A.   No, I don't.
6  Q.   Do you think it was in 2005?
7  A.   I don't remember. I'm not very good with
8  remembering dates and times.
9  Q.   Has it been more than a year?
10 A.   Yes, I think it has been more than a year.
11 Q.   Other than JobsPlus and the Crestview
12 Aerospace, can you recall any other specific
13 efforts to seek a job since you went on inactive
14 status at AFS?
15 A.   Asking friends if they needed any help, you
16 know, doing odd jobs, things like that.
17 Q.   What other sources of income have you had
18 since you went on inactive status with AFS?
19 A.   I had the -- the union supplies an
20 insurance. Gosh, all I can remember is that AFLAC
21 commercial on TV.
22 Q.   Some type of disability insurance?
23 A.   Disability insurance, yes, sir. They supply

---

Page 41

1  70 percent of your base pay via a check from
2  Fortis.
3  Q.   Fortis benefits?
4  A.   Yes, Fortis benefits. I received those
5  while I was on the short-term disability. After
6  that ran out, I filed for unemployment
7  compensation in the State of Alabama.
8  Q.   So Fortis was the insurance carrier for the
9  short-term disability benefits?
10 A.   Yes. It was a benefit supplied by the
11 union.
12 Q.   And those lasted approximately from the time
13 you went out until about March of 2005 when you
14 went on inactive status?
15 A.   About that. I don't really remember. I
16 can't remember.
17 Q.   How much was the short-term disability
18 benefits?
19 A.   That I do remember. It was 900 and some-odd
20 dollars.
21 Q.   Each month?
22 A.   Yes. I'm not sure. I'm not sure if it was
23 each month or two weeks. I can't remember, sir.

---

11  (Pages 38 to 41)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 42

1  Q.  It was approximately 70 percent of your pay?
2  A.  Yes, sir.
3  Q.  Have you ever received any long-term
4  disability benefits?
5  A.  No.
6  Q.  And from the VA, how much do you receive
7  from the VA?
8  A.  I receive now from the VA $2900 from the VA.
9  Q.  Per month?
10  A.  Per month. I believe it's 2956, to be
11  exact.
12  Q.  Do you receive any other type of benefits?
13  A.  I have a CRDP payment.
14  Q.  What is that?
15  A.  Oh, boy. It is -- let me think.
16  Consecutive -- I'll give you a definition of what
17  it means. I don't know what the acronym means
18  right now.
19     A CRD payment is paid by DFAS, which is
20  Defense Finance & Accounting Service, to veterans
21  who are over 20 years in the service and retired.
22  It is a makeup pay, if you want to call it that,
23  or a differential pay, due to the -- wait a

Page 43

1  minute -- concurrent receipt bill that was passed
2  after the Civil War that applied to military
3  veterans.
4     There is a program where, if you are
5  receiving money from, say, the Air Force, and you
6  are receiving benefits from the VA, you give up
7  one dollar for each dollar that you submit. But
8  this counterbalances that; and you receive your
9  what they call a CRDP check, eliminating the
10  inaccuracy of the payment system.
11  Q.  How much is it for each month?
12  A.  I believe it's $1,000.
13  Q.  Do you also receive pension payments?
14  A.  No.
15  Q.  How old are you now?
16  A.  Fifty-one.
17  Q.  When will you start receiving your pension
18  benefits from the military?
19  A.  I started as soon as I retired. But since
20  I'm 100 percent total and permanent, I give up my
21  Air Force retirement check to the VA, and the VA
22  pays me back.
23  Q.  And that's the purpose of the CRDP?

Page 44

1  A.  Right. To make up the differential loss.
2  Q.  Any other benefit payments that you
3  currently receive?
4  A.  No.
5  Q.  So just to summarize, currently you receive
6  a VA check of approximately $2,956 per month and a
7  CRDP check of approximately $1,000 a month?
8  A.  I may be wrong on -- yes, that's right.
9  That's about right.
10  Q.  Any other source of income you've had since
11  March of 2005?
12  A.  That I've earned, no.
13  Q.  How long has your wife been working at her
14  current job?
15  A.  I don't know. I'm not going to give you --
16  Q.  More than three years?
17  A.  Yes, sir, more than three years.
18  Q.  More than five years maybe?
19  A.  Less than five years.
20  Q.  Are your kids in college or are they out of
21  college now?
22  A.  They are not in college.
23  Q.  Are they out on their own?

Page 45

1  A.  No.
2  Q.  Do you continue to support them?
3  A.  Yes.
4  Q.  What are they currently doing?
5  A.  My oldest daughter has bought a route with
6  FedEx Ground, bought a delivery truck, and she
7  runs her own business as a FedEx Ground truck
8  driver.
9  Q.  Where is she living?
10  A.  Living at my home.
11  Q.  And then --
12  A.  My youngest daughter is currently working at
13  the Hilton Hotel and is waiting to take her test
14  as a massage therapist to get her state license.
15  Q.  Where does she live?
16  A.  With me, same residence.
17  Q.  Did you help your daughter start the FedEx
18  route?
19  A.  Yes.
20  Q.  Financially supported her?
21  A.  Yes.
22  Q.  By the way, if you need to take a break
23  during the deposition, just let me know.

12  (Pages 42 to 45)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 46

1  Generally it is appropriate to take them after you
2  finish answering a particular question. But let
3  me know if you need to go to the restroom or
4  anything of that nature.
5  A.   Thank you. I certainly will.
6  Q.   When you first started work, was your
7  employment with DynCorp your first employment at
8  Fort Rucker?
9  A.   Yes, sir.
10 Q.   And did you go to work at DynCorp in
11 February of 2002?
12 A.   Yes, sir.
13 Q.   And then I believe that AFS took over that
14 contract at Fort Rucker at the beginning of
15 November of 2003. Does that sound correct?
16 A.   Sounds correct.
17 Q.   And did you apply for a job with AFS when
18 they took over that contract?
19 A.   Yes. There was applications that we had to
20 fill out.
21 Q.   And at the time you were at DynCorp, you
22 were an aircraft mechanic?
23 A.   Yes, sir.

Page 47

1  Q.   Was there any specific job title for that
2  job?
3  A.   Aircraft mechanic.
4  Q.   Let me hand you what I'm going to mark as
5  Exhibit 3.
6        (Defendant's Exhibit No. 3 was
7        marked for identification and a
8        copy of the same is attached
9        hereto.)
10 Q.   If you'll look at the very last page, page
11 7, it appears to be signatures on that page. Are
12 those signatures yours?
13 A.   Yes, they are.
14 Q.   And is this the application you completed
15 for Army Fleet Support?
16 A.   Yes, sir.
17 Q.   And is everything on there true and correct?
18 A.   Yes, sir.
19 Q.   Okay. Go to page 4, if you would, please.
20 A.   (Witness complies.)
21 Q.   On the employment history, the first one is
22 DynCorp with Fort Rucker, and it says "aircraft
23 mechanic."

Page 48

1        What did you do in that job?
2  A.   Everything my boss wanted me to do.
3  Q.   Describe your general duties that you did on
4  a day-to-day basis there.
5  A.   Towed aircraft, refueled aircraft, did minor
6  maintenance, major maintenance.
7  Q.   What type of aircraft were those?
8  A.   Helicopters.
9  Q.   And were you part of a team that would take
10 apart the helicopter?
11 A.   Yes, I worked on a team.
12 Q.   Okay. And it was primarily a maintenance
13 and mechanical job?
14 A.   Yes, sir.
15 Q.   Were you in any type of supervisory
16 position?
17 A.   No, I was not.
18 Q.   At Discount Auto Parts, it says
19 cashier/counter parts man.
20        Did you have any supervisory
21 responsibilities there?
22 A.   No, sir.
23 Q.   Primarily a sales position?

Page 49

1  A.   Yes. Run the cash register and helping out
2  on the back counter.
3  Q.   Then the next page, Chromalloy Gas Turbine
4  Company, quality assurance inspector.
5        What were your duties in that position?
6  A.   Had to read a micrometer.
7  Q.   What is that?
8  A.   A precision instrument for measuring metals.
9  Q.   What type of measurements?
10 A.   Internal diameters, external diameters,
11 extreme precise measurements that get down to
12 tenths of thousandths of an inch.
13 Q.   What did y'all make at Chromalloy?
14 A.   We manufactured nonspinning parts of turbin
15 engines, gas jet engines.
16 Q.   For military jets?
17 A.   Civilian and military.
18 Q.   So you were in the quality assurance
19 department?
20 A.   Yes, sir.
21 Q.   So y'all were running tests on the quality
22 of the parts y'all were making?
23 A.   This is correct.

13  (Pages 46 to 49)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 50

1  Q.  Did you work at Discount Auto Parts twice?
2  A.  Yes. I worked full time/part time while I
3  was working at Chromalloy; and then when I got
4  laid off at Chromalloy, I went back to full time.
5  Q.  Okay. I'm going to hand you what I'm going
6  to mark as Exhibit 4.
7       (Defendant's Exhibit No. 4 was
8       marked for identification and a
9       copy of the same is attached
10      hereto.)
11 Q.  I want to go back. Was Exhibit 3 a true and
12 correct copy of the application you submitted to
13 Army Fleet Support?
14 A.  Yes, sir.
15 Q.  Can you tell us what Exhibit 4 is?
16 A.  Looks like my resume.
17 Q.  Is this one that you submitted to Army Fleet
18 Support?
19 A.  Yes, sir.
20 Q.  And is all the information on there true and
21 correct?
22 A.  Yes, sir.
23 Q.  You have computer skills on here. Did you

Page 51

1  have any type of certification of the number of
2  words per minute you could type?
3  A.  No.
4  Q.  Have you ever done that?
5  A.  I did take a typing test once -- twice.
6  Q.  When was that?
7  A.  March. Between March the 7th and up until
8  the 14th, I was practicing my typing skills.
9  Q.  Of what year?
10 A.  '05.
11 Q.  Between March 7th and March 14th of 2005,
12 you were practicing your typing skills?
13 A.  Brushing up on my typing skills.
14 Q.  Did you have your words per minute certified
15 by anyone?
16 A.  At JobsPlus, no.
17 Q.  Anywhere else?
18 A.  No.
19 Q.  Have you ever had any type of formal
20 certification of words per minute?
21 A.  No.
22 Q.  Did you just time yourself?
23 A.  No. There's a computer program that you

Page 52

1  type, and it tells you how many words per minute
2  you typed.
3  Q.  Where is that program?
4  A.  At JobsPlus.
5  Q.  At JobsPlus?
6  A.  In Crestview.
7  Q.  Did you do that?
8  A.  Yes.
9  Q.  What were your results on it?
10 A.  30 words per minute.
11 Q.  Does it give you any type of printout, or it
12 just tells you?
13 A.  It tells you. And then there's another
14 printed typing test that you take that prints out
15 the results.
16 Q.  Did you do that as well?
17 A.  Yes, I did.
18 Q.  Also 30 words per minute?
19 A.  Yes.
20 Q.  And did you do a general application for
21 JobsPlus?
22 A.  A general application?
23 Q.  Did you fill out an application when you

Page 53

1  went to JobsPlus?
2  A.  I filled out the computer program.
3  Q.  Online?
4  A.  Online, yeah.
5  Q.  Was there a place that asked about the
6  number of words typed a minute?
7  A.  No. I don't remember.
8  Q.  Did you ever submit that information to
9  JobsPlus in any way?
10 A.  I'm sorry. Could you pose that question
11 again, please?
12 Q.  You said you can type 30 words per -- Strike
13 that.
14      You've testified that, at JobsPlus, you took
15 a computer-based test of words per minute; and it
16 came out at 30 words per minute, correct?
17 A.  This is true.
18 Q.  Did you ever submit that information or
19 provide that information on any of the
20 applications that you submitted to JobsPlus?
21 A.  No.
22 Q.  Or to anyone else, for that matter?
23 A.  No.

