**Samuel P. Houston**



# REDACTED

Dr. Leo Chen                                                    09/019/05

I'm writing this letter in order to help you write your letter for my Veteran
Administration (VA) Claim for my Left Shoulder.

- The history of my left shoulder starting with my first surgery dated June 15, 2000
  Surgeon was Dr. Fitzpatrick. Operation performed was Left Shoulder Arthroscopic,
  Subacromial Decompression and open rotator cuff repair.

- Your history of my last two surgeries the Operative Reports.

- Any permanent physical restrictions you deemed appropriate for my left shoulder.

- " In my professional opinion...." Knowing the Medical background of Mr. Houston
  and the many Medical restriction place on him " I recommend that
  Samuel P. Houston be removed from the work force".

- In any letter to the VA from any Doctor there are two phrases that are required in a
  Letter " In my professional opinion" and the other required phrase is " The natural
  progression of this disease".

- "The natural progression of this disease". This sentence should explain the whole
  person concept that is including the possibly of another torn rotator cuff and its
  Impact on upon my life.

- I've can not perform my duties as an aircraft mechanic any more and with the
  permanent physical restrictions that Dr. Manski put me on, due to my last back
  surgery, nobody will hire me for any kind of job. My former employer put me on long
  term medical leave status so I may pay for my dental and vision benefits
  I've accepted my fate as Mr. Mom around the house.

With your letter and Dr. Cruz 's letter, I should be granted my unemployability status
from the VA. Your copy of Dr. Manski letter explains the history of my back with your
letter explaining the history of my left shoulder and your recommendation to remove me
from the workforce. I should have a favorable out come with the VA.

Sincerely
Sam Houston

# Exhibit C

IN THE UNITED STATES DISTRICT COURT RECEIVED
FOR THE MIDDLE DISTRICT OF ALABAMA
~~NORTHERN~~ DIVISION
*SOUTHERN*

2006 MAR 15  P 1: 59

DEBRA P. HACKETT. CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| SAMUEL HOUSTON | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | CASE NUMBER ~~2:04-cv~~ **1** : 06cv 243 - MEF |
| | ) | |
| ARMY FLEET SERVICES, L.L.C., | ) | **(JURY DEMAND)** |
| | ) | |
| **Defendant** | ) | |

## COMPLAINT

### NATURE OF THE ACTION

This is an action under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq*.; and violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, et. seq, to redress unlawful treatment of the plaintiff while he was employed by Army Fleet Services, L.L.C. ("Fleet Services" or "AFS").

### JURISDICTION AND VENUE

1)    Jurisdiction of this court is invoked over this action pursuant to 28 U.S.C. §§ 1331, 1343(a) (4), 1367(a); 42 U.S.C. §§ 12117(a); 29 U.S.C. § 2617; and 2000e-5(f).    All actions alleged herein occurred while the plaintiff was employed by the defendant in Coffee County, Alabama.

### PARTIES

2)    The Plaintiff, Samuel Houston, is above the age of nineteen years and a resident of Walton County, Florida, at all times pertinent to this suit.

1

3)     The Defendant, Army Fleet Services, L.L.C., is an entity doing business in the state of Alabama.

FACTS

4)     Samuel Houston was initially hired to work as an aircraft mechanic at the Army Aviation Technical Test Center (ATTC) located at Cairns Army Air Field in February 2002 by Dyncorp Technical Services, LLC.  Houston continued this employment with the defendant Army Fleet Services, L.L.C., when the defendant won the aircraft maintenance contract from the U. S. Army.

5)     Houston was ordered by his physician to stay out of work after he suffered an injury to his back while doing chores at his home in August of 2004. Houston notified his supervisor that his doctor had imposed physical restrictions that prevented him from returning to work and he began a short-term disability leave in accordance with company policy on or about September 7, 2004. Houston subsequently had surgery on his back in November 2004

6)     Following a lengthy period of recuperation, Houston returned to the human resources office of AFS on March 7, 2005 with an authorization to return to work signed by Dr. Thomas Manski.  The physician's return to work form stated that Houston was permanently restricted from lifting more than 25 pounds; climbing; standing more than one hour and 30 minutes; prolonged sitting (more than one hour and 30 minutes); and from bending at the waist to lift, pull, twist, or push to prevent reinjury to his lower back.   The AFS human resources representative refused to accept Houston's return to work form because the

2

physician did not list a specific date for him to return to work, but did inform

Houston that he would not be able to return to his job as an aircraft mechanic with

the physical restrictions imposed by Dr. Manski.  Houston discussed with the

human resources representative the possibility of transferring to a position as an

aircraft scheduler as an accommodation for his physical restrictions. He was

informed that he would have to be able to type thirty words a minute to qualify for

that position; to brush up on his typing skills; and, that he could apply to reclassify

to the scheduler's position when he returned to human resources with his dated

return to work slip.

      6)    Houston returned home to seek an appointment with his physician to

obtain a dated return-to-work authorization.  He also enrolled at the  Jobs Plus

center in Crestview, Florida to practice his typing skills in order to qualify for the

controller's position and was able to successfully achieve the desired thirty words

per minute typing rate.

      7)    Houston obtained a return-to-work authorization dated for March 3rd

from Dr. Manski on March 10th and returned to the AFS human resources office

on March 14, 2005. Houston had been informed on a visit to the human resources

office on March 11, 2005 that he would be fired due to physical restrictions which

had been listed on his initial return to work form.  Houston reported to the AFS

human resources office on March 14th to in-process from his short-term disability

leave and was officially informed that he would be involuntarily terminated.

When Houston asked about reclassifying to another position as an accommodation

3

of his physical disabilities, he was informed that he could not reclassify for another position until he was able to return to work in his job as an aircraft mechanic.    This was impossible since his physical limitations permanently prevented him from returning to his job as an aircraft mechanic, Houston asked for the forms to request reclassification as an aircraft scheduler.  He was refused the appropriate paperwork to request this accommodation.

8)    Houston did receive forms that day from AFS to out-process from his employment at the Army Aviation Training Command work center which stated that he had been involuntarily terminated.  Houston began the formal process of his separation from employment with the defendant.

9)    Houston returned to AFS on March 15, 2005 to complete his out-processing and was given new paperwork which indicated that he was being administratively terminated from his job.  He was told that he would have "call back" rights under the union bargaining agreement for his job as an aircraft mechanic.  He was also informed that he could receive unemployment benefits due to his termination.

10)    Houston unsuccessfully sought assistance from the EEO office at Eglin AFB, Florida, and the EEO and Inspector General's office at Fort Rucker, Alabama in an effort to redress the issue of his termination due to his physical disability.

11)    Houston was eventually denied unemployment benefits when AFS claimed that he was not really terminated from his job as an aircraft mechanic, but

4

instead that he was laid off and subject to being called back to work in that position.

12)    Houston pursued his complaint of disability discrimination through U. S. Department of Labor and the Office of Federal Contract Compliance, and was issued a notice

## COUNT ONE
### (Americans with Disabilities Act/Retaliation)

13)    Plaintiff incorporates by reference each and every allegation contained in paragraphs one through twelve as if fully rewritten herein and further states:

14)    Count One of this Complaint is brought pursuant to 42 U.S.C. § 12101 et seq.

15)    The defendant, Army Fleet Services, L.L.C.,  is an entity in a business affecting commerce as defined in 42 U.S.C. § 12111(5) (A).

16)    The Plaintiff is a qualified individual  with a disability, or one who is perceived to have a disability, as defined in 42 U.S.C. § 12111(8), and who was an employee of the defendant at all times pertinent to this suit..

17)    The Plaintiff was unlawfully discriminated against by the denial of accommodation for said disability, or perception thereof; and by his discharge from employment by the defendant Army Fleet Services, because of his disability, or perception thereof, and in retaliation for seeking said accommodations.

18)    Fleet Services unlawfully retaliated against Houston for pursuing his

5

rights under the Americans with Disabilities Act following his termination from employment by interference with his right to qualify for and receive benefits earned and due him, and otherwise.

19)    The actions of the Defendant in this denial of rights secured by law were committed intentionally and in reckless disregard for the law.

WHEREFORE, the plaintiff prays that Army Fleet Services, upon a trial by jury, be adjudicated to have violated the ADA; that he be awarded (i) appropriate damages to compensate him for any and all back pay and other benefits, including but not limited to reinstatement, promotions, transfers, and any other appropriate relief that the plaintiff has lost as a result of defendant's violation of the ADA; (ii) appropriate "compensatory damages" within the meaning of 42 U.S.C. § 1981a or as otherwise allowed by law; (iii) punitive damages in an appropriate amount as determined by the jury;  (iv) that the defendant be permanently enjoined from continuing these unlawful practices;  (v) reasonable costs and attorney's fees; and (vi) any and all other relief to which he may be entitled in law or in equity.

### COUNT TWO
### (FMLA Interference)

20)    Plaintiff incorporates by reference each and every allegation contained in paragraphs one through eighteen as if fully rewritten herein and further states:

21)    Count Two of this Complaint is brought pursuant to 29 U.S.C. § 2611 et seq.

6

22)    Houston was employed by AFS and/or its predecessor in interest for longer than 12 months prior to the leave of absence at issue and worked at least 1,250 hours of service for AFS during the 12 months preceding his request for a medical leave of absence.  As such, Houston was an "eligible employee" pursuant to 29 U.S.C. § 2611(2).

23)    Defendant, AFS, employed 50 or more employees at the location where plaintiff was employed or in combination with other locations within a 75-mile radius of plaintiff's work site for each working day during each of 20 or more calendar work weeks in the previous calendar year and was a covered "employer" pursuant to 29 U.S.C. § 2611(4).

24)    Houston injured himself as set forth above and underwent surgery in November 2004.  He notified his supervisor at Fleet Services of his injury and medical restrictions on or about September 7, 2004, and was placed on short term medical disability.    Houston kept defendant apprised regarding his medical condition during his leave of absence.

25)    Houston was not given notice in writing before the leave began that his paid time off leave and short term disability leave would be counted towards his maximum 12 weeks of leave allowed under the FMLA.    Houston never received any notice that his short-term medical disability was or was not designated as FMLA-qualifying leave for his own serious health condition.

26)    When Houston attempted to return to work with physical restrictions on or about March 7, 2005, he was informed that he would not be returned to his

7

prior job as an aircraft mechanic, with or without accommodations. Houston requested that he be permitted to qualify for a transfer to another job classification which would accommodate his restrictions, and was informed of the qualifications for that position.

27)    Fleet Services denied Houston any opportunity to return to his employment, and terminated his employment without any effort to accommodate his medical restrictions. Houston was informed that he would have to be able to return to his prior position before he could be considered for any equivalent positions which might accommodate his medical restrictions.

28)    These actions of the defendant constitute an interference with Houston's rights under the FMLA and his termination of employment is unlawful.

29)    Fleet Services retaliated against Houston following his efforts for redress of its discrimination against him by interference with his right to qualify for and receive benefits earned and due him.

WHEREFORE, the plaintiff prays that Army Fleet Services, upon a trial by jury, be adjudicated to have violated the FMLA; that he be awarded: (i) appropriate damages to compensate him for any and all back pay and other benefits, including but not limited to reinstatement, promotions, transfers, and any other appropriate relief that the plaintiff has lost as a result of defendant's violation of the FMLA; (ii) appropriate "compensatory damages" within the meaning of 42 U.S.C. § 1981a or as otherwise allowed by law; (iii) liquidated damages in an appropriate amount as equal to the compensatory damages

determined by the jury; (iv) that he be awarded compensatory and exemplary damages due him for the retaliation against him for asserting his legal rights; that the defendant be permanently enjoined from continuing these unlawful practices; (v) reasonable costs and attorney's fees; and (vi) any and all other relief to which he may be entitled in law or in equity.

THE PLAINTIFF REQUESTS A TRIAL BY JURY.

_____
JIMMY JACOBS (JAC051)
Attorney for Plaintiff
143 Eastern Boulevard
Montgomery, Alabama 36117
(334) 215-1788

# Exhibit D

**STATE OF ALABAMA**       )
                                    )
**COUNTY OF DALE**           )

### AFFIDAVIT OF ROBERT WHITNEY

1.      My name is Robert A. Whitney. I am over nineteen (19) years of age. I currently serve as Manager for Security and Investigations for AFS's operations at Fort Rucker. I have held my current position since February 2006. Prior to holding my current position, I was the Human Resources Compliance officer. The facts in this affidavit are based upon my own personal knowledge and/or review of documents kept in the normal course of business by AFS.

2.      AFS-Fort Rucker is a unionized workforce. Bargaining unit positions are governed by a collective bargaining agreement.

3.      The collective bargaining agreement sets out certain procedures regarding employees that wish to reclassify to another position. Specifically, section 35.1 of the CBA provides that in order to reclassify an employee must be qualified for the position requested, must be an active employee, must be the most senior of the employees bidding for the position and must have a status change request form on file.

