**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SAMUEL HOUSTON** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER 1:06-cv-243-MEF** |
| | ) | |
| **ARMY FLEET SERVICES, L.L.C.,** | ) | **(JURY DEMAND)** |
| **Defendant** | ) | |

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I. Introduction**

After serving over 24 years in the U. S. Air Force in the field of aircraft maintenance, Sam Houston began work for a defense contractor as an aircraft mechanic at Fort Rucker, Alabama. He planned to continue to use his skills in the service of his country until he retired from the workforce. Instead, the defendant, Army Fleet Support, L.L.C, (AFS) refused to make any effort to accommodate his disabilities when he attempted to return to work after back surgery in March 2005. When Mr. Houston complained about this mistreatment to AFS and every official agency he could think of, AFS retaliated against him by causing him to be denied his right to receive unemployment compensation from the state of Alabama. AFS now contends that Mr. Houston is still an employee; that he does not suffer a disabling condition and it has never considered him to be disabled; but, that they would have accommodated his disabilities if only he had made a formal request for an accommodation. The linchpin that undermines this argument is the provision AFS relies upon in their Collective Bargaining Agreement (CBA) with the International Association of Machinists and Aerospace Workers (IAM) which stipulates an employee must be "active" in order to request a reclassification. Mr.

Houston was deemed "inactive" while on Short Term Disability (STD) as per AFS policy. AFS now claims it would have been a violation of company policy and the Collective Bargaining Agreement to permit Mr. Houston to request reclassification to a position that could accommodate his disabilities without first returning to his job as an aircraft mechanic. AFS's argument is fatally flawed, and is a mere pretext for their discrimination against Mr. Houston due to his disabilities.

## II. Statement Of Undisputed Facts

1)      Sam Houston began work as an aircraft mechanic at Fort Rucker, Alabama on February 25, 2002 for Dyncorp, the predecessor to Army Fleet Support, LLC as a civilian defense contractor for the Army Aviation Training and Command. He planned to use his 24 years of Air Force experience in the service of his country to continue supporting the defense efforts in the civilian sector for the next twenty years. (PX 1: Houston Depo. p. 145:02-13) The company does not acknowledge any problems with his work performance. (PX 2: AFS Depo p.67:18-20)

2)      Mr. Houston suffered a nonwork-related injury to his back in August of 2004 and began short-term disability on September 7, 2004. Surgery was performed on November 10 of that year and Mr. Houston was placed in the "inactive department" by AFS while on short-term disability medical leave on October 15, 2004 (PX 3: AFS Letter to Houston). Mr. Houston continued his recuperation on short-term disability leave throughout late 2004 and early 2005. On December 17, 2004 and January 13, 2005, his physicians recommended that Mr. Houston be placed in a more sedentary job than aircraft mechanic so as to avoid re-injuring his back in the future. (PX 4: Dr. Kosmatka Letter, 12/17/04; PX 5: Dr. Manski Letter, 1/13/05, p. 2 ¶ 5)

3)     AFS advised Mr. Houston on February 8, 2005 that his status would change from "medical leave" to "administrative termination" on March 14, 2005, unless he returned to work by that date. (PX 6: AFS Letter to Houston, ¶ 1) Mr. Houston brought a medical clearance form from Dr. Thomas Manski to the AFS human resources office on or about March 7, 2004. (PX 1: Houston Depo. p. 72:20-23) This form listed Mr. Houston's physical restrictions as:

(1) No lifting more than 25 pounds;
(2) No climbing;
(3) No standing for more than 1 ½ hours;
(4) No prolonged sitting for more than 1 ½ hours; and
(5) No bending at the waist to lift, pull, twist or push.

4)     Although AFS refused to accept this return to work memo because it did not have a date designated for Houston to return, the company's human resource representative acknowledged that Dr. Manski recommended that Mr. Houston not return to work as an aircraft mechanic to avoid future re-injury to his back and discussed the option of reclassifying to a position as an aircraft scheduler.  Mr. Houston's physical restrictions could be accommodated in the scheduler position, and he would be able to continue his employment with AFS.  Mr. Houston was advised that the scheduler position required him to be able to type 30 words per minute and he should brush up on his typing skills before bringing his dated return-to-work form back to human resources. (PX 1: Houston Depo pp. 171:05-19; PX 2: AFS Depo p. 75:11-19)

5)     Mr. Houston returned to his home in Crestview, Florida; obtained an appointment with Dr. Manski to get a new return-to-work form; and, began to brush up on his typing speed at the Jobs Plus center in Crestview.  Jobs Plus is Florida's state employment agency.  Mr. Houston obtained a medical clearance to return-to-work dated

for March 14, 2005 by which time he had improved his typing skills to 30 words per minute.  (PX 1: Houston Depo. p. 52:1-19)

6)     Mr. Houston returned to the AFS human resources office on March 14th with his medical clearance form and met with Ms. Penny Westrick and another AFS human resources employee, now believed by AFS to be either Ms. Jo Ann Carmarata or Ms. Cathy Jeffers.(PX 2: AFS Depo. p. 76:22-77:03; PX 7: Medical Clearance, 3/10/05) Ms. Westrick, telephoned each of the four AFS air field directors, all of whom stated that Mr. Houston could not return to work as a mechanic with his physical restrictions. In one of the conversations Ms. Westrick could not complete the list of restrictions before the director indicated Mr. Houston could not accommodated giving the impression they were coached on how to respond.  (PX 1: Houston Depo. p 98:10-23; 174:01-15) Mr. Houston's Return To Work form notes that he was returning from FMLA leave and Short Term Disability, and the "Cannot" be accommodated block was checked on the form. (PX 8: AFS-RTW form, 3/14/05)

7)     Mr. Houston asked about transferring to an aircraft scheduler position and explained to the human resources personnel how he had improved his typing skills. Either Ms. Carmarata or Ms. Jeffers informed him that he could not request a reclassification into the scheduler job because he was not an "active" employee; i.e., he would have to be able to return to his old job before he could submit paperwork to request a transfer to a different position.(PX 1: Houston Depo. p. 172:17-173:15; PX 2: AFS Depo. p. 46:09-19)

8)     Mr. Houston protested AFS's refusal to accommodate his disability by permitting him to apply for the aircraft scheduler position.  When he was informed that

he had to be an "active" employee, i.e., able to return to his old job, before he could submit a request to reclassify to another position, he requested to be returned to his old position for long enough to submit the paperwork.  (PX 1: Houston Depo. p. 75:04-14; PX 9: DIR Hearing transcript p. 9:11-19)  AFS refused him this opportunity, although during the same general time period another aircraft mechanic, P. D., was accommodated twice though she had restrictions remarkably similar to Mr. Houston.  (PX 10: AFS-RTW form, 6/28/04; PX 11: AFS-RTW form, 2/22/05)  Mr. Houston was given paperwork to process out of his employment which stated that he was being "involuntarily terminated". Mr. Houston started the process but was so upset at what had been done to him that he went home without completing the termination process. (PX 1: Houston Depo. p. 175:08-12)