14  (Pages 50 to 53)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 54

1    Q.   So I guess if someone is looking at your
2    file, there's no way to determine how many words
3    per minute you can type, based on the paper in the
4    file?
5    A.   Are you talking about my resume here?
6    Q.   Correct.
7    A.   That's correct.
8    Q.   Do you know if the 30 words per minute is
9    recorded anywhere in any records of AFS or
10   JobsPlus?
11   A.   No.
12        MR. STARLING:  Have we received any
13   JobsPlus applications from you-all?
14        MR. JACOBS:  Let's go off the record.
15        MR. STARLING:  Yeah.
16        (An off-the-record discussion
17        was held.)
18   (BY MR. STARLING)
19   Q.   Did you ever go into a JobsPlus office
20   actually, or just do everything online?
21   A.   I went into a JobsPlus office, signed in,
22   filled out an application online.
23   Q.   Did you fill it out online at the JobsPlus

Page 55

1    center?
2    A.   Yes, I did.
3    Q.   Is that also where you applied for
4    unemployment compensation?
5    A.   No.
6    Q.   Where did you apply for unemployment
7    compensation?
8    A.   Here in Enterprise.
9    Q.   At the Alabama Unemployment Comp Office?
10   A.   Yes, sir.
11   Q.   Did you fill out any kind of job application
12   there?
13   A.   I don't remember.  I probably did.
14   Q.   You applied for unemployment benefits?
15   A.   Yes, sir.
16   Q.   To your knowledge -- well, you don't recall
17   whether or not you filled out an application at
18   the Alabama Unemployment Comp Office?
19   A.   I don't remember.
20   Q.   Did you search for employment through any
21   Alabama employment agency at all?
22   A.   I spoke to the veteran officer there.
23   Q.   And they directed you to JobsPlus in

Page 56

1    Florida?
2    A.   I don't remember.
3    Q.   Did they provide any job opportunities to
4    you when you talked to them?
5    A.   I don't remember.
6    Q.   What was your rate of pay at AFS the last
7    time you were actively employed?
8    A.   19 dollars some-odd cents an hour.
9    Q.   Did you work significant overtime?
10   A.   Please define "significant."
11   Q.   Were you working overtime every week?
12   A.   One to two hours maybe.
13   Q.   Was that pretty much standard?
14   A.   Yes, sir.  At ATTC, we didn't get a lot of
15   overtime.
16   Q.   Who was your last supervisor at AFS?
17   A.   Mark Pesa.
18   Q.   How do you spell his last name?
19   A.   P-E-S-A.
20   Q.   And who was your supervisor before that?
21   A.   Bill Warnick.
22   Q.   Did you have any other direct supervisors at
23   AFS?

Page 57

1    A.   Other than my lead man, no.
2    Q.   Who was your lead man?
3    A.   Marvin Harold.
4    Q.   Let me show you a document that I'll mark as
5    Defendant's Exhibit 5.
6        (Defendant's Exhibit No. 5 was
7        marked for identification and a
8        copy of the same is attached
9        hereto.)
10   Q.   Do you recognize the document I've marked as
11   Defendant's Exhibit No. 5?
12   A.   Yes, sir.
13   Q.   Is this the job description for the aircraft
14   mechanic position at AFS?
15   A.   Yes, sir.
16   Q.   Would you take a look at that and see if you
17   agree with the essential duties and
18   responsibilities of that position?
19   A.   Yes, sir.
20   Q.   Is that generally descriptive of the duties
21   of an aircraft mechanic at AFS?
22   A.   Yes, sir.
23   Q.   Were you in any position other than aircraft

15  (Pages 54 to 57)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 58

1  mechanic while you were at AFS?
2  A.  No, sir.
3  Q.  That was the only job classification you
4  had?
5  A.  Yes, sir.
6  Q.  It appears you injured your back on August
7  the 11th of 2004; is that correct?
8  A.  I don't remember, sir, the exact date.
9  Q.  How did you hurt your back?
10  A.  I don't remember.
11  Q.  It was not a work-related injury, was it?
12  A.  No. It was not at work, no.
13      MR. JACOBS:  Let me suggest a break.
14  If you want to go ahead and answer that first.
15  Q.  If you want to go ahead and finish up, a
16  break might be helpful.
17  A.  A break would be good.
18  Q.  Okay.
19      (A brief recess was taken.)
20  (BY MR. STARLING)
21  Q.  Do you have a copy of the application you
22  submitted to Crestview Aerospace?
23  A.  No.

Page 59

1  Q.  Did you keep any copy of that?
2  A.  No.
3  Q.  How did you submit that to Crestview
4  Aerospace?
5  A.  I went to the HR office; I filled out the --
6  well, excuse me. I had an outstanding application
7  on record, and I gave them an updated resume.
8  Q.  When had you originally applied at Crestview
9  Aerospace?
10  A.  Back in '97.
11  Q.  In 1997?
12  A.  Yes.
13  Q.  Okay.
14  A.  Excuse me. Wrong. '01.
15  Q.  2001?
16  A.  Yes.
17  Q.  Before you went to work for DynCorp?
18  A.  Yes.
19  Q.  Did you call up the HR department and say
20  you'd like to apply again?
21  A.  I just went there in person.
22  Q.  And they still had that on record?
23  A.  Yeah. I periodically, like once a year,

Page 60

1  went up there, on the date that I filled out the
2  initial application, and renewed it, kept it
3  updated.
4  Q.  What about any application you filled out
5  for JobsPlus? Do you have any copy of that?
6  A.  No. It's electronic. It's on their system.
7  Q.  So it would be on their electronic system
8  only?
9  A.  Yes, sir.
10  Q.  You did not fill out any hard paper
11  application at JobsPlus?
12  A.  Not that I know of.
13  Q.  Let's go back to your back injury. Do you
14  recall that being in August of 2004?
15  A.  I believe so, yes.
16  Q.  How did that come about that you had the
17  back problem?
18  A.  My daughter's nightstand bottom drawer
19  wouldn't open up. She had it out in the garage
20  and she was refinishing it, and she wanted to pull
21  the bottom drawer out. And I bent over and tried
22  getting the drawer out, and it wouldn't come. And
23  that's when I injured my back.

Page 61

1  Q.  Had you had any back problems prior to that?
2  A.  Yes, sir.
3  Q.  Had you had any surgery prior to that?
4  A.  Yes, sir.
5  Q.  Had those been while you were in the
6  service?
7  A.  Yes, sir.
8  Q.  What type of back problems had you had?
9  A.  I had a discectomy of my L4-L5.
10  Q.  Do you recall that, basically, you stopped
11  working for AFS on about September 2nd of 2004?
12  A.  Did you say the 2nd or the 7th?
13  Q.  I said 2nd. September 2, 2004.
14  A.  I don't remember. No, I don't remember.
15  Q.  I'm going to hand you what I'm going to mark
16  as Exhibit 6.
17      (Defendant's Exhibit No. 6 was
18      marked for identification and a
19      copy of the same is attached
20      hereto.)
21  Q.  Do you recognize this document?
22  A.  Yes, sir, I do.
23  Q.  Is this the short-term disability claim form

16  (Pages 58 to 61)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 62

1  that you completed for Fortis?
2  A.   Yes, sir, it is.
3  Q.   And is that your signature on the bottom of
4  that first page?
5  A.   Yes, sir, it is.
6  Q.   Is this your handwriting on the document?
7  A.   Yes, it is.
8  Q.   Both the -- on the first page?
9  A.   Yes, it is.
10 Q.   On the second page, that's not your
11 handwriting, is it?
12 A.   No, it's not.
13 Q.   Is that a doctor's statement that you
14 attached to the application?
15 A.   Looks like a doctor's signature at the
16 bottom.
17 Q.   It looks like it's physician Timothy
18 Kosmatka?
19 A.   Yes, sir.
20 Q.   Was that your treating physician at the
21 time?
22 A.   Yes, sir.
23 Q.   It appears that he completed this form, I

Page 63

1  guess, to be submitted with the Fortis benefits
2  claim?
3  A.   Yes, sir.
4  Q.   Do you recall whether you were the one who
5  attached that or whether it was sent to AFS
6  directly by Dr. Kosmatka?
7  A.   I believe I had Dr. Kosmatka -- it looks
8  like Dr. Kosmatka filled it out and I sent it in.
9  Q.   On here, on the first page, on about the
10 second line down, it looks like date last worked
11 is 9/2/04. Is that what that says?
12 A.   Up here?
13 Q.   Correct.
14 A.   Okay. Yes, that's correct.
15 Q.   It looks like number of hours worked that
16 day, eight hours. So that indicates you actually
17 worked on September 2nd of 2004, it appears?
18 A.   Yes.
19 Q.   And is that your recollection?
20 A.   Yes, sir.
21 Q.   It appears, down here near the bottom, date
22 symptoms first appeared, 11 August of '04.
23     That's when you were talking about the

Page 64

1  bottom drawer of the dresser that your daughter
2  had?
3  A.   Yes, sir.
4  Q.   Okay. And you ended up being qualified to
5  receive those benefits from Fortis?
6  A.   Yes.
7  Q.   And that's the ones we were talking about
8  earlier?
9  A.   Yes. I was wrong on the amount of money
10 that Fortis gave me. It was $794.40. Well,
11 excuse me.
12 Q.   I see. It looks like here you were earning
13 at that time 794.40 a week?
14 A.   Right.
15 Q.   And your benefit was 556.08 a week?
16 A.   Right.
17 Q.   That's what you recall?
18 A.   Yes. The previous conversation we had about
19 the amount of money I got from Fortis, I told you
20 the wrong number.
21 Q.   So this number is what you recall, this
22 556.08 a week?
23 A.   Yes, sir. I just wanted to make sure that

Page 65

1  was clear.
2  Q.   Thank you. I'm going to show you what I'm
3  going to mark as Defendant's Exhibit No. 7.
4      (Defendant's Exhibit No. 7 was
5      marked for identification and a
6      copy of the same is attached
7      hereto.)
8  Q.   Do you recognize the document I've marked as
9  Defendant's Exhibit No. 7?
10 A.   Yes, I do.
11 Q.   And does that appear to be a supplementary
12 report of benefits for Fortis?
13 A.   Yes, it is.
14 Q.   And is that your signature on the bottom
15 there?
16 A.   Yes, it is.
17 Q.   And it looks like this is something you
18 completed for Fortis on December 13th of 2004,
19 correct?
20 A.   Yes.
21 Q.   On No. 12, it says, "Have you discussed
22 returning to work with your doctor?" And you
23 checked, "Yes." But there's nothing there that

17  (Pages 62 to 65)

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 66

1   says -- it says, "If 'Yes,' what did he/she
2   advise."
3       Do you recall what you discussed with your
4   doctor at that time?
5   A.   No, I don't remember.
6       MR. JACOBS:  I'm sorry.  Just to
7   clarify, this note says, "Sometime in March '05."
8   Block No. 8.  Is that what you were asking about?
9       MR. STARLING:  No.  I was asking about
10  Block No. 12.
11      MR. JACOBS:  Okay.  I'm sorry.
12  Q.   On Block No. 8, it says, "Do you expect to
13  return to work?"  "Yes."  And you wrote in,
14  "Sometime in March '05."  Is that your
15  handwriting?
16  A.   Yes.
17  Q.   So you were anticipating returning to work
18  in March of '05?
19  A.   Yes, I was.
20  Q.   Is that -- did you have to periodically
21  submit these supplemental reports for benefits to
22  Fortis?
23  A.   Yes, sir.

Page 67

1   Q.   And I guess you had to certify that you were
2   unable to work at that particular point in time,
3   correct?
4   A.   Yes, sir.
5   Q.   And I guess you continued your application
6   through March of '05, when the benefits finally
7   ended?
8   A.   Yes, sir.
9   Q.   Let me show you what I'm marking as Exhibit
10  8.
11      (Defendant's Exhibit No. 8 was
12      marked for identification and a
13      copy of the same is attached
14      hereto.)
15  Q.   Have you seen the document I've marked as
16  Defendant's Exhibit No. 8?
17  A.   Yes, sir.
18  Q.   Was this a separate disability policy being
19  applied for?
20  A.   Yes, sir.
21  Q.   Do you know who -- where did the Minnesota
22  Life come from?  Was that something you had on
23  your own?