5.      An employee seeking reclassification must be qualified for the position being sought. An employee's qualifications for the position are determined by a review of the employee's personnel file at they time the employee request's reclassification. Therefore, it is the responsibility of the employee wishing to reclassify to ensure his personnel file reflects his qualifications in terms of requisite skill, education and experience.

6.      Inactive employees retain certain rights under the CBA, including the absolute right to reinstatement of the last classification held, the continued accrual of seniority and the opportunity to participate in employer-sponsored benefits programs. These rights continue

through the lesser of the employee's length of seniority at the time leave commences or five years.

7.    At the time Mr. Houston attempted to return to work in March 2005, I interpreted the CBA to provide that an employee remains active for purposes of reclassification through the duration of paid short-term disability leave. In other words, an employee's active employment status ends at the expiration of short-term disability leave. I believe this interpretation was fairly widespread among the Human Resources staff, including bargaining unit members serving as Personnel Specialists.    Subsequent to this litigation, it came to light that an alternative interpretation provides that active employment ceases after thirty days of continuous leave. The Company has expressed that it interprets the CBA in this way. This interpretation is reflected in the company's long standing personnel procedure regarding medical leave. A true and accurate copy of that procedure is attached hereto as Exhibit 1.

8.    Mr. Houston applied for FMLA leave on September 10, 2004. I directed the approval of his request. It is customary for me to return the FMLA application, noting approval or disapproval, to the employee by mail or in person. Although I do not recall with certainty, I believe I returned Mr. Houston's application, with my approval noted, to him in person. Mr. Houston did not attempt to return to work when his FMLA leave expired in December 2004. It is my understanding that his doctor had no released him to return work at this point. Even after his FMLA leave expired, Mr. Houston's paid short-term disability leave continued for an additional fourteen weeks.

9.    I recall Jo Ann Camarata, the HR Specialist responsible for reclassifications, asking me to intervene in a conversation she was having with Mr. Houston regarding his return to work in March 2005. Mr. Houston was upset that he would not be returned to his Aircraft

Mechanic position and that his pay would decrease if he reclassified to an Aircraft Scheduler position. I reiterated the CBA requirements for reclassification and, recognizing that Houston's active employment with the Company was ending that day, the day his short-term disability leave expired, I offered to allow Mr. Houston an additional week to submit a status change request form and supplement his personnel file with verification of his ability to type thirty words per minute, if he was interested. Houston did not express interest in an alternative position and demanded that he be returned to the Aircraft Mechanic position. He was upset at the suggestion by HR staff that he consider returning into a lower classification for lower pay. I told Houston to take some time to think about his reclassification options. Mr. Houston left the personnel office at this time.

10. Mr. Houston returned the following day with his wife to process out of his short-term disability leave into extended administrative leave and to enroll in benefits continuation. Accordingly, I concluded that Mr. Houston had decided to take extended leave rather than seek reclassification. At no time did Mr. Houston submit a reclassification form or typing verification.

11. I do not recall having any involvement in the company's response to Mr. Houston's application for unemployment compensation until the hearing before the Board of Appeals in July 2005. I did not have primary responsibility for responding to unemployment compensation applications at that time.

11. On September 6, 2005, I received an email from Mr. Houston advising me that the Veterans Administration had denied his claim for disability benefits because AFS had told the VA that he was still employed, albeit inactive. Houston asked me to send a statement to the VA clarifying his employment status. I passed this request on to my supervisor, Darlene

Whelan.  Ms. Whelan complied with Mr. Houston's request and sent a clarification to the VA.

Mr. Houston emailed me a few months later to tell me he had been deemed 100% disabled by the

VA.  Attached hereto as Exhibit 2 is a true and accurate copy of Mr. Houston's email.


Robert A. Whitney

Date: _3 / 3 0 / 0 7_


**STATE OF ALABAMA**              )
                                                    )
**DALE COUNTY**                       )


        Before me the undersigned Notary for the said County and State did appear Robert A.
Whitney, who being known to me did swear and affirm that the foregoing is true and complete,
on this the _30th_ day of _March_ _____, 2007.

                                        NOTARY PUBLIC _Janie Sanders_
                                        My Commission Expires: _11/20/2007_

EXHIBIT
1
ALL-STATE LEGAL®

# CHAPTER 46

## MEDICAL LEAVE

**I.    PURPOSE:**  To provide guidelines for administering the policy regarding medical leave of absence.

**II.   OBJECTIVES:**  To ensure proper administration and monitoring of the Medial Leave programs provided by the Company and to ensure strict adherence to applicable Federal Laws covering medical leave programs including the Family Medical Leave Act (FMLA).

**III.  CONTROLS:**  Supervisors approve disability leave of absence upon established proof of disability and indicate absence code on PAL Card.  The Manager, Personnel Services and the Benefits Manager both monitor the FMLA program

**IV.   DEFINITIONS:**  None.

**V.    PROCEDURES:**

A. Disabled employees notify their supervisor of the disability and request leave of absence.  The employee submits proof of disability through the Doctor's Certification.

B. Extended Medical Leave

1. If disabled longer than 30 days, employees are transferred from their assigned work area to an inactive status under the jurisdiction of the Human Resources Department as follows:

| | |
|---|---|
| Personal Disability | - Direct Labor - Department 40 |
| Personal Disability | - Indirect Labor - Department 41 |
| Industrial Accident | - Direct Labor - Department 42 |
| Industrial Accident | - Indirect Labor - Department 43 |
| Family and Medical Leave | - Direct Labor - Department 44 |
| Family and Medical leave | - Indirect Labor - Department 45 |

2. The Personnel Section processes a Personnel Status Change Request, form 01-229, transferring the employee to an inactive status and clearing the employee through the department level.

3. PAL cards indicating absence code are no longer required when transferred to the Inactive Department.

Sam Houston v. L3
Communications
2015

C.  Employees must present to Manager, Personnel Services with a release to return to work signed by their physician. Personnel Section coordinates with the appropriate director to determine location assignment.

  1.  Personnel Section prepares Personnel Action transferring the employee to active status and coordinates with the department head to where he will be assigned.

  2.  The returning employee may be examined by the company doctor at the discretion of the company. This examination is at the company's expense.

  3.  The employee is allowed to return to work at light duty or with restrictions if he can be reasonably accommodated for a given period of time. The Manager, Personnel Services and the department head maintain coordination during the period of restriction.

  4.  Employees will not be allowed to work while taking narcotics and/or mind-altering medications.

Sam Houston v. L3
Communications
2016

**REDACTED**

**Whitney, Robert A.**

| | |
|---|---|
| **From:** | Sam Houston |
| **Sent:** | Friday, December 23, 2005 11:10 AM |
| **To:** | Whitney, Robert A. |
| **Subject:** | The VA |

**EXHIBIT**

2

Hi Bob,

I got some good news from the VA I was granted my 100% total and permanent disability from the VA, after 2 years of fighting.

Thanks for your help I will never forget you

Merry Christmas just 2 more days until Jesus Birthday
Sam

Sam Houston v. L3
Communications
244

# Exhibit E

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

SAMUEL HOUSTON,

     Plaintiff,

vs.               CASE NO. CV-06-243-MEF

ARMY FLEET SERVICES, L.L.C.,

     Defendant.


\* \* \* \* \* \* \* \* \* \*


     DEPOSITION OF ROBERT ALFRED WHITNEY,

taken pursuant to stipulation and agreement

before Sherry Mack, Court Reporter and

Commissioner for the State of Alabama at Large,

in the Conference Room of Holiday Inn Express,

9 North Pointe Boulevard, Enterprise, Alabama, on

Wednesday, February 21, 2007, commencing at

approximately 8:55 a.m.


\* \* \* \* \* \* \* \* \* \*

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

2 (Pages 2 to 5)

---

**Page 2**

```
 1        APPEARANCES
 2  FOR THE PLAINTIFF:
 3  Mr. Jimmy Jacobs
    LAW OFFICE OF JIMMY JACOBS
 4  Attorney at Law
    4137 Carmichael Road, Suite 100
 5  Montgomery, Alabama  36106
 6  FOR THE DEFENDANT:
 7  Ms. Monica G. Graveline
    Mr. M. Jefferson Starling, III
 8  BALCH & BINGHAM, L.L.P.
    Attorneys at Law
 9  1710 Sixth Avenue North
    Birmingham, Alabama  35203
10
    ALSO PRESENT:
11
    Mr. Ken Demarco
12        * * * * * * * * * * *
13      EXAMINATION INDEX
14  ROBERT ALFRED WHITNEY
    BY MR. JACOBS          4
15    BY MS. GRAVELINE      108
16      EXHIBIT INDEX
17  PLAINTIFF'S EXHIBIT NO.:
18  1  Defendant's response      10
       to plaintiff's 30(b)(6)
19     deposition notice
20  2  Defendant's responses     14,67,74
       to plaintiff's requests
21     for admission
22  3  Answer                    15,16,67
23  4  Complaint                 15,16
```

---

**Page 3**

```
 1  (PLAINTIFF'S EXHIBITS CONTINUED:)
 2  5  Job description-          58
       aircraft scheduler
 3
    6  Return-to-work slip       91
 4     from Dr. Manski
 5  7  Return-to-work form       92
 6  8  Personnel status          96
       change request
 7
    9  Page 1 of personnel action  103-105
 8
    10 Page 2 of personnel action  103,104
 9
10        * * * * * * * * * * *
11      STIPULATIONS
12      It is hereby stipulated and agreed by
13  and between counsel representing the parties that
14  the deposition of ROBERT ALFRED WHITNEY is taken
15  pursuant to the Federal Rules of Civil Procedure
16  and that said deposition may be taken before
17  Sherry Mack, Court Reporter and Commissioner for
18  the State of Alabama at Large, without the
19  formality of a commission; that objections to
20  questions other than objections as to the form of
21  the questions need not be made at this time but
22  may be reserved for a ruling at such time as the
23  deposition may be offered in evidence or used for
```

---

**Page 4**

```
 1  any other purpose as provided for by the Federal
 2  Rules of Civil Procedure.
 3      It is further stipulated and agreed by
 4  and between counsel representing the parties in
 5  this case that said deposition may be introduced
 6  at the trial of this case or used in any manner
 7  by either party hereto provided for by the
 8  Federal Rules of Civil Procedure.
 9        * * * * * * * * * * *
10      MS. GRAVELINE:  I think we'll read and
11      sign.
12      ROBERT ALFRED WHITNEY
13      The witness, having first been duly
14  sworn to speak the truth, the whole truth, and
15  nothing but the truth, testified as follows:
16      EXAMINATION
17  BY MR. JACOBS:
18  Q. Mr. Whitney, I'm Jimmy Jacobs.  I'm an
19     attorney representing Sam Houston in this
20     case.  We met a little bit earlier.  But this
21     is what is called under the rules a 30(b)(6)
22     deposition.  Do you understand what that is?
23  A. Not fully, sir.
```

---

**Page 5**

```
 1  Q. It is a procedure under the rule whereby a
 2     party -- in this case, the plaintiff,
 3     Mr. Houston -- can take a deposition of a
 4     business entity, the defendant in this case.
 5     So although I'm going to be asking you a lot
 6     of questions today, I'm actually asking those
 7     questions of the company.  And are you
 8     qualified to respond on behalf of the
 9     company?
10  A. Yes, I am.
11  Q. Would you state your full name for us,
12     please?
13  A. Robert Alfred Whitney.
14  Q. What is your connection with the defendant,
15     Army Fleet Services?
16  A. How do you mean, sir?
17  Q. Are you employed by the Army Fleet Services?
18  A. Yes, I am.  I'm a current employee.
19  Q. What is your position of employment?
20  A. I'm the manager of security and
21     investigations.
22  Q. As the manager of security and
23     investigations, what generally are your
```

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

3 (Pages 6 to 9)

### Page 6

1    duties?
2    A. My primary duties are the oversight of
3       compliance of the security section in
4       accordance with the NISPOM, N-I-S-P-O-B --
5       P-O-M. Sorry. National Security
6       Regulations, 3-16, operational security, op
7       sec, and also internal investigations in
8       compliance.
9    Q. Could I ask you generally in compliance with
10      what? Let me rephrase.
11   A. Yes, sir.
12   Q. Do you have any responsibility for ensuring
13      compliance with the provisions of the
14      Americans With Disabilities Act? Is that
15      part of your job description?
16   A. Yes, sir.
17   Q. And exactly what are your duties in
18      connection with ensuring compliance with the
19      ADA?
20   A. I don't understand. What do you mean, sir?
21   Q. Well, I'm trying to find out. You said that
22      part of your job was ensuring compliance with
23      the ADA. I'm trying to find out what your

### Page 7

1    duties are in that regard, what
2    responsibilities do you have for ensuring
3    compliance with the Americans With
4    Disabilities Act?
5    A. Primarily, I consult and train our
6       subordinate staff within HR on the rules and
7       regulations of the Americans With
8       Disabilities Act as well as other federal
9       laws, and ensure that they apply those rules
10      and regulations correctly.
11   Q. Do you have a similar responsibility for the
12      provisions of the Family Medical Leave Act?
13   A. Yes, sir.
14   Q. Okay. Are you -- is your position a part of
15      the Human Resources division or department of
16      the defendant?
17   A. No, sir. Security is not assigned to Human
18      Resources.
19   Q. How long have you been in the position you're
20      in currently?
21   A. Under this title, this current position has
22      existed for approximately 12 months.
23   Q. So January or February of 2006 is when you