9)    Mr. Houston returned to Fort Rucker on March 15th with his wife in order to complete his out-processing paperwork.  Mrs. Houston accompanied him so that she could make certain that she understood the payments obligations for the family to continue their health insurance coverage. (PX 1: Houston Depo. pp. 115:05-20; 166:11-18)  On this date, Mr. Houston was given a Personnel Status Change Request Form that indicated that his status change was "involuntary termination". (PX 12: PSCR Form 3/15/05)  Later that day he was given a AFS Personnel Action form that listed his status as "administrative termination".  (PX 13: PA Form, 3/15/05)  Mr. Houston once again asked to be given the opportunity to reclassify into the aircraft scheduler position, but was refused.  Mrs. Houston was present and confirms that her husband requested this opportunity on March 15th, but was informed that he could not reclassify because he was not an "active" employee. (PX 14: Brigitte Houston Affidavit, p. 1)

10)     Mr. Houston protested AFS's refusal to accommodate his disability by permitting him to apply for the aircraft scheduler position, beginning on the date of the initial refusal upon his return to work on March 14, 2007; again, upon his return to complete out-processing from his job on the next day; and, continuing until the filing of this lawsuit. (PX 1: Houston Depo. p. 130:13-23)  Mr. Houston visited the EEO office at Eglin AFB, Florida on March 17, 2005 to seek assistance regarding AFS's discrimination against him and was advised to contact the EEO office at Fort Rucker. (PX 15: EEO Record of Initial Contact)  Houston visited the Judge Advocate's Office at Fort Rucker on April 6, 2005 to try to get information to support his position that he was being treated wrongfully by AFS.  He was informed that the U.S. Army did not have responsibility under the FOIA for a private contractor's records, and that he should take his request to the offices at AFS.  (PX 16: Houston Affidavit p. 1, ¶ 3)  He made this request to Mr. Ed Brown at the AFS human resources office on April 7, 2005 requesting documentation of his work and personnel records.  Mr. Brown refused his request, claiming that the information was proprietary.  Brown also told Houston during this meeting that he did not deserve to receive unemployment benefits because he had quit his job.  (PX 15: Houston Affidavit p. 2, ¶ 4)  Mr. Houston also sent a letter dated April 4, 2005 stating his complaint about disability discrimination to the EEO offices at Eglin AFB and Fort Rucker; to the EEOC; to the OFCCP; to the Department of Labor; to the Veteran's Administration; to Ken Manne at AFS's parent company, L-3 Communications; and, to Governor Bob Riley, among others. (PX 17: Houston letter dated 4/4/05 and list of recipients)

11)     Mr. Houston made his initial call to the Alabama Department of Industrial Relations (DIR) to apply for unemployment on March 16, 2005[1], and informed them that AFS had refused to accommodate his disability when he sought to return to work on the 14th. (PX 18: DIR New Claim Record) This application was questioned when AFS informed DIR that Mr. Houston had "quit" his job due to "Physical Disability". (PX 19: DIR Notice of Claim and Request for Separation Information 3/22/05)  AFS replied, through Liz Ligeiza, to DIR's inquiry about Mr. Houston's status on March 31st that they "could not accommodate" Mr. Houston's restrictions, and that he asked to reclassify to another position, even clerical, but they couldn't do that because of his "sitting" restriction. (PX 20: DIR Record of Statements)   Mr. Houston was informed that AFS contested his eligibility because he had "voluntary quit due to health conditions".  (PX 21: DIR Notice of Determination, 3/28/05)  Mr. Houston prevailed and began to receive benefits, but AFS filed an appeal which they lost due to their nonappearance at the hearing. (PX 22: Decision on Unemployment Compensation Claim, 5/5/05)

12)     On May 23, 2005, Ed Brown, AFS's HR Manager, submitted a request to DIR that the company be permitted to initiate an out-of-time appeal of Mr. Houston's receipt of unemployment benefits.  AFS stated in this request that Mr. Houston was still an "inactive" employee of AFS with "reinstatement rights" to his old job. (PX 23: Brown letter to DIR)  On the same date, Mr. Brown sent an email in which he acknowledged that he had received a telephone call from the VA that Houston had filed a claim for unfair practices in his termination of employment. (PX 24: Brown email to Whelan)   Mr. Houston had met with Brown on April 7, 2005 in an effort to get information to support

---

[1] AFS claims in brief that Houston "…filed for unemployment compensation benefits one day before he presented his dated return-to-work note to HR personnel."  PX 18 shows that his initial call was on 3/16/05. 3/13/05, a Sunday, appears to be the beginning of DIR's claims reporting period.

his complaints about AFS's failure to accommodate him. (PX 16: Houston Affidavit: p. 1-2, ¶ 3) Mr. Brown falsely states in his affidavit submitted with defendant's brief (DX J: ¶ 7) that he had no knowledge of any complaints of discrimination by Houston at the time either of AFS's appeals were submitted.

13)     At the hearing of this second AFS appeal, Mr. Robert Whitney, AFS HR Compliance Officer, testified under oath that Mr. Houston should not receive unemployment benefits because he could have come back to work if he had submitted the correct paperwork to reclassify to another position.  (PX 9: DIR Hearing p. 12:08-14) Whitney stated that it was AFS's position that Mr. Houston "did not have to return to his old job; "not for one day, for one hour, or even one minute" in order to request the opportunity to reclassify. (PX 9: DIR Hearing p. 12:02-06) This is contrary to the position asserted by Mr. Whitney on behalf of AFS in its 30(b)(6) deposition where he repeatedly stated that Mr. Houston would have to be able to return as an active employee to his previous job in order to apply for another position.  (PX 2: AFS Depo. p. 46:13-19) It is also contrary to the statement of Ms. Ligeiza to DIR on March 31, 2005 that Whitney denied Houston's request for reclassification. (PX 20: DIR Record of Statements) Based upon the representation that Mr. Houston was derelict in not submitting his reclassification paperwork, the DIR appeals board ruled that he was not eligible for unemployment benefits and ordered that he repay the $3,740.00 that he had received.  (PX 25: DIR Notices of Determination of Overpayment)

14)     On or about May 27, 2005, Vice-President Ken Manne submitted a response on behalf of AFS's parent company, L-3 Communication Vertex Aerospace, L.L.C., to Mr. Houston's complaint to the company of wrongful termination due to the

failure to accommodate his disability.  Mr. Manne stated in his letter that Mr. Houston's job status was "administrative term."(*ination*) and that while he had call-back rights to his job as an aircraft mechanic, his physical restrictions would prevent him from returning to the job. (PX 26:  Manne letter to Houston)

15)    Darlene Whelan (`nee Sanders), AFS Human Resources Supervisor, submitted the company's response to Mr. Houston's complaint to the OFCCP on or about the date of June 21, 2005 in which she stated that Mr. Houston was offered an opportunity to reclassify but that he refused it. (PX 27: Whelan letter to OFCCP)  She subsequently wrote to the EEOC on July 5, 2005 claiming that AFS did not have a record of Mr. Houston applying for reclassification, but that it did have a record of his being offered the opportunity to reclassify.  (PX 28: Whelan letter to EEOC, p. 1 ¶ 2)  AFS has not produced any documentation of this record in response to Mr. Houston's discovery requests in this case.