Page 68

1   A.   I believe it was a life insurance policy
2   that came through either Army Fleet Support or the
3   union, sir.  And I remember the form.  I remember
4   dropping off the form at the doctor's office.
5   Q.   This is Dr. Manski?
6   A.   Yes, sir.
7   Q.   M-A-N-S-K-I?
8   A.   Yes, sir.
9   Q.   Now, what type of doctor is he?
10  A.   He was the neurosurgeon that performed my
11  last back surgery.
12  Q.   And who is Dr. Kosmatka?
13  A.   He was my primary care manager at Eglin Air
14  Force Base Hospital.
15  Q.   Not a neurosurgeon?
16  A.   Just a medical doctor.
17  Q.   Dr. Manski did your surgery?
18  A.   Yes, sir.
19  Q.   And this appears to have been dated, on the
20  second page, by Dr. Manski on March the 2nd of
21  2005.  Does that seem right to you?
22  A.   Yes, sir.
23  Q.   I notice up above, on the second page, under

Page 69

1   the "Progress" section, it says, "If recovered,
2   date released to return to work."  "2/24/05."
3       Do you recall Dr. Manski saying that you
4   would be released to work at that point in time?
5   A.   I don't remember.  I don't remember.
6   Q.   Right below that progress note it says, "Is
7   patient disabled and unable to perform his/her
8   regular work?"  And it says, "Yes.  No heavy
9   mechanical aircraft work."
10      Is that the way you read that?
11  A.   Yes, sir.
12  Q.   At that time, could you do your aircraft
13  mechanic job?
14  A.   On February 24, '05, I was still
15  convalescing from the surgery.
16  Q.   And so you could not do the job?
17  A.   That is correct.
18  Q.   Did you discuss this report from Dr. Manski
19  with any of the people at AFS?
20  A.   No, sir.
21  Q.   Could you do any other jobs at this point in
22  time?
23  A.   I was still recovering.  I was still

18  (Pages 66 to 69)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

Page 70

1  convalescing from the surgery, going through
2  physical therapy.
3  Q.  So you could not?
4  A.  Not at that time. I was still in recovery,
5  doing the physical therapy.
6  Q.  When did you recover enough that you could
7  perform a job, if you have?
8  A.  When my doctor released me.
9  Q.  When was that?
10  A.  In March.
11  Q.  Which doctor would that have been?
12  A.  That would be Thomas Manski, my
13  neurosurgeon.
14  Q.  Not Kosmatka?
15  A.  No. Let me clarify something with you with
16  Kosmatka. In the military, TriCare Prime, for
17  retirees, you go to him, as in Kosmatka, get a
18  referral to the neurosurgeon, and then you become
19  a patient of the neurosurgeon.
20  Q.  So like an HMO, basically?
21  A.  Correct.
22  Q.  Did you seek any reclassification with AFS
23  at this point in time?

---

Page 71

1  A.  No, sir.
2  Q.  Did you understand, at this point in time,
3  that your 26 weeks of short-term disability was
4  going to end around March the 10th, or a week or
5  so later?
6  A.  Yes, sir.
7  Q.  Did you understand that you were required to
8  reclassify before that time, if you were going to
9  reclassify a job position?
10     MR. JACOBS: Object to the form of the
11  question. Answer it if you can.
12  Q.  Did you understand that you were required to
13  reclassify to another job position, if you wished
14  to seek one, prior to March the 10th of 2005?
15  A.  Do I understand that I was supposed to
16  reclassify prior to 10 March?
17  Q.  Correct.
18  A.  No.
19  Q.  What was your understanding of what you were
20  supposed to do as of March the 10th at AFS?
21  A.  I had to bring in a doctor's slip with my
22  restrictions, ask to reclassify at that time, fill
23  out the paperwork for the reclassification, and

---

Page 72

1  then go through procedures of reclassification,
2  and then go to my next job.
3  Q.  Did you do that?
4  A.  No, that did not happen.
5  Q.  Did you bring in the doctor's note?
6  A.  Yes, I did.
7  Q.  And that was the doctor's note from Dr.
8  Manski?
9  A.  Correct.
10  Q.  And did you seek to reclassify?
11  A.  I brought in the doctor's note the first
12  time, and it was missing the return-to-work date.
13  So I had to go back down to Fort Walton Beach to
14  Dr. Manski's office and get one that had a
15  return-to-work date on it.
16  Q.  And he provided one to you?
17  A.  Yes, he did.
18  Q.  And did it have the restrictions on it?
19  A.  It most definitely did, yes, sir.
20  Q.  When did you bring in the slip the first
21  time?
22  A.  I believe it was the 7th.
23  Q.  Of March 2005?

---

Page 73

1  A.  Yes, sir.
2  Q.  And when did you bring back a note with a
3  return-to-work date?
4  A.  The 14th of March.
5  Q.  Were you unable to get it before March the
6  10th?
7  A.  I stopped by at the HR office the 11th,
8  walked in, asked them about being a day late on
9  the 10th. And they said, Don't worry about it.
10  You come in next Monday and bring in your
11  return-to-work slip with the correct date on it,
12  and you can come back to work Monday.
13  Q.  And did you return that Monday?
14  A.  Yes, sir.
15  Q.  And you think that was March the 14th?
16  A.  Yes, sir.
17  Q.  Who did you meet with on March 10th? I'm
18  sorry. March the 11th.
19  A.  An HR representative. I do not remember the
20  person's name.
21  Q.  Where did you meet with them?
22  A.  In the HR office in Daleville.
23  Q.  When you originally brought the note in that

---

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 74

1  didn't have the release, that was March the 7th,
2  you believe?
3  A.   Yes, sir.
4  Q.   And who did you meet with at that point in
5  time?
6  A.   An HR representative.
7  Q.   Also at Daleville?
8  A.   Yes, sir.
9  Q.   What happened when you came to work on the
10  14th?
11  A.   I was told that I was going to be fired.
12  Q.   And who told you that?
13  A.   One of the HR representatives.
14  Q.   Which was also in Daleville?
15  A.   Yes, sir.
16  Q.   Do you recall, was it a man or a woman?
17  A.   Both a man and a woman were there.
18  Q.   What race were they, white or black?
19  A.   I don't remember.
20  Q.   Do you remember any other details about
21  them?
22  A.   They were a man and woman -- there was two
23  women, possibly three, that were there, one man.

Page 75

1  And that was it.
2  Q.   And what is your recollection of the
3  discussions at that point in time?
4  A.   My recollection is -- what I remember is I
5  asked if I could reclassify, because I wanted to
6  go into scheduling; and I was told that I was not
7  allowed to go back in my old job as an aircraft
8  mechanic, so then I could not reclassify.
9       And I asked them, Well, why can't I go into
10  my old job for one day, right now, so I can
11  reclassify, fill out the paperwork?  And they
12  said, No.
13      I asked them for reclassification paperwork
14  and they refused to give it to me.
15  Q.   On the 7th, when you met with an HR
16  representative, was it a male or a female?
17  A.   I believe it was a female.
18  Q.   Do you remember the race of that person?
19  A.   No, I don't.
20  Q.   Or any other details of that person?
21  A.   Just a female, young woman.
22  Q.   On the 11th, did you meet with a male or a
23  female?

Page 76

1  A.   It was a woman.
2  Q.   And do you remember her race or any other
3  details?
4  A.   I don't remember her race.
5  Q.   There's no real dispute here that at the
6  time you returned on the 14th, you were unable to
7  do an aircraft mechanic job, right?
8  A.   I had restrictions placed upon me by my
9  neurosurgeon, Dr. Manski.  And it was explained to
10  me that I would not be able to perform the duties
11  of an aircraft mechanic.
12      And I agreed that, due to my physical
13  limitations placed upon me by my neurosurgeon,
14  that it would not be in my best interest to be an
15  aircraft mechanic anymore and that I would like to
16  go into the aircraft scheduling position.
17  Q.   The limitations at that time were permanent?
18  A.   Yes, sir, they were permanent.  On the
19  return-to-work slip that was dated that day that I
20  brought it in, the restrictions were permanent
21  from Dr. Manski.
22  Q.   And just so we're clear on the record, you
23  agree that based on those restrictions, you could

Page 77

1  not do an aircraft mechanic job?
2  A.   Yes, sir.
3  Q.   But you believed that you could do an
4  aircraft scheduler job?
5  A.   Yes, sir.
6  Q.   Have you seen one of these reclassification
7  forms before?
8  A.   Never saw one.
9  Q.   They are available from the HR office, I
10  believe.  You understood that?
11  A.   Yes, sir.
12  Q.   I also understand they were available out in
13  the field as well.  Were you aware of that?
14  A.   No.
15  Q.   So you have never filled out a
16  reclassification form?
17  A.   That is correct, sir.
18  Q.   I'm going to hand you what I'm going to mark
19  as Exhibit 9.
20          (Defendant's Exhibit No. 9 was
21          marked for identification and a
22          copy of the same is attached
23          hereto.)

20  (Pages 74 to 77)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 78

1  Q.  Do you recognize the document I've marked as
2  Defendant's Exhibit 9?
3  A.  Yes, sir.
4  Q.  Is this the job description for the aircraft
5  scheduler position?
6  A.  Yes, sir.
7  Q.  And where have you seen that before?
8  A.  HR office.
9  Q.  And when did you see that?
10  A.  The 11th of March.
11  Q.  Who provided that to you?
12  A.  The HR representative.
13  Q.  And did you ask for a reclassification form
14  at that point in time?
15  A.  No.
16  Q.  Why not?
17  A.  Because down here on "Education and
18  Experience:  Must demonstrate ability to
19  accurately keyboard at 30 words per minute on a
20  computer."
21  Q.  So ...
22  A.  I felt that I needed to brush up on my
23  typing skills prior to submitting the paperwork,

Page 79

1  to make sure that I was qualified 100 percent for
2  this job.
3  Q.  And that's when you say you went to JobsPlus
4  and did the typing?
5  A.  Yes, sir.  Brushed up on my typing skills at
6  JobsPlus.
7  Q.  And how did you demonstrate -- how would you
8  demonstrate -- Just strike that.
9       Is there any type of typing test there at
10  the HR office?
11  A.  I do not know.
12  Q.  How did you plan to demonstrate your typing
13  skills when you submitted a reclassification?
14  A.  I was going to bring in a piece of paper
15  from JobsPlus that said that I could type 30 words
16  a minute and show them that document and apply for
17  the aircraft scheduling job at the same time.
18  Q.  But you didn't have any type of document
19  from JobsPlus, did you?
20  A.  Not when I took a look at this on the 11th.
21  Q.  Or on the 14th?
22  A.  No.  Because I was told that I was going to
23  get terminated.

Page 80

1  Q.  Right.  But you didn't bring any document
2  with you on the 14th?
3  A.  That's correct, sir.
4  Q.  I remember you testified earlier you didn't
5  have any type of printout from JobsPlus, right?
6  A.  Right.
7  Q.  Other than that, was it your position that
8  you could meet these other requirements on the
9  aircraft scheduler position?
10  A.  Oh, yes, sir.
11  Q.  Did any of the restrictions you have prevent
12  you from doing any of these duties or
13  responsibilities on the aircraft scheduler
14  position?
15  A.  No, sir.
16  Q.  What does an aircraft scheduler do?
17  A.  An aircraft scheduler coordinates between
18  the flying side of the house and the maintenance
19  side of the house and brings those two agencies
20  together so they can make a flying schedule.
21      The flying side of the house have certain
22  training requirements that have to be met on their
23  side of the house; the maintenance says these are

Page 81

1  the aircraft we have available that can fly.  And
2  you marry them up, print out a schedule, you sign
3  it, and there you go.
4  Q.  Primarily clerical, it sounds like?
5  A.  Yes.
6  Q.  Office-type work?
7  A.  Sedentary.
8  Q.  Sedentary.  Let me hand you what I'm going
9  to mark as Defendant's Exhibit No. 10.
10         (Defendant's Exhibit No. 10 was
11          marked for identification and a
12          copy of the same is attached
13          hereto.)
14  Q.  Do you recognize that document I've marked
15  as Defendant's Exhibit No. 10?
16  A.  Yes, sir.
17  Q.  It appears to be a letter from Darlene
18  Sanders at AFS to you on February 8, 2005?
19  A.  Yes, sir.
20  Q.  Do you recall receiving that letter?
21  A.  I recall receiving this letter and giving it
22  to my wife, because she handles the finances of
23  our family.