### Page 8

1    assumed that position?
2    A. Yes, sir.
3    Q. All right. What was your prior position?
4    A. Previous to that -- immediate previous or --
5    Q. Immediately previous.
6    A. Immediate previous position was the HR
7       compliance officer.
8    Q. Okay. And did you have responsibilities for
9       ensuring compliance with the ADA and the FMLA
10      in that position?
11   A. Yes, sir.
12   Q. Did you have other duties in that position as
13      well?
14   A. Yes, sir.
15   Q. What were your other duties?
16   A. As the HR compliance officer, I oversaw the
17      training and administration of the general
18      rules and regulations such as FMLA, ADA,
19      ADEA, the Warrant Act, wage and hour issues,
20      FLSA, responses to federal agencies, internal
21      investigations of internal -- or internal
22      complaints as well external responses.
23   Q. Did you have responsibility for dealing

### Page 9

1    directly with employees who were processing
2    leaves and/or claims through the Human
3    Resources Department?
4    A. How do you mean, sir?
5    Q. Well, let me give you a for example.
6       Mr. Houston was on medical leave. Are you
7       aware of that?
8    A. Yes, sir.
9    Q. In order to obtain that leave and maintain
10      that leave, Mr. Houston had to submit various
11      forms and interact with the Human Resources
12      Department. Was your position one where he
13      would have interacted with you?
14   A. No, sir.
15   Q. What was your position relative to those
16      persons that he would have interacted with?
17      Let me rephrase. Were you the supervisor of
18      the persons who he would have interacted
19      with?
20   A. No, sir.
21   Q. What was your relationship with those persons
22      that he did interact with?
23   A. I -- I want to make sure we're clear by your

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

4 (Pages 10 to 13)

Page 10

1    stating that the persons he interacted with.
2    Q. For example, there was an individual whose
3       name I've seen.  Just one I recall was a
4       Penny Westrick, I believe.
5    A. Okay.
6    Q. What was your relationship within in the
7       organization with Ms. Westrick?
8    A. Penny Westrick is a program coordinator
9       within HR.  At the time, I was HR
10      compliance.  Although I would not have been a
11      direct supervisor, I could act in consulting
12      manner or intervene on the manager's behalf.
13   Q. Did you direct her activities in any way?
14   A. In this instant or the --
15   Q. In this instance.  I'll get it down to that.
16   A. I really don't know, sir.
17   Q. You don't know.  I'll mark this as
18      Plaintiff's #1, and I want to show you.  Have
19      you seen the deposition notice that you're
20      here on today?
21   A. This document right here?
22   Q. No, not this document.  Have you seen a copy
23      of a document headed Notice of 30(b)(6)

Page 11

1    Deposition?
2    A. I don't know by that title, sir.
3    Q. Have you seen the document that informed you
4       of the topics that I would be asking you
5       questions the about today?
6    A. I don't know, sir.
7    Q. You don't know whether you have or not?
8    A. Correct, sir.  I mean, I've seen documents.
9       I don't know which document you're referring
10      to.
11   Q. Okay.  Well, let's just go through them.  The
12      document that you have in front of you is
13      your attorney's response to my 30(b)(6)
14      deposition notice.  So I'll just ask you if
15      you are aware of and able to answer questions
16      regarding all of the facts and opinions that
17      Army Fleet Services may have that would bear
18      on the accuracy or inaccuracy of their
19      denials in their answer to Mr. Houston's
20      complaint?
21      MS. GRAVELINE: Jimmy, we're tendering
22      him pursuant to -- or limited by
23      the objections we've made, so I'm

Page 12

1    going to object to this as an
2    unfair question to him because
3    we're not tendering him to testify
4    to the topics as you wrote them.
5    I'm only tendering him to testify
6    to the topics pursuant to our
7    objections.  And some of them have
8    been limited by our objections.
9    MR. JACOBS:  Would you explain to me
10   what the limits of your objection
11   are, though?
12   MS. GRAVELINE:  Yeah.  We can't --
13   MR. JACOBS:  You've objected to
14   answering any questions about your
15   denials here.
16   MS. GRAVELINE:  No.  He will answer
17   within reason, but you've asked
18   for all facts and opinions.  And
19   that's overly broad.  But he is
20   here to testify as to the topics
21   subject to the limitation that he
22   can't possibly know all facts or
23   opinions.  No one could.  No one

Page 13

1    person could.  We could string 20
2    people in here, they wouldn't know
3    it.
4    Q. Can you testify to all facts and opinions
5       that are within the knowledge of Army Fleet
6       Services regarding their denials in this
7       complaint today?
8    A. I can only testify to my own.
9    Q. Have you done any investigation to look into
10      what the facts and opinions are of Army Fleet
11      Services regarding their denials in this
12      complaint before you came here today?
13   A. How do you mean, sir?
14   Q. I mean, have you done any preparation for
15      this deposition today?
16      MS. GRAVELINE:  I'll caution you not to
17      share anything you and I have
18      talked about.
19   Q. Not anything you discussed with the attorney,
20      but --
21   A. I have reviewed our responses to federal
22      agencies and documents we produced.
23   Q. Have you investigated any of the matters

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                           2/21/2007
DEPOSITION OF ROBERT WHITNEY

5 (Pages 14 to 17)

Page 14

1    behind those documents? For example, if it
2    asserted a fact, did you determine whether
3    that fact was true or not?
4    A. How do you mean, sir?
5    Q. Have you done anything further than simply
6    review the documents?
7    A. I reviewed all documents pertaining to this
8    complaint as represented by Army Fleet
9    Support. Yes, sir.
10   Q. Okay. We're going to go through these, so
11   we'll find out. Have you seen Mr. Houston's
12   request for admissions in this case?
13   A. By title, I don't know, sir.
14   Q. Okay.
15       MR. JACOBS: Mark this as Plaintiff's
16       #2.
17   Q. If you would look at the document, it's
18   titled Defendant's Responses to Plaintiff's
19   Request for Admissions. Have you seen that
20   document before today?
21   A. I have --
22   Q. -- before today?
23   A. I have seen this.

Page 15

1    Q. Are you prepared to answer questions
2    regarding those denials that are contained in
3    this document today?
4    A. I am.
5    Q. Okay.
6       MR. JACOBS: Mark this as #3.
7    Q. Have you reviewed the Army Fleet Services
8    answer to Mr. Houston's complaint in this
9    case, the documents that's before you now?
10   A. I have.
11   Q. Okay.
12       MR. JACOBS: Let's go ahead and mark
13       the next one.
14   Q. This is a copy of the complaint. Have you
15   reviewed this document?
16   A. Yes, sir.
17   Q. I would suggest that we -- we're going to
18   look at the complaint and answer, and I'm
19   going to ask you some questions regarding
20   that.
21   A. The first -- you mean the #4 document?
22   Q. Yes. I'm going to ask you questions
23   regarding the answers, but the way the

Page 16

1    answers are constructed, it's going to be
2    necessary for us to look at both documents to
3    see the question as well as the answer.
4    A. You're looking at #3 and #4?
5    Q. Yes. I'd like to direct you to #4. Does
6    Army Fleet Services deny that Mr. Houston
7    initially went to work for DynCorp in 2002?
8    A. I'm sorry, sir. Repeat please.
9    Q. Does Army Fleet Services deny that
10   Mr. Houston initially went to work -- was
11   hired and went to work with DynCorp in
12   February of 2002? In the answer, you only
13   admit that he was employed -- became employed
14   by AFS.
15   A. Yes, sir. And that's what my response is.
16   Mr. Houston was hired by Army Fleet Support
17   in December of 2003.
18   Q. Was he formerly an employee of DynCorp?
19   A. I can speculate, sir. His seniority states
20   that he held employment previous.
21   Q. Does his personnel file at DynCorp include
22   any information related to his job
23   performance while he was working as an

Page 17

1    employee of DynCorp?
2    A. Army Fleet Support does not have access to
3    DynCorp personnel files. I don't know what's
4    in his DynCorp personnel file, sir.
5    Q. And that is in essence my question. There
6    was no transfer of personnel files or
7    information from DynCorp to Army Fleet
8    Services when they took over?
9    A. No, sir. Army Fleet Support does not have
10   DynCorp files.
11   Q. Okay. You'll notice in the answer there are
12   two number sixes, and that was my error in
13   drafting the complaint. There are, in fact,
14   two number sixes in the complaint itself. In
15   your -- the first number six in the
16   complaint, there's a statement that
17   Mr. Houston returned to the Human Resources
18   office on March the 7th with an authorization
19   to return to work signed by Dr. Manski; that
20   that return to work form stated that he was
21   permanently restricted from lifting more than
22   25 pounds, climbing, standing more than an
23   hour and a half, prolonged sitting more than

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

6 (Pages 18 to 21)

Page 18

1    an hour and a half or from bending at the
2    waist to lift, pull, twist, or push in order
3    to prevent re-injury to his lower back.
4        It goes on to state that the Human
5    Resources representative refused to accept
6    that return-to-work form because the
7    physician did not list a specific date for
8    him to return to work but did inform him that
9    he would not be able to return to work as an
10   aircraft mechanic with the physical
11   restrictions imposed by Dr. Manski.
12       Goes on to state Mr. Houston discussed
13   with the a Human Resources representative the
14   possibility of transferring to a position as
15   an aircraft scheduler as an accommodation for
16   his physical restrictions; that he was
17   informed at that time that he would have to
18   type 30 words a minute to qualify for that
19   position, to brush up on his typing skills
20   and that he could apply to reclassify when he
21   returned to HR with this dated return-to-work
22   slip. The answer to that paragraph admits
23   that he went to the Human Resource office on

Page 19

1    March the 7th.
2        Are all of the other matters in that
3    paragraph true?
4    A. I wanted to clarify one thing first. When
5       you read number six, and I don't know if the
6       court reporter heard it different than I, you
7       had read 45 pounds on the restrictions. It
8       says 25 pounds.
9    Q. If I made that error, I regret it. It is 25
10      pounds.
11   A. Yes, sir. The only thing I'm aware of -- and
12      I can explain why the response would be like
13      this is that he came to the Human Resources
14      office. The person he would see would be a
15      bargaining unit person who would receive that
16      person at the window, take a look at the
17      return-to-work slip and then begin the
18      process of filling out a return-to-work slip
19      form. If the form is incomplete, either the
20      return-to-work date saying you're authorized
21      to return to work today or you're authorized
22      to return to work on Monday is incomplete or
23      it fails to state your restrictions or lack

Page 20

1    of restrictions and/or medications, it's
2    considered incomplete. And you must go back
3    to your treating physician and get
4    clarification. So in answering this, I did
5    not see Mr. Houston on this meeting where he
6    came to the Human Resources office on the
7    7th, so I can't speak to what he states that
8    a person told him these things. There is no
9    record of any person saying that you can come
10   back and you can do this, this, or this, just
11   that you simply need to go back and get
12   clarification on your return to work slip.
13   Q. Is there any record of his visit on that
14      date?
15   A. I don't know, sir.
16   Q. If there were a record, where would it be?
17   A. Just as all persons coming to the Human
18      Resources office, they're required to sign
19      in.
20   Q. Okay. If you'd explain the physical layout
21      for me. Is this office in a building?
22   A. Yes, sir.
23   Q. What else is in that building?