16)    Ms. Whelan wrote again to the OFCCP on July 26, 2005 in reference to the CBA provision governing reclassification, "that an 'active' employee may apply for alternate positions...At the time of Mr. Houston's return to the HR office March 14th and through March 19th, Mr. Houston had full rights to request an alternate position through the reclassification process as prescribed in Article 35 without having to return in his current classification." (PX 29: Whelan 2nd letter to OFCCP, p. 1 ¶ 4)  This position is, again, contrary to Mr. Whitney's testimony in AFS's 30(b)(6) deposition, as well as being inconsistent with the language of Section 35 of the CBA and AFS's own paperwork which shows that Mr. Houston was "inactive" from October 12, 2004 until his

termination on March 15, 2005 and thereafter.(PX 3: AFS letter to Houston, 10/15/04; PX 6: AFS letter to Houston, 2/8/05)

17)    Ms. Whelan contradicted her own statements to the OFCCP in a September 6, 2005 letter to the Veteran's Administration in response to Mr. Houston's discrimination complaint when she stated, on behalf of AFS, that Mr. Houston must have the capacity to function as an aircraft mechanic in order to be qualified to apply for reclassification to another position. (PX 30: Whelan letter to VA, ¶ 1)

18)    Mr. Houston was issued a Notice of Right Sue dated December 22, 2005 (PX 31: NRTS) and timely filed this complaint on March 15, 2006. (Record)

### III. Summary Judgment Standard

In order to prevail on a motion for summary judgment under Rule 56(b) of the *Federal Rules of Civil Procedure*, the moving party bears the burden of showing by reference to materials on file that there is no genuine issue as to material facts and that the movant is entitled to judgment as a matter of law. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144 (1970). When that burden is met, the nonmoving party must respond with a showing that there is indeed a material issue of fact that precludes summary judgment. *Clark v. Coats & Clark,* 929 F.2d. 604, 608 (11t1I Cir. 1991) *{citing Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)).

In an action claiming disparate treatment under the Americans with Disabilities Act, a plaintiff must raise an inference of discrimination by establishing a *prima facie* case, and by presenting direct, circumstantial, and/or statistical evidence of discriminatory intent. *Corbin v. Southland Int'l Trucks,* 25 F.3d 1545, 1548 (11th Cir. 1994). In a discrimination case, such as this one, in which the plaintiff/employee

establishes a *prima facie* case and the defendant/employer proffers a nondiscriminatory reason for its actions, the court must review all of the evidence, in the light most favorable to the nonmoving plaintiff/employee, to evaluate whether the jury could reasonably conclude that the employer's proffered reasons were not what actually motivated its conduct and that it, more likely than not, was motivated by the impermissible discriminatory factor. *Combs v. Plantation Patterns,* (106 F.3d 1519 11th Cir. 1997).

Courts are to review all evidence and all reasonable factual inferences drawn from them in the light most favorable to the party opposing the motion. *Warren v. Crawford,* 927 F.2d 559, 56 1-2 (11th Cir. 1991). Issues of fact and the sufficiency of evidence are properly reserved for the jury. The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue. Accordingly,

> [T]he grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable in Title VII cases in which the Plaintiff has established a prima facie case because of the "elusive factual question" of intentional discrimination. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 921 (11th Cir. 1993) (emphasis added) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981)).

In reaching this conclusion, the *Hairston* court relied upon a major pronouncement from the U.S. Supreme Court on the importance of a plaintiff's right to cross examine the non-discriminatory reason the defendant articulates to rebut the plaintiff's prima facie case. *Hairston,* 9 F.3d 913, 919 (citing *St. Mary's Honor Center v. Hicks,* 113 S. Ct. 2742 (1993)). The "full and fair" opportunity for cross examination is

not present via summary judgment. The court must "avoid weighing conflicting evidence or making credibility determinations." *Id.*

The Supreme Court has recently reiterated and strengthened these standards by holding that court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000) (discussing standard for granting judgment as a matter of law under *Fed.R. Civ.P.* 50, which is the "same" as the standard for granting summary judgment under Rule 56). "[T]he court should give credence to the 'evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' "Id. (citations omitted). In other words, courts must consider the entire record, but "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 2102. The Eleventh Circuit completely endorses and adopts the *Reeves* standards. *Hinson v. Clinch County,* 231 F.3d.821 (11th Cir. 2000).

### IV. Argument And Citations Of Authority

A.    <u>Houston has established a *prima facie* case of discrimination under the Americans with Disabilities Act (ADA). as amended.</u>

In order to establish a prima facie case of discrimination under the ADA, Mr. Houston must demonstrate that (1) he has a disability or that he was perceived as having a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination as the result of her real or perceived disability. *Pritchard v. Southern Company Services,* 92 F.3d 1130, 1132 (11th Cir.1996); *Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996). According to law, a "qualified individual with a

disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 US. C. § 12111(8)*. In the ADA, Congress has defined "disability" as a (1) physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such impairment. *42 US.C. § 12102 (2)*.

To establish a prima facie case of discrimination under the ADA, Houston has to show he has, or was perceived as having, a disability; that he was otherwise qualified to perform the essential functions of the job, with or without accommodations; and, he was discriminated against based upon the (real or perceived) disability. *Gordon v. E.L. Hamm & Assoc., Inc.,* 100 F.3d 907, 910 (11th Cir.1996). Houston does not have to offer proof of an actual disability in order to maintain his claim of discrimination due to the perception of disability. *Williams v. Motorola, inc.,* 303 F.3d 1284, 1290 (11th Cir. 2002) As the Third Circuit stated in *Deane v. Pocono Medical Center,* 142 F.3d 138, 144 (3d Cir. 1998), even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability."

1. Houston has produced substantial material evidence that he had a disability as defined by the ADA at the time AFS terminated his employment.