21  (Pages 78 to 81)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 82

1   Q.   All right.  Did you read the letter?
2   A.   Yes, I did.
3   Q.   Let me hand you what I'll mark as
4   Defendant's Exhibit No. 11.
5           (Defendant's Exhibit No. 11 was
6           marked for identification and a
7           copy of the same is attached
8           hereto.)
9   Q.   Do you recognize the document I've marked as
10  Defendant's Exhibit No. 11?
11  A.   Yes, sir.
12  Q.   And is that a letter that you received?
13  A.   I don't remember receiving the letter,
14  but ...
15  Q.   The letter is familiar to you?
16  A.   Yes.  The letter is familiar, yes, sir.
17  Q.   Look on what I've marked as Defendant's
18  Exhibit No. 10.
19      Do you see that language at the very first
20  sentence: "Your status will be changed on or
21  around 03/14/05, from medical leave of absence to
22  administrative termination"?
23  A.   Yes, sir.

Page 83

1   Q.   What did you understand that to mean?
2   A.   Administrative termination means that I am
3   going to be terminated from my employment from
4   Army Fleet Support.
5   Q.   Now, the second sentence reads: "This
6   change is for administrative reasons only and will
7   not affect your rights in accordance with article
8   4.6(d) of the Collective Bargaining Agreement."
9       Do you see that?
10  A.   Yes, sir.
11  Q.   What did you understand to be your rights
12  under 4.6(d) of the Collective Bargaining
13  Agreement?
14  A.   If I'm understanding the article correctly,
15  I believe that pertains to my callback rights to
16  my job as an aircraft mechanic.
17  Q.   After being laid off, essentially recall
18  rights?
19  A.   Yes, sir, being called back.
20  Q.   Now, are you familiar with the term
21  "administrative termination"?
22  A.   Yes, sir.
23  Q.   And you understood that to mean completely

Page 84

1   terminated from employment at AFS?
2   A.   I was not clocking in at the clock, so I
3   considered that not working.
4   Q.   Now, you were already not clocking in, from
5   September through March, right?
6   A.   That's correct.
7   Q.   But you still considered yourself employed
8   there?
9   A.   Yes.
10  Q.   So, at this time, you understood that you
11  needed to do something prior to --
12          MR. JACOBS:  Object to the form of the
13  question.
14          MR. STARLING:  Strike that then.
15  Q.   Did you understand that you had to take some
16  steps prior to March the 14th of 2005?
17  A.   What steps are we talking about?
18  Q.   What did you understand you needed to do
19  before March the 14th of 2005?
20  A.   Show back up to work with my return-to-work
21  slip from my doctor, report in, sign in, fill out
22  the paperwork to reclassify from aircraft mechanic
23  to aircraft scheduler.

Page 85

1   Q.   You mentioned earlier that you asked if you
2   could be reinstated for one day as an aircraft
3   mechanic?
4   A.   Yes, sir.  That was what I was told that I
5   needed to do, by the HR personnel; yet the HR
6   personnel would not let me do that.
7   Q.   But you understood that your restrictions
8   precluded you from being qualified for that
9   aircraft mechanic position though?
10  A.   Right.
11  Q.   But nevertheless you asked to be reinstated
12  to that position for one day?
13  A.   Because that's what they said I needed to do
14  to be able to reclassify.
15  Q.   Did you do anything in response to this
16  letter marked as Defendant's Exhibit No. 10?
17  A.   Yes, sir.  I gave it to my wife so she could
18  pay the bill.
19  Q.   Take any other action in response to that?
20  A.   Other than that?  Yes, I needed to get my
21  return-to-work slip from my Dr. Manski.
22  Q.   I'm going to hand you what I'm going to mark
23  as Defendant's Exhibit No. 12.

22  (Pages 82 to 85)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 86

1    (Defendant's Exhibit No. 12 was
2    marked for identification and a
3    copy of the same is attached
4    hereto.)
5  Q.  Do you recognize the document I've marked as
6  Defendant's Exhibit 12?
7  A.  Yes, sir.
8  Q.  And was that a note from Dr. Kosmatka?
9  A.  Yes, sir.
10 Q.  And did you discuss with Dr. Kosmatka that
11 you probably needed to be in a position other than
12 aircraft mechanic?
13 A.  Yes, sir.
14 Q.  And is that what you understood his
15 recommendation to the company was, that you move
16 into something other than aircraft mechanic?
17 A.  Yes, sir.
18 Q.  Prior to going to AFS in March of 2005, did
19 you have any discussion with anyone there about
20 moving to another position?
21 A.  Back in December?
22 Q.  Correct.
23 A.  With anybody from the HR office?

Page 87

1  Q.  Correct.
2  A.  Back in December?  I don't remember.
3  Q.  Did you have any discussions with anyone
4  other than your doctors about performing a
5  different job back at AFS?
6  A.  My wife.
7  Q.  Other than your wife?
8  A.  No.
9  Q.  Okay.  Did you agree with Dr. Kosmatka that
10 you needed to seek a position other than aircraft
11 mechanic?
12 A.  Yes, sir.
13 Q.  At this time, did you consider any other
14 position for which you might be qualified?
15 A.  I don't remember.
16 Q.  Let me show you what I'm going to mark as
17 Defendant's Exhibit 13.
18     (Defendant's Exhibit No. 13 was
19     marked for identification and a
20     copy of the same is attached
21     hereto.)
22 Q.  Before we get there, can I go back to this
23 document that is marked Defendant's Exhibit 12?

Page 88

1  Did you give a copy of that to anyone at AFS?
2  A.  Yes, sir.
3  Q.  Who did you give that to?
4  A.  One of the HR representatives.
5  Q.  Do you recall when you did it?  Was it
6  around the time of December 17th?
7  A.  No, I don't remember.
8  Q.  Do you recognize the document marked as
9  Defendant's Exhibit 13?
10 A.  Yes, sir.
11 Q.  And is this a letter from Dr. Manski to whom
12 it may concern?
13 A.  Yes, sir.
14 Q.  Is that something you asked Dr. Manski to
15 draft?
16 A.  Yes, sir.
17 Q.  Did you provide this letter, Defendant's
18 Exhibit 13, to anyone at AFS?
19 A.  Yes, sir.
20 Q.  Who did you provide that to?
21 A.  One of the representatives at HR.
22 Q.  Do you recall when you provided it to them?
23 A.  No, I don't.

Page 89

1  Q.  Were you about to say something else?
2  A.  No.
3  Q.  You didn't take this in January though to
4  AFS, did you?
5  A.  I don't remember.
6  Q.  Did you -- was -- Strike that.
7     Was March the first time you went to
8  Daleville to meet with the HR people?
9  A.  Yes, I believe so.
10 Q.  So can I assume that you wouldn't have
11 delivered it to anybody at AFS prior to that time?
12 A.  I don't think so.  I don't know.
13 Q.  You don't recall sending either Defendant's
14 Exhibit 12 or 13 by mail to anyone at AFS, do you?
15 A.  I don't remember.
16 Q.  You mentioned earlier that you did provide
17 it to someone in HR at AFS.  Was that by hand?
18 A.  I believe I mailed it.  I may have mailed
19 it.
20 Q.  You may have mailed it?
21 A.  I mailed it.
22 Q.  You mailed it?
23 A.  I'm pretty sure I did.

23  (Pages 86 to 89)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 90

1  Q.   You don't recall when though?
2  A.   No, I don't recall.
3  Q.   The second page of Defendant's Exhibit 13,
4  Dr. Manski says: "I would recommend Mr. Houston
5  not return to doing heavy mechanical aircraft work
6  as he has had two disc herniations at L4-5
7  requiring surgery and he would be at increased
8  risk for recurrent disc herniations if he were to
9  perform strenuous, heavy physical activities that
10 might strain or injure his lower back."
11     That's your recollection of what you had
12 discussed with Dr. Manski?
13 A.   Yes, sir.
14 Q.   And were you in agreement with that?
15 A.   Yes, sir.
16 Q.   You agreed also that you should be retrained
17 for a position that would be more sedentary?
18 A.   Yes, sir.
19 Q.   Let me hand you what I'm going to mark as
20 Defendant's Exhibit 14.
21          (Defendant's Exhibit No. 14 was
22          marked for identification and a
23          copy of the same is attached

Page 91

1          hereto.)
2  Q.   Do you recognize the document marked as
3  Defendant's Exhibit 14?
4  A.   Yes, sir.
5  Q.   Is that a doctor's note from Dr. Manski that
6  you received?
7  A.   Yes, sir.
8  Q.   Is this the one that you provided to AFS on
9  March the 14th?
10 A.   Yes, sir.
11 Q.   And is this your understanding of some of
12 your restrictions -- no lifting more than 25
13 pounds, no climbing, no standing more than one and
14 a half hours, no prolonged sitting more than one
15 and a half hours, no bending at the waist to lift,
16 pull, twist, or push to prevent reinjury to lower
17 back?  Is that what you understood your
18 restrictions to be?
19 A.   Yes, sir.
20 Q.   And it says, "These restrictions are
21 permanent."  Did you understand that as well?
22 A.   Yes, sir.
23 Q.   Now, you submitted a prior note, you're

Page 92

1  saying, that did not have a return-to-work date?
2  A.   Yes, sir.
3  Q.   But not this one that's been marked as
4  Defendant's Exhibit 14?
5  A.   That's correct, sir.
6  Q.   What other -- what problems did you have,
7  other than what's listed in the restrictions?  You
8  couldn't do heavy mechanical work, right?
9  A.   Yes, sir.
10 Q.   You could still walk?
11 A.   Yes, sir.
12 Q.   And breathe?
13 A.   Yes, sir.
14 Q.   Eat?
15 A.   Yes, sir.
16 Q.   See?
17 A.   Yes, sir.
18 Q.   Hear?
19 A.   Yes, sir.
20 Q.   Speak?
21 A.   Yes, sir.
22 Q.   So you could take care of yourself, in terms
23 of bathing and getting dressed, those types of

Page 93

1  things?
2  A.   Yes, sir.
3  Q.   Did you have any mental problems at that
4  point in time?
5  A.   No, sir.
6  Q.   At this point in time, you believed you
7  could work as a scheduler?
8  A.   Yes, sir.
9  Q.   Were there other jobs that you believe you
10 could physically do at that point in time, other
11 than a scheduler job?
12 A.   Other than sedentary-type work?
13     MR. STARLING:  Strike that.  Let me
14 start over.
15 Q.   You believe you could do any sedentary-type
16 work for which you are qualified to do?
17 A.   Yes, sir.
18 Q.   You just couldn't do things that were
19 prohibited by these restrictions?
20 A.   Correct.
21 Q.   And by "restrictions," I mean what's been
22 outlined on Defendant's Exhibit 14.
23 A.   Yes, sir.

24  (Pages 90 to 93)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 94

1  Q.  Those were really your only limitations at
2  that point in time?
3  A.  Yes, sir.
4  Q.  Were there any other jobs at AFS that you
5  think you were qualified to do, including
6  experience -- not just physically, but experience
7  in other things -- other than the scheduler
8  position?
9  A.  That were sedentary-type jobs?
10  Q.  Correct.
11  A.  Yeah, I could do that.  If it was a
12  sedentary-type job and I had the work skills and
13  the knowledge, yes, I could perform the required
14  job.
15  Q.  Are there any specific names of job
16  classifications you can identify, other than
17  scheduler?
18  A.  I don't remember any.
19  Q.  I'm assuming there's -- strike that.
20      Based on these restrictions, there's no
21  way -- is there any way you could have done the
22  aircraft mechanic job?
23  A.  Based upon these restrictions being an

Page 95

1  aircraft mechanic?
2  Q.  Right.
3  A.  At my former workplace?  No.  You need to be
4  physically able to perform all the tasks that are
5  restricted here.
6  Q.  You said, at your former workplace.  Is
7  there somewhere else you could have done it?
8  A.  Well, my former workplace being Cairns
9  Field-ATTC.  That's where I was employed at.
10  Q.  Which is at AFS?
11  A.  Yes, sir.  I'm sorry for confusing you.
12  Q.  What's ATTC?
13  A.  Army -- I can't remember the acronym.  It
14  stands for testing.
15  Q.  That's a department of AFS?
16  A.  Correct.
17  Q.  And you listed Cairns Field?
18  A.  Yes, sir.  That's the field that I was
19  assigned to.
20  Q.  So were there other aircraft mechanic jobs
21  you believe you could have done at other fields?
22  A.  Not with these restrictions.
23  Q.  What other fields are there, by the way?