Page 21

1    A. Not to -- not to be a stickler, are you
2       talking about the time Mr. Houston did these
3       actions --
4    Q. Yeah.
5    A. -- or currently?
6    Q. That would be sufficient.
7    A. Because the office is different.
8    Q. Yes.
9    A. All right. At the time of this, the Human
10      Resources office is located within a small
11      strip mall in Daleville, Alabama. The Human
12      Resources office is isolated from other
13      adjoining offices. Although there is a
14      separate door for Labor Relations, you can
15      get to Labor Relations by going through Human
16      Resources. That's not the primary entrance
17      for Labor Relations. Otherwise, when you
18      walk into the Human Resources office, you
19      have a single-door entrance, goes into a
20      small reception area. The reception area has
21      a window which also has a counter where
22      employees are asked to sign in and
23      acknowledge that they need help. There's a

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

7 (Pages 22 to 25)

Page 22

1    receptionist there who is bargaining unit.
2    And the receptionist sees the primary purpose
3    for that person coming to Human Resources and
4    directs them to the bargaining unit personnel
5    handling their area.
6 Q. And I'm sorry. I didn't understand. Are you
7    saying the bargaining unit person?
8 A. Yes. In Human Resources, there are -- just
9    as in any union environment, there are hourly
10   bargaining unit and salaried exempt, which
11   are non-bargaining unit.
12 Q. Okay. Do you have different persons that
13   would handle different bargaining units? For
14   example, I know IAM is one of the unions you
15   deal with. Are there other unions?
16 A. It's the only union, sir.
17 Q. It's the only union. Okay.
18 A. I'm sorry if my terminology is archaic, but
19   it's the day-to-day term.
20 Q. That's one of those things about being an
21   attorney; you get to learn all sorts of
22   terminology and archaean things that are
23   common to other people but are strange to

Page 23

1    you.
2 A. Yes, sir.
3 Q. So when a person walks through the door, in
4    essence, they have to sign in before anything
5    else happens?
6 A. They should sign in, sir.
7 Q. What is the procedure once this person is
8    directed to a Human Resources
9    representative? What sort of records are
10   maintained?
11 A. Sir, it would really depend on the personnel
12   action. If a person is coming to change
13   their address or their phone number, they're
14   given the form to fill out. They go to the
15   HR representative, and that person enters the
16   data. If the person is coming in to elect or
17   change benefits or beneficiaries or something
18   like that, they'd be directed to that section
19   to fill out the necessary paperwork and
20   they'll be processed by them.
21 Q. What is the company's requirement for the HR
22   representative to make a record of their
23   activity in interacting with an employee, or

Page 24

1    is there any?
2 A. How do you mean, sir?
3 Q. Is the HR employee required to document their
4    meetings with employees?
5 A. There's no requirement for any sort of work
6    diary or work log. However, there must a
7    source document. The source document must be
8    approved -- reviewed and approved prior to
9    any input.
10 Q. In the instance of Mr. Houston's visit with
11   his undated return-to-work form, what would
12   be the source document?
13 A. There would be no source document because he
14   would have been told, please go back to your
15   doctor and get clarification. A copy of that
16   document wouldn't have been kept.
17 Q. In the second number six, the statements
18   regarding Mr. Houston returning home and
19   practicing his typing skills and so on, and
20   the response is that you -- I'm sorry -- that
21   Fleet Services doesn't have enough
22   information to know whether that's true or
23   not. Is that essentially correct?

Page 25

1 A. There is no record of any of this, sir.
2 Q. Paragraph seven relates that Mr. Houston
3    obtained his return-to-work authorization.
4    And I made an error in the complaint, dated
5    for March the 7th. Actually, it's March the
6    14th. And that he returned to the Human
7    Resources offices again. That is denied. Is
8    there any record that Mr. Houston visited the
9    Human Resources offices again on March the
10   10th?
11      (Brief pause)
12 A. Excuse me.
13 Q. Sure.
14 A. I wanted to finish this.
15 Q. I'm trying to determine the basis for the
16   denial. Obviously, he didn't have a form
17   that said that he could come back to work on
18   March the 10th, but is there any record that
19   he returned to HR on March the 10th?
20 A. And I apologize for the delay. I'm -- I'm
21   just rereading these first two sentences and
22   making sure I understand exactly what they're
23   saying because they really don't. And if you

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

8 (Pages 26 to 29)

Page 26

1    could excuse me one second while I put my
2    jacket on.
3    Q. Okay.
4         (Brief pause)
5    A. All right. I'm sorry. And we're talking
6    about the second number six, correct?
7    Q. We're talking about number seven.
8    A. Number seven. Thank you.
9    Q. I think there may be two errors in that
10   statement.
11   A. I believe so, sir.
12   Q. Okay. There would be a record of each time
13   that Mr. Houston visited the HR department in
14   March of 2005, would there not be, since he
15   has to sign in? Would that be correct?
16   A. Provided he did sign in.
17   Q. Would anyone have talked with him unless he
18   had signed in? I mean, an HR representative?
19   A. It's possible, sir.
20   Q. Okay.
21   A. So I'm still working on like I said these
22   first three sentences. I've gone one more.
23   But the first sentence says Mr. Houston

Page 27

1    obtained a return-to-work authorization dated
2    for March 3rd from Dr. Manski on March 10th
3    and returned to the Human Resources office on
4    March 14th.
5    Q. That's obviously an error on my part. It's
6    not true, and you certainly could deny that.
7    A. And I do.
8    Q. That's not true.
9    A. The second one is, Houston had been informed
10   on a visit to Human Resources office on March
11   11th that he would be fired due to physical
12   restrictions which had been listed on his
13   initial return-to-work form.
14        I'm not aware of any HR person who
15   would have made a statement like that. And
16   bargaining unit personnel would have been the
17   ones to have received him, would have known
18   his return-to-work conditions which would not
19   have included being fired.
20   Q. Okay.
21   A. So that one I also would have to deny.
22   Houston reported to the AFS office -- Human
23   Resources office on March 14th to in-process

Page 28

1    from his short-term disability leave and was
2    officially informed he would be involuntarily
3    terminated.
4         I'm not aware of that either.
5    Q. So you deny that -- are you denying -- does
6    the company deny that he returned for
7    in-processing on March the 14th?
8    A. By the form that you're asking, yes, he would
9    not come to in-process. A person returning
10   to work from a short-term disability is not
11   returning to in-process. They're returning
12   under the provisions under Article 35 to
13   their previous classification, which is
14   returning to work, not to in-process.
15   Q. Okay. Well, then let's change the
16   terminology if we will. Does the company
17   deny that he came on March the 14th to return
18   to work?
19   A. I would have to look at his return-to-work
20   documents to the confirm the dates.
21   Q. We'll do that shortly.
22   A. Yes, sir.
23   Q. Let's look at paragraph eight which AFS

Page 29

1    denied. It states that Houston did receive
2    forms on the day that he came back to return
3    to work to out-process from his employment
4    and that he was involuntarily terminated, and
5    that he began that formal process of
6    separation on that date.
7    A. Once again, the form of the question, I have
8    to deny because at the end of your six month
9    short-term disability, you are not
10   out-processed from the company unless the six
11   months is longer than your time of
12   employment. His reinstatement rights were
13   out to five years or length of seniority,
14   whichever is less. So his out-processing
15   ATTC and Human Resources office was, in
16   effect, the beginning of his status as an
17   inactive employee after his short-term
18   disability.
19   Q. Was he an active employee while he was on
20   short-term disability?
21   A. Not after 30 days.
22   Q. All right. So he processed from being an
23   inactive employee to being an inactive

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

9 (Pages 30 to 33)

Page 30

1     employee?
2     A. Yes, sir. Under a different provision of the
3        CBA.
4     Q. Was he on the payroll?
5     A. At which time, sir?
6     Q. While he was on short-term disability.
7     A. How do you mean, sir?
8     Q. Was he on the company payroll?
9     A. How do you mean, was he on the payroll? He
10       was not actively working; therefore, he was
11       not receiving a paycheck. However, he was
12       receiving company benefits.
13    Q. Tell me how many different ways you could be
14       on the Army Fleet Services payroll.
15    A. Please work with me on this.
16    Q. I'm trying to.
17    A. How do you mean on the payroll?
18    Q. He --
19    A. The provision -- and I'm sorry to interrupt.
20       I know that I asked for a classification.
21       But the provisions of the collective
22       bargaining agreement establish the different
23       status of employment, currently working or as

Page 31

1     to whether you're on a short-term disability
2        status, military leave of status -- or
3        military leave of absence, or on extended
4        leave of absence after short-term disability.
5     Q. Well, I think I understand he was on short-
6        term disability for a period of time of
7        approximately six months.
8     A. Yes, sir.
9     Q. Right. Was he on the payroll during that
10       time period?
11    A. Mr. Houston was still accruing seniority and
12       he was accruing benefits.
13    Q. During the time he was on the short-term
14       disability?
15    A. Yes, sir.
16    Q. When he attempted to return to work, on the
17       day after that, was he on the payroll?
18    A. I don't know what you mean, sir.
19    Q. Well, and I'm not sure that I know either.
20       It seems to me like a simple question. It's
21       either yes or no he was on the payroll or
22       not. Was he accruing seniority and benefits
23       after March the 14th like he was while he was

Page 32

1     on short-term disability?
2     A. No, sir. He was accruing seniority. His
3        benefits were paid. He picked up the
4        employer contribution, but he was not under
5        COBRA status.
6     Q. And I'm going to have to ask you to explain
7        that to me just a little bit. After March
8        the 14th, he began to pay the employer
9        portion of his benefits as well as the
10       employee portion; is that correct?
11    A. If his short-term disability benefits have
12       run out, yes, sir, up to the length of
13       seniority or five years, whichever is less.
14    Q. All right. So he was receiving no benefits
15       from Army Fleet Support or Services after
16       that date?
17    A. How do you mean, sir?
18    Q. Well, was he receiving any benefits from Army
19       Fleet Services after that date?
20    A. Yes, sir.
21    Q. What benefit was he receiving from the
22       company?
23    A. After that date, he still accrues seniority,

Page 33

1     and he's still allowed to participate in the
2        company-sponsored benefits at less than the
3        COBRA rate.
4     Q. Okay. Let's go to number nine, states that
5        he returned on March 15th to complete his
6        out-processing and was given paperwork that
7        indicated that he was being administratively
8        terminated. Is that the admission in number
9        nine, admitted he returned on March the 15th?
10    A. Number nine has more statements in it,
11       though.
12    Q. Tell me which parts of that are not true.
13    A. If there is record that Mr. Houston returned
14       on March 15th to complete his
15       out-processing -- and that would be on his
16       out-processing check list -- and was given
17       new paperwork which indicated that he was
18       being administratively terminated, that would
19       have been the terminology used on that
20       document at that time. It's old main frame
21       language, which is clarified. He was told
22       that he would have call-back rights under the
23       union bargaining agreement for his job as an

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

10 (Pages 34 to 37)

---

Page 34

1  aircraft mechanic. I don't know who would
2  have told him that, but that would be
3  correct. However, he was also informed that
4  he could receive unemployment benefits due to
5  his termination. I know of no person who
6  would have offered that up. He would have
7  been talking to bargaining unit personnel on
8  his out-processing.
9  Q. Okay. Do employees of AFS not qualify for
10  unemployment compensation if they are laid
11  off?
12  A. To my knowledge, Mr. Houston was not laid off
13  if that's what your question was.
14  Q. Well, it was going to be my question
15  ultimately, but my question was, would AFS
16  employees be entitled to unemployment if they
17  were laid off?
18  A. I don't know, sir.
19  Q. Okay. You don't know whether they would or
20  not?
21  A. Correct, sir. I --
22  Q. Okay. Could you give me the definitions that
23  AFS uses for the word "termination?"

---

Page 35

1  A. How do you mean, sir?
2  Q. On March the 14th and 15th of 2005, what were
3  the definitions of the word "terminated" from
4  employment in connection with employment that
5  AFS had?
6  A. How do you mean, sir? What was the
7  definition of termination?
8  Q. Yes. What was the definition of the word
9  termination in regard to your employment at
10  AFS on March the 14th and 15th?
11  A. The definition wouldn't change from day to
12  day. The definition of a termination is end
13  of employment.
14     However, as was clarified in several
15  instances, the word termination was language
16  that was embedded in a system that AFS no
17  longer possesses which carried that language,
18  not only in instances like this but also
19  under military, which we know is not a
20  termination. It's simply language that keys
21  benefits and change of status.
22  Q. Is that defined anywhere in company -- or was
23  that defined anywhere in company documents

---

Page 36

1  that that's what the word termination meant?
2  A. How do you mean, sir?
3  Q. Well, I mean in the real world where most of
4  us are -- and I understand that sometimes the
5  military world is a little different -- if a
6  person is terminated from their job, they no
7  longer have a job. So what I'm asking for is
8  where and how did AFS define the term
9  "termination" in connection with employment
10  with AFS as of March the 14th and 15th of
11  2005?
12  A. Then I would have to respond that termination
13  is a cessation of all pay and benefits in
14  affiliation with the company to include
15  representation by the collective -- or within
16  the collective bargaining agreement.
17  Q. Was Mr. Houston still within the collective
18  bargaining agreement on March the 14th?
19  A. Yes, sir.
20  Q. Of 2005?
21  A. Yes, sir.
22  Q. Was he still within the collective bargaining
23  agreement on April 1st, 2005?

---

Page 37

1  A. Yes, sir.
2  Q. Is he still within the collective bargaining
3  agreement today?
4  A. To my knowledge he is.
5  Q. All right. Number 10 indicates that Houston
6  unsuccessfully sought assistance from the
7  EEO office at Eglin and the IG's office at
8  Ft. Rucker, and that is denied.
9     You deny that that happened?
10  A. I deny any knowledge of it.
11  Q. Okay. Number 11, Houston was eventually
12  denied unemployment benefits when AFS claimed
13  he was not really terminated from his job as
14  an aircraft mechanic, but instead, he was
15  laid off and subject to being recalled.
16     You do admit that he was denied
17  unemployment benefits because his employment
18  had not be terminated. Is that the
19  discussion that we just had, that it's your
20  contention he was terminated but not
21  terminated?
22  A. No, sir, I've never made that claim.
23  Q. What was his status?