The law defines major life activities as "those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. pt. 1630 App. §1630.2(i). The enforcing regulations state that major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing,

speaking, breathing, learning, and working,"[2] but the list is meant to be illustrative, not exhaustive. *Bragdon v. Abbott*, 524 U.S. 624, 638-639 (1998) (interpreting ADA consistently with the Rehabilitation Act); *Oesterling v. Walters*, 760 F.2d 859, 861 (8th Cir. 1985); 29 C.F.R. pt. 1630 App. §1630.2(i).  The case law reflects a variety of major life activities,[3] including the following: caring for oneself,[4] bathing,[5] dressing,[6] toileting,[7] controlling bowels,[8] waste elimination,[9] sleeping,[10] getting into or out of bed,[11] getting

---

[2] 29 C.F.R. §1630.2(i) (Title I); 28 C.F.R. §35.104 (Title II); 28 C.F.R. §36.104 (Title III); 28 C.F.R. §41.31(b)(2) (Rehabilitation Act).  These regulations all state that major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

[3] *See, e.g.,* National Council on Disability's ADA Policy Brief No. 13, *The Supreme Court's ADA Decisions Regarding Substantial Limitation of Major Life Activities*, at nn. 10-73 (April 29, 2003); *Snakes and Ladders: Expanding the Definition of Disability in the Americans with Disabilities Act*, 33 Texas Tech L. Rev. 321 (2002).

[4] *Fenney v. Dakota, Minnesota & Eastern Railroad Co.*, ___ F.3d ___, 2003 WL 1956138, at *4 (8th Cir. 2003); *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 (2d Cir. 2003) ("The ability to care for oneself is a major life activity recognized under the Rehabilitation Act; it 'encompasses normal activities of daily living; including feeding oneself, driving, grooming, and cleaning [one's] home.'"); *Nawrot v. CPC Int'l*, 277 F.3d 896, 903 (7th Cir. 2002); *Davoll v. Webb*, 194 F.3d 1116, 1134 (10th Cir. 1999); *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999), *amended on other grounds*, 201 F.3d 1211 (9th Cir.), *cert. denied*, 530 U.S. 1243 (2000); *Zenor v. El Paso Healthcare System*, 176 F.3d 847, 859 n.8 (5th Cir. 1999).  See also the Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (March 25, 1997); *Marinelli v. City of Erie*, 216 F.3d 354, 362-363 (3d Cir. 2000) (caring for oneself means the ability to perform tasks required for living in a healthy and sanitary environment, like washing dishes and picking up trash, but does not include housework beyond basic chores); *Schwertfager v. City of Boynton Beach*, 42 F.Supp.2d 1347, 1359 (S.D.Fla. 1999) (finding caring for oneself to be a major life activity, but finding no substantial limitation).

[5] *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999). See also the EEOC's Instructions for Field Offices: Analyzing ADA Charges After Supreme Court Decisions Addressing "Disability" and "Qualified," Part One (First Definition)(IV)(C)(4) (EEOC 7/26/99) (cooking and bathing are basic activities of caring for oneself).

[6] *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999). *See also Schwertfager v. City of Boynton Beach*, 42 F.Supp.2d 1347, 1359 (S.D.Fla. 1999) (finding dressing oneself to be a major life activity, but finding no substantial limitation).

[7] *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999).

[8] *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999).

[9] *Erjavac v. Holy Family Health Plus*, 13 F.Supp.2d 737, 746-747 (N.D.Ill. 1998).

14

around outside,[12] getting around inside,[13] keeping house,[14] living independently,[15] eating,[16] drinking,[17] cooking,[18] using stairs,[19] sitting,[20] standing,[21] reaching,[22] throwing,[23] squatting,[24] bending, and lifting[25].

---

[10] *McAlindin v. County of San Diego*, 192 F.3d 1226, 1233 (9th Cir. 1999), *amended on other grounds*, 201 F.3d 1211 (9th Cir.), *cert. denied*, 530 U.S. 1243 (2000); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.), *cert. denied*, 528 U.S.811 (1999); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998); *Bennett v. Unisys Corp.*, 2000 WL 33126583, at *5 (E.D.Pa. Dec. 11, 2000); *Presta v. Southeastern Pa. Transp. Authority*, 1998 WL 310735, at *7 (E.D.Pa. June 11, 1998); *Silk v. City of Chicago*, 1997 WL 790598, at *7 (N.D.Ill. Dec. 17, 1997), *aff'd on other grounds*, 194 F.3d 708 (7th Cir. 1999); *Seaman v. C.S.P.H., Inc.*, 1997 WL 538751, at *12 (N.D.Tex. Aug. 25, 1997); *Coghlan v. H.J. Heinz Co.*, 851 F.Supp. 808, 814 (N.D.Tex. 1994) (finding a genuine dispute about the existence of a disability because plaintiff's diabetes affected the major life activities of eating and sleeping); EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (March 25, 1997), online at <http://www.eeoc.gov/docs/psych.html>.

[11] The studies relied on by the Court in *Sutton* in determining who is a person with a disability suggest that this is a major life activity. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 485 (1999).

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id. Compare U.S. v. Southern Mgmt. Corp*., 955 F.2d 914, 919 (4th Cir. 1992) (referring to the ability to obtain housing in a case decided under the Fair Housing Act's substantially similar definition of disability).

[16] *Waldrip v. General Electric Co.*, 325 F.3d 652, 655 (5th Cir. 2003); *Lawson v. CSX Transportation, Inc*., 245 F.3d 916, 923 (7th Cir. 2001); *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999); *Amir v. St. Louis University*, 184 F.3d 1017, 1027 (8th Cir. 1999); *Coghlan v. H.J. Heinz Co.*, 851 F.Supp. 808, 814 (N.D.Tex. 1994) (finding a genuine dispute about the existence of a disability because plaintiff's diabetes affected the major life activities of eating and sleeping).

[17] *Amir v. St. Louis University*, 184 F.3d 1017, 1027 (8th Cir. 1999).

[18] *Schwertfager v. City of Boynton Beach*, 42 F.Supp.2d 1347, 1359 (S.D.Fla. 1999) (finding cooking for oneself to be a major life activity, but finding no substantial limitation). *See also* the EEOC's Instructions for Field Offices: Analyzing ADA Charges After Supreme Court Decisions Addressing "Disability" and "Qualified," Part One (First Definition)(IV)(C)(4) (EEOC 7/26/99), (cooking and bathing are basic activities of caring for oneself).

[19] *Nodelman v. Gruner & Jahr USA Publishing*, 2000 WL 502858*7 (S.D.N.Y. April 26, 2000). Also, the studies relied on by the Court in *Sutton* in determining who is a person with a disability suggest that this is a major life activity. *Sutton v. United Air Lines, Inc.*, 527 US 471, 485 (1999).