Page 96

1  A.  There's Hanchey, there's Lowe, Cairns.
2  Q.  These are all airfields at Fort Rucker,
3  right?
4  A.  Yes, sir.  I don't remember the rest of the
5  airfields or the rest of the names of the
6  airfields.
7  Q.  Let me hand you what has been marked
8  Defendant's Exhibit 15.
9      (Defendant's Exhibit No. 15 was
10      marked for identification and a
11      copy of the same is attached
12      hereto.)
13  Q.  Do you recognize the document marked as
14  Defendant's Exhibit 15?
15  A.  Yes, sir, I do.
16  Q.  This appears to be a return-to-work slip.
17  Did you complete this?
18  A.  No, I did not.
19  Q.  Where do you recognize this from?
20  A.  When I returned on the 14th, they filled it
21  out at the HR office.
22  Q.  You don't recall who was the one who filled
23  it out?

Page 97

1  A.  No.
2  Q.  Now, you had been on Family Medical Leave
3  Act leave for some time right?  FMLA?
4  A.  I'm not familiar with the details of that,
5  sir.
6  Q.  These names written in hand over here on the
7  right, Don Donley, D-O-N-L-E-Y, who is he?
8  A.  He was the field manager, the overall field
9  manager for Cairns Airfield.
10  Q.  What about Bill Parsons?
11  A.  Excuse me.  I'll correct that.  He is the
12  field manager for the director of ATTC on Cairns.
13  Q.  Does that mean that he was somewhere up in
14  the chain of command directly from you?
15  A.  Yes.  I worked for him at ATTC.
16  Q.  With some levels of supervision in between?
17  A.  Yes, sir.
18  Q.  Who was Bill Parsons?
19  A.  Bill Parsons would be the field manager at
20  Lowe Airfield on Fort Rucker.
21  Q.  Larry Larkin?
22  A.  He would be the field manager for Cairns
23  Airfield.

25  (Pages 94 to 97)

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 98

1  Q.  And Bob Chipman?
2  A.  At Knox Airfield.
3  Q.  Field manager there as well?
4  A.  Yes, sir.
5  Q.  So these four were the top four people at
6  these four locations?
7  A.  Yes, sir.  These are just four locations of
8  the many airfields at Fort Rucker.  There are
9  other.
10  Q.  Now, when you met on the 14th, do you recall
11  or were you involved in any phone conversations
12  with any of these four people?
13  A.  I heard just the conversation with Mr.
14  Donley.
15  Q.  And tell me about that conversation.
16  A.  The female lady at the HR called up Mr.
17  Donley and explained over the phone about my
18  return-to-work slip and the restrictions I have.
19  Q.  You're referring to Defendant's Exhibit 14?
20  A.  Yes, I am.  And he stopped her short, before
21  she could explain the rest of the details, and
22  said that he couldn't use me.  So she turned
23  around and said, "He says he can't use you."

Page 99

1  Q.  Did you understand that to mean that he
2  didn't think you could perform the aircraft
3  mechanic functions with those restrictions?
4  A.  Yes, sir.
5      MR. JACOBS:  Are y'all about ready for
6  a break?
7      MR. STARLING:  Yeah.
8      (A lunch recess was taken.)
9  (BY MR. STARLING)
10  Q.  Mr. Houston, we're back on the record after
11  lunch.
12    I want to go back to some of your testimony
13  earlier about the March 14th meeting at AFS.
14  A.  Uh-huh, yes.
15  Q.  Was that the last time you went back and
16  talked to anyone at AFS?
17  A.  Yes.
18  Q.  Did you have any other conversation with
19  anybody from AFS after that, regarding your
20  employment?
21  A.  Yes, I did.
22  Q.  Tell me about those conversations.
23  A.  I went and saw Mr. -- I'm trying to think of

Page 100

1  his name.  I can see his face.
2  Q.  What type of position was he in?  Was it
3  someone at HR?
4  A.  It was an HR person.  Robert --
5  Q.  Whitney?
6  A.  Whitney, yes.  The reason I spoke to Mr.
7  Whitney was because the VA had sent a letter about
8  my employment status, and he answered the letter.
9  And the reply that the VA sent me was that I was
10  still employed with Army Fleet Support.
11    Well, I went and took this letter, stating
12  that I was still employed with Army Fleet Support,
13  up to Mr. Whitney.  And I explained to him, and I
14  said, "This is wrong.  I am not still employed,
15  and I would like you to straighten out this
16  problem with the VA because I'm looking to settle
17  this claim with them."
18    So I contacted the VA again, and they sent
19  another letter.  And he discussed or wrote down
20  his answer that was telling them that I was not
21  employed by Army Fleet Support.
22  Q.  He sent a letter to the VA?
23  A.  Uh-huh.

Page 101

1  Q.  Correct?
2  A.  The correct letter correcting my employment
3  status with Army Fleet Support.
4  Q.  When was this that you had the conversation
5  with Mr. Whitney?
6  A.  I don't remember, sir.
7  Q.  Okay.  Months after March the 14th?
8  A.  Yes, months.
9  Q.  March the 14th was the last time you went to
10  the HR office?
11  A.  Well, up until that one moment when I had to
12  go back with the letters showing Mr. Whitney the
13  problem.
14  Q.  At the March 14th meeting, you testified
15  earlier, I believe, that you were refused a copy
16  of the reclassification form?
17  A.  That's correct, sir.
18  Q.  And who is it that you said refused to give
19  it to you?
20  A.  One of the HR representatives.  One of the
21  ladies there.
22  Q.  And then what is it you're saying that you
23  were told about your employment status at that

26 (Pages 98 to 101)

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 102

1  point in time?
2  A.  I was administratively terminated at the HR,
3  and then went over to my work center to
4  outprocess, and then I was told that I was
5  involuntarily terminated and I was taking
6  involuntary termination paperwork.
7  Q.  And did you complete the paperwork at that
8  point in time?
9  A.  Uh-huh. I had to outprocess my workplace at
10  ATTC.
11  Q.  Just because it wasn't on the record, was
12  that a yes that you did complete some paperwork?
13  A.  What I did was an outprocessing checklist to
14  fill out; and I filled out the checklist and
15  brought it back to HR.
16  Q.  Did you complete any other paperwork at that
17  point in time?
18  A.  No.
19  Q.  You testified earlier about being fired, I
20  believe. Did anyone use the word "fire" in any
21  conversations with you?
22  A.  When I was handed my involuntary termination
23  paperwork at my work center, I read the

Page 103

1  description of -- you know, the purpose behind
2  this paperwork out loud, and I said, "I'm being
3  involuntarily terminated. That means I'm fired."
4  And she goes, "No, you have recall rights." And I
5  said, "Oh." And that was it.
6  Q.  Let me hand you what is marked as
7  Defendant's Exhibit 16.
8      (Defendant's Exhibit No. 16 was
9       marked for identification and a
10      copy of the same is attached
11      hereto.)
12  Q.  Do you recognize the document marked as
13  Defendant's Exhibit 16?
14  A.  Yes, I do.
15  Q.  Is this a letter that you received?
16  A.  Yes.
17  Q.  In this letter, Ms. Whelan, it appears,
18  explained your administrative termination status?
19  A.  Yes.
20  Q.  Do you understand that you have not been
21  fired from AFS as of today?
22  A.  Yes.
23  Q.  In fact, you could probably reapply for an

Page 104

1  aircraft mechanic position today, if you were
2  physically capable of doing that?
3  A.  Yes.
4  Q.  And just to be clear for the record, to date
5  you have not reapplied for a position with AFS,
6  correct?
7  A.  I have not; that's correct.
8  Q.  Did you ever talk with a union
9  representative about your employment status?
10  A.  Could you rephrase the question?
11  Q.  Around the time that you were going through
12  this process in March of 2005, did you ever talk
13  with a union representative about your job status
14  with AFS?
15  A.  Yes.
16  Q.  Who did you speak with?
17  A.  Mr. Blevins.
18  Q.  When did you talk with him?
19  A.  The 15th, I believe.
20  Q.  That was the day after the March 14th
21  meeting?
22  A.  Uh-huh.
23  Q.  Yes?

Page 105

1  A.  Yes.
2  Q.  And what did you discuss with Mr. Blevins?
3  A.  Mr. Blevins -- I said that I had been
4  involuntarily terminated with AFS. And at that
5  time, there was a contract negotiation going on.
6  And Mr. Blevins and a few of his coworkers were in
7  the office. And it was first thing in the
8  morning. And they looked like they had spent the
9  whole night being up during the negotiations.
10      And I asked them, I said, Well, what do you
11  guys want to do about this?" And they said,
12  "Well, do you want to file a grievance?" And I
13  said, "Not right now. I'll get back with you."
14      Because they didn't look like they were very
15  interested in talking to me. They had spent the
16  whole night being up. They were drinking coffee
17  and running on coffee and whatever. They looked
18  pretty ragged.
19  Q.  Did you ever request that they file a
20  grievance?
21  A.  No.
22  Q.  Did you speak with a union rep ever again
23  after that?

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 106

1  A.  Yes, I did.
2  Q.  When was that?
3  A.  I spoke to Mr. Blevins again, and I was told
4  by him that I was outside of the contract.  And
5  then he referred me to Mr. Wilmer Tharpe for legal
6  advice.
7  Q.  What was outside the contract?
8  A.  I was outside the contract.
9  Q.  Did he explain why?
10  A.  No.  He didn't say anything.  He just said I
11  was outside the contract, and he referred me to
12  Mr. Wilmer Tharpe.
13  Q.  And did you go see Mr. Tharpe?
14  A.  Yes, I did.
15  Q.  Mr. Tharpe, was ... (unintelligible) the
16  union representative?
17  A.  He was the -- well, he still is the lawyer
18  for the union.
19  Q.  And I don't want to know about your
20  discussions with Mr. Tharpe in particular.
21     Did you retain Mr. Tharpe as your attorney
22  at that time?
23  A.  I retained him, yes.

Page 107

1  Q.  And did Mr. Tharpe file any claims on your
2  behalf?
3  A.  No.
4  Q.  Other than that conversation you just
5  mentioned with Mr. Blevins -- you've mentioned two
6  -- did you have any other conversations with the
7  union after that?
8  A.  No.
9  Q.  Did you have any conversations with any
10  union representatives, prior to March the 15th,
11  about your status?
12  A.  No.
13  Q.  Did you ever ask the union for a job
14  reclassification form?
15  A.  No.
16  Q.  Are you familiar with the Collective
17  Bargaining Agreement that was in place at this
18  point in time?
19  A.  Yes.
20  Q.  Let me hand you what I'm going to mark as
21  Defendant's Exhibit 17.
22     (Defendant's Exhibit No. 17 was
23     marked for identification and a

Page 108

1     copy of the same is attached
2     hereto.)
3  Q.  Does that appear to be a true and correct
4  copy of the Collective Bargaining Agreement
5  between DynCorp and the union?  Excuse me.  Strike
6  that.
7     Between AFS and the union?
8  A.  It does say, "DynCorp Fort Rucker" here.
9  Q.  It appears to be missing the cover page.
10  The agreement starts on page 1.  We'll come back
11  to that in just a minute.
12     MR. JACOBS:  I'm going to object to you
13  asking him anything about that.  That antedates
14  the date of his termination.
15     MR. STARLING:  Right.  The one that is
16  marked Defendant's Exhibit 17 is the Collective
17  Bargaining Agreement that was in effect at the
18  time of this matter.
19  Q.  Does that appear to you to be a true and
20  correct copy of the Collective Bargaining
21  Agreement?
22  A.  Yes, sir.
23  Q.  Do you understand, or did you understand

Page 109

1  that to reclassify, you had to be active in your
2  existing job classification?
3  A.  Could you rephrase the question, please?
4  Q.  Did you understand that, under the
5  Collective Bargaining Agreement, to reclassify to
6  another job position, you had to be actively
7  employed in your current job position?
8  A.  Yes.  That's what I was told by the HR
9  representatives.
10  Q.  Let me hand you what has been marked as
11  Defendant's Exhibit 18.
12     (Defendant's Exhibit No. 18 was
13     marked for identification and a
14     copy of the same is attached
15     hereto.)
16  Q.  Do you recognize the document marked as
17  Defendant's Exhibit 18?
18  A.  Yes, sir.
19  Q.  Is that your signature in the middle of the
20  first page?
21  A.  Yes, sir.
22  Q.  Is this an FMLA application that you
23  completed?