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

Page 38

1   A. Mr. Houston was an inactive employee with
2      recall rights.
3   Q. What recall rights did he have?
4   A. The same as all other bargaining unit in
5      inactive status, up to five years or length
6      of seniority.
7   Q. Specifically, what call-back rights did he
8      have?
9   A. How do you mean, sir?
10  Q. What could he be called back for?
11  A. If Mr. Houston's condition had improved such
12     or allowed for his ability to return to work
13     in his previous classification and could be
14     with or without or could work in that
15     classification with or without
16     accommodations, he had full reinstatement
17     rights with seniority.
18  Q. Okay. So he could be called back as an
19     aircraft mechanic? That was his status with
20     the company?
21  A. That's what he left as, yes, sir.
22  Q. Okay. Could he called back in any other
23     position?

Page 39

1   A. How do you mean, sir?
2   Q. Well, and I don't know all of the positions
3      that the company has. I sent some discovery
4      requests, so we'll determine that. But I do
5      know that there's one called an aircraft
6      scheduler. Under the terms of his
7      termination, could he have been called back
8      as an aircraft scheduler?
9   A. To my knowledge, and through a review of his
10     personnel file, I don't know him to be
11     qualified as an aircraft scheduler;
12     therefore, he would not be able to hold a
13     position as an aircraft scheduler.
14  Q. Okay. We'll come back to that one, too. In
15     response to the complaint as well as response
16     for request of admissions, AFS denies that
17     Mr. Houston is a disabled person according to
18     the terms of the ADA. You've indicated you
19     you're responsible for the compliance with
20     the ADA. Could you tell me the basis of the
21     company's denial, facts and opinions that you
22     rely on that he is not a disabled person
23     within the terms of the ADA?

Page 40

1      MS. GRAVELINE: I object to that as
2         legal conclusion. You can answer
3         if you know.
4   A. And that's -- and that's --
5   Q. And that's not a valid objection in the
6      deposition, but go ahead.
7   A. That's my question. Are you asking for the
8      legal definition under the ADA or --
9   Q. That's what this case is all about, is
10     whether he was a disabled person, and the
11     company has denied that he was. So I would
12     like to know what facts you rely on to deny
13     that he was a disabled person under the terms
14     of the ADA.
15     MS. GRAVELINE: Same objection. You
16        can answer if you know.
17  A. Under the ADA, a person must be able to
18     perform the primary functions of the job with
19     or without accommodations. By Mr. Houston's
20     return-to-work slip and the advice of his
21     treating physician, Mr. Houston could not
22     perform as an aircraft mechanic in any
23     capacity.

Page 41

1   Q. All right. Was there any other job that he
2      could have performed?
3   A. Since Mr. Houston did not request an
4      evaluation for any other position, I really
5      wouldn't know what to evaluate him on.
6   Q. What analysis did Army Fleet Services
7      undertake to determine whether or not the
8      position of aircraft mechanic could be
9      accommodated to his physical restrictions?
10  A. How do you mean, sir?
11  Q. What process did AFS undertake, go through,
12     in order to make a determination that that
13     job could not be accommodated to the physical
14     abilities that he possessed on March the 14th
15     of 2005?
16  A. Thank you, sir. Thank you. And I'm going to
17     go through the standard procedure, and then
18     we'll go to this particular return.
19     When a person is out on any length
20     of -- of -- should I say medical evaluation,
21     which under the CBA even states as short as
22     three days -- if I'm out for three days and
23     under medical supervision or for a medical

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

12 (Pages 42 to 45)

Page 42

1    reasons, when I return, I have to produce a
2    certification from my doctor stating when I'm
3    able to return to work, any and all
4    restrictions or lack of restrictions and any
5    medications.  At that time, if there are
6    medications and/or restrictions, the hourly
7    personnel will contact designated personnel
8    at the field, usually the field manager, the
9    who one oversees all maintenance on the
10   airfield operations, to see if the specific
11   restrictions and/or medications or durations
12   of any of the above can or cannot be
13   accommodated.
14        In this case -- now we go to
15   Mr. Houston.  Mr. Houston worked for the
16   Aviation Technical Test Center, ATTC, when he
17   brought his work restrictions in, even though
18   the doctor's note said, cannot work in any
19   capacity of an aircraft mechanic, it was
20   processed the same as all others.  Under
21   normal circumstances, under the CBA, I will
22   call your director because that's who I
23   worked for.  I left ATTC.  I will call ATTC,

Page 43

1    and I will see if there is anything out there
2    available which can accommodate your
3    restrictions, duration of restrictions,
4    and/or medications.
5        In this case, because they did seem so
6    severe and we'd already gotten a denial from
7    the ATTC director who could not -- his
8    aircraft mechanics work on extremely
9    technical aircraft -- could not work with any
10   of these restrictions, we actually attempted
11   to see if there were any other fields that
12   might be able to, which was above and beyond
13   what we would normally do.  Because of the
14   extensive amount of restrictions and the fact
15   that the doctor's recommendation was cannot
16   work in this capacity, it was determined by
17   each field director that they could not
18   accommodate him.
19   Q.  When you say a field director, I have some
20       passing familiarity with this area.  And
21       let's say, for example, Lowe Field.  Is that
22       who you refer to as a field director, the
23       person in charge of Lowe Field?

Page 44

1    A.  Each of the Army airfields have a director of
2        maintenance.
3    Q.  So the person you're referring to is the
4        airfield director?
5    A.  Yes, sir.
6    Q.  And I believe Mr. Donley was the director at
7        the field that Mr. Houston had been working
8        at.  Is that your memory?
9    A.  Yes, sir.
10   Q.  So you contacted all of the directors to see
11       if there were any other jobs or job
12       classifications that Mr. Houston could
13       perform?
14   A.  No, sir, I did not and I would not.
15   Q.  What did you do?  Because that's what I
16       understood you to tell me.
17   A.  No, sir.  When a person returns from a length
18       of absence, an hourly employee will -- will
19       take their paperwork, in-process it.  They
20       will make the contacts.  They will fill out
21       the return-to-work slip.  You have a copy of
22       one in some of the -- I would believe -- of
23       Mr. Houston's return-to-work slip that is

Page 45

1    signed by Mr. Donley and also signed by the
2    HR department.  And any -- any circumstance,
3    we could not call to see if there's any
4    classification or any alternate job that a
5    person could do because that would affect
6    their conditions of employment and circumvent
7    the collective bargaining agreement.  We can
8    only request can this person go back, can you
9    accommodate them in their current
10   classification, job, if you will.
11   Q.  How would that circumvent the collective
12       bargaining agreement?
13   A.  It would impose a classification on a person
14       without their request.
15   Q.  So it's designed to protect the employee from
16       being put in some classification they don't
17       want?
18   A.  The company cannot change a person's
19       conditions of employment without their
20       request.
21   Q.  Okay.  Did Mr. Houston direct the company not
22       to look at any other classifications where he
23       might could be accommodated?

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                                2/21/2007
DEPOSITION OF ROBERT WHITNEY

13 (Pages 46 to 49)

Page 46

1   A. How do you mean, sir?
2   Q. Well, you said that you couldn't reclassify
3      him or change his conditions of employment
4      without his consent or without his request.
5      And did he tell the company that he didn't
6      want to be put in any other job
7      classification where his physical
8      restrictions could be accommodated?
9   A. Were Mr. Houston to have received
10     consideration as an active employee, he
11     would have had to have requested a
12     reclassification.
13  Q. Okay. Did he request a reclassification?
14  A. Mr. Houston was not an active employee.
15  Q. So he couldn't request a reclassification?
16  A. Not as an inactive employee.
17  Q. So he's an inactive employee, and he can't
18     request a reclassification; is that right?
19  A. That's correct, sir.
20  Q. And his medical restrictions prevent him from
21     coming back to work as an active employee; is
22     that correct?
23  A. To my knowledge, yes, sir.

Page 47

1   Q. That was a determination that AFS made; is
2      that not correct?
3   A. What is that, sir?
4   Q. I'm sorry?
5   A. What is a determination that AFS made?
6   Q. Well, you told me you went through some
7      process where you contacted all the field
8      directors, and they told you they couldn't
9      accommodate his restriction. So did you not
10     make a determination that he couldn't work as
11     an aircraft mechanic because of his physical
12     restrictions?
13  A. No, sir. His physician made that
14     determination.
15  Q. Did not his physician request that he be
16     placed in another position where he didn't
17     have to do those things?
18  A. How do you mean, sir?
19  Q. Well, I mean, you're now telling me that
20     you're not relying on your own analysis, but
21     you're relying on the physician's analysis.
22     And I'm asking you if the physician did not
23     also indicate that it was his belief that

Page 48

1      Mr. Houston should be reclassified or
2      transferred to a position where he could meet
3      the physical requirements to work.
4   A. I do believe there is a return-to-work that
5      states that he should be put in a sedentary
6      job. However, under Article 35.2, an
7      employee must request.
8   Q. All right. And the company denies that
9      Mr. Houston requests to be placed in another
10     position where he could continue to work?
11  A. I'm not aware of Mr. Houston ever requesting
12     an alternate classification.
13  Q. All right. Do you have any documentation
14     that he never requested to be placed in an
15     alternate classification?
16  A. I have no documentation showing where he did.
17  Q. All right. Do you have any that he did not?
18  A. I don't understand the question, sir.
19     That -- that is a double negative.
20  Q. Well, we're in jabberwocky now, anyway. So I
21     guess that we're dancing on the head of a pin
22     as the scholastics used to call it. What
23     qualifications do your field directors have

Page 49

1      to make a determination as to whether a job
2      can be accommodated within the requirements
3      of the Americans With Disabilities Act?
4   A. How do you mean they're qualifications, sir?
5   Q. I mean, what qualifications do they have in
6      order to make a determination consistent with
7      the requirements of the Americans With
8      Disabilities Act as to whether a job can be
9      accommodated or not?
10  A. Thank you. By contract, the field managers
11     must have specific experience, not only in
12     maintenance but in aircraft maintenance,
13     specifically; and all of them have specific
14     experience to the airframe that they
15     maintain. In other words, they are
16     considered the subject matter experts on not
17     only the aircraft but the maintenance of
18     those aircraft. These individuals are
19     responsible to answer to the government on
20     all aspects of maintenance, maintenance
21     production --
22        (Brief interruption)
23  A. -- as well as the physical requirements of

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

14 (Pages 50 to 53)

Page 50

1     the manpower to maintain the aircraft. Does
2     that make sense, sir?
3  Q. Do they have any expertise in the area of
4     compliance with the Americans With
5     Disabilities Act?
6        MS. GRAVELINE: Object to form.
7  A. How do you mean, sir?
8  Q. Well, you told me earlier that you were the
9     person who was in charge of compliance with,
10    among other things, the ADA.
11 A. Yes, sir.
12 Q. Do those individuals who are field directors
13    have any expertise in meeting the
14    requirements to comply with the ADA?
15 A. How do you mean expertise?
16 Q. I mean, expertise, knowledge and training.
17 A. They do have knowledge, and they do have
18    training.
19 Q. What is the nature of their knowledge?
20 A. I can't answer the nature of their
21    knowledge. I can answer the nature of their
22    training.
23 Q. What knowledge do they have? What knowledge

Page 51

1     do they have?
2  A. How do you mean, sir?
3  Q. I mean, what knowledge do they have? You
4     said they have knowledge and training, so
5     what knowledge do they have?
6  A. They have received training.
7  Q. All right. Well, I've received training on
8     playing the guitar, but I'll admit I don't
9     have much knowledge or skill at it. What
10    knowledge do they have? Do you have any
11    knowledge of what knowledge they have?
12 A. I'm aware that they receive annual training.
13 Q. Then tell me about the training they get.
14 A. To my knowledge, besides any training I have
15    provided on a one-to-one basis, each field
16    manager is afforded training packages which
17    are available in my office as well as through
18    L3, the parent company, on discrimination,
19    harassment, ADA, FMLA, the primary
20    supervisory type of legislation.
21 Q. So they have packets of information that are
22    available to them. That's their training?
23 A. How do you mean, sir?

Page 52

1  Q. Well --
2  A. Each one is different. I can't answer for a
3     group of people. I can answer for specific
4     people at certain times. You're asking me to
5     balloon everybody into a group of knowledge.
6  Q. Well, let me ask you about Mr. Donley. What
7     training did he have?
8  A. Besides having a master's degree in Human
9     Resources, which also covers labor law, same
10    course as I took, he also has a master's
11    degree in business administration and is
12    extremely well-versed in aspects of Human
13    Resources.
14 Q. What training does he have relative to making
15    determinations about accommodations and job
16    skills in compliance with the ADA?
17 A. Thank you. Mr. Donley has an extensive
18    background in knowing the job functions and
19    functional capacity for each position to
20    include his aircraft maintenance personnel,
21    what their day-to-day duties include, what
22    they are required to do on a day-to-day basis
23    and what he can or cannot accommodate.