[20] *Davoll v. Webb*, 194 F.3d 1116, 1134 (10th Cir. 1999); *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944 (8th Cir. 1999); *Oesterling v. Walters*, 760 F.2d 859, 861 (8th Cir. 1985). *See also* 29 C.F.R. pt. 1630 App. §1630.2(i).

Mr. Houston suffered physical restrictions on his major life activities of lifting, climbing, sitting, standing, and bending at the waist. (PX 7: Medical Clearance)  Each of these restrictions substantially limited his ability to perform in a normal manner in these respective areas of major life activities in the same manner as an average person in the general population.  Mr. Bill Vinson, a licensed vocational expert, found that, taken together, they restricted Mr. Houston's ability to perform a broad class and range of jobs which were available to him, based upon his education and experience, prior to his disabilities.  Although Mr. Vinson found that Houston could still perform sedentary activities with his disabilities, he was restricted from 92% of the jobs that had previously been available to him. (PX 32: Vinson Declaration & Vocational Evaluation)

2.  Houston has produced substantial evidence that he had a record of a disability prior to his termination by AFS.

---

[21] *Id.*

[22] *Davoll v. Webb*, 194 F.3d 1116, 1134 (10th Cir. 1999); *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944 (8th Cir. 1999); *Lukens v. National R.R. Passenger Corp.*, 2000 WL 1622745, at *5 (E.D.Pa. Oct. 25, 2000).  *See also* 29 C.F.R. pt. 1630 App. §1630.2(i).

[23] *Prince v. Claussen*, 1999 WL 152282*5 (10th Cir. 1999) (unreported decision).

[24] *Id.*

[25] *Weiss-Clark v. Kaiser Foundation Health Plan of the Northwest*, 2001 WL 204823, at *4 (D.Or. Feb. 7, 2001); *Webner v. Titan Distribution, Inc.*, 101 F.Supp.2d 1215, 1222 (N.D.Iowa 2000); *Miller v. Cohen*, 52 F.Supp.2d 389, 395 (M.D.Pa. 1998) (major life activities include, but are not limited to, walking, lifting, standing, reaching, and bending, citing 29 C.F.R. Part 1630 App. §1630.2(i)); *United States v. City & County of Denver*, 49 F.Supp.2d 1233, 1253 (D.Colo. 1999), *aff'd without deciding this point*, 194 F.3d 1116 (10th Cir. 1999); *Whitfield v. Pathmark Stores, Inc.*, 39 F.Supp.2d 434 (D.Del. 1999); *Boyd v. Borg-Warner Protective Servs.*, 1999 U.S.Dist. LEXIS 13974*7 (S.D.Fla. 1999); *Yerby v. Wal-Mart Stores, Inc.*, 1997 WL 902108, at *6 (E.D.Okla. Aug. 29, 1997), *aff'd*, 145 F.3d 1347 (10th Cir. 1998) (unreported decision).  *See also Cook v. Rhode Island*, 10 F.3d 1725 (1st Cir. 1993) (belief that plaintiff's morbid obesity interfered with her ability to undertake physical activities -- including walking, lifting, bending, stooping, and kneeling -- was sufficient for jury to find that defendant viewed plaintiff's impairment as interfering with major life activities); *Miecznikowski v. UPS*, 1998 US Dist LEXIS 21581*9 (M.D.Fla. 1998) (because of his hip condition, plaintiff could not perform as the average man of his age in areas such as lifting, bending and stooping), *aff'd*, 196 F.3d 1260 (11th Cir. 1999) (without reported opinion).

Mr. Houston identified himself as a disabled veteran when he was initially employed by Dyncorp, and its successor AFS.  Specifically he had been found to have a disability rating of 70% by the Veteran's Administration following his retirement from the United States Air Force.  (PX 33: Houston Memo to Phyllis Kennedy)   In addition, he was placed on short-term disability by AFS on at least on occasion prior to the September 2004-March 2005 disability leave which culminated in the termination of his employment by the defendant. (PX 34: AFS RTW form 1/24/04)  His physicians also made recommendations in December 2004 and January 2005 to the defendant that Mr. Houston should be retrained for a more sedentary job in order to avoid future re-injury to his back.  (PX 4: Kosmatka letter; PX 5: Manski letter) AFS was aware of this record of disability on the part of Mr. Houston, and he satisfies the second alternative prong of the ADA definitional framework.

3.   Mr. Houston was regarded by AFS as having a disabling condition which caused it to terminate his employment.

AFS argues in brief that it did not consider Mr. Houston as having a disability. Yet, the Return-to-Work form required by AFS and completed by its employee designates Mr. Houston as disabled.  (PX 8: AFS-RTW form, 3/14/05) AFS placed Mr. Houston on Short-term **Disability** Leave. (PX 3: AFS letter to Houston)   Additionally, AFS's own termination paperwork for Houston indicates that he was terminated involuntarily (code "9") due to "**Physical Disability**" (code "S"). (PX 35: AFS Termination Checklist)  AFS falsely reported to the Alabama Department of Industrial Relations that Mr. Houston "voluntarily quit" his job due to "medical reasons". (PX 19: Notice of Claim & Request for Information)  AFS refused to consider Mr. Houston for any position it had available, even clerical, due to his physical restrictions. (PX 20: DIR

17

Record of Statements)  There is ample, substantial evidence from which the jury may reasonably infer that AFS regarded Mr. Houston as one who suffered from a disability which would seriously impact his ability to work for the company in any job.

B.  **AFS failed its obligation to provide an accommodation which could have permitted Mr. Houston to continue work as an aircraft mechanic or in a related position**.

1.  The defendant falsely argues that Houston's physical restrictions could not be accommodated in the aircraft mechanic position.

Mr. Houston's physical restrictions, as noted above, involved the inability to lift more than 25 pounds; climb; stand or sit more than one and a half hours; or, bend at the waist to lift, pull, twist or push. (PX 7: Medical Clearance)  AFS summarily found, without any real or verified investigation into potential modifications of the essential functions of the job vis-à-vis his restrictions that he could not be accommodated so as to return to the position of aircraft mechanic.  Both Houston and AFS employees Whitney and Westrick acknowledge that the sole extent of AFS's exploration of potential accommodation consisted of reading his physical restrictions to the air field directors. (PX 2: AFS Depo. p. 42:06-13)  One director did not even wait to hear the entire list of restrictions before he cut the AFS human resources employee off and stated that Houston could not be accommodated.  (PX 1: Houston Depo. p. 98:10-23; 174:01-15)

2.  The defendant did not discharge its obligation to engage in an open and interactive process to determine whether any reasonable accommodation was available to assist Mr. Houston to remain in the workforce.