28 (Pages 106 to 109)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

Page 110

1  A.  Yes, sir.
2  Q.  Is that your handwriting on the top half of
3  the first page?
4  A.  Yes, sir.
5  Q.  And it appears that the second, third, and
6  fourth pages were completed by Dr. Kosmatka. Do
7  you see that?
8  A.  Yes, sir.
9  Q.  Did you request that he complete that
10 certification of healthcare provider?
11 A.  Yes, sir.
12 Q.  And it appears that you applied for FMLA
13 leave on September the 10th of 2004. Do you see
14 that?
15 A.  Yes, sir.
16 Q.  And do you recall being granted FMLA leave?
17 A.  I don't remember.
18 Q.  Do you recall receiving a copy of this
19 document marked Defendant's Exhibit 18?
20 A.  Receiving a copy of this, sir?
21 Q.  Correct.
22 A.  I remember filling out this top part of the
23 form and bringing it to the doctor; but as for

---

Page 111

1  receiving a copy of it, no, I don't remember
2  receiving a copy of it.
3  Q.  Do you know, do you understand, that under
4  the Family Medical Leave Act, you're entitled to
5  12 weeks of unpaid leave?
6  A.  Yes, sir.
7  Q.  And did you understand that you received
8  those 12 weeks of FMLA, starting on September
9  10th?
10 A.  I don't remember, sir.
11 Q.  Prior to September of 2005, had you taken
12 any other leaves of absence from AFS?
13 A.  September 2005?
14 Q.  I'm sorry.  2004.  Prior to going out on
15 your short-term disability and FMLA in 2004, had
16 you taken any other leaves of absence from AFS?
17 A.  Yes, sir, I believe so.
18 Q.  What type were they?
19 A.  I pulled my rotator cuff, had surgery and
20 had to fix it.
21 Q.  Was that an on-the-job injury?
22 A.  Uhm -- hmm.
23 Q.  Do you recall what type of leave you

---

Page 112

1  received?
2  A.  Short-term disability.
3  Q.  Do you recall how long you were out on
4  short-term disability at that time?
5  A.  No, sir.
6  Q.  Was it the full six months?
7  A.  I don't remember.
8  Q.  Were you reinstated to your aircraft
9  mechanic job after that?
10 A.  Yes, sir.
11 Q.  The Collective Bargaining Agreement we
12 referenced earlier, do you understand that
13 governed your employment at AFS?
14 A.  Yes.
15 Q.  Let me show you what I'm going to mark as
16 Defendant's Exhibit 19.
17        (Defendant's Exhibit No. 19 was
18        marked for identification and a
19        copy of the same is attached
20        hereto.)
21 Q.  Do you recognize that document marked as
22 Defendant's Exhibit 19?
23 A.  Yes, sir.

---

Page 113

1  Q.  And is that an e-mail that you sent to Bob
2  Whitney?
3  A.  Yes, sir.
4  Q.  Is that still your e-mail address,
5  REDACTED
6  A.  Yes, sir.
7  Q.  Okay. And earlier you discussed
8  conversation you had with Bob Whitney about
9  application for VA benefits, correct?
10 A.  Yes, sir.
11 Q.  And is this e-mail addressing that
12 discussion you had?
13 A.  Wait a minute. Let me read it.
14        (The witness examines the
15        document.)
16 A.  Yes.
17 Q.  And you testified earlier that Mr. Whitney
18 subsequently submitted a letter. And I take it,
19 from that, that you were able to qualify for VA
20 benefits after that?
21 A.  Yes, sir.
22 Q.  Let me hand you what I'm marking as
23 Defendant's Exhibit 20.

29  (Pages 110 to 113)

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 114

1    (Defendant's Exhibit No. 20 was
2    marked for identification and a
3    copy of the same is attached
4    hereto.)
5  Q.  Do you recognize that document?
6  A.  Yes, sir.
7  Q.  Is Exhibit 20 a fax that you sent to AFS?
8  A.  Yes, sir.
9  Q.  And what was the purpose of this fax?
10 A.  To update my daughter on the dental plan.
11 Q.  Okay.  And did they update your daughter on
12 the dental plan?
13 A.  Yes, sir.
14 Q.  Okay.  You continued to receive benefits
15 from AFS even after March 14th, correct?
16 A.  Yes, sir.
17    (Defendant's Exhibit No. 21 was
18    marked for identification and a
19    copy of the same is attached
20    hereto.)
21 Q.  Let me show you what I've marked as
22 Defendant's Exhibit 21.
23    Do you recognize the document I've marked as

Page 115

1  Defendant's Exhibit 21?
2  A.  Yes, sir.
3  Q.  Is that your signature on the bottom left?
4  A.  Yes, sir.
5  Q.  And is Brigitte M. Houston your wife?
6  A.  Yes, sir.
7  Q.  And is this a form for all the insurance and
8  other benefits you were continuing to receive at
9  AFS?
10 A.  That I was paying for, yes, sir.
11 Q.  And it looks like it's dated March the 15th
12 of '05.
13    When you said you went and completed a form
14 on March the 15th, is this the form you completed?
15 A.  That was one of the forms.  There was an
16 outprocessing form and this
17 paying-for-the-benefits form.
18 Q.  So there's some type of outprocessing form
19 that you also completed?
20 A.  Yes, sir.
21 Q.  I'm handing you what I'll mark as
22 Defendant's Exhibit 22.
23    (Defendant's Exhibit No. 22 was

Page 116

1    marked for identification and a
2    copy of the same is attached
3    hereto.)
4  Q.  Do you recognize the document marked as
5  Defendant's Exhibit 22?
6  A.  Yes, sir.
7  Q.  And what is that?
8  A.  Verification of my daughter's enrollment in
9  school full time.
10 Q.  Did AFS have some type of tuition
11 reimbursement plan or something of that nature?
12 A.  Not that I know of.  I don't know.
13 Q.  Or was this for benefits purposes?
14 A.  This was for benefits purposes, for a dental
15 plan.
16 Q.  And it looks like --
17    (Defendant's Exhibit No. 23 was
18    marked for identification and a
19    copy of the same is attached
20    hereto.)
21 Q.  I'm handing you Defendant's Exhibit 23.
22 That appears to be the same issue, which is your
23 daughter being registered a full-time student for

Page 117

1  purposes of getting benefits for her?
2  A.  Yes, sir.
3  Q.  And is that a true and correct copy of what
4  appears to be a letter from Okaloosa-Walton
5  Community College?
6  A.  Yes, sir.
7  Q.  Now, after you were no longer actively
8  working at AFS in March of 2005, did you apply for
9  unemployment compensation?
10 A.  Yes, sir.
11 Q.  And as I understand it, initially the
12 unemployment agency ruled favorably to you, and
13 then it was appealed; is that correct?
14 A.  That's correct.
15 Q.  And ultimately you were denied unemployment?
16 A.  Yes, sir.
17 Q.  Do you understand the reason that you were
18 denied unemployment?
19 A.  The reason?  Could you rephrase the
20 question, please?
21 Q.  What was the reason provided by the State of
22 Alabama as to why you were ultimately denied
23 unemployment compensation?

30  (Pages 114 to 117)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 118

1  A.   I do not remember.
2       (Defendant's Exhibit No. 24 was
3       marked for identification and a
4       copy of the same is attached
5       hereto.)
6  Q.   What I'm handing you is marked as
7  Defendant's Exhibit No. 24.
8       Do you recognize that document?
9  A.   Yes, sir, I do.
10 Q.   Is that the Decision of the Board of Appeals
11 for the Department of Industrial Relations on your
12 unemployment claim?
13 A.   Yes, sir.
14 Q.   Do you see on the second page where it says,
15 under "Decision," second sentence, "The claimant
16 has failed to comply with the terms of the Labor
17 Agreement. He is disqualified under the
18 provisions of Section 25-4-77(a)(3) of the Law
19 effective March 13, 2005."
20 A.   Yes, sir.
21 Q.   Now, you attended an unemployment
22 compensation hearing as part of that unemployment
23 process, correct?

Page 119

1  A.   Do you mean the hearing? Yes, sir.
2  Q.   It was a hearing where you were sworn under
3  oath and you gave testimony, as well as others?
4  A.   Yes, sir.
5  Q.   And did you testify truthfully at that
6  hearing?
7  A.   Yes, sir.
8       (Defendant's Exhibit No. 25 was
9       marked for identification and a
10      copy of the same is attached
11      hereto.)
12 Q.   Let me hand you what I've marked as
13 Defendant's Exhibit 25. I will advise you that
14 that is a copy of the transcript from the
15 unemployment hearing that we received from the
16 State of Alabama.
17      Have you seen that document before?
18 A.   Yes, sir.
19 Q.   Okay. Does that appear to be a true and
20 correct copy of the transcript from the
21 unemployment hearing?
22 A.   It appears to be, yes, sir.
23 Q.   Look at page 9, if you would, Mr. Houston.

Page 120

1  A.   Yes.
2  Q.   About halfway down, next to your name, it
3  says, "I was there on the morning and I asked very
4  politely to the HR representative if I could go
5  into my old career field for one day so I may be
6  allowed to reclassify, but they would not allow me
7  to go into my old career field due to my physical
8  limitations."
9       Is that a true statement as to your
10 recollection of what happened?
11 A.   Yes. But you failed to read the last
12 sentence.
13 Q.   "They refused to accommodate those
14 limitations"?
15 A.   That is correct.
16 Q.   So is that a true recollection of what
17 happened that day?
18 A.   Yes, sir.
19 Q.   And is that referencing your meeting on
20 March the 14th of 2005?
21 A.   Yes, sir.
22 Q.   Did you ever receive any training from AFS
23 on discrimination or harassment policies?

Page 121

1  A.   Are you talking about, like, equal
2  treatment?
3  Q.   Equal employment.
4  A.   Equal employment?
5  Q.   Yes.
6  A.   Yes, sir, I believe there was. In the
7  introduction week, we had it at Knox Field.
8  Q.   Do you recall the nature of that type of
9  training?
10 A.   The nature?
11 Q.   What the training was about.
12 A.   What the training was about? At Knox Field,
13 it was just an introduction training session into
14 what to expect working for DynCorp.
15 Q.   Did you receive any additional training when
16 AFS took over the contract?
17 A.   Not that I remember.
18 Q.   Did you receive a copy of the Collective
19 Bargaining Agreement when you first came on with
20 DynCorp?
21 A.   Yes.
22 Q.   And was the same agreement utilized after
23 AFS took over the contract?

31  (Pages 118 to 121)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 122

1   A.   There was negotiations for redoing the
2 contract, if that's what you're talking about,
3 with the CBA. Yes, there was a different CBA.
4   Q.   Did you receive whatever additional --
5   A.   Yes.
6   Q.   You did?
7   A.   Yes.
8   Q.   When did you decide to sue AFS in this case
9 that we are here for today?
10   A.   Sometime after April.
11   Q.   April of 2005?
12   A.   Yes.
13   Q.   Why after April of 2005?
14   A.   I believed that I was discriminated against.
15   Q.   In what way do you believe you were
16 discriminated against?
17   A.   Under the guidelines of the Americans with
18 Disabilities Act.
19   Q.   And what are the guidelines that you are
20 referring to?
21   A.   The employer has to make a reasonable
22 accommodation to the employee who has a
23 disability.