Page 53

1  Q. All right. Is there any record that
2     Mr. Donley or any other field director made
3     any such analysis of all of the job duties
4     and whether or not there was any way that
5     they could be modified in order to
6     accommodate Mr. Houston's disabilities?
7  A. The ADA doesn't require modification of a
8     primary function of the job, but I'm not
9     aware of any such analysis. I am not.
10       MR. STARLING: Can we take a break here
11       in a minute?
12       MR. JACOBS: Yes. Make it brief,
13       though, because we are going to
14       finish by noon, so let's take
15       about five minutes.
16       (Brief recess)
17 Q. I believe when we took a break that I was
18    asking you if there were any records of any
19    analysis that was performed to determine
20    whether Mr. Houston could or could not
21    perform the duties of the job of aircraft
22    mechanic. And your answer was?
23 A. I'm not aware of any physical analysis, no,

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

15 (Pages 54 to 57)

| Page 54 | Page 56 |
|---|---|

**Page 54**

1    sir.
2  Q. Are you aware of any record of any such
3    analysis having been made? Let me rephrase
4    that. Does the company have a record of any
5    such analysis having been performed?
6  A. To my knowledge, the record that exists is
7    the field managers were notified, told of the
8    restrictions, and having full, in-depth
9    knowledge of the functional capacity of the
10    aircraft mechanic, were qualified to make the
11    decision whether there was an accommodation
12    available.
13  Q. And that was the extent of the company's
14    efforts to provide any reasonable
15    accommodation for Mr. Houston; is that
16    correct?
17  A. How do you mean, sir?
18  Q. I mean, is there any record anywhere that the
19    company did any further action or undertook
20    any further actions to make a determination
21    as to whether there were any means to
22    accommodate Mr. Houston's disability?
23       MS. GRAVELINE: Object to form.

**Page 55**

1  A. The only thing we were presented were
2    Mr. Houston's restrictions.
3  Q. Right.
4  A. And in contacting the field managers, those
5    restrictions could not be accommodated.
6  Q. And that was the end of the inquiry; is that
7    correct?
8  A. Yes, sir.
9  Q. Okay. During the time that Mr. Houston was
10    on short-term disability, did he have to
11    submit medical verification of his condition
12    to maintain that leave?
13  A. I don't know, sir.
14  Q. Okay. Does the Human Resources Department of
15    AFS require once an employee goes on medical
16    leave or short-term leave that they
17    provide -- does it require any documentation
18    so that they can continue on that leave?
19  A. I don't know, sir.
20  Q. Okay. Who would know?
21  A. The best person to answer that would be the
22    Human Resources Medical Services Program
23    coordinator.

**Page 56**

1  Q. And who would that individual be or who would
2    it have been in 2005?
3  A. Currently it would be Ms. Penny Westrick.
4  Q. All right. Do you know if she held that job
5    at that time?
6  A. I believe so, sir.
7  Q. Do you have any knowledge of what kind of
8    information would be provided to justify that
9    leave, continuation of a leave?
10  A. I'm sorry, sir. Question again.
11  Q. Do you know what kind of information a doctor
12    would need to supply in order to justify the
13    continuation of the short-term disability
14    leave?
15  A. I don't understand, sir. I don't know of
16    documentation that's required, therefore, I
17    don't know what the doctor would have to
18    submit.
19  Q. Could you tell me what the company's
20    procedures are for an individual to qualify
21    for FMLA leave?
22  A. The company's requirements are the same as
23    the federal language.

**Page 57**

1  Q. How does the company implement those
2    requirements of the federal language?
3  A. How do you mean, sir?
4  Q. I mean, what does the company require an
5    individual to do?
6  A. Thank you. An employee must fill out a
7    request for family medical leave. And
8    depending on the reason for medical
9    certification from the Department of Labor,
10    using a Department of Labor form, is received
11    and the response is given from one of the HR
12    managers.
13  Q. Okay. What does an individual have to do in
14    order to -- is there any requirement that an
15    individual must do anything else in order to
16    maintain the leave?
17  A. How do you mean, sir?
18  Q. Does the company require medical
19    certification periodically in order to
20    continue on FMLA leave?
21  A. I don't know, sir. Once a person has been
22    granted family medical leave, based on a
23    doctor's certification which usually gives

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

16 (Pages 58 to 61)

Page 58

1    the time, the inclusive time, is basically
2    the -- the lack of authorization unless it's
3    intermittent. If a -- if a person -- if
4    their condition has changed such as if a
5    doctor says a person should be given two
6    weeks and their condition has not improved or
7    has gotten worse, yes, they will have to have
8    medical certification to extend it. If
9    they're given 12 weeks and they want to
10   return to work after six, yes, they'll have
11   to have a doctor's release. But these aren't
12   required to just inadvertently or --
13   Q. Okay.
14        MR. JACOBS: I'd like to mark this
15        Plaintiff's Exhibit #5. I have
16        a -- Monica, if I can get down in
17        here and find it. It's the
18        scheduler description. Here you
19        go.
20        MS. GRAVELINE: Thank you.
21   Q. Do you recognize this document?
22   A. Yes, I do.
23   Q. What is it?

Page 59

1    A. This is the job description for an aircraft
2    scheduler.
3    Q. As of 2005?
4    A. Yes, sir.
5    Q. Has that job description changed since 2005?
6    A. Not to my knowledge.
7    Q. I'd like you to review the requirements of
8    this and ask you if there are any of those
9    things that Mr. Houston's medical
10   restrictions will prevent him from doing?
11        MS. GRAVELINE: Object to form.
12   A. I can't answer that question, sir.
13   Q. You can't answer that question?
14   A. I don't understand it.
15   Q. Okay. We can go through them, I guess, one
16   by one. Was there anything regarding
17   Mr. Houston's restrictions about lifting more
18   than 25 pounds, not being able to stand for
19   more than an hour and a half or sit for more
20   than an hour and a half without a break or
21   bend at the waist, to lift, pull, push, and
22   so that would keep him from being able to
23   review the aircraft requirements and

Page 60

1    availability of production and maintenance
2    conditions and select assignments of
3    aircraft --
4    A. When you said -- I'm sorry to interrupt, but
5    when you had said review the requirements, I
6    was looking at the bottom of this where it
7    says requirements. I didn't know you were
8    talking about the essential --
9    Q. Essential duties?
10   A. -- duties and responsibilities. Okay.
11   Yeah.
12   Q. If you would look at those and just tell me
13   if there are any of those that he couldn't do
14   or, you know, that he couldn't be
15   accommodated.
16   A. Possibly.
17   Q. Which one possibly?
18   A. Number two.
19   Q. Number two is coordinates with flight and
20   company departments to ensure that specific
21   requirements are known and that aircraft are
22   scheduled in accordance with policies or
23   procedures. How would his restrictions

Page 61

1    prevent him from being able to do that?
2    A. The aircraft scheduler, to my knowledge, has
3    to be able to interact not only from their
4    basic work area, their -- their desk area,
5    they also have to be able to go to other
6    departments which can be as far as across the
7    airfield a distance away, up and down stairs,
8    and at points in time, meeting with different
9    parts of the maintenance group to find out
10   status on aircraft; such as, for me to find
11   it, if the Army is requesting an aircraft for
12   a specific type mission for a two-hour stint,
13   I have to find that aircraft that best fits
14   that configuration that has the closest
15   amount of time on it before it goes into a
16   type of maintenance. It's not something you
17   can do from a desk and say, this aircraft
18   goes here because it's ready, this one goes
19   here. You have to also monitor your flight
20   hours to maintenance hours and try to
21   identify those aircraft by their maintenance
22   status and when they're best available for
23   the type of mission. So that means you're

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

Page 62

1    having to go completely mobile.
2         Now, whether or not that is something
3    that can be accommodated, in any
4    circumstance, would not be my call. We
5    would contact the field manager and let him
6    know because each field is slightly
7    different. But the first thing that would
8    have to happen is he would have to request
9    reclassification. His file would have to be
10   reviewed. He would have to be qualified for
11   the job, available for the job, and he would
12   have to be an active employee to -- to
13   request a position.
14   Q. I understand the company's position in that
15   it's irrelevant because he wasn't an active
16   employee, but I would like to try to make
17   some determination. And you're telling me
18   that the aircraft scheduler had to like
19   physically go out and locate all of these
20   aircrafts and determine their condition in
21   order to know whether they could be scheduled
22   for a flight or not?
23   A. No, sir, that's not what I said.

Page 63

1    Q. Okay. Well, that's what I understood you to
2    say.
3    A. He has to be able to go from site to site.
4    Q. From what kind of site to what kind of site?
5    A. Within the airfield.
6    Q. Within the airfield?
7    A. Yes, sir.
8    Q. Okay. What kind of sites are in the
9    airfield?
10   A. How do you mean, sir?
11   Q. Well, I don't know. You're telling me you'd
12   have to go to site to site within the
13   airfield.
14   A. Okay. Each field is differently configured.
15   You have the Army, which is where we report
16   to. You have aircraft records. You have
17   maintenance. You have the director's
18   office. And a scheduler has to be able to go
19   from each of these and be able to maintain
20   status.
21   Q. Does the company have a database that
22   maintains that information?
23   A. Not to my knowledge.

Page 64

1    Q. So the scheduler has to physically go to each
2    of these locations and make an assessment of
3    the availability of aircraft?
4    A. To my knowledge, quite often they do but --
5    Q. How much knowledge do you have of the job of
6    aircraft scheduler?
7    A. Only what's been told to me.
8    Q. And who has told you anything about the job
9    of aircraft scheduler?
10   A. The field managers.
11   Q. Any other things there that you think
12   couldn't be accommodated?
13        MS. GRAVELINE: Object to form.
14   A. Once again, I don't know because I wouldn't
15   be the one making that determination.
16   Q. But you have some knowledge of the job?
17   A. Yes, sir, but I wouldn't be making the
18   determination. Each field is different.
19   Q. I'm sorry, but you're the only one I've got
20   here representing the company today. And you
21   have some knowledge of the job. So --
22   A. Yes, sir.
23   Q. Is there anything else on there that you

Page 65

1    think couldn't be accommodated?
2        MS. GRAVELINE: Object to form. I
3        think he's not qualified to answer
4        these questions. And I don't
5        recall this being a topic.
6    A. I don't know, sir.
7    Q. How does the company make a determination
8    that a person is qualified for the position
9    of flight scheduler?
10   A. The first thing that has to happen is a
11   person has to request it.
12   Q. Well, suppose a person requests it. How does
13   the company go about determining that they're
14   qualified for it?
15   A. The human resource manager or the program
16   coordinator for manpower will review the
17   personnel file.
18   Q. And what would he look for in a personnel
19   file? I mean, how would they know whether
20   the person was qualified or not?
21   A. They would look for what's required in the
22   job description.
23   Q. So everything that's in the job description

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                              2/21/2007
DEPOSITION OF ROBERT WHITNEY

18 (Pages 66 to 69)

Page 66

1     would have to be in the personnel file?
2  A. Anything that's listed as education,
3     experience, or requirements, yes, sir.
4  Q. If it were a new applicant who didn't have a
5     personnel file, how would you determine if
6     they were qualified?
7  A. There are two parts to that. Army Fleet
8     Support primarily uses the Alabama State
9     Employment Services, so all applicants are
10    prescreened. If somehow or other a person
11    gets through that and is either
12    misrepresented or -- or somehow or other gets
13    to the AFS recruiting site and they don't
14    hold those requirements, must have it in
15    their possession when they get there. That's
16    where the final check and balance is. Their
17    documents are reviewed at the time of
18    application.
19 Q. Do you know if AFS has any knowledge of
20    whether Mr. Houston can type 30 words a
21    minute or not?
22 A. No, sir.
23 Q. I'd like to direct you to the responses to

Page 67

1     the request for admission. I believe you
2     have that before you. I don't remember which
3     one we marked it but --
4  A. Is that #3?
5        MS. GRAVELINE: I have it as #2.
6  Q. I'd like to direct you to page 2 on number
7     eight. I'm a little puzzled at the
8     response. AFS admits he was generally
9     considered to perform satisfactorily through
10    September the 1st but couldn't admit he did
11    so all times.
12       And other than that, you deny the
13    request. Are you aware of any unsatisfactory
14    performance by Mr. Houston during that time
15    period?
16       MS. GRAVELINE: Object to form.
17 A. I don't know, sir. I'm not his supervisor.
18 Q. Does the company have any record of any
19    unsatisfactory performance?
20 A. I don't know, sir.
21 Q. All right. If there were any documents that
22    would indicate that his performance was
23    unsatisfactory, where would they be located?