Mr. Houston presented his undated medical clearance to return to work, along with a letter from Dr. Manski, to AFS human resources personnel upon his visit to the office on March 7, 2005.  Both the medical clearance and the letter set out his physical restrictions, and the letter recommended that he be retrained for a more sedentary

18

position. (PX 7: Medical Clearance; PX 5: Dr. Manski Letter) Houston was informed on March 7th by AFS personnel that he would not be permitted to return to work as an aircraft mechanic and reclassification as an aircraft scheduler was discussed with him. (PX 1: Houston Dep. P. 171:05-14; PX 2: AFS Dep. P. 75:11-19) He was told that he should brush up on his typing skills and submit a request for reclassification when he returned with a dated medical clearance. Mr. Houston did, in fact, get his typing skills up to speed, but when he returned to AFS on the 14th, he was summarily told that his restrictions could not be accommodated and that he could not request reclassification since he could return to active duty in his old job as an aircraft mechanic. (PX 1: Houston Depo p. 172:17-23)

The defendant mis-relies upon a section of its CBA, §35.1, to support its argument that Mr. Houston could not be reclassified because he was not an "active" employee. Section 35.1 reads as follows:

> 35.1 RECLASSIFICATIONS
> When a vacancy occurs within a bargaining unit classification, other than as a result of layoff, it will be assigned to employees on the active payroll (**i.e., not on** indefinite layoff or **a leave of absence <u>other than medical leave,</u> of more than 30 calendar days**) by seniority who have the qualifications to perform the work involved and who have valid status change request forms on file in the Personnel section. If the vacancy involves adding a person on the payroll, employees on indefinite layoff compete for the vacancy, provided they have a valid reclassification request on file. An employee's personnel file as it exists at the time the vacancy occurs, including on-the-job experience as shown in the personnel file, and the job description shall be the determining factors in filling vacancies. An employee entering a classification which he has not held before may be temporarily assigned to a shift, location, or workweek for familiarization, where he would not work alone before he has completed 60 days in the new classification. (*emphasis added*)

Mr. Houston was on medical leave from September 2004 until he returned to work in March 2005. He clearly fell within the medical leave exception in §35.1 to be treated as

though he was on the "active payroll" for the purposes of requesting reclassification. AFS pointedly fails to acknowledge this exception each time it refers to the "active" employee requirement in its argument. (Brief at p. 3, ¶ 3; p. 5 ¶ 2; and, p. 27 ¶ 2)

      3.  <u>Houston was not provided accommodation for his physical disabilities as were similarly-situated AFS employees</u>.

      In at least one instance, AFS provided accommodations, not just once but twice, for an aircraft mechanic with physical restrictions remarkably similar to those of Houston. A fellow mechanic with restrictions from her doctor that she could not "lift, push or pull more than 25 pounds, no outstretched reach, no overhead work, and no repetitive motion with arms or neck" was provided with accommodations on June 29, 2004 until she was placed on STD on December 31, 2004. (PX 10: AFS-RTW 6/28/04) She returned to work on February 23, 2005 with restrictions of "no lifting of more than 25 pounds, no climbing, and no excessive bending" and was provided an accommodation once again to return to work as an aircraft mechanic. (PX 11: AFS RTW 2/23/05) Mr. Houston himself was accommodated in January 2004 when his physician imposed restrictions on the use of his upper extremities with no lifting of more than 25 pounds. (PX 34: AFS-RTW 1/21/04) The assertion of AFS that Mr. Houston's restrictions could not be accommodated on March 14, 2005, even if only for long enough to allow him to submit a request for reclassification simply lack any credibility at all, and is substantial evidence of AFS's lack of good faith effort to provide available accommodations for Mr. Houston, as well as evidence of the lack of good faith participation in the interactive process as required by the ADA.

      Additionally, AFS has responded to Houston's discovery request by identifying 179 aircraft mechanics who received accommodations from the company in the aircraft

mechanic position between December 1, 2003 and the present.  AFS has refused to respond the Houston's request for documents[26] that would permit him to know the restrictions and accommodations offered to these individuals, but a jury could reasonably draw the inference that at least some of them were also for restrictions involving lifting, sitting, standing and bending such as Houston presented.  At the summary judgment stage, this inference must be reasonably drawn in favor of Mr. Houston.

**C.  The defendant's "legitimate, nondiscriminatory reason" for its treatment of Houston is pretextual**.

Judge Johnson, in his special concurrence in *Walker v. Nationsbank of Florida*, 53 F.3d 1548, 1564 (11th Cir. 1995), set forth several methods by which a plaintiff may prove pretext by showing that the employer's proffered legitimate reason(s) *(1) had no basis in fact, (2) did not actually motivate the employment decision, or (3) were insufficient to motivate the employment decision.* (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  <u>See also</u>: *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000)

The Eleventh Circuit has established a variety of means by which a plaintiff may demonstrate that an employer's proffered reasons for an adverse action may be found by the fact finder to be a pretext for discrimination.  Among those most pertinent to this case are that a jury may reasonably find pretext when there are inconsistencies in the testimony of the defendant regarding the reasons for the actions taken against the plaintiff

---

[26] Houston submitted interrogatories seeking the identity of employees who had been placed on medical leave or STD; submitted RTW forms; requested reclassification; and who were administratively terminated from 12/101/03 to the present.  AFS identified aircraft mechanics falling in most of these categories but has responded to accompanying requests for documents with a statement that the request is "…request is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."

(*Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)) and when the reasons proffered for the defendant's actions are false or lack credibility (*Carter v. DecisionOne Corp.*, 122 F.3d 997 (11th Cir. 1997)).

    1.  <u>AFS creates ample sufficient doubt for the fact-finder to find pretext in its varying and inconsistent statements regarding Mr. Houston's capacity and/or efforts to seek reclassification as a scheduler.</u>

Mr. Houston testified in the DIR unemployment compensation hearing that he asked to be accommodated in his old job for just one day so that he could submit the paperwork for reclassification to the sedentary position of aircraft scheduler. (PX 9: DIR Hearing pp. 9:11– 11:10)  Robert Whitney, AFS HR compliance officer (and its representative at its 30(b)(6) deposition) testified at this hearing that Mr. Houston did not have to come back to work, "not for one hour, not for one day, not at all", in order to submit a request to reclassify. (PX 9: DIR Hearing p. 12:02-06)  Mr. Whitney testified on behalf of AFS in its 30(b)(6) deposition that Mr. Houston could not seek reclassification, or be reclassified, unless he was an "active" employee.  (PX 2: AFS Depo. p. 46:13-19)  This is the position that AFS maintains in this motion for summary judgment (Brief at pp. 27-28), and it is clearly inconsistent with the prior sworn testimony of AFS's compliance officer and corporate representative, as well as the communications of AFS human resources supervisor, Darlene Whelan (PX 27, 28, 29 & 30).