Page 123

1   Q.   You mean you considered yourself disabled?
2   A.   Yes.
3   Q.   What accommodation did you believe that AFS
4 owed you?
5   A.   Could you rephrase the question, please?
6   Q.   You testified that you filed suit because
7 you believe that AFS was obligated to make
8 reasonable accommodations to you, correct?
9   A.   That is correct.
10   Q.   And my question is: What accommodations do
11 you believe AFS was obligated to provide to you?
12   A.   Reasonable accommodations to fit my
13 disabilities.
14   Q.   And can you tell me what those reasonable
15 accommodations are, or what those reasonable
16 accommodations should have been as of March of
17 2005?
18       MR. JACOBS: I'm going to object to the
19 form of that, of what they should have been.
20       MR. STARLING: Well, he's alleged them.
21   Q.   Okay. What are the reasonable
22 accommodations you believe that AFS was obligated
23 to provide you but did not?

Page 124

1       MR. JACOBS: I'll object again. Answer
2 if you can. But I just object to the question.
3 It's their obligation to accommodate; it's not his
4 to decide what they are.
5   A.   I'm still trying to figure out the question
6 again. Could you say it again?
7   Q.   You have testified that you filed this
8 lawsuit because you believe that AFS did not make
9 reasonable accommodations to you, under the
10 Americans With Disabilities Act, correct?
11   A.   That is correct.
12   Q.   My question was: When you say they did not
13 make reasonable accommodations, what reasonable
14 accommodations are you referring to?
15   A.   To accommodate my permanent restrictions
16 that Dr. Manski levied upon me in my
17 return-to-work slip.
18   Q.   What are you alleging they should have done?
19   A.   Provided me a chance to have a
20 sedentary-type job where I could have used my work
21 skills and my work experience for the company.
22   Q.   You're not aware of any position, other than
23 the aircraft scheduler position, that you believe

Page 125

1 you are qualified to perform, are you?
2   A.   There was no other -- to my knowledge, there
3 was no other jobs that I knew that I was able that
4 I could do at the time.
5   Q.   And how do you believe that they should have
6 accommodated you to allow you to perform the
7 aircraft scheduler position?
8   A.   Can you say that again, please?
9   Q.   Let's try it this way: What do you think
10 they didn't do that they should have done?
11   A.   I don't believe they should have terminated
12 my employment.
13   Q.   And by that you mean you believe you were
14 terminated on March the 14th, 2005?
15   A.   Yes, sir.
16   Q.   Any other accommodation you believe that
17 they should have made for you?
18   A.   A reasonable accommodation to find me a job
19 I was -- I had the ability and qualifications to
20 do.
21   Q.   Now, you don't think they could have or
22 should have violated the Collective Bargaining
23 Agreement to do that, do you?

32 (Pages 122 to 125)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 126

1  A.  Could you please explain what you mean by
2  having they violate the Collective Bargaining
3  Agreement? I'm not following what you mean.
4      Are you saying that they are supposed to
5  violate the CBA to accommodate me? Is that what
6  you're saying?
7  Q.  Right. Is that what you are suggesting?
8  A.  Well, how would they be violating the CBA if
9  they were complying with the federal law.
10  Q.  You agree the Collective Bargaining
11  Agreement is the agreement that governs the terms
12  and conditions for employees at AFS that are
13  covered by that bargaining agreement, right?
14  A.  Yes.
15  Q.  And there are provisions in that Collective
16  Bargaining Agreement addressing job
17  reclassification, seniority bidding rights, et
18  cetera, correct?
19  A.  This is correct.
20  Q.  And those terms in that Collective
21  Bargaining Agreement govern how AFS must address
22  employees who seek to reclassify, bid, et cetera,
23  right?

Page 127

1  A.  This is true.
2  Q.  So is your claim that AFS simply should have
3  put you in another position, namely an aircraft
4  scheduler, upon your request?
5  A.  Upon my -- upon me filling out a
6  reclassification form and getting it approved and
7  going through the channels that were the
8  procedures, yes.
9  Q.  And being qualified for that position?
10  A.  And being qualified for that position, or
11  any other position that I was qualified to do.
12  Q.  For example, having a record of being able
13  to type 30 words per minute?
14      MR. JACOBS: Object to the form of the
15  question.
16  Q.  Being able to type 30 words per minute was a
17  requirement for the aircraft scheduler position,
18  right?
19  A.  That's correct, yes.
20  Q.  And you had to have a record on file of
21  being able to do that to be qualified for that
22  position?
23      MR. JACOBS: Object to the form of the

Page 128

1  question.
2  Q.  Do you understand that to be the case?
3  A.  Yes.
4  Q.  You had to have documentation that you
5  qualified to meet the prerequisites of the
6  aircraft scheduler, correct?
7  A.  This is right.
8  Q.  Is there any reason that you believe
9  JobsPlus would not have a record of you ever being
10  there or applying there?
11  A.  Could you say that again, please?
12  Q.  If JobsPlus has no record of you having
13  submitted an application there or doing anything
14  there, would you have any explanation for that?
15  A.  No. You would have to contact JobsPlus.
16  Q.  Now, did you seek help from the EEO office
17  at Eglin Air Force Base?
18  A.  Yes, I did.
19  Q.  Why did you decide to go there?
20  A.  Why did I decide to go there? My Air Force
21  training told me that I had been terminated
22  without cause, and I wanted to see if there was
23  any kind of avenues I could follow or get some

Page 129

1  advice from the EEOC office on Eglin to pursue
2  this matter that I was -- the hand I was dealt by
3  AFS.
4  Q.  Did you go down to Eglin and fill out a
5  form?
6  A.  Yes, I did.
7  Q.  And what did you tell the person at Eglin
8  that you spoke with about your claim?
9  A.  I was involuntarily terminated.
10  Q.  Did you also complain to the Department of
11  Labor?
12  A.  Yes. I wrote a letter to them too.
13  Q.  And did you fill out a form there also?
14  A.  Which Department of Labor are we talking
15  about?
16  Q.  Who all did you go to?
17  A.  Do you want all the names of the Department
18  of Labor offices I've wrote to?
19  Q.  Yeah.
20  A.  I'll have to go out to my truck and get a
21  spreadsheet.
22  Q.  Let's try as many as we can do here. OFCCP?
23  A.  OFCCP was one, yes.

33  (Pages 126 to 129)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 130

1  Q.  Who else do you recall complaining to?
2  A.  Numerous agencies.
3  Q.  Was your complaint of the same nature at
4  each agency that you complained to?
5  A.  Yes, sir.
6  Q.  Same claim about being involuntarily
7  terminated?
8  A.  Yes, sir.
9  Q.  Did you make any claims about lack of
10 reasonable accommodation?
11 A.  I just said that I was involuntarily
12 terminated.
13 Q.  When did you request an accommodation from
14 AFS?
15 A.  On the 14th.
16 Q.  March the 14th, 2005?
17 A.  Yes, sir.
18 Q.  And how did you make that request?
19 A.  I asked them.  I asked one of the lady
20 representatives at HR if I could have a
21 reclassification form, right then and there, to
22 fill out; and I was denied the appropriate
23 reclassification form to fill out.

Page 131

1  Q.  Any other requests for accommodation that
2  you made?
3  A.  As to the reclassification form?
4  Q.  Or any other type of request for
5  accommodation?
6  A.  I don't believe so, no.
7  Q.  Are you aware of anyone else who has been
8  accommodated under similar circumstances as you?
9  A.  No.
10 Q.  Let me hand you what I'm going to mark as
11 Exhibit 26.
12      (Defendant's Exhibit No. 26 was
13      marked for identification and a
14      copy of the same is attached
15      hereto.)
16 Q.  Do you recognize the document I've marked as
17 Defendant's Exhibit 26?
18 A.  Yes, sir.
19 Q.  Is that a status change request form from
20 AFS?
21 A.  Yes, sir.
22 Q.  Is this the form that you complete to
23 request reclassification?

Page 132

1  A.  Yes, sir.
2  Q.  You've seen this before?
3  A.  As for shift preferences, yes.
4  Q.  Have you filled it out for shift preferences
5  before?
6  A.  Yes, sir.
7  Q.  When did you do that?
8  A.  I do not remember, sir.  Early in my
9  employment with DynCorp.
10 Q.  Where did you get the form that time when
11 you did that?
12 A.  I don't remember.
13 Q.  I'm going to hand you what I'm going to mark
14 as Defendant's Exhibit 27.
15      (Defendant's Exhibit No. 27 was
16      marked for identification and a
17      copy of the same is attached
18      hereto.)
19 Q.  Do you recognize the document I've marked as
20 Defendant's Exhibit 27?
21 A.  Yes, sir.
22 Q.  Is that the Complaint in this lawsuit?
23 A.  Yes, sir.

Page 133

1  Q.  And as for the factual allegations in here,
2  are they true and correct?
3  A.  Yes, sir.
4  Q.  In paragraph 18, you allege that Fleet
5  Services unlawfully retaliated against you for
6  pursuing rights under the ADA following your
7  termination from employment by interference with
8  your right to qualify for and receive benefits
9  earned and due you.
10     What benefits are you talking about in that
11 paragraph?
12     MR. STARLING:  Let's go off the record
13 for just a minute.
14     (An off-the-record discussion
15     was held.)
16 A.  Receive benefits earned and due to me, I
17 would think these benefits would be the
18 unemployment compensation benefits.
19 Q.  Any other benefits?
20 A.  No.
21 Q.  AFS has been helpful in your request for VA
22 benefits, right?
23 A.  On my second request, yes, they were, when I

34  (Pages 130 to 133)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

Page 134

1    showed them that they made a mistake.
2        MR. STARLING: Why don't we take a
3    break here?
4        (A brief recess was taken.)
5        MR. STARLING: We're back on the
6    record. We're continuing to look at Exhibit No.
7    27, the Complaint in this matter.
8    Q.    If you'll go to paragraph 24 -- actually,
9    look down to paragraph 25, if you would, "Houston
10   was not given notice in writing before the leave
11   began that his paid time off leave and short-term
12   disability would be counted towards his maximum 12
13   weeks of leave allowed under the FMLA."
14       Did you not receive any notice, you're
15   claiming, that FMLA would be counted during the
16   time of your short-term disability?
17   A.    I don't remember.
18   Q.    Do you understand what your FMLA claim is in
19   this case?
20   A.    No.
21   Q.    Do you -- Strike that.
22       You don't have any idea what violation of
23   the FMLA you are claiming in this lawsuit?

---

Page 135

1    A.    I left that up to my attorney.
2    Q.    So you don't know then?
3    A.    I just know what the meaning of the
4    abbreviation is. As for the details, no, sir, I
5    don't know the details.
6    Q.    You are not claiming that you should be
7    entitled to an additional 12 weeks off of work, or
8    paid, or anything like that, are you?
9    A.    (No response.)
10   Q.    Paragraph 29 says, "Fleet Services
11   retaliated against Houston following his efforts
12   for redress of its discrimination against him by
13   interference with his right to qualify for and
14   receive benefits earned and due him."
15       Again, is that relating to your unemployment
16   compensation benefits?
17   A.    That would be one, yes, sir.
18   Q.    Any other benefits that you're claiming were
19   denied in retaliation for you making a claim?
20   A.    This document was drawn up by my attorney,
21   and I believe that you would have to refer to him
22   on those said benefits.
23   Q.    Let's try it this way: Other than

---

Page 136

1    unemployment benefits, what other benefits have
2    you been denied?
3    A.    Other than my unemployment benefits, I don't
4    recall any.
5        (Defendant's Exhibit No. 28 was
6        marked for identification and a
7        copy of the same is attached
8        hereto.)
9    Q.    I'm handing you what's been marked as
10   Defendant's Exhibit No. 28.
11       MR. STARLING: Let's go off the record.
12       (An off-the-record discussion
13       was held.)
14   (BY MR. STARLING)
15   Q.    We'll come back to 28 in just a minute. You
16   referenced earlier a spreadsheet. I'm sorry.
17   Here we go.
18       I've handed you what's been marked as
19   Defendant's Exhibit No. 28. Can you tell me what
20   this is?
21   A.    My spreadsheet.
22   Q.    Earlier you referenced a spreadsheet that
23   you said was in your vehicle outside, correct?