Page 68

1  A. How do you mean, sir?
2  Q. Well, it's kind of a hedged response. So
3     what I want to know is if his work wasn't
4     unsatisfactory, how would AFS know that?
5  A. That would depend on the severity.
6  Q. How would it depend on severity?
7  A. Okay. And all I can do is -- is give
8     examples which may or may not pertain to him.
9        You come in to work and you get into an
10    argument with another employee. We have work
11    rules that preclude or prohibit -- I'm
12    sorry -- not preclude but prohibit employee
13    conflicts. Well, you have a conflict but
14    it's resolved. Your first line supervisor
15    resolves it right there. Whether it's your
16    fault or not, you had an employee conflict.
17    The supervisor can administer work rules and
18    give you a letter or could just put an e-mail
19    saying, please, watch whatever you do, or not
20    produce a record at all. But there was still
21    unsatisfactory performance. And once again,
22    depending on severity would depend on whether
23    or not the supervisor made a record or

Page 69

1     referred it to Labor Relations for formal
2     action. So to answer at all times, I -- I
3     can't answer that.
4  Q. Okay. If there were a record of any
5     unsatisfactory performance, would it be in
6     these e-mails or other documents you've
7     referred to?
8  A. I've not said that there were e-mails.
9  Q. I'm just asking you if there were. You said
10    that the supervisor could put it in an e-mail
11    or he could do something else. That's why I
12    said e-mail.
13 A. Yeah. A -- a supervisor could do that. Now,
14    whether his supervisor did that or not, I
15    don't know. And whether there was such a
16    thing that required it, I don't know. I
17    can't answer the question because it says at
18    all times.
19 Q. Yeah. And I accept that you don't know, but
20    I'm asking you, If there were a record, where
21    would it be?
22 A. I don't know, sir.
23 Q. You don't know the company keeps its records

Page 70

1    of unsatisfactory performance of employees?
2    A. Depending on severity, yes, sir.
3    Q. Well, where are all the possible places that
4       you could keep it depending on severity?
5          MS. GRAVELINE: Object to form.
6    A. I don't know, sir.
7    Q. If I wanted to know if there were any
8       unsatisfactory performance on the part of
9       Mr. Houston, where would I have to look?
10   A. Are you --
11         MS. GRAVELINE: Object to form.
12   A. Are you asking about disciplinary actions or
13      unsatisfactory performance?
14   Q. I'll ask you about both. In disciplinary
15      actions, where would they be?
16   A. Labor Relations.
17   Q. And where is Labor Relations?
18   A. Adjacent to Human Resources.
19   Q. All right. Is that a department within the
20      AFS Human Resources division?
21   A. It is not, sir.
22   Q. It is separate?
23   A. Yes, sir.

Page 71

1    Q. Do you know who was in charge of that
2       division in 2005 by any chance, the
3       individual?
4    A. Of what?
5    Q. Of Labor Relations?
6    A. The manager for Labor Relations is Mark
7       Couch.
8          MS. GRAVELINE: C-O-U-C-H.
9    Q. How does Labor Relations differ from Human
10      Resources?
11         MS. GRAVELINE: I'm sorry. I was
12            spelling for the court reporter.
13   Q. How does Labor Relations differ from Human
14      Resources?
15   A. How do you mean, sir?
16   Q. Well, I don't understand the distinction, so
17      I'm just trying to find out how they're
18      different. That's my ignorance about union
19      work places, I suppose.
20   A. Labor Relations is a separate function within
21      Army Fleet Support. It's external to Human
22      Resources. Human Resources process the
23      day-to-day activities of all employees.

Page 72

1    Labor Relations is the negotiating body or
2       representative of AFS to the union.
3    Q. All right. So if an employee were
4       disciplined, it would go to Labor Relations,
5       not to HR?
6    A. Yes, sir.
7    Q. Okay. Let's suppose -- well, are employees
8       evaluated on their job performance by AFS --
9          MS. GRAVELINE: Object to form.
10   Q. -- formally?
11   A. How do you mean, sir?
12   Q. Well, in various jobs I've held, my
13      supervisor conducted a job evaluation and
14      that was put somewhere. Are AFS employees
15      evaluated on the job by their supervisors
16      formally?
17   A. Once again, we have two parts of employees
18      hourly and management. Are you talking all
19      AFS --
20   Q. Let me ask you about hourly since that's
21      what Mr. Houston was.
22   A. Thank you. And are they evaluated?
23   Q. Yes. Is there a formal evaluation process?

Page 73

1    A. Only during the probationary period, which is
2       at 30, 60, and 85 days.
3    Q. And I didn't hear the -- it's a 36?
4          MS. GRAVELINE: 30, 60, 85.
5    A. 30, 60, and 85 days.
6    Q. Oh, okay.
7    A. It's a performance evaluation for hourly
8       employees, and that's only during the
9       probational period. I'm sorry. I'm not a
10      loud person.
11   Q. Then it would be appropriate for me to
12      conclude that Mr. Houston was never subjected
13      to any formal job evaluation by AFS since his
14      seniority would have put him beyond that
15      point when AFS took over?
16   A. I'm not --
17         MS. GRAVELINE: Object to form.
18   A. I'm not aware of any.
19   Q. Okay. Number 10.
20   A. On?
21   Q. The request for admissions. Just want -- I'm
22      basically clarifying a few things now. I
23      asked --

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                2/21/2007
DEPOSITION OF ROBERT WHITNEY

20 (Pages 74 to 77)

Page 74

1          MS. GRAVELINE: Plaintiff's #2.
2    Q.  I asked AFS to indicate that the -- or to
3        admit that the defendant, AFS, did not offer
4        to consider any accommodations that would
5        permit the plaintiff to remain employed.  And
6        that was denied, they said.  What
7        accommodations did AFS consider that would
8        have permitted Mr. Houston to remain
9        employed?
10   A.  To my knowledge, there was no request for
11       accommodation from Mr. Houston nor was any
12       request -- no request for accommodation was
13       stated by Mr. Houston.  Sorry.
14   Q.  Mr. Houston didn't ask to be reclassified as
15       an aircraft scheduler?
16   A.  No, sir, he did not.
17   Q.  Verbally he did not ask to be reclassified as
18       an aircraft scheduler?
19   A.  To my knowledge, at no time did Mr. Houston
20       ask to be reclassified to an aircraft
21       scheduler.
22   Q.  Number 11.  Well, I'm not finished with ten.
23       Excuse me.  Were there any accommodations

Page 75

1        that were considered that would permit him to
2        remain employed by the company whether he
3        requested them or not?
4          MS. GRAVELINE: Object to form.
5    A.  The company cannot make assumptions about a
6        person's limitations or restrictions.  If a
7        person feels they have restrictions as such
8        that they would like to request -- would like
9        to request accommodations, they have to state
10       so.  And then those accommodations can be
11       evaluated in a two-way communication.  To my
12       knowledge, when Mr. Houston returned and an
13       hourly employee talked to him and asked him
14       if he would consider an alternative position
15       such as a clerical scheduler position,
16       Mr. Houston rejected that offer, although the
17       hourly employee could not make a contractual
18       offer the company or the union would have
19       to -- have to live by.
20   Q.  Who was that hourly employee that made an
21       offer to him of some alternative assignment?
22          MS. GRAVELINE: Object to form.
23   Q.  Is there a record of that offer having been

Page 76

1        made?
2    A.  By, say, a summation of the facts, yes.
3    Q.  And where is that summation of facts?
4    A.  In Mr. Houston's complaint to the OFCCP where
5        he states that he returned, an HR person
6        suggested to him that he consider a position
7        such as aircraft scheduler but that he would
8        have to be able to type 30 words a minute.
9        In speaking with the hourly employees who
10       would have received him, they consider having
11       conversations with Mr. Houston and that when
12       Mr. Houston was told to consider or consider
13       a -- a clerical position such as, he became
14       upset, demanded to go back as an aircraft
15       mechanic, and he left.
16   Q.  Is there a record of that conversation
17       anywhere?
18   A.  Not my knowledge sir.
19   Q.  And you don't know who the individual was
20       that reports that that conversation took
21       place?
22   A.  In discussing with our hourly employees, the
23       two primary persons who received him and

Page 77

1        advised him on his options were the shop
2        steward, Ms. Jo Ann Camarata, and the other
3        hourly employee Ms. Cathy Jeffers.
4    Q.  So are those the two HR representatives that
5        he dealt with when he brought his first
6        return-to-work form and his second return-to-
7        work form to AFS?
8    A.  Those are the hourly employees from HR he
9        would have seen.
10   Q.  And did either one of those make a written
11       record of their contact with Mr. Houston on
12       those dates?
13   A.  Not to my knowledge, sir.
14   Q.  Subsequent to those dates, have they made any
15       written record of their encounters with
16       Mr. Houston on those dates?
17   A.  Mr. Houston has come in to apply for
18       benefits, for his continued benefits, and
19       they've received him and processed his
20       paperwork.
21   Q.  That would have been after the incidence
22       where he came and brought his return to work
23       form?

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                          2/21/2007
DEPOSITION OF ROBERT WHITNEY

21 (Pages 78 to 81)

Page 78

1    A.  That would be subsequent, yes, sir.
2    Q.  Have these two individuals that you named,
3         Ms. Jeffers and who was the other?
4    A.  Camarata.
5    Q.  Camarata.  Have either one of those made any
6         written record of their encounter with
7         Mr. Houston on those two occasions subsequent
8         to those dates?
9    A.  Are you asking if they have produced after
10        the fact documents of their previous
11        encounters or --
12   Q.  Yes.
13   A.  -- documentation as to encounters after the
14        fact?
15   Q.  I'm asking you if on those two dates, one of
16        which we believe was March the 10th or March
17        the 7th -- and I will admit there is some
18        confusion as to that date.  I think it's
19        March the 7th -- and March the 14th when
20        Mr. Houston came to the HR office in
21        Daleville and presented a return-to-work
22        form, he interacted with two HR
23        professionals.  Those individuals, according

Page 79

1         to what you told me were Ms. Camarata and
2         Ms. Jeffers.  Subsequent to those dates, have
3         either of those individuals made any record,
4         any documentation of their interaction and/or
5         conversation with Mr. Houston on those
6         dates?
7    A.  About the previous encounters when he came
8         back for --
9    Q.  Right, about the previous encounters.
10   A.  Thank you, sir.  Thank you.  Not to my
11        knowledge.
12   Q.  And your knowledge today is the company's
13        knowledge.
14   A.  Yes, sir.
15   Q.  And you've already told me that they didn't
16        make a contemporaneous record other than the
17        fact that he just -- when he signed in, there
18        was a record that he came.
19   A.  Yes, sir.
20   Q.  Number 12, it's a little more information
21        here.  I asked if reasonable accommodations
22        were available, who would have permitted the
23        plaintiff, Mr. Houston, to transfer to

Page 80

1         another position with the defendant.  And
2         there is a denial along with the explanation
3         that he failed to submit a status-change form
4         as required by the Collective Bargaining
5         Agreement and, therefore, was ineligible.
6         And I think we've been through that.  You
7         told me that he had to be an active employee
8         in order to request a transfer.  Is that
9         correct, according to the Collective
10        Bargaining Agreement?
11   A.  Yes, sir.
12   Q.  Therefore, he couldn't transfer to another
13        position; is that correct?
14        MS. GRAVELINE:  Object to form.
15   A.  How do you mean, sir?  I'm sorry.  Please.
16   Q.  If he had to be an active employee to request
17        a transfer, I assume that you're telling me
18        that he couldn't be transferred to another
19        position since he wasn't an active employee.
20   A.  Yes, sir.
21   Q.  To go back to the request for admission, were
22        there reasonable accommodations available
23        that would have been permitted him to

Page 81

1         transfer to another position?
2    A.  Are you talking about number 12?
3    Q.  Yes.  Whether he asked for them or not or
4         whether he was an active employee or not,
5         were there reasonable accommodations
6         available if he had been transferred to
7         another position?
8    A.  I can't make that decision, sir, for several
9         reasons.
10   Q.  Okay.
11   A.  Bear with me.
12   Q.  Name them for me.
13   A.  Thank you.  The first off is we don't know
14        what he would have requested.  Therefore, we
15        would have had to have first off looked to
16        see what he's requesting, is he qualified, is
17        the position available, does he meet the
18        fundamental job -- requirement of the
19        description, and could he be accommodated.
20        Obviously, if -- if you are a -- an
21        aircraft mechanic and you suffer from vertigo
22        and you request a reasonable accommodation
23        and the only thing available is a pilot, can

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                              2/21/2007
DEPOSITION OF ROBERT WHITNEY

22 (Pages 82 to 85)

Page 82

1    I give you a pilot's position?  No.  Because
2    once again, that can't be accommodated.  If
3    you're a mechanic and your lifting
4    restrictions are 25 pounds and the only thing
5    available is a sheet metal mechanic who lifts
6    more than an aircraft mechanic, I can't just
7    say, well, we can move here because we're
8    going to make a reasonable accommodation,
9    move you to another classification.  I can't
10   do that unless, first off, you identify what
11   you are requesting to fall within a provision
12   of CBA 35.2.
13       We then look at your personnel file,
14   make sure that you're qualified, meet
15   provisions of job description.  Then once
16   again, we would have to contact that field
17   manager and see under this classification,
18   you know, as an active employee under this
19   classification, can you be accommodated in
20   that because the other classifications also
21   require certain -- certain functional
22   capacity.  Does that make sense, sir?
23   Q. Okay.  Is it AFS's position that if an