Ms. Whelan wrote in AFS's response to the OFCCP in June 2005 that Mr. Houston was offered an opportunity to reclassify, but that he refused it. (PX 28: Whelan letter to EEOC)  She subsequently informed the OFCCP that AFS had a record that Mr. Houston had been offered the opportunity to reclassify (PX 29: Whelan letter to OFCCP), although they have not produced such record in this lawsuit.

Ms. Whelan wrote again to the OFCCP on July 26, 2005 in reference to the CBA provision governing reclassification, "that an 'active' employee may apply for alternate positions...At the time of Mr. Houston's return to the HR office March 14th and through March 19th, Mr. Houston had full rights to request an alternate position through the reclassification process as prescribed in Article 35 without having to return in his current classification." (PX 29: Whelan 2nd letter to OFCCP)  This is, again, contrary to Mr. Whitney's testimony in AFS's 30(b)(6) deposition, as well as being inconsistent with the language of Article 35 of the CBA and AFS's own paperwork which shows that Mr. Houston was "inactive" from October 12, 2004 until his termination on March 15, 2005 and thereafter.(PX 3: FS letter to Houston; PX 5: AFS letter to Houston; PX 2: AFS Depo. p. 29:13- 30:03)

Ms. Whelan again contradicted her statements to the OFCCP in a September 9, 2005 letter to the Veteran's Administration in response to Mr. Houston's discrimination complaint when she stated, on behalf of AFS, that Mr. Houston must have the capacity to function as an aircraft mechanic in order to be qualified to apply for reclassification to another position.  (PX 30: Whelan letter to VA)

The truth is that AFS had no intention of permitting Mr. Houston to seek an accommodation.  AFS set up an unbreachable barrier for Houston: His disabilities could be accommodated by reclassification to the aircraft scheduler position, but he could only request reclassification if he was able to return to his former job as an aircraft mechanic where AFS refused to accommodate his disabilities—even for one day.  The jury may reasonably infer from this evidence that AFS employees actively colluded and conspired to reach a decision that Mr. Houston would be denied a reasonable accommodation

between the date that Houston was informed that he could reclassify to the scheduler position (March 7) and the day of his return to work on March 14th.

2. <u>AFS's legitimate, nondiscriminatory reason for denying Mr. Houston the opportunity to seek an available accommodation lacks credibility</u>.

The reliance of AFS on its contract with the IAM, specifically section 35.1, as justification for its refusal to allow Mr. Houston to seek accommodation by reclassification as an aircraft scheduler lacks any credibility at all.  Section 35.1 contains a specific exception for employees who are on medical leave to seek reclassification opportunities: an exception that Houston clearly fell within.  The omission of this exception from AFS's brief to this Court, as well as from any of their previous responses to the numerous complaints of discrimination lodged by Mr. Houston speaks volumes regarding the willful intent of AFS to deny his rights under the ADA.  The jury will reasonably infer that AFS's stated reason for refusing Mr. Houston any opportunity for accommodation is false, and that discrimination due to his disabilities is the true reason for their failure to engage in the interactive process, to provide available accommodation; and, to terminate his employment.

Additionally, even if AFS's contention were factual, it would represent a mere sham for Mr. Houston or any other employee who returned from short-term medical disability.  All such employees are placed on "inactive" status and would have to be able to return to their prior job before they could seek reclassification.  Such a provision would be clearly illusory and discriminatory on its face.  Consideration for transfer or

24

reassignment to another job which could accommodate disabilities of returning employees, as required under the law[27.] would be impossible.

**D.** **AFS retaliated against Houston for his complaints of discrimination by actively seeking to deny him the unemployment benefits he had earned while in their employ.**

Mr. Houston establishes a prima facie case for retaliation under the ADA by showing that (1) he engaged in statutorily protected expression, (2) there was subsequently an adverse employment action, and (3) there is a causal link between the protected expression and the adverse action. *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1021 ( 11th Cir. 1994); *Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir.1998)  The causal link requirement has been interpreted broadly to require the plaintiff only to show that protected activity and the adverse employment action are not completely unrelated.

AFS makes an attempt to thwart Mr. Houston's retaliation claim by insulating the company from knowledge of his formal EEOC and OFCCP complaints. (Brief at pp. 32-33)  Houston, in fact, complained to AFS human resources personnel on the date of his termination, March 14, and on the date of his return to complete the paperwork for out processing from his job, March 15. (PX 1: Houston Depo. pp.  171:20 – 173:11; 175:13-21)

Mr. Houston also complained to the Alabama Department of Industrial Relations that he was terminated from his job due to his disabilities.  (PX 20: DIR Record of

---

[27] See: *Smith v. Midland Brake, Inc.,*  180 F.3d 1154, 1164-1166 (10th Cir. 1999) (en banc); *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1304 (D.C. Cir. 1998) (en banc);  *Ransom v. State of Arizona Bd. of Regents*, 983 F. Supp. 895 (D. Ariz. 1997); *Rouillard v. Potter*, 2003 WL 21026814, at *7 (D. Minn. 2003) (policy precluding transfers may support a failure-to-accommodate claim); Davis v. City of Grapevine, 188 S.W.3d 748, 764-765 (Tex. App.–Fort Worth 2006, rev. denied) (state law claim that tracks federal law). See also: *EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, Question 29 and n.87 (EEOC October 2002, Revised).

Statements)  AFS responded to this claim by falsely informing DIR that he "voluntarily quit" due to "medical reasons" in an attempt to deny Houston the unemployment benefits he had paid taxes for during his employ with them.(PX 19: DIR Notice)   He visited the EEO offices at Eglin AFB, Florida and Fort Rucker, Alabama beginning on March 23, 2005 to seek assistance with the discrimination against him by AFS and sent a letter dated April 4, 2005 to the EEOC, Department of Labor, OFCCP, Veteran's Administration, the governor of Alabama and the vice-president of AFS's parent company seeking assistance in obtaining accommodations for his disabilities and redress for his termination. (*See* PX 15, 17).   He also discussed his requests for personnel information to support his claims, as well as his application for unemployment benefits with Mr. Brown, on April 7th.  (PX 16: Houston Affidavit p. 1, ¶ 3)  He won an appeal of his right to receive these unemployment benefits on April 8th by defeating AFS's false statement that he had "voluntarily quit". (PX 21: DIR Notice)

AFS sought an out-of-time appeal of the award of benefits on May 23rd by claiming that Mr. Houston was still employed by AFS. (PX 23: Brown letter to DIR) Brown attempts to claim that he had no knowledge of Houston's complaints of discrimination at this time, but he admits in an email to his boss, Ms. Whelan, that he had received a call from the VA regarding Houston's complaint the previous Thursday. Brown refers to Mr. Houston in this email as the individual who has been terminated for medical accommodations. (PX 24: email to Whelan) In fact, Ms. Whelan had already received notice from the National Labor Relations Board about Mr. Houston's complaint and had entered an appearance for AFS on the case at that time. (PX 36: NLRB Notice of Appearance, 5/21/05)