---

Page 137

1    A.    And this is it. This is a copy of it.
2    Q.    And you discussed that, in that spreadsheet,
3    you had listed all of the various organizations to
4    which you had complained about your treatment by
5    AFS. Is that what this is?
6    A.    This is a spreadsheet that tracked the
7    number of packages I sent out to various
8    organizations in this country, yes, sir, to
9    complain about my treatment.
10   Q.    And did all of those organizations deny your
11   request?
12   A.    No, sir. Some of them answered me and some
13   of them didn't. I should say they responded and
14   some of them did not respond.
15   Q.    Did any of them take action on your behalf?
16   A.    Yes.
17   Q.    Which ones were those?
18   A.    Equality Opportunity and Treatment
19   Commission of Birmingham, Alabama; the National
20   Labor Relations Board; the Staff Judge Advocate or
21   the Army -- oh, here we go.
22   Q.    And just for the record, you're looking at
23   the second page of the spreadsheet, which has what

---

35  (Pages 134 to 137)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

Page 138

1  action was taken on it, it appears to be?
2  A.  Yes.
3  Q.  And does that correctly identify or explain
4  what action was taken?
5  A.  It does identify certain letters that I had
6  a response by organizations that I sent a package
7  to.  And some organizations failed to respond
8  whatsoever.
9  Q.  And that's set forth in column E of the
10  spreadsheet?
11  A.  Yes, sir.
12  Q.  Column A is the organization, correct?
13  A.  The name, yes, and the organization.
14  Q.  What is column B?
15  A.  The date.
16  Q.  That you originally --
17  A.  Sent the package off.
18  Q.  And what is column C?
19  A.  The date that I received a response.
20  Q.  Okay.  And then column F?
21  A.  Is a mistake.
22  Q.  Okay.  In your Complaint, you seek various
23  forms of damages in this lawsuit.  For example,

Page 139

1  back pay.
2       How much back pay do you believe you are
3  entitled to?
4  A.  I would reference that answer to my lawyer.
5  He knows the specifics on that.
6  Q.  Let's put it in simple terms here.  If you
7  had received the aircraft scheduler position on
8  March the 14th --
9  A.  Yes.
10  Q.  -- do you know what your rate of pay would
11  have been for that position?
12  A.  I know it would not be as high as an
13  aircraft mechanic's.  That's all I know.  I know
14  it would be somewhat less, but still a living
15  wage.
16  Q.  And you are claiming that if the company had
17  accommodated you in some way, you would have had
18  that aircraft scheduler position, up until
19  December 2005, when you became eligible for the VA
20  benefits?
21  A.  I would still be working there if I was
22  allowed to have the aircraft scheduler job.
23  Q.  Today you would?

Page 140

1  A.  Yes.
2  Q.  I thought you testified earlier that you
3  were completely disabled, as of --
4  A.  Yes, I am disabled.  But because of the
5  incident that I was thrown into, I applied through
6  the VA for disability and I was granted, for I saw
7  no job offer coming from Army Fleet Support at the
8  time.
9       And I said, Well, I've got to have an income
10  coming into my family, so I'll go to the VA and
11  see what they can do for me.
12  Q.  Now, as part of your application to the VA,
13  haven't you told them that you were unable to
14  perform any job?
15  A.  That was up to the VA's determination; that
16  wasn't up to me.  I just handed them the medical
17  evidence.
18  Q.  So as we sit here today, you think that you
19  are physically capable of performing an aircraft
20  scheduler position?
21  A.  If I was not already rated 100 percent
22  permanent and total by the VA, I would be able and
23  qualified to perform the job as an aircraft

Page 141

1  scheduler, yes, sir.
2  Q.  Was that a yes or a no?
3  A.  Yes.
4  Q.  You would be able to perform your job?
5  Strike that.
6       As we sit here today, you are perfectly
7  capable of performing an aircraft scheduler
8  position?
9  A.  If I was given the job as an aircraft
10  scheduler, and the accommodations were made that I
11  could get up and move around every hour and a half
12  as needed for my back, yes, I don't see why I
13  could not be an aircraft scheduler.
14  Q.  And you also applied for Social Security
15  Disability, right?
16  A.  Yeah.  Because the VA rated me as 100
17  percent total and permanent.
18  Q.  And as we discussed earlier, you have not
19  received the determination from Social Security?
20  A.  That is still up in the air.
21  Q.  In your submission to Social Security for
22  those disability benefits, did you tell them that
23  you were unable to perform any and all jobs?

36  (Pages 138 to 141)

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 142

1  A.  That's to be handled by my attorney down in
2  Tampa.
3  Q.  Did you sign a form?
4  A.  I signed a lot of forms with Bender &
5  Bender.
6  Q.  What do you recall the forms stating about
7  your capability of performing jobs?
8  A.  I don't remember.
9  Q.  What do you want out of this lawsuit?
10  A.  There is a principle, an ethical question
11  here that I want resolved.
12      When I was wronged, you know, when I was
13  refused to be allowed to reclassify, I want that
14  issue brought to justice for ethical reasons and
15  for my own personal integrity.
16      There was a question that was brought up
17  whether I -- let me rephrase that -- that I was
18  not allowed to continue my work with this company.
19  I was wondering why that the HR people took an
20  attitude or made a -- not an attitude, but a
21  decision -- that would violate the Americans With
22  Disabilities Act, when it was as blatant as this.
23  They -- you know, I was shocked. I just wanted to

Page 143

1  get some judicial satisfaction.
2  Q.  You don't want your job? You don't want the
3  aircraft scheduler position now, do you?
4  A.  No. Because I'm totally out of the
5  workforce now.
6  Q.  And you are content with that?
7  A.  Yes, I am.
8  Q.  So you just want money and the satisfaction,
9  is that it?
10  A.  I would rather have the personal
11  satisfaction that I righted a wrong. And as for
12  the money, it would be nice, but it's not the main
13  reason why I'm going ahead and doing this. I'm
14  not going through this for the money; I'm going
15  through it because I was wronged and I want
16  something righted.
17  Q.  Well, are you looking for some type of
18  apology from AFS?
19  A.  I would like them to abide by the federal
20  laws; you know, to do the right thing with people.
21  I'm looking for not myself, but somebody else down
22  the line that would hopefully never fall into the
23  same situation that I fell into; that, you know,

Page 144

1  that would not happen to them.
2  Q.  Is there anyone in particular at AFS that
3  you are mad at or you think was --
4  A.  No. I'm not mad at anybody at AFS.
5  Q.  Just the system itself was --
6  A.  It was flawed. It was a mistake in
7  somebody's judgment or a procedural mistake or an
8  oversight, or whatever you want to call it. There
9  was something wrong, and it happened to me, and
10  I'd like to get that straightened out.
11  Q.  Because my sense is, even after March, I
12  mean, when you went back to an e-mail back to Bob
13  Whitney, I mean, he was trying to help you, at the
14  end of the day, get the benefits and stuff. I
15  mean, it wasn't like he was out to get you.
16  A.  Oh, yeah, yeah. Bob's a fine guy. I have
17  no beef with Bob. In fact, all the people were
18  very nice. I just don't understand how it
19  happened to me.
20  Q.  I think there's some claims for emotional
21  distress and stuff in the lawsuit. I'm sure
22  attorneys draft these things.
23      But what stress, if any, or other types of

Page 145

1  mental anguish have you had since March of 2005?
2  A.  Well, I'll put it to you this way: When I
3  got hired on by DynCorp, I told Bill Warnick that
4  I was there for 20 years or better. I was going
5  to make a career out of driving up the road from
6  Crestview, wearing out tires, burning up cars,
7  making a living.
8      There was another factor. I'm retired
9  military. This country is at war. And I'm an old
10  warrior that got put out to pasture, so I was
11  doing my bit for this country, working for a
12  defense contractor in support of the United States
13  Army.
14      Now, I had a very hard time understanding
15  why all this occurred to me, why I was
16  involuntarily terminated; so I sought out mental
17  health counselors to find out what was going on,
18  you know, why all this -- I needed somebody to
19  talk to besides my wife. It's not every day
20  you're middle-aged and you get fired, when you're
21  planning on riding it out for a good 20 years.
22  Q.  What did you tell the counselors?
23  A.  All sorts of stuff.

37  (Pages 142 to 145)

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

c92c66b7-aec3-44b6-87b9-61af8b1c538c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 146

1  Q.  Things unrelated to the job as well?
2  A.  Well, things related to the job, things
3  unrelated to the job, how I felt about the whole
4  situation that occurred to me. It's not
5  everything; it's one of those things.
6      I was doing my bit for the country and
7  making a living for my family, and making a pretty
8  good living at that; and this happens, this
9  incident in my life.
10 Q.  Are you still able to do other things in
11 your life? hobbies and stuff?
12 A.  Yeah.
13 Q.  What do you like to do?
14 A.  I like to go deep-sea fishing.
15 Q.  Been a good year?
16 A.  Well, yeah; not bad.
17 Q.  Where do you go fishing?
18 A.  Down in Destin. Hop on a boat, go out, hit
19 some of the wrecks, drop a line, pull up a fish.
20     I also like going to the rifle club on
21 Herbert Field shooting a high-powered rifle and
22 pistol now and then. Target shooting.
23 Q.  .308s, or what do you shoot?

Page 147

1  A.  30-06 9 mill. Poking holes in paper.
2  Q.  That's good stress relief?
3  A.  Not bad.
4  Q.  Have there been any other events that have
5  caused you any type of depression or anxiety over
6  the last couple of years, other than work?
7  A.  This incident. That's all.
8  Q.  Feel like you're almost back to normal now?
9  A.  Yeah. Yes.
10 Q.  Maybe it's fair to ask: Do you feel like
11 you are back to normal now?
12 A.  As normal as my body will let me be.
13 Q.  Have you given all the documents you have
14 related to this lawsuit to your attorney?
15 A.  Yes, sir.
16 Q.  Do you keep a diary or anything?
17 A.  No.
18 Q.  Any tape recordings, video or anything that
19 relate to this lawsuit in any way?
20 A.  Oh, no. Only thing I video is my kids.
21 Q.  What doctors are you still -- are you still
22 seeing any doctors?
23 A.  Oh, yeah.

Page 148

1  Q.  Are you still seeing any mental health
2  providers?
3  A.  Yes.
4  Q.  Who do you see for that?
5  A.  I see a Dr. Kelley over in Pensacola in the
6  VA.
7  Q.  A VA doctor?
8  A.  VA clinic over there.
9  Q.  Is that where the Lexapro comes from?
10 A.  No. My Lexapro was prescribed to me by my
11 physician on Eglin, Dr. Kosmatka.
12 Q.  Has Dr. Kelley prescribed any prescription
13 drugs?
14 A.  No. No, he doesn't.
15 Q.  I believe there was a question in discovery
16 that asked something about your data, and you said
17 something about your computer hard drive had
18 crashed?
19 A.  Oh, yeah. Yeah, my computer hard drive
20 crashed.
21 Q.  Did you lose anything related to this
22 lawsuit at all?
23 A.  That spreadsheet, everything. Everything I

Page 149

1  had was gone. This is the only thing I have a
2  copy of.
3  Q.  Was there anything else related to the
4  lawsuit?
5  A.  Everything that I had. All the letters that
6  I had typed up and had sent out, per this tracking
7  device, gone, other than the copies that were made
8  prior to the crash. Everything else is gone.
9      MR. STARLING: Can we go off the record
10 for a second?
11     (An off-the-record discussion
12     was held.)
13     (Defendant's Exhibit No. 29 was
14     marked for identification and a
15     copy of the same is attached
16     hereto.)
17 (BY MR. STARLING)
18 Q.  I've handed you what's been marked as
19 Defendant's Exhibit No. 29. These are your
20 responses to Defendant's Request for Production of
21 Documents.
22     I believe you testified a minute ago that
23 you produced all the documents in your possession

38  (Pages 146 to 149)

c92c66b7-aec3-44b6-87b9-61af8b1c538c