Page 83

1    individual who has physical limitations such
2    as Mr. Houston did when he came back work
3    does not specifically request another
4    position, that the company has no obligation
5    to explore that option with him?
6        MS. GRAVELINE:  Object to form.
7    A. How do you mean, sir?
8    Q. I mean, if Mr. Houston came back to work with
9    those physical restrictions and absolutely,
10   as you testified, didn't ask for another
11   position, is it your testimony on behalf of
12   the company that the company has no
13   obligation to consider any potential other
14   accommodation for him?
15       MS. GRAVELINE:  Object to form.
16   A. The company can't make an assumption as to
17   what a person's intent for reclassification
18   is.  When -- if I circumvent Article 35 and,
19   once again, you come back with limitations or
20   restrictions, well, I'm just going to put you
21   in this classification.  I've changed your
22   conditions of employment.  I've changed your
23   pay.  I've changed your -- I may have even

Page 84

1    circumvented other people who had a request
2    on file.
3    Q. Is it your position AFS would have no
4    obligation to discuss that with the
5    individual?
6        MS. GRAVELINE:  Object to the form.  I
7        think he's answered this question.
8    A. The individual has to request and state that
9    they are requesting an accommodation.
10   Q. A specific accommodation?
11   A. There has to be two-way communication.
12   Q. Certainly.
13   A. When Army Fleet Support bargaining unit
14   personnel suggested to Mr. Houston, have you
15   considered a position such as, Mr. Houston
16   refused those and left.  There was no two-way
17   communication.
18   Q. Which AFS bargaining personnel suggested that
19   he consider a position such as an aircraft
20   scheduler?
21   A. To the best of our knowledge, in conversation
22   and through investigation and preparation of
23   the responses to the -- to various agencies,

Page 85

1    we believe it to have been Ms. Jeffers and
2    Camarata.
3    Q. But there is no record that they made such an
4    offer?
5    A. How do you mean, sir?
6    Q. There is no paperwork that shows that they
7    made that offer and that it was refused, is
8    there?
9    A. Only through his own statement that that did
10   happen and that the individuals confirm that
11   they had discussions which included that.  So
12   since both agreed that HR representatives did
13   suggest this to him and that he did not come
14   back and request such a position.
15   Q. Are you aware that Mr. Houston gave a
16   deposition yesterday?
17   A. Yes, sir.
18   Q. I want to show you what was marked in that
19   deposition as Defendant's Exhibit Number 17,
20   a rather lengthy document.  And I'll show it
21   to you, and it's what was offered as the
22   Collective Bargaining Agreement that was in
23   effect in 2005.  I believe it's still in

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                2/21/2007
DEPOSITION OF ROBERT WHITNEY

Page 86

1    effect, isn't it?
2  A. No, sir.
3  Q. Is there a new agreement?
4  A. Yes, sir.
5  Q. When was the new agreement adopted?
6  A. May 2005.
7  Q. I want to show you Section 35.1 which is on
8     page 92 of the agreement. Could you read for
9     me the language in that agreement that
10    prevented Mr. Houston's -- any accommodation
11    for Mr. Houston?
12       MS. GRAVELINE: Object to form.
13  A. How do you mean, sir?
14  Q. The language that permitted him to be
15    reclassified into another position.
16  A. When a vacancy occurs within a bargaining
17    unit classification other than that or as a
18    result of lay-off, it will be assigned to
19    employees on the active payroll.
20  Q. Okay. So that's the basis for the contention
21    that since he was not on the active payroll,
22    he could not be reclassified, correct?
23  A. How do you mean, sir?

Page 87

1  Q. Well, I'm trying to determine the basis. But
2    it's AFS's position, if I can restate it --
3    and you can change what I say if I'm not
4    correct. But it's AFS's position, as I
5    understand it, that you could not offer the
6    accommodation of transfer to another position
7    to Mr. Houston because he was not an active
8    employee because the union contract would
9    prevent it. Is that the language that the
10    company is relying on?
11  A. I -- I want to make sure I understand your
12    question, sir.
13  Q. Okay.
14  A. The first piece of language -- you ready --
15    is 35.2a which is employees must file a
16    separate status change request form for each
17    classification, bonus paid job, assignment
18    work week, or location desired. The second
19    part of language is 35.1 which states will be
20    assigned to employees on the active payroll.
21    Under 35.14, employees who become unable to
22    perform the duties and responsibilities of
23    the classification --

Page 88

1  Q. Slow down.
2  A. 35.14, employees who become unable to perform
3    the duties and responsibilities of the
4    classification or with permanent disability
5    or who cannot be accommodated as such the
6    accommodations defined or required by federal
7    law, which we already understand Mr. Houston
8    does not fall under, shall be allowed to
9    exercise his options under the lay-off
10    procedures for positions which he is able to
11    perform or shall be given a leave of absence
12    in accordance with Article 5.
13       Now, you've not given me Article 5 or
14    4.7, which is also referred. But those, the
15    intent of the language, which you have the
16    written language which is -- it started over
17    in 1951 has been run through over 18
18    different vendors or -- I'm sorry -- 18
19    different negotiations throughout history,
20    this is not the best language. Then you rely
21    on if the language is not clear, you go with
22    the intent of the language which is a person
23    who is not active does not have bumping

Page 89

1    rights to an active employee. The second
2    part is -- I just lost my train of thought
3    when I heard that going off. I'm sorry. The
4    second part --
5  Q. The second part that he doesn't have bumping
6    rights.
7  A. And the second part is the sustainment of an
8    employee's rights to reinstatement for up to
9    five years or length of employment,
10    protecting a person's job should they become
11    well enough to come back and fulfill the
12    primary functions of their job as they left.
13    Okay.
14  Q. Okay.
15  A. I didn't write it. Sorry.
16  Q. And that is what the company relies on for
17    Mr. Houston's status?
18  A. The language is presented past practice, and
19    the intent of the language protect those on
20    the active payroll. Yes, sir.
21  Q. As the individual at AFS who is responsible
22    for compliance with the ADA, are you
23    satisfied that that complies with the

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

24 (Pages 90 to 93)

---

Page 90

1    requirements of the ADA?
2    A. Yes, sir.
3         MR. JACOBS: It's eleven o'clock.
4            We'll take a break.
5            (Brief recess)
6    Q. Mr. Whitney, between September the 2nd of
7       2004 and March the 14th of 2005, was
8       Mr. Houston an active employee or an inactive
9       employee?
10   A. Mr. Houston became an inactive employee for
11      purposes of benefits administration as of 30
12      days. His 31st day he goes into a different
13      status under the CBA for his benefits. At
14      the end of the six months, which is what
15      you're referring to, the end of his short-
16      term disability, his status actually goes
17      into an extended -- extended leave of absence
18      as covered under a separate article which is
19      his reinstatement rights.
20   Q. For other purposes other than benefits
21      continuation, was Mr. Houston an active
22      employee or an inactive employee from
23      September the 2nd of 2004 to March the 14th

---

Page 91

1    of 2005?
2    A. Once again, his active status would have
3       ended after 30 days.
4    Q. For all purposes?
5    A. Yes, sir.
6    Q. Okay. Just a few things here I'd like to
7       identify. I think they've all already been
8       admitted. And if you want me to pull out
9       copies, I can, but --
10        MS. GRAVELINE: Were they things that
11           were admitted yesterday?
12        MR. JACOBS: Yes, I think so.
13        MS. GRAVELINE: I've got a stack.
14   Q. The first one will be Plaintiff's #6.
15        MS. GRAVELINE: Defendant's #6?
16        MR. JACOBS: No. I'm going to call it
17           Plaintiff's #6.
18   Q. This is the return to -- the medical excuse
19      from Dr. Manski. Do you recognize that
20      document?
21   A. Yes, sir.
22   Q. Is that the return-to-work authorization from
23      Dr. Manski that Mr. Houston brought back to

---

Page 92

1    AFS?
2    A. This is one of them, yes, sir.
3    Q. And there was an earlier one, as I understand
4       it; is that correct?
5    A. That's not what I was referring to, sir. It
6       was the associated letter from Dr. Manski or
7       from Mr. Manski or Dr. Manski that stated he
8       could not -- company that said he could not
9       stay under the classification of aircraft
10      mechanic.
11   Q. So there was a letter that came along with
12      this?
13   A. That Mr. Houston brought with him, yes, sir.
14   Q. Okay.
15        MR. JACOBS: Mark this as
16           Plaintiff's #7.
17   Q. This is the return-to-work slip. She's going
18      to give you that one. Would you identify
19      this document for me?
20   A. Yes, sir. This is a return-to-work slip
21      dated 3/14/05.
22   Q. It says Army Fleet Support. Is this a
23      standard form that AFS uses?

---

Page 93

1    A. Yes, it is, sir.
2    Q. Okay. And the individual who signed this is
3       Penny Westrick?
4    A. Yes, sir.
5    Q. What is the relevance of the numbers after
6       her name?
7    A. I'm sorry, sir. That's her badge number, her
8       employee ID.
9    Q. The reference here to see attached where it
10      says authorized to return to work on 3/14,
11      would they be the -- do you think it would be
12      the letter that you've referred to?
13   A. Anytime there are restrictions that exceed
14      the amount of writing space, they'll just
15      use, see attached; and that would be any
16      letter that was provided by a doctor.
17   Q. And then the block where it indicates able to
18      accommodate medical restrictions, cannot, I
19      believe we've talked about Don Donley. Was
20      that the field director? Who was Don Donley?
21   A. Mr. Don Donley was the field manager for
22      Army -- Aviation Technical Test Center, ATTC.
23   Q. Where is that physically located?

SAMUEL HOUSTON v. ARMY FLEET SERVICES, LLC                    2/21/2007
DEPOSITION OF ROBERT WHITNEY

Page 94

1  A. Within Cairns Field just outside of
2     Daleville, Alabama.
3  Q. Who is Bill Parsons?
4  A. At that time, Mr. Bill Parsons was the field
5     manager for Lowe Field.
6  Q. All right. And just to be sure I picked up
7     on the distinction, Donley was a field
8     director?
9  A. Field director, field manager. They're
10    synonymous.
11 Q. They're interchangeable?
12 A. They are synonymous.
13 Q. And Larry Larkin, who was that?
14 A. Mr. Larry Larkin was and still currently is
15    the field manager for Cairns.
16 Q. And Bob Chipman?
17 A. Mr. Bob Chipman was at that time the field
18    manager for Knox Army Airfield.
19 Q. And those are all separate locations where
20    aircraft mechanics work for AFS?
21 A. Yes, sir. Each airfield has a different type
22    of aircraft. As the Army students come
23    through, they train on the primary aircraft

Page 95

1     at Cairns, which is a trainer. And then they
2     go from there to their specific assigned
3     aircraft. Knox Army Airfield will be a CH-47
4     Chinook. Bill Parsons would be Lowe Army
5     Airfield, which would be Black Hawks.
6  Q. Okay. AA --
7  A. ATTC.
8  Q. ATTC is also a field as well?
9  A. Per se. ATTC is almost a contract within a
10    contract. As I stated, each Army airfield
11    conducts student training. They have a
12    specific type of aircraft. However, within
13    the contract that Army Fleet Support has, a
14    separate entity within it is called ATTC.
15    They're funded separately; they're operated
16    separately by a different contracting
17    officer. They still file -- fall under the
18    hierarchy and shared services of AFS.
19 Q. Okay.
20 A. However, ATTC is considered a separate field
21    by the collective bargaining agreement. Each
22    one is separately identified under Article 35
23    whatever. It's -- it's in there. They're

Page 96

1     all separately identified. And that's -- the
2     only impact that has is each one has to be a
3     request. Remember under Article 35.2, each
4     request has to be filed separately. So if I
5     want to be on second shift, I have to file a
6     request for second. If I want to be on third
7     shift, I have to request third shift. If I
8     want to go from Hanchey Field to Lowe Field,
9     I must request a separate field. Okay. So
10    each -- each one is submitted separately.
11 Q. So each one of these locations are places
12    where an aircraft mechanic could or would
13    work?
14 A. Yes, sir.
15 Q. Would aircraft schedulers also work at all of
16    those locations?
17 A. Yes, sir.
18 Q. All right.
19    MR. JACOBS: Mark this one as next
20      Plaintiff's exhibit. What number
21      is it going to be?
22    COURT REPORTER: #8.
23    MR. JACOBS: #8?

Page 97

1  Q. Could you identify this form for me?
2  A. Yes, sir. This is --
3  Q. Please do.
4  A. This is a personal status change request
5     form. This is called a 212 form. It -- this
6     one is an automated system document under the
7     old HRIS called PRISM, P-R-I-S-M.
8  Q. Okay. What's the purpose of this form?
9  A. To identify a change of status.
10 Q. What change is reported on this form?
11 A. This is moving a person into inactive status.
12 Q. Does it indicate where they were moved from?
13 A. Yes, sir, Department 40.
14 Q. What is Department 40?
15 A. Inactive employee extended illness.
16 Q. I notice it has the word "direct." Is there
17    some other kind of extended illness other
18    than a direct?
19 A. No, sir. Direct and indirect employees are a
20    government funded definition. In other
21    words, those persons who handle aircraft,
22    physically handle, aircraft mechanic, sheet
23    metal -- any of those classifications that