AFS presented a sham argument to DIR in the appeal above that Mr. Houston had not "quit" his job as they previously claimed, but instead, that he was merely "Inactive" due to his physical condition.  He was certainly "inactive".  He had no job with AFS and no income.  AFS's sham "reinstatement" rights were only for the aircraft mechanic job which they had deemed that he could not perform. (PX 26: Manne letter to Houston) When Mr. Houston visited the AFS human resources office to talk to Mr. Brown regarding their efforts to deny him his unemployment benefits, Brown told him that he "didn't deserve to get unemployment."  (PX 16: Houston Affidavit p, 2 ¶ 4; PX 33: Houston Memo to Kennedy, 6/3/05)

There is ample substantial evidence from which the jury will infer that AFS's claim that lack of knowledge of Houston's complaints is a barrier to their culpability for retaliation in the denial of his unemployment benefits is without credibility.

AFS also seeks to avoid Houston's retaliation claim by asking the Court to adopt a rule that the claim is outside his administrative charge. (Brief at pp. 29-31)  There is no such rule in the Eleventh Circuit, however.  The Eleventh Circuit hold simply that (1) an administrative charge perfects any claim that could be reasonably covered by an investigation arising out of the charge, and (2) retaliation claims are covered by this rule. *See, e.g., Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 168-69 (11th Cir. 1988); *Gupta v. East Texas State Univ*., 654 F.2d 411, 414 (5th Cir. 1981) The law of this Circuit, dating back to Gupta, is that once a timely charge is filed the purposes of the file-charging requirement are satisfied as to any claim that could be covered by a reasonable investigation of the charge.  The point of the requirement is not to create a trap for the

unwary employee, many of whom like Houston here, file without the assistance of an attorney, but to provide general notice to the employer of the nature of the charge.

      E.      **Houston's application for and receipt of Veteran's Administration disability benefits does not preclude his ADA disability and retaliation claims**.

The defendant argues that Mr. Houston can not pursue his ADA claims against AFS because he initiated inquiries to the VA in early 2005 about a potential increase in his disability rating and ultimately was rated 100% disabled according the VA's guideline in December 2005 after surgery to his shoulder.  Mr. Houston notes, initially, that AFS has not shown that the qualifying conditions for VA disability and the ADA are identical so that approval for VA benefits would preclude one from being a "qualified individual, with or without accommodations" as required to work under the ADA.  They are not; in fact, Mr. Houston had been rated 70% disabled by the VA at the time AFS employed him in the strenuous position of aircraft mechanic, and the basis of his complaint to the VA after his termination was that AFS refused to accommodate his disabilities when they terminated him. (PX 33: Memo to Kennedy)

The U. S. Supreme Court has held, in *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795 (1999), that conflicting statements in the disability application context do not preclude a plaintiff from pursuing an ADA claim of disability.  This is especially true in situations where the standards applicable to the claims are different.  As the Court noted in *Cleveland*, the requirements for disability under Social Security (and the VA) do not make any provision for accommodations such as Houston sought from AFS. (*Id*. at 803)   The letter from Dr. Manski that AFS relies upon on this point in its brief to this Court (at p. 4, ¶ 3) specifically states that Mr. Houston should be accommodated by a more sedentary job such as the aircraft scheduler position that AFS

refused to allow him to pursue. (DX B at Ex. 14)  The letter to Dr. Chen, dated February 2, 2005[28,] requesting his assistance in providing information regarding his shoulder problems to support his pending effort to increase his VA disability rating does not contain any statements that Houston claimed he was totally unable to work in any job, with or without accommodations.

These letters are nothing more than Houston's quite realistic effort, in the face of Dr. Manski's admonition that he should not resume work as an aircraft mechanic in order to avoid possible future re-injury to his back, to pursue whatever claims might be available to him to ensure that he had a replacement income in the event he was not returned to work.  The Supreme Court, in *Cleveland*, fully endorsed a person's right to "set forth two or more statements of a claim or defense hypothetically" and to "state as many separate claims or defenses as a party has, regardless of consistency."[29] *Id.* at 805.

Houston testified that he is still capable of performing the duties of the aircraft scheduler position he sought reassignment to as an accommodation, but to do so would require him to forsake the increased disability allowance he received from the VA following the post-termination surgery to his shoulder. (PX 1: Houston Depo. p. 140:18-141:13)  It was this third rotator cuff surgery on his left shoulder in September 2005 that led Mr. Houston to submit his September 19, 2005 letter to Dr. Chen requesting that the doctor inform the VA that he should be removed from the workforce. (PX 1: Houston Depo. pp.157:22-158:16; DX B at EX 47)  These statements are not at all inconsistent

---

[28] AFS misstates in its brief at p. 9 that Houston's letter of this date contained statements relating to his requesting to be removed from the workforce.  Ex. 47 is actually a letter dated 9/25/05; well after AFS's discrimination against Houston and after his subsequent shoulder surgery.

[29] Houston applied for Social Security disability following the initiation of this lawsuit, but was found not be disabled because he was capable of sedentary work such as that required of an aircraft scheduler for which he sought accommodation. (See Dft. Brief, Ex. K: p.6 of 78)

29

with Houston's ADA claims that he was able to work with accommodations in March of 2005, or that AFS retaliated against him for his claims of their discriminatory conduct. His actions are absolutely reasonable and understandable in the context of AFS's termination of his employment; their willful efforts to deny him the unemployment benefits that he had earned while in their employ; his inability to find any other employment following his termination; and, the limitations imposed by his subsequent shoulder surgery. (PX 1: Houston Depo. p. 140:04-17)

### V. Conclusion

The plaintiff has shown by reference to material on file with this response that there are material and substantial issues of fact for the jury on his ADA and retaliation claims against Army Fleet Support, L.L.C. in this action. The defendant's motion for summary judgment is due to be denied.

Respectfully submitted this 3rd day of May 2007.

/S/ **JIMMY JACOBS**
JIMMY JACOBS (JAC051)
Attorney for Plaintiff
4137 Carmichael Rd, Ste 100
Montgomery, Alabama 36106
(334) 215-1788

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using CM/ECF system and service will be perfected upon counsel of record following this the 3rd day of May, 2007.

/s/JIMMY JACOBS
Jimmy Jacobs (JAC051)
4137 Carmichael Road, Ste 100
Montgomery, Alabama 36106
(334)215-1788


COUNSEL OF RECORD:

M. Jefferson Starling (STA062)
Brent T. Cobb (COB020)
Monica G. Graveline (GRA100)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306