

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

---

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  SOUTHERN DIVISION
4
5  CASE NUMBER:  1:06-cv-243-MEF
6
7  SAMUEL HOUSTON,
8      Plaintiff,
9  vs.
10  ARMY FLEET SERVICES, L.L.C.,
11      Defendant.
12
13
14  BEFORE:
15  Cynthia M. Noakes, Commissioner
16  and Court Reporter
17
18
19
20  DEPOSITION TESTIMONY OF SAMUEL HOUSTON
21
22
23  *****************************

---

**Page 2**

1  S T I P U L A T I O N
2
3      IT IS STIPULATED AND AGREED by and
4  between the parties through their respective
5  counsel, that the deposition of SAMUEL HOUSTON
6  may be taken before Cynthia M. Noakes, Court
7  Reporter, at the Offices of HOLIDAY INN EXPRESS,
8  1006 Boll Weevil Circle, Enterprise, Alabama
9  36330, on the 20th day of February, 2007.
10      IT IS FURTHER STIPULATED AND AGREED
11  that the signature to and the reading of the
12  deposition by the witness is waived, the
13  deposition to have the same force and effect as
14  if full compliance had been had with all laws and
15  rules of Court relating to the taking of
16  depositions.
17      IT IS FURTHER STIPULATED AND AGREED
18  that it shall not be necessary for any objections
19  to be made by counsel to any questions except as
20  to the form or leading questions, and that
21  counsel for the parties may make objections and
22  assign grounds at the time of the trial, or at
23  the time said deposition is offered in evidence,

---

**Page 3**

1  or prior thereto.
2      IT IS FURTHER STIPULATED AND AGREED
3  that the notice of filing of the deposition by
4  the Court Reporter is waived.
5
6
7
8
9
10
11
12
13
14
15
16  *****************************************
17
18
19
20
21
22
23

---

**Page 4**

1  INDEX
2  EXAMINATION BY:
3  MR. STARLING                    PAGE NUMBER:
                                    8-167, 176-179
4  MR. JACOBS                      167-176
5
6  EXHIBITS:
7  Defendant's Exhibit No. 1        12
8  Defendant's Exhibit No. 2        29
9  Defendant's Exhibit No. 3        47
10  Defendant's Exhibit No. 4        50
11  Defendant's Exhibit No. 5        57
12  Defendant's Exhibit No. 6        61
13  Defendant's Exhibit No. 7        65
14  Defendant's Exhibit No. 8        67
15  Defendant's Exhibit No. 9        77
16  Defendant's Exhibit No. 10       81
17  Defendant's Exhibit No. 11       82
18  Defendant's Exhibit No. 12       85
19  Defendant's Exhibit No. 13       87
20  Defendant's Exhibit No. 14       90
21  Defendant's Exhibit No. 15       96
22  Defendant's Exhibit No. 16       103
23  Defendant's Exhibit No. 17       107

---

1 (Pages 1 to 4)

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**



**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3               SOUTHERN DIVISION
4
5    CASE NUMBER:  1:06-cv-243-MEF
6
7    SAMUEL HOUSTON,
8        Plaintiff,
9    vs.
10   ARMY FLEET SERVICES, L.L.C.,
11       Defendant.
12
13
14   BEFORE:
15    Cynthia M. Noakes, Commissioner
16     and Court Reporter
17
18
19
20   DEPOSITION TESTIMONY OF SAMUEL HOUSTON
21
22
23    ****************************
```

Page 2

```
1         S T I P U L A T I O N
2
3        IT IS STIPULATED AND AGREED by and
4    between the parties through their respective
5    counsel, that the deposition of SAMUEL HOUSTON
6    may be taken before Cynthia M. Noakes, Court
7    Reporter, at the Offices of HOLIDAY INN EXPRESS,
8    1006 Boll Weevil Circle, Enterprise, Alabama
9    36330, on the 20th day of February, 2007.
10       IT IS FURTHER STIPULATED AND AGREED
11   that the signature to and the reading of the
12   deposition by the witness is waived, the
13   deposition to have the same force and effect as
14   if full compliance had been had with all laws and
15   rules of Court relating to the taking of
16   depositions.
17       IT IS FURTHER STIPULATED AND AGREED
18   that it shall not be necessary for any objections
19   to be made by counsel to any questions except as
20   to the form or leading questions, and that
21   counsel for the parties may make objections and
22   assign grounds at the time of the trial, or at
23   the time said deposition is offered in evidence,
```

Page 3

```
1   or prior thereto.
2        IT IS FURTHER STIPULATED AND AGREED
3    that the notice of filing of the deposition by
4    the Court Reporter is waived.
5
6
7
8
9
10
11
12
13
14
15
16    ****************************************
17
18
19
20
21
22
23
```

Page 4

```
1                INDEX
2    EXAMINATION BY:              PAGE NUMBER:
3    MR. STARLING            8-167, 176-179
4    MR. JACOBS                  167-176
5
6    EXHIBITS:
7    Defendant's Exhibit No. 1          12
8    Defendant's Exhibit No. 2          29
9    Defendant's Exhibit No. 3          47
10   Defendant's Exhibit No. 4          50
11   Defendant's Exhibit No. 5          57
12   Defendant's Exhibit No. 6          61
13   Defendant's Exhibit No. 7          65
14   Defendant's Exhibit No. 8          67
15   Defendant's Exhibit No. 9          77
16   Defendant's Exhibit No. 10         81
17   Defendant's Exhibit No. 11         82
18   Defendant's Exhibit No. 12         85
19   Defendant's Exhibit No. 13         87
20   Defendant's Exhibit No. 14         90
21   Defendant's Exhibit No. 15         96
22   Defendant's Exhibit No. 16        103
23   Defendant's Exhibit No. 17        107
```

1 (Pages 1 to 4)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 5

1        INDEX (continued)
2
3    Defendant's Exhibit No. 18      109
4    Defendant's Exhibit No. 19      112
5    Defendant's Exhibit No. 20      113
6    Defendant's Exhibit No. 21      114
7    Defendant's Exhibit No. 22      115
8    Defendant's Exhibit No. 23      116
9    Defendant's Exhibit No. 24      118
10   Defendant's Exhibit No. 25      119
11   Defendant's Exhibit No. 26      131
12   Defendant's Exhibit No. 27      132
13   Defendant's Exhibit No. 28      136
14   Defendant's Exhibit No. 29      149
15   Defendant's Exhibit No. 30      150
16   Defendant's Exhibit No. 31      151
17   Defendant's Exhibit No. 32      153
18   Defendant's Exhibit No. 33      154
19   Defendant's Exhibit No. 34      154
20   Defendant's Exhibit No. 35      155
21   Defendant's Exhibit No. 36      156
22   Defendant's Exhibit No. 37      156
23   Defendant's Exhibit No. 38      156

Page 6

1        INDEX (continued)
2
3    Defendant's Exhibit No. 39      158
4    Defendant's Exhibit No. 40      160
5    Defendant's Exhibit No. 41      160
6    Defendant's Exhibit No. 42      161
7    Defendant's Exhibit No. 43      161
8    Defendant's Exhibit No. 44      162
9    Defendant's Exhibit No. 45      163
10   Defendant's Exhibit No. 46      176
11   Defendant's Exhibit No. 47      177
12   Reporter's Certificate         180
13
...
20   *****************************************

Page 7

```
1            APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF:
4        JIMMY JACOBS, Esquire
5        4137 Carmichael Road
6        Suite 100
7        Montgomery, Alabama  36106
8        (334) 215-1788
9
10   ON BEHALF OF THE DEFENDANT:
11       M. JEFFERSON STARLING, III, Esquire
12       MONICA B. GRAVELINE, Esquire
13       BALCH & BINGHAM, LLP
14       1710 Sixth Avenue North
15       Birmingham, Alabama  35203
16       (205) 226-3406
17
18   ALSO PRESENT:
19       KEN DEMARKO, Army Fleet Support
20       Representative
21
22   *****************************************
23
```

Page 8

```
1        I, CYNTHIA M. NOAKES, a Court Reporter
2    of Eufaula, Alabama, acting as Commissioner,
3    certify that on this date, as provided by the
4    Alabama Rules of Civil Procedure and the
5    foregoing stipulation of counsel, there came
6    before me at the Offices of HOLIDAY INN EXPRESS,
7    1006 Boll Weevil Circle, Enterprise, Alabama
8    36330, beginning at 9 a.m., SAMUEL HOUSTON,
9    witness in the above cause, for oral examination,
10   whereupon the following proceedings were had:
11
12       SAMUEL HOUSTON,
13   being first duly sworn, was examined and
14       testified as follows:
15
16       THE COURT REPORTER:  Usual
17   stipulations?
18       MR. JACOBS:  Yes.
19       MR. STARLING:  Sure.
20
21       EXAMINATION
22   BY MR. STARLING:
23   Q.   Mr. Houston, have you ever been deposed
```

2 (Pages 5 to 8)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 9

1    before?
2    A.    (No response.)
3    Q.    We're in a deposition today. Have you ever
4    been in this setting before?
5    A.    No, I haven't.
6    Q.    Okay. Just some kind of background
7    information: I'm going to be asking questions
8    today for you to answer. You're sworn under oath
9    at this point in time. Do you understand that?
10   A.    Yes, I do.
11   Q.    If you don't understand the question, please
12   ask me to rephrase it; I'll be happy to.
13   A.    I will.
14   Q.    We've got a court reporter here who is
15   taking a transcript of this. That requires you
16   answer verbally, so head nods and uh-huhs will not
17   work. It's a natural human reaction to do that.
18        So at times I may ask you, "Was that a yes
19   or a no?" just so it will be clear. So if you'll
20   try to do that, that will help us move along
21   quicker today.
22        Is there anything that would prevent you
23   from testifying truthfully today?

Page 10

1    A.    No.
2    Q.    Anything that would prevent you from
3    testifying to the fullest extent of your knowledge
4    today?
5    A.    No.
6    Q.    Are you taking any drugs or alcohol
7    currently that would affect your ability to
8    testify truthfully and to the fullest extent of
9    your knowledge?
10   A.    No.
11   Q.    Any mental problems that would prevent you
12   from testifying truthfully today and to the
13   fullest extent of your knowledge?
14   A.    No.
15   Q.    Any physical problems that would prevent you
16   from testifying truthfully today or to the fullest
17   extent of your knowledge?
18   A.    No.
19   Q.    Have any trouble sleeping last night?
20   A.    Yes.
21   Q.    What happened last night?
22   A.    Just didn't get a good night's sleep.
23   Q.    Because of the deposition or anything else?

Page 11

1    A.    Strange environment, different bed.
2    Q.    You stayed in a hotel last night?
3    A.    Upstairs.
4    Q.    Oh, here at this hotel?
5    A.    Yes, sir.
6    Q.    Okay. Suffering from schizophrenia?
7    A.    No.
8    Q.    Manic depression?
9    A.    No.
10   Q.    Do you have any bipolar disorder?
11   A.    No.
12   Q.    In good mental health?
13   A.    Yes.
14   Q.    Any history of any of those mental disorders
15   -- schizophrenia, bipolar disorder, anything of
16   that nature?
17   A.    No.
18   Q.    Are you currently taking any medications?
19   A.    Yes, I am.
20   Q.    What medications are you taking?
21   A.    I have a list here.
22   Q.    Okay. Okay. I think what we'll do is mark
23   that as Defendant's Exhibit 1 to this deposition,

Page 12

1    and when we get an opportunity we can make a copy
2    of it.
3             (Defendant's Exhibit No. 1 was
4             marked for identification and a
5             copy of the same is attached
6             hereto.)
7    Q.    Okay. Mr. Houston, I've got in front of me
8    what we've marked as Defendant's Exhibit No. 1,
9    and this appears to be a list of drugs that you
10   are currently taking; is that correct?
11   A.    Yes.
12   Q.    And I see you have them broken down into
13   what looks like four categories. The first one
14   has 13 different drugs on it. What are those
15   drugs for?
16   A.    Okay. Number one is Glucophage. I'm a
17   diabetic, type 2. Number two is Lexapro. That is
18   for my anxiety and depression. Number three is
19   Tricor. That's for -- I'm thinking here -- the
20   high blood pressure. It's a statin drug. Keeps
21   cholesterol down. Cymbalta is for my pain
22   management for my spinal problem. Lyrica is pain
23   management for my spinal problem. Ecotrin is a

3 (Pages 9 to 12)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

### Page 13

1  baby aspirin for heart attack prevention.
2  Prinivil is for my blood pressure. Ambien is for
3  getting a good night's sleep. The Doryx is for an
4  infection of my scalp. The Zyrtec-D is for a
5  sinus problem. The Robinul is for my scalp
6  problem. The Lidoderm patches are for my lower
7  back -- muscular problems. And I'm going to
8  slaughter the pronunciation of this; it's --
9  Q.    Why don't you just spell it?
10  A.    C-L-O-B-E-T-A-S-O-L P-R-O-P-I-O-N-A-T-E.
11  And that is topical solution for the itch in my
12  scalp. Pain medications taken as needed: Lortab,
13  which I no longer take because it makes me itch.
14  I have a reaction to it. The Vicodin, which I no
15  longer take because it doesn't work; and the
16  OxyContin, which I very rarely take, maybe once a
17  month, due to the highly addictive nature of the
18  drug and that I am very aware of this medicine's
19  problems.
20  Q.    Which pain is that for?
21  A.    Lower back. And I also have a pain in my
22  shoulder.
23      Dietary supplements taken daily:

### Page 14

1  Glucosamine and Chondroitin with MSM; Evening Prim
2  Rose Oil; Cinnamon; and a diabetic health pack by
3  Nature Made.
4      And I also take this medication for stomach
5  pain as needed: Phenergan.
6  Q.    What is the stomach problem?
7  A.    I had a GERD, a hiatal hernia with a reflex.
8  And I had that for 14 years and I was on
9  medication for it. And back about '97, I had a
10  surgery to fix it. And if, say, I was to get sick
11  and I needed to vomit, well I cannot vomit because
12  of the Lap Nissen knot. What they do is they take
13  your stomach and wrap it around your esophagus and
14  tie a knot there. Well, if I was to try to vomit,
15  I'd break the knot and end up back in surgery. So
16  the Phenergan takes care of any need for me to ...
17  Q.    Okay. Had you been taking any of the pain
18  medications prior to the back surgery you had in,
19  what was it, 2004?
20  A.    No.
21  Q.    Was it 2004 or '-5 that you had the back
22  surgery?
23  A.    I can't remember exactly.

### Page 15

1  Q.    But you were not taking any of the pain
2  medications before that?
3  A.    Right. I was not on any medication prior to
4  that -- pain medications.
5  Q.    Pain medications, correct. You had some
6  medications for some other problems you've had;
7  but the pain medications, not until you had the
8  back surgery that you started taking those?
9  A.    Right. Afterwards.
10  Q.    And none of these drugs affect your ability
11  to remember anything or testify truthfully today?
12  A.    Remember? Well, no, I can remember.
13  Q.    And nothing would affect your ability to
14  testify truthfully?
15  A.    That's correct.
16  Q.    Have you -- in the past, have you taken
17  Zoloft and other drugs of that nature?
18  A.    I was on Zoloft; and I got off it and I went
19  to the Lexapro.
20  Q.    How often do you take the -- I see out here,
21  just so I can be clear, on this Defendant's
22  Exhibit 1, you've got beside each drug a
23  milligrams and what appears to be the time you

### Page 16

1  take it each day; is that correct?
2  A.    That's correct.
3  Q.    So, for example, on the first one --
4  A.    The Glucophage.
5  Q.    You take 850 milligrams twice daily?
6  A.    That's correct. Once in the morning and
7  once in the evening.
8  Q.    Have you ever been involved in any other
9  type of litigation, other than this case?
10  A.    I hired Bender & Bender to represent me for
11  my Social Security Disability.
12  Q.    When was that?
13  A.    Last year.
14  Q.    Okay. And did you apply for Social Security
15  Disability?
16  A.    Yes.
17  Q.    And what did you hire them to do?
18  A.    Represent me.
19  Q.    And what was the result of your application
20  for Social Security Disability?
21  A.    It's in progress right now.
22  Q.    The claim has not been resolved one way or
23  the other?

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

### Page 17

1 A. This is true.
2 Q. Was there any initial denial of the claim?
3 A. No, not yet.
4 Q. When did you end up filing the application?
5 A. This past summer.
6 Q. Do you know if that is a document that you
7 have produced to us already?
8 A. I believe not. I don't believe I've
9 produced any documents to that.
10 Q. Did you complete an application for Social
11 Security Disability?
12 A. Yes, I have.
13 Q. What is your claim for Social Security
14 Disability based on?
15 A. My lower back and my shoulder, and my feet
16 and my diabetes and my neuropathy.
17 Q. What is neuropathy?
18 A. A lack of sense of feeling due to diabetes.
19 Q. It's a result of the diabetes?
20 A. Yes.
21 Q. Where do you have the lack of sensations or
22 feelings?
23 A. From my tips of my toes all the way up to my

### Page 18

1 hips.
2 Q. So in making your Social Security Disability
3 claim, it was the back, the shoulder -- you had,
4 what, rotator cuff surgery on the shoulder?
5 A. Yes.
6 Q. And your diabetes?
7 A. Yes.
8 Q. And they have not responded to you?
9 A. No, they have not.
10 Q. Did they give you any type of deadline of
11 when they will respond?
12 A. No.
13 Q. Other than your application for your Social
14 Security Disability, have you been involved in any
15 other type of litigation? For example, as a
16 witness?
17 A. No.
18 Q. As a party to any other type of litigation?
19 A. No.
20 Q. Have you ever been charged with any crimes
21 or arrested?
22 A. No. Excuse me. When you say "crimes," do
23 you mean felonies?

### Page 19

1 Q. Felonies or misdemeanors. I wouldn't
2 include speeding tickets.
3 A. No.
4 Q. For example, have you been arrested for DUI
5 before?
6 A. No, I have not.
7 Q. Where did you grow up?
8 A. Where did I grow up? I was a military brat;
9 I grew up all over the world.
10 Q. Where did you attend high school?
11 A. I attended high school -- the first high
12 school I went to was Clearwater Central Catholic,
13 then I went to Boca Ciega, and then I went to
14 Seminole, all in Pinellas County, Florida, the St.
15 Petersburg area down there.
16 Q. Which one did you graduate from?
17 A. Seminole.
18 Q. Was your father in the military?
19 A. Yes, he was.
20 Q. What did he do?
21 A. He was in the Coast Guard for 31 years.
22 Q. After you graduated from high school, what
23 did you do?

### Page 20

1 A. I went to Pinellas Vocational Technical
2 Institute to be an auto mechanic.
3 Q. What year did you graduate high school?
4 A. '75.
5 Q. And you studied to be an auto mechanic at
6 Pinellas Vocation Technical School?
7 A. Yes.
8 Q. How long did you do that?
9 A. About two years.
10 Q. Did you end up with any degree or graduate?
11 A. Yeah, I graduated.
12 Q. What was your degree in?
13 A. Oh, I didn't get a degree; it was just a
14 diploma type.
15 Q. What did you do after that?
16 A. Joined the Air Force.
17 Q. Where were you stationed first in the Air
18 Force?
19 A. Kadena Air Base, Okinawa, Japan.
20 Q. How long were you there?
21 A. About two and a half years.
22 Q. How long did you stay in the Air Force all
23 together?

5 (Pages 17 to 20)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 21

1  A.  24 years, two months, 16 days.
2  Q.  What was the highest rank you achieved?
3  A.  E-7, Master Sergeant.
4  Q.  And what was your specialty?
5  A.  I was an aircraft maintenance technician.
6  Q.  What did you do as an aircraft maintenance
7  technician?
8  A.  I did aircraft maintenance; all phases of
9  aircraft maintenance, from minor maintenance to
10  major maintenance to anything that needed to be
11  done in the way of my career field.
12  Q.  Any particular type of aircraft?
13  A.  Yes.  I worked F-4s, and then I worked
14  A-10s, then I worked F-16s.  That's about it.
15  Q.  When you reached the level of E-7, is that
16  what you were before you retired, or is that the
17  highest level?
18  A.  That's the highest level, yes.
19  Q.  How long were you an E-7?
20  A.  From '97 to '01.
21  Q.  Those years that you just described, '97 to
22  '01, what were your duties when you were an E-7
23  then?

Page 22

1      For example, did you have any supervisory
2  responsibilities?
3  A.  Oh, yes.  I was in management.
4  Q.  Can you generally describe what your duties
5  were?
6  A.  I ran a phase dock -- phase inspection.
7  Q.  And what does that mean?
8  A.  We have aircraft that are required for
9  "periodical" maintenance to come into a hangar;
10  and they get dismantled, inspected, serviced, ops
11  check all the necessary operational checks,
12  reassembled and test flown.  And I oversaw all of
13  that.
14  Q.  How many people did you supervise in that
15  position?
16  A.  On the books, I was authorized 35.  I was
17  authorized 35 people.
18  Q.  Is that typically how many you ended up
19  having?
20  A.  No.  What you're authorized and what you
21  have assigned are ...
22  Q.  How many did you have assigned?
23  A.  About 18.

Page 23

1  Q.  I assume, in the Air Force, you received
2  certification in certain technical areas.  I don't
3  need an unlimited list, but, in general, what type
4  of certifications or special training did you
5  receive?
6  A.  Like social action training, EOT, human
7  relations training, management, or I would call
8  supervisor leadership courses, official Air Force
9  management courses, NCO what they call
10  professional military education courses,
11  leadership courses, the NCO Academy courses.
12      All these courses are there to polish up the
13  skills you already have.
14  Q.  And just for the benefit of our record here,
15  NCO is noncommissioned officer?
16  A.  That's correct.
17  Q.  And all of those training courses were in
18  addition to, I assume, the technical aircraft
19  maintenance training you had received years
20  before?
21  A.  Yes, sir.
22  Q.  Are you currently married?
23  A.  Yes, I am.

Page 24

1  Q.  And what is your spouse's name?
2  A.  Brigitte.  It's spelled the French way:
3  B-R-I-G-I-T-T-E.
4  Q.  How long have you been married?
5  A.  Since '83.
6  Q.  Were you married previously?
7  A.  No, I have not been married previously.
8  Q.  This is your first and only marriage?
9  A.  Yes.
10  Q.  Do you have any children?
11  A.  Yes, I do.
12  Q.  How old are they?
13  A.  20 and 22.
14  Q.  Do they live in Alabama?
15  A.  No, they don't.
16  Q.  Do you have any relatives living in Alabama?
17  A.  I have one relative that lives up in a Arab,
18  Alabama, the north part of Alabama; but nobody in
19  the southern part of Alabama.
20  Q.  Does your wife currently work?
21  A.  Yes, she does.
22  Q.  What does she do?
23  A.  She is an office manager/biller and coder

6 (Pages 21 to 24)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

**Page 25**

1  for three doctors.
2  Q.  What is the name of the practice group?
3  A.  (No response.)
4  Q.  Or do you know the name of the three
5  doctors?
6  A.  Oh, I know the name of the three doctors.
7  Q.  Can you tell me them?
8  A.  Dr. Alec Schmidt.
9  Q.  S-C-H-M-I-D-T?
10  A.  Yes. Dr. Wayne Justice, and Dr. Kit Kuss.
11  Q.  What type of practice is it?
12  A.  General.
13  Q.  And where are they located?
14  A.  Niceville. Twin City Hospitals complex.
15  Q.  Where do you currently reside?
16  A.  4765 Coronado Circle, Crestview, Florida
17  32539.
18  Q.  How long have you been at that address?
19  A.  Since '97.
20  Q.  Are you a member of any church?
21  A.  Yes, I am.
22  Q.  What church is that?
23  A.  Our Lady of Victory.

**Page 26**

1  Q.  And where is that located?
2  A.  Crestview, Florida.
3  Q.  A member of any civic or social groups?
4  A.  Does a shooting club be considered a social
5  group?
6  Q.  Sure.
7  A.  The Herbert Field Shooting Club.
8  Q.  Is that like skeet shooting?
9  A.  No, it's no skeet; it's just a rifle and
10  pistol range.
11  Q.  Is that something you participate in?
12  A.  When I can.
13  Q.  Are you still doing it now?
14  A.  I haven't currently done it in about a year.
15  Q.  Any particular reason?
16  A.  No.
17  Q.  Did you do anything to prepare for your
18  deposition today?
19  A.  Define "prepare."
20  Q.  Did you review any documents to prepare for
21  today?
22  A.  Yes.
23  Q.  What all did you review?

**Page 27**

1  A.  Documents supplied by my attorney.
2  Q.  And were those documents you had previously
3  given your attorney?
4  A.  Yes.
5  Q.  Do you know if you have produced all of
6  those documents to us, if we have been given
7  copies of those documents?
8  A.  You would have to ask my attorney.
9       MR. STARLING:  Do you want to go off
10  the record just for a second?
11       (An off-the-record discussion
12       was held.)
13       MR. STARLING:  Counsel confirmed that
14  Plaintiff has not reviewed any documents that have
15  not been produced by the defendant to the
16  plaintiff or by the plaintiff to the defendant.
17  (BY MR. STARLING)
18  Q.  Did you meet with your attorney prior to
19  today to prepare for this deposition?
20  A.  Yes.
21  Q.  Approximately how long did you meet with
22  him?
23  A.  About two and a half hours yesterday.

**Page 28**

1  Q.  What year did you get out of the military?
2  A.  '01.
3  Q.  What was your reason for leaving?
4  A.  High year tenure.
5  Q.  What does that mean?
6  A.  That means if you stay in one rank long
7  enough, you have reached what the military calls,
8  "high year tenure." If you do not progress to the
9  next rank, you have to get out at that year of
10  grade, year in grade and time.
11       So that means if I spent 24 years as a
12  Master Sergeant E-7 in the Air Force, I had
13  reached my high year tenure and I could not stay
14  in the Air Force any longer.
15  Q.  What would be the next grade after E-7?
16  A.  Senior Master Sergeant, E-8.
17  Q.  Is that something you applied for?
18  A.  No. It's testable.
19  Q.  Like a written test?
20  A.  Yes, sir.
21  Q.  Did you attempt to test it?
22  A.  Yes.
23  Q.  And did not pass, I take it?

7 (Pages 25 to 28)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 29

1   A.   That's right.
2   Q.   What did you do after you retired from the
3   Air Force?
4   A.   I went to work for Discount Auto Parts as a
5   cashier and counterman.
6   Q.   Where was that?
7   A.   At Fort Walton Beach.
8   Q.   Let me hand you what I'm going to mark as
9   Exhibit 2.
10        (Defendant's Exhibit No. 2 was
11        marked for identification and a
12        copy of the same is attached
13        hereto.)
14  Q.   I will tell you that this is a copy of your
15  response to interrogatories that the defendant may
16  have had served on you.
17       If you will look on page 9, you'll see a
18  signature blank for your name.  Is that your
19  signature?
20  A.   Yes, it is.
21  Q.   And is all the information provided in your
22  responses to these interrogatories true and
23  correct?

Page 30

1   A.   Yes, it is.
2   Q.   Starting on the first page, Question No. 2
3   says to identify all employers you've worked with
4   in the past ten years.  I see the Air Force, then
5   Discount Auto Parts, Chromalloy Gas Turbin, Army
6   Fleet Support Fort Rucker.
7       Are those all the employers you've worked
8   for since you retired from the Air Force?
9   A.   Yes.
10  Q.   Not any additional ones?
11  A.   No.
12  Q.   Do you recall your last day of work with the
13  defendant, AFS, the date of it?
14  A.   It's September --
15  Q.   Let me ask you this question:  What I'd like
16  you to do is list all your earnings that you have
17  had since the time your employment with AFS ended.
18  A.   Could you rephrase that question, please?
19  Q.   Can you tell me all of your earnings that
20  you've had since your employment with AFS
21  terminated?
22  A.   After my employment?
23  Q.   Correct.

Page 31

1   A.   Okay.  All my earnings.  The sources of my
2   earnings?
3   Q.   Correct.  And maybe we can start with:  Have
4   you been employed anywhere else since your
5   employment with AFS terminated?
6   A.   No, I haven't.
7   Q.   Have you sought employment anywhere else?
8   A.   Yes, I have.
9   Q.   Where all have you sought employment?
10  A.   I've gone to JobsPlus in Crestview, Florida.
11  Q.   And what is JobsPlus?
12  A.   It's the employment agency that's run by the
13  State of Florida.
14  Q.   Did you complete an application there?
15  A.   Yes.  I filled out an application online to
16  their computer system.
17  Q.   And have they submitted your application to
18  any employers?
19  A.   Not that I know of.
20  Q.   Have you interviewed with any employers?
21  A.   No.
22  Q.   What type of job were you seeking through
23  JobsPlus?

Page 32

1   A.   Aviation related jobs.
2   Q.   So in the aviation industry?
3   A.   Yes.
4   Q.   Are there any --
5       MR. STARLING:  Hold on just a second.
6       (An off-the-record discussion
7       was held.)
8   (BY MR. STARLING)
9   Q.   Are you aware of any aviation jobs near the
10  area where you live?
11  A.   Yes.  I was contacted by the Veterans Center
12  in JobsPlus and referred to Crestview Aerospace
13  for a possible hiring on a CH-47 program that
14  Crestview Aerospace was spinning up.
15  Q.   And did you interview for that job?
16  A.   No, I didn't.
17  Q.   Did you submit an application for it?
18  A.   Yes, I did.
19  Q.   And am I to assume that you did not get that
20  job?
21  A.   Correct.
22  Q.   Did they provide you with any reason?
23  A.   No.

8 (Pages 29 to 32)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 33

1  Q.   How did you learn that you did not get it?
2  A.   I made inquiries of Crestview Aerospace.
3  Q.   And they simply said they were not hiring?
4  A.   They hired somebody a week before my
5  application made it to their desk.
6  Q.   Are you aware of your application being
7  submitted by JobsPlus to any other employers?
8  A.   Just the Crestview Aerospace. Because they
9  are the only aviation -- well, they're not the
10  only aviation industry there, but the primary one.
11  Q.   What other ones are there?
12  A.   A few.
13  Q.   Have you -- how far away are you from Fort
14  Rucker?
15  A.   It was 96 miles from my front door to the
16  time clock at Cairns ATTC.
17  Q.   Would you seek employment at Fort Rucker
18  now, or are you?
19  A.   No.
20  Q.   Because of distance or other reasons?
21  A.   Other reasons.
22  Q.   And what reasons are those?
23  A.   May I speak to my lawyer?

Page 34

1  Q.   I mean, unless it's some privileged
2  conversation, I would ask that you answer the
3  question.
4       MR. JACOBS:  Would you repeat the
5  question?
6       MR. STARLING:  I said:  Is there some
7  reason you're not seeking employment at somewhere
8  in Fort Rucker?
9       MR. JACOBS:  If you can answer, go
10  ahead and answer.
11  A.   I no longer can work in the workforce.
12  Q.   In any capacity?
13  A.   In any capacity; that's correct.
14  Q.   Was there a job you could have performed at
15  the company you named earlier that you submitted
16  an application to?
17  A.   Yes. Prior to this decision being made.
18  Q.   What job were you seeking at that company?
19  I'm sorry. What was the name of it, the one in
20  Crestview?
21  A.   Crestview Aerospace.
22  Q.   What type of job were you seeking there?
23  A.   It was a job to work with the CH-47 program.

Page 35

1  Q.   An aircraft mechanic job?
2  A.   Yes.
3  Q.   When did you seek that job?
4  A.   During the summer of '05, I believe.
5  Somewhere thereabouts. No. I can't remember. I
6  take that back.
7  Q.   Just to refresh your memory, in your
8  Complaint, you allege that in August of '04 is
9  when you went out from work from AFS with the back
10  injury.
11  A.   Uh-huh.
12  Q.   And then you had surgery in November of
13  2004?
14  A.   Yes.
15  Q.   And then in March of 2005 is when you were
16  placed on a form of administrative leave from AFS;
17  no longer an active employee, I guess?
18  A.   That's correct.
19  Q.   So given those dates, when is it that you
20  think you applied with Crestview Aerospace?
21  A.   Later on that year.
22  Q.   In 2005?
23  A.   Yes.

Page 36

1  Q.   And at the time that you applied then, did
2  you think that you could perform an aircraft
3  maintenance job?
4  A.   Yes.
5  Q.   Was I understanding your testimony a little
6  while ago, you no longer believe you're capable of
7  performing that aircraft maintenance job?
8  A.   That's true.
9  Q.   When was that change in your position?
10  A.   When the Veterans Administration -- I filed
11  a claim to the Veterans Administration, and I was
12  deemed totally and permanently disabled by them,
13  and unemployable.
14  Q.   And do you consider yourself unemployable at
15  this stage?
16  A.   Yes, I do.
17  Q.   So we're clear on the record, is it your
18  position that there is no job that you can perform
19  at this point in time?
20  A.   That's correct.
21  Q.   And that's because of your varying ailments,
22  or is it because of one in particular?
23  A.   Varying ailments.

9 (Pages 33 to 36)

**Page 37**

1    Q.    And the reason I asked that: Earlier you
2    listed you have the back problem and a shoulder
3    problem as well as diabetes.
4        Is it your position -- does your diabetes
5    prevent you from performing any job at this point
6    in time?
7    A.    No.
8    Q.    Does your back prevent you from performing
9    any job at this time?
10   A.    The restrictions based upon my back do, yes.
11   Q.    What are the restrictions currently?
12   A.    I can't lift anything more than 25 pounds; I
13   can no longer stand -- I can't stand for more than
14   an hour and a half; I can't sit for more than an
15   hour and a half; no bending or twisting at the
16   waist; no pushing or pulling; no climbing; no
17   crawling.
18       To the best of my knowledge, that's the crux
19   of it.
20   Q.    So is it your position that the diabetes, in
21   conjunction with the back problem, is what
22   prohibits you from being --
23   A.    There's a lot of people in the world who

**Page 38**

1    have diabetes and they are very productive members
2    of society.  If diabetes was the only problem I
3    had, I would be a productive member of the
4    workforce.
5    Q.    Does your shoulder cause you to have
6    limitations on your ability to work?
7    A.    Yes, it does.
8    Q.    What type of limitations does it create?
9    A.    Physical limitations; carrying limitations,
10   in the way of being able to carry any kind of
11   loads.
12   Q.    Are those in addition to the limitations you
13   were just listing for me related to your back?
14   A.    Yes.  Separate from my back.
15   Q.    Can you give me specifically the limitations
16   you have from your shoulder?
17   A.    Certain movements I can't do.
18   Q.    For example?
19   A.    Lifting anything above my shoulders,
20   reaching behind my back, carrying any substantial
21   weight or anything more than 25 pounds in my hand
22   or in my arm, anything that has to do with
23   supporting my body or my body weight.

**Page 39**

1    Q.    For example, climbing?
2    A.    Yes.
3    Q.    Which shoulder is it, by the way?
4    A.    My left shoulder.
5    Q.    How did you injure that?
6    A.    I've got four torn rotator cuffs to my
7    credit.
8    Q.    How long ago was your first one?
9    A.    I don't remember.  It was at the time I was
10   in the service.
11   Q.    Was the Crestview Aerospace job the last one
12   that you are aware that you submitted application
13   for?
14   A.    Yes.
15   Q.    Did you stop searching after that point in
16   time?
17   A.    No.
18   Q.    How much longer did you search for another
19   job?
20   A.    I don't remember.
21   Q.    Until you received the --
22   A.    The determination from the VA that I was
23   permanently and totally disabled.

**Page 40**

1    Q.    At that point in time, you stopped your job
2    search?
3    A.    Yes, sir.
4    Q.    Do you recall when that was?
5    A.    No, I don't.
6    Q.    Do you think it was in 2005?
7    A.    I don't remember.  I'm not very good with
8    remembering dates and times.
9    Q.    Has it been more than a year?
10   A.    Yes, I think it has been more than a year.
11   Q.    Other than JobsPlus and the Crestview
12   Aerospace, can you recall any other specific
13   efforts to seek a job since you went on inactive
14   status at AFS?
15   A.    Asking friends if they needed any help, you
16   know, doing odd jobs, things like that.
17   Q.    What other sources of income have you had
18   since you went on inactive status with AFS?
19   A.    I had the -- the union supplies an
20   insurance.  Gosh, all I can remember is that AFLAC
21   commercial on TV.
22   Q.    Some type of disability insurance?
23   A.    Disability insurance, yes, sir.  They supply

10 (Pages 37 to 40)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

### Page 41

1 70 percent of your base pay via a check from
2 Fortis.
3 Q. Fortis benefits?
4 A. Yes, Fortis benefits. I received those
5 while I was on the short-term disability. After
6 that ran out, I filed for unemployment
7 compensation in the State of Alabama.
8 Q. So Fortis was the insurance carrier for the
9 short-term disability benefits?
10 A. Yes. It was a benefit supplied by the
11 union.
12 Q. And those lasted approximately from the time
13 you went out until about March of 2005 when you
14 went on inactive status?
15 A. About that. I don't really remember. I
16 can't remember.
17 Q. How much was the short-term disability
18 benefits?
19 A. That I do remember. It was 900 and some-odd
20 dollars.
21 Q. Each month?
22 A. Yes. I'm not sure. I'm not sure if it was
23 each month or two weeks. I can't remember, sir.

### Page 42

1 Q. It was approximately 70 percent of your pay?
2 A. Yes, sir.
3 Q. Have you ever received any long-term
4 disability benefits?
5 A. No.
6 Q. And from the VA, how much do you receive
7 from the VA?
8 A. I receive now from the VA $2900 from the VA.
9 Q. Per month?
10 A. Per month. I believe it's 2956, to be
11 exact.
12 Q. Do you receive any other type of benefits?
13 A. I have a CRDP payment.
14 Q. What is that?
15 A. Oh, boy. It is -- let me think.
16 Consecutive -- I'll give you a definition of what
17 it means. I don't know what the acronym means
18 right now.
19    A CRD payment is paid by DFAS, which is
20 Defense Finance & Accounting Service, to veterans
21 who are over 20 years in the service and retired.
22 It is a makeup pay, if you want to call it that,
23 or a differential pay, due to the -- wait a

### Page 43

1 minute -- concurrent receipt bill that was passed
2 after the Civil War that applied to military
3 veterans.
4    There is a program where, if you are
5 receiving money from, say, the Air Force, and you
6 are receiving benefits from the VA, you give up
7 one dollar for each dollar that you submit. But
8 this counterbalances that; and you receive your
9 what they call a CRDP check, eliminating the
10 inaccuracy of the payment system.
11 Q. How much is it for each month?
12 A. I believe it's $1,000.
13 Q. Do you also receive pension payments?
14 A. No.
15 Q. How old are you now?
16 A. Fifty-one.
17 Q. When will you start receiving your pension
18 benefits from the military?
19 A. I started as soon as I retired. But since
20 I'm 100 percent total and permanent, I give up my
21 Air Force retirement check to the VA, and the VA
22 pays me back.
23 Q. And that's the purpose of the CRDP?

### Page 44

1 A. Right. To make up the differential loss.
2 Q. Any other benefit payments that you
3 currently receive?
4 A. No.
5 Q. So just to summarize, currently you receive
6 a VA check of approximately $2,956 per month and a
7 CRDP check of approximately $1,000 a month?
8 A. I may be wrong on -- yes, that's right.
9 That's about right.
10 Q. Any other source of income you've had since
11 March of 2005?
12 A. That I've earned, no.
13 Q. How long has your wife been working at her
14 current job?
15 A. I don't know. I'm not going to give you --
16 Q. More than three years?
17 A. Yes, sir, more than three years.
18 Q. More than five years maybe?
19 A. Less than five years.
20 Q. Are your kids in college or are they out of
21 college now?
22 A. They are not in college.
23 Q. Are they out on their own?

11 (Pages 41 to 44)

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 45

1  A.  No.
2  Q.  Do you continue to support them?
3  A.  Yes.
4  Q.  What are they currently doing?
5  A.  My oldest daughter has bought a route with
6  FedEx Ground, bought a delivery truck, and she
7  runs her own business as a FedEx Ground truck
8  driver.
9  Q.  Where is she living?
10  A.  Living at my home.
11  Q.  And then --
12  A.  My youngest daughter is currently working at
13  the Hilton Hotel and is waiting to take her test
14  as a massage therapist to get her state license.
15  Q.  Where does she live?
16  A.  With me, same residence.
17  Q.  Did you help your daughter start the FedEx
18  route?
19  A.  Yes.
20  Q.  Financially supported her?
21  A.  Yes.
22  Q.  By the way, if you need to take a break
23  during the deposition, just let me know.

Page 46

1  Generally it is appropriate to take them after you
2  finish answering a particular question. But let
3  me know if you need to go to the restroom or
4  anything of that nature.
5  A.  Thank you. I certainly will.
6  Q.  When you first started work, was your
7  employment with DynCorp your first employment at
8  Fort Rucker?
9  A.  Yes, sir.
10  Q.  And did you go to work at DynCorp in
11  February of 2002?
12  A.  Yes, sir.
13  Q.  And then I believe that AFS took over that
14  contract at Fort Rucker at the beginning of
15  November of 2003. Does that sound correct?
16  A.  Sounds correct.
17  Q.  And did you apply for a job with AFS when
18  they took over that contract?
19  A.  Yes. There was applications that we had to
20  fill out.
21  Q.  And at the time you were at DynCorp, you
22  were an aircraft mechanic?
23  A.  Yes, sir.

Page 47

1  Q.  Was there any specific job title for that
2  job?
3  A.  Aircraft mechanic.
4  Q.  Let me hand you what I'm going to mark as
5  Exhibit 3.
6       (Defendant's Exhibit No. 3 was
7       marked for identification and a
8       copy of the same is attached
9       hereto.)
10  Q.  If you'll look at the very last page, page
11  7, it appears to be signatures on that page. Are
12  those signatures yours?
13  A.  Yes, they are.
14  Q.  And is this the application you completed
15  for Army Fleet Support?
16  A.  Yes, sir.
17  Q.  And is everything on there true and correct?
18  A.  Yes, sir.
19  Q.  Okay. Go to page 4, if you would, please.
20  A.  (Witness complies.)
21  Q.  On the employment history, the first one is
22  DynCorp with Fort Rucker, and it says "aircraft
23  mechanic."

Page 48

1       What did you do in that job?
2  A.  Everything my boss wanted me to do.
3  Q.  Describe your general duties that you did on
4  a day-to-day basis there.
5  A.  Towed aircraft, refueled aircraft, did minor
6  maintenance, major maintenance.
7  Q.  What type of aircraft were those?
8  A.  Helicopters.
9  Q.  And were you part of a team that would take
10  apart the helicopter?
11  A.  Yes, I worked on a team.
12  Q.  Okay. And it was primarily a maintenance
13  and mechanical job?
14  A.  Yes, sir.
15  Q.  Were you in any type of supervisory
16  position?
17  A.  No, I was not.
18  Q.  At Discount Auto Parts, it says
19  cashier/counter parts man.
20       Did you have any supervisory
21  responsibilities there?
22  A.  No, sir.
23  Q.  Primarily a sales position?

12 (Pages 45 to 48)

## Page 49

1   A.   Yes.  Run the cash register and helping out
2   on the back counter.
3   Q.   Then the next page, Chromalloy Gas Turbine
4   Company, quality assurance inspector.
5        What were your duties in that position?
6   A.   Had to read a micrometer.
7   Q.   What is that?
8   A.   A precision instrument for measuring metals.
9   Q.   What type of measurements?
10  A.   Internal diameters, external diameters,
11  extreme precise measurements that get down to
12  tenths of thousandths of an inch.
13  Q.   What did y'all make at Chromalloy?
14  A.   We manufactured nonspinning parts of turbin
15  engines, gas jet engines.
16  Q.   For military jets?
17  A.   Civilian and military.
18  Q.   So you were in the quality assurance
19  department?
20  A.   Yes, sir.
21  Q.   So y'all were running tests on the quality
22  of the parts y'all were making?
23  A.   This is correct.

## Page 50

1   Q.   Did you work at Discount Auto Parts twice?
2   A.   Yes.  I worked full time/part time while I
3   was working at Chromalloy; and then when I got
4   laid off at Chromalloy, I went back to full time.
5   Q.   Okay.  I'm going to hand you what I'm going
6   to mark as Exhibit 4.
7        (Defendant's Exhibit No. 4 was
8        marked for identification and a
9        copy of the same is attached
10       hereto.)
11  Q.   I want to go back.  Was Exhibit 3 a true and
12  correct copy of the application you submitted to
13  Army Fleet Support?
14  A.   Yes, sir.
15  Q.   Can you tell us what Exhibit 4 is?
16  A.   Looks like my resume.
17  Q.   Is this one that you submitted to Army Fleet
18  Support?
19  A.   Yes, sir.
20  Q.   And is all the information on there true and
21  correct?
22  A.   Yes, sir.
23  Q.   You have computer skills on here.  Did you

## Page 51

1   have any type of certification of the number of
2   words per minute you could type?
3   A.   No.
4   Q.   Have you ever done that?
5   A.   I did take a typing test once -- twice.
6   Q.   When was that?
7   A.   March.  Between March the 7th and up until
8   the 14th, I was practicing my typing skills.
9   Q.   Of what year?
10  A.   '05.
11  Q.   Between March 7th and March 14th of 2005,
12  you were practicing your typing skills?
13  A.   Brushing up on my typing skills.
14  Q.   Did you have your words per minute certified
15  by anyone?
16  A.   At JobsPlus, no.
17  Q.   Anywhere else?
18  A.   No.
19  Q.   Have you ever had any type of formal
20  certification of words per minute?
21  A.   No.
22  Q.   Did you just time yourself?
23  A.   No.  There's a computer program that you

## Page 52

1   type, and it tells you how many words per minute
2   you typed.
3   Q.   Where is that program?
4   A.   At JobsPlus.
5   Q.   At JobsPlus?
6   A.   In Crestview.
7   Q.   Did you do that?
8   A.   Yes.
9   Q.   What were your results on it?
10  A.   30 words per minute.
11  Q.   Does it give you any type of printout, or it
12  just tells you?
13  A.   It tells you.  And then there's another
14  printed typing test that you take that prints out
15  the results.
16  Q.   Did you do that as well?
17  A.   Yes, I did.
18  Q.   Also 30 words per minute?
19  A.   Yes.
20  Q.   And did you do a general application for
21  JobsPlus?
22  A.   A general application?
23  Q.   Did you fill out an application when you

13 (Pages 49 to 52)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

| | |
|---|---|
| **Page 53** | **Page 55** |

**Page 53**

1  went to JobsPlus?
2  A.  I filled out the computer program.
3  Q.  Online?
4  A.  Online, yeah.
5  Q.  Was there a place that asked about the
6  number of words typed a minute?
7  A.  No.  I don't remember.
8  Q.  Did you ever submit that information to
9  JobsPlus in any way?
10  A.  I'm sorry.  Could you pose that question
11  again, please?
12  Q.  You said you can type 30 words per -- Strike
13  that.
14      You've testified that, at JobsPlus, you took
15  a computer-based test of words per minute; and it
16  came out at 30 words per minute, correct?
17  A.  This is true.
18  Q.  Did you ever submit that information or
19  provide that information on any of the
20  applications that you submitted to JobsPlus?
21  A.  No.
22  Q.  Or to anyone else, for that matter?
23  A.  No.

**Page 54**

1  Q.  So I guess if someone is looking at your
2  file, there's no way to determine how many words
3  per minute you can type, based on the paper in the
4  file?
5  A.  Are you talking about my resume here?
6  Q.  Correct.
7  A.  That's correct.
8  Q.  Do you know if the 30 words per minute is
9  recorded anywhere in any records of AFS or
10  JobsPlus?
11  A.  No.
12      MR. STARLING:  Have we received any
13  JobsPlus applications from you-all?
14      MR. JACOBS:  Let's go off the record.
15      MR. STARLING:  Yeah.
16      (An off-the-record discussion
17      was held.)
18  (BY MR. STARLING)
19  Q.  Did you ever go into a JobsPlus office
20  actually, or just do everything online?
21  A.  I went into a JobsPlus office, signed in,
22  filled out an application online.
23  Q.  Did you fill it out online at the JobsPlus

**Page 55**

1  center?
2  A.  Yes, I did.
3  Q.  Is that also where you applied for
4  unemployment compensation?
5  A.  No.
6  Q.  Where did you apply for unemployment
7  compensation?
8  A.  Here in Enterprise.
9  Q.  At the Alabama Unemployment Comp Office?
10  A.  Yes, sir.
11  Q.  Did you fill out any kind of job application
12  there?
13  A.  I don't remember.  I probably did.
14  Q.  You applied for unemployment benefits?
15  A.  Yes, sir.
16  Q.  To your knowledge -- well, you don't recall
17  whether or not you filled out an application at
18  the Alabama Unemployment Comp Office?
19  A.  I don't remember.
20  Q.  Did you search for employment through any
21  Alabama employment agency at all?
22  A.  I spoke to the veteran officer there.
23  Q.  And they directed you to JobsPlus in

**Page 56**

1  Florida?
2  A.  I don't remember.
3  Q.  Did they provide any job opportunities to
4  you when you talked to them?
5  A.  I don't remember.
6  Q.  What was your rate of pay at AFS the last
7  time you were actively employed?
8  A.  19 dollars some-odd cents an hour.
9  Q.  Did you work significant overtime?
10  A.  Please define "significant."
11  Q.  Were you working overtime every week?
12  A.  One to two hours maybe.
13  Q.  Was that pretty much standard?
14  A.  Yes, sir.  At ATTC, we didn't get a lot of
15  overtime.
16  Q.  Who was your last supervisor at AFS?
17  A.  Mark Pesa.
18  Q.  How do you spell his last name?
19  A.  P-E-S-A.
20  Q.  And who was your supervisor before that?
21  A.  Bill Warnick.
22  Q.  Did you have any other direct supervisors at
23  AFS?

14 (Pages 53 to 56)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

**Page 57**

1  A.  Other than my lead man, no.
2  Q.  Who was your lead man?
3  A.  Marvin Harold.
4  Q.  Let me show you a document that I'll mark as
5  Defendant's Exhibit 5.
6       (Defendant's Exhibit No. 5 was
7       marked for identification and a
8       copy of the same is attached
9       hereto.)
10  Q.  Do you recognize the document I've marked as
11  Defendant's Exhibit No. 5?
12  A.  Yes, sir.
13  Q.  Is this the job description for the aircraft
14  mechanic position at AFS?
15  A.  Yes, sir.
16  Q.  Would you take a look at that and see if you
17  agree with the essential duties and
18  responsibilities of that position?
19  A.  Yes, sir.
20  Q.  Is that generally descriptive of the duties
21  of an aircraft mechanic at AFS?
22  A.  Yes, sir.
23  Q.  Were you in any position other than aircraft

**Page 58**

1  mechanic while you were at AFS?
2  A.  No, sir.
3  Q.  That was the only job classification you
4  had?
5  A.  Yes, sir.
6  Q.  It appears you injured your back on August
7  the 11th of 2004; is that correct?
8  A.  I don't remember, sir, the exact date.
9  Q.  How did you hurt your back?
10  A.  I don't remember.
11  Q.  It was not a work-related injury, was it?
12  A.  No. It was not at work, no.
13       MR. JACOBS: Let me suggest a break.
14  If you want to go ahead and answer that first.
15  Q.  If you want to go ahead and finish up, a
16  break might be helpful.
17  A.  A break would be good.
18  Q.  Okay.
19       (A brief recess was taken.)
20  (BY MR. STARLING)
21  Q.  Do you have a copy of the application you
22  submitted to Crestview Aerospace?
23  A.  No.

**Page 59**

1  Q.  Did you keep any copy of that?
2  A.  No.
3  Q.  How did you submit that to Crestview
4  Aerospace?
5  A.  I went to the HR office; I filled out the --
6  well, excuse me. I had an outstanding application
7  on record, and I gave them an updated resume.
8  Q.  When had you originally applied at Crestview
9  Aerospace?
10  A.  Back in '97.
11  Q.  In 1997?
12  A.  Yes.
13  Q.  Okay.
14  A.  Excuse me. Wrong. '01.
15  Q.  2001?
16  A.  Yes.
17  Q.  Before you went to work for DynCorp?
18  A.  Yes.
19  Q.  Did you call up the HR department and say
20  you'd like to apply again?
21  A.  I just went there in person.
22  Q.  And they still had that on record?
23  A.  Yeah. I periodically, like once a year,

**Page 60**

1  went up there, on the date that I filled out the
2  initial application, and renewed it, kept it
3  updated.
4  Q.  What about any application you filled out
5  for JobsPlus? Do you have any copy of that?
6  A.  No. It's electronic. It's on their system.
7  Q.  So it would be on their electronic system
8  only?
9  A.  Yes, sir.
10  Q.  You did not fill out any hard paper
11  application at JobsPlus?
12  A.  Not that I know of.
13  Q.  Let's go back to your back injury. Do you
14  recall that being in August of 2004?
15  A.  I believe so, yes.
16  Q.  How did that come about that you had the
17  back problem?
18  A.  My daughter's nightstand bottom drawer
19  wouldn't open up. She had it out in the garage
20  and she was refinishing it, and she wanted to pull
21  the bottom drawer out. And I bent over and tried
22  getting the drawer out, and it wouldn't come. And
23  that's when I injured my back.

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

### Page 61

1  Q.  Had you had any back problems prior to that?
2  A.  Yes, sir.
3  Q.  Had you had any surgery prior to that?
4  A.  Yes, sir.
5  Q.  Had those been while you were in the
6  service?
7  A.  Yes, sir.
8  Q.  What type of back problems had you had?
9  A.  I had a discectomy of my L4-L5.
10  Q.  Do you recall that, basically, you stopped
11  working for AFS on about September 2nd of 2004?
12  A.  Did you say the 2nd or the 7th?
13  Q.  I said 2nd.  September 2, 2004.
14  A.  I don't remember.  No, I don't remember.
15  Q.  I'm going to hand you what I'm going to mark
16  as Exhibit 6.
17        (Defendant's Exhibit No. 6 was
18        marked for identification and a
19        copy of the same is attached
20        hereto.)
21  Q.  Do you recognize this document?
22  A.  Yes, sir, I do.
23  Q.  Is this the short-term disability claim form

### Page 62

1  that you completed for Fortis?
2  A.  Yes, sir, it is.
3  Q.  And is that your signature on the bottom of
4  that first page?
5  A.  Yes, sir, it is.
6  Q.  Is this your handwriting on the document?
7  A.  Yes, sir, it is.
8  Q.  Both the -- on the first page?
9  A.  Yes, it is.
10  Q.  On the second page, that's not your
11  handwriting, is it?
12  A.  No, it's not.
13  Q.  Is that a doctor's statement that you
14  attached to the application?
15  A.  Looks like a doctor's signature at the
16  bottom.
17  Q.  It looks like it's physician Timothy
18  Kosmatka?
19  A.  Yes, sir.
20  Q.  Was that your treating physician at the
21  time?
22  A.  Yes, sir.
23  Q.  It appears that he completed this form, I

### Page 63

1  guess, to be submitted with the Fortis benefits
2  claim?
3  A.  Yes, sir.
4  Q.  Do you recall whether you were the one who
5  attached that or whether it was sent to AFS
6  directly by Dr. Kosmatka?
7  A.  I believe I had Dr. Kosmatka -- it looks
8  like Dr. Kosmatka filled it out and I sent it in.
9  Q.  On here, on the first page, on about the
10  second line down, it looks like date last worked
11  is 9/2/04.  Is that what that says?
12  A.  Up here?
13  Q.  Correct.
14  A.  Okay.  Yes, that's correct.
15  Q.  It looks like number of hours worked that
16  day, eight hours.  So that indicates you actually
17  worked on September 2nd of 2004, it appears?
18  A.  Yes.
19  Q.  And is that your recollection?
20  A.  Yes, sir.
21  Q.  It appears, down here near the bottom, date
22  symptoms first appeared, 11 August of '04.
23        That's when you were talking about the

### Page 64

1  bottom drawer of the dresser that your daughter
2  had?
3  A.  Yes, sir.
4  Q.  Okay.  And you ended up being qualified to
5  receive those benefits from Fortis?
6  A.  Yes.
7  Q.  And that's the ones we were talking about
8  earlier?
9  A.  Yes.  I was wrong on the amount of money
10  that Fortis gave me.  It was $794.40.  Well,
11  excuse me.
12  Q.  I see.  It looks like here you were earning
13  at that time 794.40 a week?
14  A.  Right.
15  Q.  And your benefit was 556.08 a week?
16  A.  Right.
17  Q.  That's what you recall?
18  A.  Yes.  The previous conversation we had about
19  the amount of money I got from Fortis, I told you
20  the wrong number.
21  Q.  So this number is what you recall, this
22  556.08 a week?
23  A.  Yes, sir.  I just wanted to make sure that

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 65

1  was clear.
2  Q.  Thank you.  I'm going to show you what I'm
3  going to mark as Defendant's Exhibit No. 7.
4        (Defendant's Exhibit No. 7 was
5        marked for identification and a
6        copy of the same is attached
7        hereto.)
8  Q.  Do you recognize the document I've marked as
9  Defendant's Exhibit No. 7?
10  A.  Yes, I do.
11  Q.  And does that appear to be a supplementary
12  report of benefits for Fortis?
13  A.  Yes, it is.
14  Q.  And is that your signature on the bottom
15  there?
16  A.  Yes, it is.
17  Q.  And it looks like this is something you
18  completed for Fortis on December 13th of 2004,
19  correct?
20  A.  Yes.
21  Q.  On No. 12, it says, "Have you discussed
22  returning to work with your doctor?"  And you
23  checked, "Yes."  But there's nothing there that

Page 66

1  says -- it says, "If 'Yes,' what did he/she
2  advise."
3        Do you recall what you discussed with your
4  doctor at that time?
5  A.  No, I don't remember.
6        MR. JACOBS:  I'm sorry.  Just to
7  clarify, this note says, "Sometime in March '05."
8  Block No. 8.  Is that what you were asking about?
9        MR. STARLING:  No.  I was asking about
10  Block No. 12.
11        MR. JACOBS:  Okay.  I'm sorry.
12  Q.  On Block No. 8, it says, "Do you expect to
13  return to work?"  "Yes."  And you wrote in,
14  "Sometime in March '05."  Is that your
15  handwriting?
16  A.  Yes.
17  Q.  So you were anticipating returning to work
18  in March of '05?
19  A.  Yes, I was.
20  Q.  Is that -- did you have to periodically
21  submit these supplemental reports for benefits to
22  Fortis?
23  A.  Yes, sir.

Page 67

1  Q.  And I guess you had to certify that you were
2  unable to work at that particular point in time,
3  correct?
4  A.  Yes, sir.
5  Q.  And I guess you continued your application
6  through March of '05, when the benefits finally
7  ended?
8  A.  Yes, sir.
9  Q.  Let me show you what I'm marking as Exhibit
10  8.
11        (Defendant's Exhibit No. 8 was
12        marked for identification and a
13        copy of the same is attached
14        hereto.)
15  Q.  Have you seen the document I've marked as
16  Defendant's Exhibit No. 8?
17  A.  Yes, sir.
18  Q.  Was this a separate disability policy being
19  applied for?
20  A.  Yes, sir.
21  Q.  Do you know who -- where did the Minnesota
22  Life come from?  Was that something you had on
23  your own?

Page 68

1  A.  I believe it was a life insurance policy
2  that came through either Army Fleet Support or the
3  union, sir.  And I remember the form.  I remember
4  dropping off the form at the doctor's office.
5  Q.  This is Dr. Manski?
6  A.  Yes, sir.
7  Q.  M-A-N-S-K-I?
8  A.  Yes, sir.
9  Q.  Now, what type of doctor is he?
10  A.  He was the neurosurgeon that performed my
11  last back surgery.
12  Q.  And who is Dr. Kosmatka?
13  A.  He was my primary care manager at Eglin Air
14  Force Base Hospital.
15  Q.  Not a neurosurgeon?
16  A.  Just a medical doctor.
17  Q.  Dr. Manski did your surgery?
18  A.  Yes, sir.
19  Q.  And this appears to have been dated, on the
20  second page, by Dr. Manski on March the 2nd of
21  2005.  Does that seem right to you?
22  A.  Yes, sir.
23  Q.  I notice up above, on the second page, under

17 (Pages 65 to 68)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 69

1  the "Progress" section, it says, "If recovered,
2  date released to return to work." "2/24/05."
3      Do you recall Dr. Manski saying that you
4  would be released to work at that point in time?
5  A.   I don't remember. I don't remember.
6  Q.   Right below that progress note it says, "Is
7  patient disabled and unable to perform his/her
8  regular work?" And it says, "Yes. No heavy
9  mechanical aircraft work."
10     Is that the way you read that?
11  A.   Yes, sir.
12  Q.   At that time, could you do your aircraft
13  mechanic job?
14  A.   On February 24, '05, I was still
15  convalescing from the surgery.
16  Q.   And so you could not do the job?
17  A.   That is correct.
18  Q.   Did you discuss this report from Dr. Manski
19  with any of the people at AFS?
20  A.   No, sir.
21  Q.   Could you do any other jobs at this point in
22  time?
23  A.   I was still recovering. I was still

Page 70

1  convalescing from the surgery, going through
2  physical therapy.
3  Q.   So you could not?
4  A.   Not at that time. I was still in recovery,
5  doing the physical therapy.
6  Q.   When did you recover enough that you could
7  perform a job, if you have?
8  A.   When my doctor released me.
9  Q.   When was that?
10  A.   In March.
11  Q.   Which doctor would that have been?
12  A.   That would be Thomas Manski, my
13  neurosurgeon.
14  Q.   Not Kosmatka?
15  A.   No. Let me clarify something with you with
16  Kosmatka. In the military, TriCare Prime, for
17  retirees, you go to him, as in Kosmatka, get a
18  referral to the neurosurgeon, and then you become
19  a patient of the neurosurgeon.
20  Q.   So like an HMO, basically?
21  A.   Correct.
22  Q.   Did you seek any reclassification with AFS
23  at this point in time?

Page 71

1  A.   No, sir.
2  Q.   Did you understand, at this point in time,
3  that your 26 weeks of short-term disability was
4  going to end around March the 10th, or a week or
5  so later?
6  A.   Yes, sir.
7  Q.   Did you understand that you were required to
8  reclassify before that time, if you were going to
9  reclassify a job position?
10     MR. JACOBS:  Object to the form of the
11  question. Answer it if you can.
12  Q.   Did you understand that you were required to
13  reclassify to another job position, if you wished
14  to seek one, prior to March the 10th of 2005?
15  A.   Do I understand that I was supposed to
16  reclassify prior to 10 March?
17  Q.   Correct.
18  A.   No.
19  Q.   What was your understanding of what you were
20  supposed to do as of March the 10th at AFS?
21  A.   I had to bring in a doctor's slip with my
22  restrictions, ask to reclassify at that time, fill
23  out the paperwork for the reclassification, and

Page 72

1  then go through procedures of reclassification,
2  and then go to my next job.
3  Q.   Did you do that?
4  A.   No, that did not happen.
5  Q.   Did you bring in the doctor's note?
6  A.   Yes, I did.
7  Q.   And that was the doctor's note from Dr.
8  Manski?
9  A.   Correct.
10  Q.   And did you seek to reclassify?
11  A.   I brought in the doctor's note the first
12  time, and it was missing the return-to-work date.
13  So I had to go back down to Fort Walton Beach to
14  Dr. Manski's office and get one that had a
15  return-to-work date on it.
16  Q.   And he provided one to you?
17  A.   Yes, he did.
18  Q.   And did it have the restrictions on it?
19  A.   It most definitely did, yes, sir.
20  Q.   When did you bring in the slip the first
21  time?
22  A.   I believe it was the 7th.
23  Q.   Of March 2005?

18 (Pages 69 to 72)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 73

1  A.   Yes, sir.
2  Q.   And when did you bring back a note with a
3  return-to-work date?
4  A.   The 14th of March.
5  Q.   Were you unable to get it before March the
6  10th?
7  A.   I stopped by at the HR office the 11th,
8  walked in, asked them about being a day late on
9  the 10th. And they said, Don't worry about it.
10  You come in next Monday and bring in your
11  return-to-work slip with the correct date on it,
12  and you can come back to work Monday.
13  Q.   And did you return that Monday?
14  A.   Yes, sir.
15  Q.   And you think that was March the 14th?
16  A.   Yes, sir.
17  Q.   Who did you meet with on March 10th? I'm
18  sorry. March the 11th.
19  A.   An HR representative. I do not remember the
20  person's name.
21  Q.   Where did you meet with them?
22  A.   In the HR office in Daleville.
23  Q.   When you originally brought the note in that

Page 74

1  didn't have the release, that was March the 7th,
2  you believe?
3  A.   Yes, sir.
4  Q.   And who did you meet with at that point in
5  time?
6  A.   An HR representative.
7  Q.   Also at Daleville?
8  A.   Yes, sir.
9  Q.   What happened when you came to work on the
10  14th?
11  A.   I was told that I was going to be fired.
12  Q.   And who told you that?
13  A.   One of the HR representatives.
14  Q.   Which was also in Daleville?
15  A.   Yes, sir.
16  Q.   Do you recall, was it a man or a woman?
17  A.   Both a man and a woman were there.
18  Q.   What race were they, white or black?
19  A.   I don't remember.
20  Q.   Do you remember any other details about
21  them?
22  A.   They were a man and woman -- there was two
23  women, possibly three, that were there, one man.

Page 75

1  And that was it.
2  Q.   And what is your recollection of the
3  discussions at that point in time?
4  A.   My recollection is -- what I remember is I
5  asked if I could reclassify, because I wanted to
6  go into scheduling; and I was told that I was not
7  allowed to go back in my old job as an aircraft
8  mechanic, so then I could not reclassify.
9      And I asked them, Well, why can't I go into
10  my old job for one day, right now, so I can
11  reclassify, fill out the paperwork? And they
12  said, No.
13      I asked them for reclassification paperwork
14  and they refused to give it to me.
15  Q.   On the 7th, when you met with an HR
16  representative, was it a male or a female?
17  A.   I believe it was a female.
18  Q.   Do you remember the race of that person?
19  A.   No, I don't.
20  Q.   Or any other details of that person?
21  A.   Just a female, a woman.
22  Q.   On the 11th, did you meet with a male or a
23  female?

Page 76

1  A.   It was a woman.
2  Q.   And do you remember her race or any other
3  details?
4  A.   I don't remember her race.
5  Q.   There's no real dispute here that at the
6  time you returned on the 14th, you were unable to
7  do an aircraft mechanic job, right?
8  A.   I had restrictions placed upon me by my
9  neurosurgeon, Dr. Manski. And it was explained to
10  me that I would not be able to perform the duties
11  of an aircraft mechanic.
12      And I agreed that, due to my physical
13  limitations placed upon me by my neurosurgeon,
14  that it would not be in my best interest to be an
15  aircraft mechanic anymore and that I would like to
16  go into the aircraft scheduling position.
17  Q.   The limitations at that time were permanent?
18  A.   Yes, sir, they were permanent. On the
19  return-to-work slip that was dated that day that I
20  brought it in, the restrictions were permanent
21  from Dr. Manski.
22  Q.   And just so we're clear on the record, you
23  agree that based on those restrictions, you could

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 77

1  not do an aircraft mechanic job?
2  A.  Yes, sir.
3  Q.  But you believed that you could do an
4  aircraft scheduler job?
5  A.  Yes, sir.
6  Q.  Have you seen one of these reclassification
7  forms before?
8  A.  Never saw one.
9  Q.  They are available from the HR office, I
10  believe.  You understood that?
11  A.  Yes, sir.
12  Q.  I also understand they were available out in
13  the field as well.  Were you aware of that?
14  A.  No.
15  Q.  So you have never filled out a
16  reclassification form?
17  A.  That is correct, sir.
18  Q.  I'm going to hand you what I'm going to mark
19  as Exhibit 9.
20       (Defendant's Exhibit No. 9 was
21       marked for identification and a
22       copy of the same is attached
23       hereto.)

Page 78

1  Q.  Do you recognize the document I've marked as
2  Defendant's Exhibit 9?
3  A.  Yes, sir.
4  Q.  Is this the job description for the aircraft
5  scheduler position?
6  A.  Yes, sir.
7  Q.  And where have you seen that before?
8  A.  HR office.
9  Q.  And when did you see that?
10  A.  The 11th of March.
11  Q.  Who provided that to you?
12  A.  The HR representative.
13  Q.  And did you ask for a reclassification form
14  at that point in time?
15  A.  No.
16  Q.  Why not?
17  A.  Because down here on "Education and
18  Experience:  Must demonstrate ability to
19  accurately keyboard at 30 words per minute on a
20  computer."
21  Q.  So ...
22  A.  I felt that I needed to brush up on my
23  typing skills prior to submitting the paperwork,

Page 79

1  to make sure that I was qualified 100 percent for
2  this job.
3  Q.  And that's when you say you went to JobsPlus
4  and did the typing?
5  A.  Yes, sir.  Brushed up on my typing skills at
6  JobsPlus.
7  Q.  And how did you demonstrate -- how would you
8  demonstrate -- Just strike that.
9      Is there any type of typing test there at
10  the HR office?
11  A.  I do not know.
12  Q.  How did you plan to demonstrate your typing
13  skills when you submitted a reclassification?
14  A.  I was going to bring in a piece of paper
15  from JobsPlus that said that I could type 30 words
16  a minute and show them that document and apply for
17  the aircraft scheduling job at the same time.
18  Q.  But you didn't have any type of document
19  from JobsPlus, did you?
20  A.  Not when I took a look at this on the 11th.
21  Q.  Or on the 14th?
22  A.  No.  Because I was told that I was going to
23  get terminated.

Page 80

1  Q.  Right.  But you didn't bring any document
2  with you on the 14th?
3  A.  That's correct, sir.
4  Q.  I remember you testified earlier you didn't
5  have any type of printout from JobsPlus, right?
6  A.  Right.
7  Q.  Other than that, was it your position that
8  you could meet these other requirements on the
9  aircraft scheduler position?
10  A.  Oh, yes, sir.
11  Q.  Did any of the restrictions you have prevent
12  you from doing any of these duties or
13  responsibilities on the aircraft scheduler
14  position?
15  A.  No, sir.
16  Q.  What does an aircraft scheduler do?
17  A.  An aircraft scheduler coordinates between
18  the flying side of the house and the maintenance
19  side of the house and brings those two agencies
20  together so they can make a flying schedule.
21      The flying side of the house have certain
22  training requirements that have to be met on their
23  side of the house; the maintenance says these are

20 (Pages 77 to 80)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

## Page 81

1  the aircraft we have available that can fly. And
2  you marry them up, print out a schedule, you sign
3  it, and there you go.
4  Q.  Primarily clerical, it sounds like?
5  A.  Yes.
6  Q.  Office-type work?
7  A.  Sedentary.
8  Q.  Sedentary. Let me hand you what I'm going
9  to mark as Defendant's Exhibit No. 10.
10     (Defendant's Exhibit No. 10 was
11     marked for identification and a
12     copy of the same is attached
13     hereto.)
14  Q.  Do you recognize that document I've marked
15  as Defendant's Exhibit No. 10?
16  A.  Yes, sir.
17  Q.  It appears to be a letter from Darlene
18  Sanders at AFS to you on February 8, 2005?
19  A.  Yes, sir.
20  Q.  Do you recall receiving that letter?
21  A.  I recall receiving this letter and giving it
22  to my wife, because she handles the finances of
23  our family.

## Page 82

1  Q.  All right. Did you read the letter?
2  A.  Yes, I did.
3  Q.  Let me hand you what I'll mark as
4  Defendant's Exhibit No. 11.
5     (Defendant's Exhibit No. 11 was
6     marked for identification and a
7     copy of the same is attached
8     hereto.)
9  Q.  Do you recognize the document I've marked as
10  Defendant's Exhibit No. 11?
11  A.  Yes, sir.
12  Q.  And is that a letter that you received?
13  A.  I don't remember receiving the letter,
14  but ...
15  Q.  The letter is familiar to you?
16  A.  Yes. The letter is familiar, yes, sir.
17  Q.  Look on what I've marked as Defendant's
18  Exhibit No. 10.
19     Do you see that language at the very first
20  sentence: "Your status will be changed on or
21  around 03/14/05, from medical leave of absence to
22  administrative termination"?
23  A.  Yes, sir.

## Page 83

1  Q.  What did you understand that to mean?
2  A.  Administrative termination means that I am
3  going to be terminated from my employment from
4  Army Fleet Support.
5  Q.  Now, the second sentence reads: "This
6  change is for administrative reasons only and will
7  not affect your rights in accordance with article
8  4.6(d) of the Collective Bargaining Agreement."
9     Do you see that?
10  A.  Yes, sir.
11  Q.  What did you understand to be your rights
12  under 4.6(d) of the Collective Bargaining
13  Agreement?
14  A.  If I'm understanding the article correctly,
15  I believe that pertains to my callback rights to
16  my job as an aircraft mechanic.
17  Q.  After being laid off, essentially recall
18  rights?
19  A.  Yes, sir, being called back.
20  Q.  Now, are you familiar with the term
21  "administrative termination"?
22  A.  Yes, sir.
23  Q.  And you understood that to mean completely

## Page 84

1  terminated from employment at AFS?
2  A.  I was not clocking in at the clock, so I
3  considered that not working.
4  Q.  Now, you were already not clocking in, from
5  September through March, right?
6  A.  That's correct.
7  Q.  But you still considered yourself employed
8  there?
9  A.  Yes.
10  Q.  So, at this time, you understood that you
11  needed to do something prior to --
12     MR. JACOBS: Object to the form of the
13  question.
14     MR. STARLING: Strike that then.
15  Q.  Did you understand that you had to take some
16  steps prior to March the 14th of 2005?
17  A.  What steps are we talking about?
18  Q.  What did you understand you needed to do
19  before March the 14th of 2005?
20  A.  Show back up to work with my return-to-work
21  slip from my doctor, report in, sign in, fill out
22  the paperwork to reclassify from aircraft mechanic
23  to aircraft scheduler.

21 (Pages 81 to 84)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

Page 85

1  Q.  You mentioned earlier that you asked if you
2  could be reinstated for one day as an aircraft
3  mechanic?
4  A.  Yes, sir.  That was what I was told that I
5  needed to do, by the HR personnel; yet the HR
6  personnel would not let me do that.
7  Q.  But you understood that your restrictions
8  precluded you from being qualified for that
9  aircraft mechanic position though?
10  A.  Right.
11  Q.  But nevertheless you asked to be reinstated
12  to that position for one day?
13  A.  Because that's what they said I needed to do
14  to be able to reclassify.
15  Q.  Did you do anything in response to this
16  letter marked as Defendant's Exhibit No. 10?
17  A.  Yes, sir.  I gave it to my wife so she could
18  pay the bill.
19  Q.  Take any other action in response to that?
20  A.  Other than that?  Yes, I needed to get my
21  return-to-work slip from my Dr. Manski.
22  Q.  I'm going to hand you what I'm going to mark
23  as Defendant's Exhibit No. 12.

---

Page 86

1        (Defendant's Exhibit No. 12 was
2        marked for identification and a
3        copy of the same is attached
4        hereto.)
5  Q.  Do you recognize the document I've marked as
6  Defendant's Exhibit 12?
7  A.  Yes, sir.
8  Q.  And was that a note from Dr. Kosmatka?
9  A.  Yes, sir.
10  Q.  And did you discuss with Dr. Kosmatka that
11  you probably needed to be in a position other than
12  aircraft mechanic?
13  A.  Yes, sir.
14  Q.  And is that what you understood his
15  recommendation to the company was, that you move
16  into something other than aircraft mechanic?
17  A.  Yes, sir.
18  Q.  Prior to going to AFS in March of 2005, did
19  you have any discussion with anyone there about
20  moving to another position?
21  A.  Back in December?
22  Q.  Correct.
23  A.  With anybody from the HR office?

---

Page 87

1  Q.  Correct.
2  A.  Back in December?  I don't remember.
3  Q.  Did you have any discussions with anyone
4  other than your doctors about performing a
5  different job back at AFS?
6  A.  My wife.
7  Q.  Other than your wife?
8  A.  No.
9  Q.  Okay.  Did you agree with Dr. Kosmatka that
10  you needed to seek a position other than aircraft
11  mechanic?
12  A.  Yes, sir.
13  Q.  At this time, did you consider any other
14  position for which you might be qualified?
15  A.  I don't remember.
16  Q.  Let me show you what I'm going to mark as
17  Defendant's Exhibit 13.
18        (Defendant's Exhibit No. 13 was
19        marked for identification and a
20        copy of the same is attached
21        hereto.)
22  Q.  Before we get there, can I go back to this
23  document that is marked Defendant's Exhibit 12?

---

Page 88

1  Did you give a copy of that to anyone at AFS?
2  A.  Yes, sir.
3  Q.  Who did you give that to?
4  A.  One of the HR representatives.
5  Q.  Do you recall when you did it?  Was it
6  around the time of December 17th?
7  A.  No, I don't remember.
8  Q.  Do you recognize the document marked as
9  Defendant's Exhibit 13?
10  A.  Yes, sir.
11  Q.  And is this a letter from Dr. Manski to whom
12  it may concern?
13  A.  Yes, sir.
14  Q.  Is that something you asked Dr. Manski to
15  draft?
16  A.  Yes, sir.
17  Q.  Did you provide this letter, Defendant's
18  Exhibit 13, to anyone at AFS?
19  A.  Yes, sir.
20  Q.  Who did you provide that to?
21  A.  One of the representatives at HR.
22  Q.  Do you recall when you provided it to them?
23  A.  No, I don't.

22 (Pages 85 to 88)

## Page 89

1  Q.  Were you about to say something else?
2  A.  No.
3  Q.  You didn't take this in January though to
4  AFS, did you?
5  A.  I don't remember.
6  Q.  Did you -- was -- Strike that.
7      Was March the first time you went to
8  Daleville to meet with the HR people?
9  A.  Yes, I believe so.
10  Q.  So can I assume that you wouldn't have
11  delivered it to anybody at AFS prior to that time?
12  A.  I don't think so.  I don't know.
13  Q.  You don't recall sending either Defendant's
14  Exhibit 12 or 13 by mail to anyone at AFS, do you?
15  A.  I don't remember.
16  Q.  You mentioned earlier that you did provide
17  it to someone in HR at AFS.  Was that by hand?
18  A.  I believe I mailed it.  I may have mailed
19  it.
20  Q.  You may have mailed it?
21  A.  I mailed it.
22  Q.  You mailed it?
23  A.  I'm pretty sure I did.

## Page 90

1  Q.  You don't recall when though?
2  A.  No, I don't recall.
3  Q.  The second page of Defendant's Exhibit 13,
4  Dr. Manski says: "I would recommend Mr. Houston
5  not return to doing heavy mechanical aircraft work
6  as he has had two disc herniations at L4-5
7  requiring surgery and he would be at increased
8  risk for recurrent disc herniations if he were to
9  perform strenuous, heavy physical activities that
10  might strain or injure his lower back."
11      That's your recollection of what you had
12  discussed with Dr. Manski?
13  A.  Yes, sir.
14  Q.  And were you in agreement with that?
15  A.  Yes, sir.
16  Q.  You agreed also that you should be retrained
17  for a position that would be more sedentary?
18  A.  Yes, sir.
19  Q.  Let me hand you what I'm going to mark as
20  Defendant's Exhibit 14.
21      (Defendant's Exhibit No. 14 was
22  marked for identification and a
23  copy of the same is attached

## Page 91

1      hereto.)
2  Q.  Do you recognize the document marked as
3  Defendant's Exhibit 14?
4  A.  Yes, sir.
5  Q.  Is that a doctor's note from Dr. Manski that
6  you received?
7  A.  Yes, sir.
8  Q.  Is this the one that you provided to AFS on
9  March the 14th?
10  A.  Yes, sir.
11  Q.  And is this your understanding of some of
12  your restrictions -- no lifting more than 25
13  pounds, no climbing, no standing more than one and
14  a half hours, no prolonged sitting more than one
15  and a half hours, no bending at the waist to lift,
16  pull, twist, or push to prevent reinjury to lower
17  back?  Is that what you understood your
18  restrictions to be?
19  A.  Yes, sir.
20  Q.  And it says, "These restrictions are
21  permanent." Did you understand that as well?
22  A.  Yes, sir.
23  Q.  Now, you submitted a prior note, you're

## Page 92

1  saying, that did not have a return-to-work date?
2  A.  Yes, sir.
3  Q.  But not this one that's been marked as
4  Defendant's Exhibit 14?
5  A.  That's correct, sir.
6  Q.  What other -- what problems did you have,
7  other than what's listed in the restrictions?  You
8  couldn't do heavy mechanical work, right?
9  A.  Yes, sir.
10  Q.  You could still walk?
11  A.  Yes, sir.
12  Q.  And breathe?
13  A.  Yes, sir.
14  Q.  Eat?
15  A.  Yes, sir.
16  Q.  See?
17  A.  Yes, sir.
18  Q.  Hear?
19  A.  Yes, sir.
20  Q.  Speak?
21  A.  Yes, sir.
22  Q.  So you could take care of yourself, in terms
23  of bathing and getting dressed, those types of

23 (Pages 89 to 92)

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 93

1  things?
2  A.  Yes, sir.
3  Q.  Did you have any mental problems at that
4  point in time?
5  A.  No, sir.
6  Q.  At this point in time, you believed you
7  could work as a scheduler?
8  A.  Yes, sir.
9  Q.  Were there other jobs that you believe you
10  could physically do at that point in time, other
11  than a scheduler job?
12  A.  Other than sedentary-type work?
13      MR. STARLING:  Strike that.  Let me
14  start over.
15  Q.  You believe you could do any sedentary-type
16  work for which you are qualified to do?
17  A.  Yes, sir.
18  Q.  You just couldn't do things that were
19  prohibited by these restrictions?
20  A.  Correct.
21  Q.  And by "restrictions," I mean what's been
22  outlined on Defendant's Exhibit 14.
23  A.  Yes, sir.

Page 94

1  Q.  Those were really your only limitations at
2  that point in time?
3  A.  Yes, sir.
4  Q.  Were there any other jobs at AFS that you
5  think you were qualified to do, including
6  experience -- not just physically, but experience
7  in other things -- other than the scheduler
8  position?
9  A.  That were sedentary-type jobs?
10  Q.  Correct.
11  A.  Yeah, I could do that.  If it was a
12  sedentary-type job and I had the work skills and
13  the knowledge, yes, I could perform the required
14  job.
15  Q.  Are there any specific names of job
16  classifications you can identify, other than
17  scheduler?
18  A.  I don't remember any.
19  Q.  I'm assuming there's -- strike that.
20      Based on these restrictions, there's no
21  way -- is there any way you could have done the
22  aircraft mechanic job?
23  A.  Based upon these restrictions being an

Page 95

1  aircraft mechanic?
2  Q.  Right.
3  A.  At my former workplace?  No.  You need to be
4  physically able to perform all the tasks that are
5  restricted here.
6  Q.  You said, at your former workplace.  Is
7  there somewhere else you could have done it?
8  A.  Well, my former workplace being Cairns
9  Field-ATTC.  That's where I was employed at.
10  Q.  Which is at AFS?
11  A.  Yes, sir.  I'm sorry for confusing you.
12  Q.  What's ATTC?
13  A.  Army -- I can't remember the acronym.  It
14  stands for testing.
15  Q.  That's a department of AFS?
16  A.  Correct.
17  Q.  And you listed Cairns Field?
18  A.  Yes, sir.  That's the field that I was
19  assigned to.
20  Q.  So were there other aircraft mechanic jobs
21  you believe you could have done at other fields?
22  A.  Not with these restrictions.
23  Q.  What other fields are there, by the way?

Page 96

1  A.  There's Hanchey, there's Lowe, Cairns.
2  Q.  These are all airfields at Fort Rucker,
3  right?
4  A.  Yes, sir.  I don't remember the rest of the
5  airfields or the rest of the names of the
6  airfields.
7  Q.  Let me hand you what has been marked
8  Defendant's Exhibit 15.
9      (Defendant's Exhibit No. 15 was
10      marked for identification and a
11      copy of the same is attached
12      hereto.)
13  Q.  Do you recognize the document marked as
14  Defendant's Exhibit 15?
15  A.  Yes, sir, I do.
16  A.  This appears to be a return-to-work slip.
17  Did you complete this?
18  A.  No, I did not.
19  Q.  Where do you recognize this from?
20  A.  When I returned on the 14th, they filled it
21  out at the HR office.
22  Q.  You don't recall who was the one who filled
23  it out?

24 (Pages 93 to 96)

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 97

1  A.  No.
2  Q.  Now, you had been on Family Medical Leave
3  Act leave for some time right?  FMLA?
4  A.  I'm not familiar with the details of that,
5  sir.
6  Q.  These names written in hand over here on the
7  right, Don Donley, D-O-N-L-E-Y, who is he?
8  A.  He was the field manager, the overall field
9  manager for Cairns Airfield.
10  Q.  What about Bill Parsons?
11  A.  Excuse me.  I'll correct that.  He is the
12  field manager for the director of ATTC on Cairns.
13  Q.  Does that mean that he was somewhere up in
14  the chain of command directly from you?
15  A.  Yes.  I worked for him at ATTC.
16  Q.  With some levels of supervision in between?
17  A.  Yes, sir.
18  Q.  Who was Bill Parsons?
19  A.  Bill Parsons would be the field manager at
20  Lowe Airfield on Fort Rucker.
21  Q.  Larry Larkin?
22  A.  He would be the field manager for Cairns
23  Airfield.

Page 98

1  Q.  And Bob Chipman?
2  A.  At Knox Airfield.
3  Q.  Field manager there as well?
4  A.  Yes, sir.
5  Q.  So these four were the top four people at
6  these four locations?
7  A.  Yes, sir.  These are just four locations of
8  the many airfields at Fort Rucker.  There are
9  other.
10  Q.  Now, when you met on the 14th, do you recall
11  or were you involved in any phone conversations
12  with any of these four people?
13  A.  I heard just the conversation with Mr.
14  Donley.
15  Q.  And tell me about that conversation.
16  A.  The female lady at the HR called up Mr.
17  Donley and explained over the phone about my
18  return-to-work slip and the restrictions I have.
19  Q.  You're referring to Defendant's Exhibit 14?
20  A.  Yes, I am.  And he stopped her short, before
21  she could explain the rest of the details, and
22  said that he couldn't use me.  So she turned
23  around and said, "He says he can't use you."

Page 99

1  Q.  Did you understand that to mean that he
2  didn't think you could perform the aircraft
3  mechanic functions with those restrictions?
4  A.  Yes, sir.
5      MR. JACOBS:  Are y'all about ready for
6  a break?
7      MR. STARLING:  Yeah.
8      (A lunch recess was taken.)
9  (BY MR. STARLING)
10  Q.  Mr. Houston, we're back on the record after
11  lunch.
12      I want to go back to some of your testimony
13  earlier about the March 14th meeting at AFS.
14  A.  Uh-huh, yes.
15  Q.  Was that the last time you went back and
16  talked to anyone at AFS?
17  A.  Yes.
18  Q.  Did you have any other conversation with
19  anybody from AFS after that, regarding your
20  employment?
21  A.  Yes, I did.
22  Q.  Tell me about those conversations.
23  A.  I went and saw Mr. -- I'm trying to think of

Page 100

1  his name.  I can see his face.
2  Q.  What type of position was he in?  Was it
3  someone at HR?
4  A.  It was an HR person.  Robert --
5  Q.  Whitney?
6  A.  Whitney, yes.  The reason I spoke to Mr.
7  Whitney was because the VA had sent a letter about
8  my employment status, and he answered the letter.
9  And the reply that the VA sent me was that I was
10  still employed with Army Fleet Support.
11      Well, I went and took this letter, stating
12  that I was still employed with Army Fleet Support,
13  up to Mr. Whitney.  And I explained to him, and I
14  said, "This is wrong.  I am not still employed,
15  and I would like you to straighten out this
16  problem with the VA because I'm looking to settle
17  this claim with them."
18      So I contacted the VA again, and they sent
19  another letter.  And he discussed or wrote down
20  his answer that was telling them that I was not
21  employed by Army Fleet Support.
22  Q.  He sent a letter to the VA?
23  A.  Uh-huh.

25 (Pages 97 to 100)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

| Page 101 | Page 103 |
|---|---|
| 1  Q.   Correct? | 1  description of -- you know, the purpose behind |
| 2  A.   The correct letter correcting my employment | 2  this paperwork out loud, and I said, "I'm being |
| 3  status with Army Fleet Support. | 3  involuntarily terminated. That means I'm fired." |
| 4  Q.   When was this that you had the conversation | 4  And she goes, "No, you have recall rights." And I |
| 5  with Mr. Whitney? | 5  said, "Oh." And that was it. |
| 6  A.   I don't remember, sir. | 6  Q.   Let me hand you what is marked as |
| 7  Q.   Okay. Months after March the 14th? | 7  Defendant's Exhibit 16. |
| 8  A.   Yes, months. | 8      (Defendant's Exhibit No. 16 was |
| 9  Q.   March the 14th was the last time you went to | 9      marked for identification and a |
| 10  the HR office? | 10      copy of the same is attached |
| 11  A.   Well, up until that one moment when I had to | 11      hereto.) |
| 12  go back with the letters showing Mr. Whitney the | 12  Q.   Do you recognize the document marked as |
| 13  problem. | 13  Defendant's Exhibit 16? |
| 14  Q.   At the March 14th meeting, you testified | 14  A.   Yes, I do. |
| 15  earlier, I believe, that you were refused a copy | 15  Q.   Is this a letter that you received? |
| 16  of the reclassification form? | 16  A.   Yes. |
| 17  A.   That's correct, sir. | 17  Q.   In this letter, Ms. Whelan, it appears, |
| 18  Q.   And who is it that you said refused to give | 18  explained your administrative termination status? |
| 19  it to you? | 19  A.   Yes. |
| 20  A.   One of the HR representatives. One of the | 20  Q.   Do you understand that you have not been |
| 21  ladies there. | 21  fired from AFS as of today? |
| 22  Q.   And then what is it you're saying that you | 22  A.   Yes. |
| 23  were told about your employment status at that | 23  Q.   In fact, you could probably reapply for an |

| Page 102 | Page 104 |
|---|---|
| 1  point in time? | 1  aircraft mechanic position today, if you were |
| 2  A.   I was administratively terminated at the HR, | 2  physically capable of doing that? |
| 3  and then went over to my work center to | 3  A.   Yes. |
| 4  outprocess, and then I was told that I was | 4  Q.   And just to be clear for the record, to date |
| 5  involuntarily terminated and I was taking | 5  you have not reapplied for a position with AFS, |
| 6  involuntary termination paperwork. | 6  correct? |
| 7  Q.   And did you complete the paperwork at that | 7  A.   I have not; that's correct. |
| 8  point in time? | 8  Q.   Did you ever talk with a union |
| 9  A.   Uh-huh. I had to outprocess my workplace at | 9  representative about your employment status? |
| 10  ATTC. | 10  A.   Could you rephrase the question? |
| 11  Q.   Just because it wasn't on the record, was | 11  Q.   Around the time that you were going through |
| 12  that a yes that you did complete some paperwork? | 12  this process in March of 2005, did you ever talk |
| 13  A.   What I did was an outprocessing checklist to | 13  with a union representative about your job status |
| 14  fill out; and I filled out the checklist and | 14  with AFS? |
| 15  brought it back to HR. | 15  A.   Yes. |
| 16  Q.   Did you complete any other paperwork at that | 16  Q.   Who did you speak with? |
| 17  point in time? | 17  A.   Mr. Blevins. |
| 18  A.   No. | 18  Q.   When did you talk with him? |
| 19  Q.   You testified earlier about being fired, I | 19  A.   The 15th, I believe. |
| 20  believe. Did anyone use the word "fire" in any | 20  Q.   That was the day after the March 14th |
| 21  conversations with you? | 21  meeting? |
| 22  A.   When I was handed my involuntary termination | 22  A.   Uh-huh. |
| 23  paperwork at my work center, I read the | 23  Q.   Yes? |

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 105

1  A.   Yes.
2  Q.   And what did you discuss with Mr. Blevins?
3  A.   Mr. Blevins -- I said that I had been
4  involuntarily terminated with AFS. And at that
5  time, there was a contract negotiation going on.
6  And Mr. Blevins and a few of his coworkers were in
7  the office. And it was first thing in the
8  morning. And they looked like they had spent the
9  whole night being up during the negotiations.
10      And I asked them, I said, Well, what do you
11  guys want to do about this?" And they said,
12  "Well, do you want to file a grievance?" And I
13  said, "Not right now. I'll get back with you."
14      Because they didn't look like they were very
15  interested in talking to me. They had spent the
16  whole night being up. They were drinking coffee
17  and running on coffee and whatever. They looked
18  pretty ragged.
19  Q.   Did you ever request that they file a
20  grievance?
21  A.   No.
22  Q.   Did you speak with a union rep ever again
23  after that?

## Page 106

1  A.   Yes, I did.
2  Q.   When was that?
3  A.   I spoke to Mr. Blevins again, and I was told
4  by him that I was outside of the contract. And
5  then he referred me to Mr. Wilmer Tharpe for legal
6  advice.
7  Q.   What was outside the contract?
8  A.   I was outside the contract.
9  Q.   Did he explain why?
10  A.  No. He didn't say anything. He just said I
11  was outside the contract, and he referred me to
12  Mr. Wilmer Tharpe.
13  Q.   And did you go see Mr. Tharpe?
14  A.   Yes, I did.
15  Q.   Mr. Tharpe, was ... (unintelligible) the
16  union representative?
17  A.   He was the -- well, he still is the lawyer
18  for the union.
19  Q.   And I don't want to know about your
20  discussions with Mr. Tharpe in particular.
21      Did you retain Mr. Tharpe as your attorney
22  at that time?
23  A.   I retained him, yes.

## Page 107

1  Q.   And did Mr. Tharpe file any claims on your
2  behalf?
3  A.   No.
4  Q.   Other than that conversation you just
5  mentioned with Mr. Blevins -- you've mentioned two
6  -- did you have any other conversations with the
7  union after that?
8  A.   No.
9  Q.   Did you have any conversations with any
10  union representatives, prior to March the 15th,
11  about your status?
12  A.   No.
13  Q.   Did you ever ask the union for a job
14  reclassification form?
15  A.   No.
16  Q.   Are you familiar with the Collective
17  Bargaining Agreement that was in place at this
18  point in time?
19  A.   Yes.
20  Q.   Let me hand you what I'm going to mark as
21  Defendant's Exhibit 17.
22      (Defendant's Exhibit No. 17 was
23      marked for identification and a

## Page 108

1      copy of the same is attached
2      hereto.)
3  Q.   Does that appear to be a true and correct
4  copy of the Collective Bargaining Agreement
5  between DynCorp and the union? Excuse me. Strike
6  that.
7      Between AFS and the union?
8  A.   It does say, "DynCorp Fort Rucker" here.
9  Q.   It appears to be missing the cover page.
10  The agreement starts on page 1. We'll come back
11  to that in just a minute.
12      MR. JACOBS: I'm going to object to you
13  asking him anything about that. That antedates
14  the date of his termination.
15      MR. STARLING: Right. The one that is
16  marked Defendant's Exhibit 17 is the Collective
17  Bargaining Agreement that was in effect at the
18  time of this matter.
19  Q.   Does that appear to you to be a true and
20  correct copy of the Collective Bargaining
21  Agreement?
22  A.   Yes, sir.
23  Q.   Do you understand, or did you understand

27 (Pages 105 to 108)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

Page 109

1 that to reclassify, you had to be active in your
2 existing job classification?
3 A.   Could you rephrase the question, please?
4 Q.   Did you understand that, under the
5 Collective Bargaining Agreement, to reclassify to
6 another job position, you had to be actively
7 employed in your current job position?
8 A.   Yes.  That's what I was told by the HR
9 representatives.
10 Q.   Let me hand you what has been marked as
11 Defendant's Exhibit 18.
12         (Defendant's Exhibit No. 18 was
13         marked for identification and a
14         copy of the same is attached
15         hereto.)
16 Q.   Do you recognize the document marked as
17 Defendant's Exhibit 18?
18 A.   Yes, sir.
19 Q.   Is that your signature in the middle of the
20 first page?
21 A.   Yes, sir.
22 Q.   Is this an FMLA application that you
23 completed?

---

Page 110

1 A.   Yes, sir.
2 Q.   Is that your handwriting on the top half of
3 the first page?
4 A.   Yes, sir.
5 Q.   And it appears that the second, third, and
6 fourth pages were completed by Dr. Kosmatka.  Do
7 you see that?
8 A.   Yes, sir.
9 Q.   Did you request that he complete that
10 certification of healthcare provider?
11 A.   Yes, sir.
12 Q.   And it appears that you applied for FMLA
13 leave on September the 10th of 2004.  Do you see
14 that?
15 A.   Yes, sir.
16 Q.   And do you recall being granted FMLA leave?
17 A.   I don't remember.
18 Q.   Do you recall receiving a copy of this
19 document marked Defendant's Exhibit 18?
20 A.   Receiving a copy of this, sir?
21 Q.   Correct.
22 A.   I remember filling out this top part of the
23 form and bringing it to the doctor; but as for

---

Page 111

1 receiving a copy of it, no, I don't remember
2 receiving a copy of it.
3 Q.   Do you know, do you understand, that under
4 the Family Medical Leave Act, you're entitled to
5 12 weeks of unpaid leave?
6 A.   Yes, sir.
7 Q.   And did you understand that you received
8 those 12 weeks of FMLA, starting on September
9 10th?
10 A.   I don't remember, sir.
11 Q.   Prior to September of 2005, had you taken
12 any other leaves of absence from AFS?
13 A.   September 2005?
14 Q.   I'm sorry.  2004.  Prior to going out on
15 your short-term disability and FMLA in 2004, had
16 you taken any other leaves of absence from AFS?
17 A.   Yes, sir, I believe so.
18 Q.   What type were they?
19 A.   I pulled my rotator cuff, had surgery and
20 had to fix it.
21 Q.   Was that an on-the-job injury?
22 A.   Uhm – hmm.
23 Q.   Do you recall what type of leave you

---

Page 112

1 received?
2 A.   Short-term disability.
3 Q.   Do you recall how long you were out on
4 short-term disability at that time?
5 A.   No, sir.
6 Q.   Was it the full six months?
7 A.   I don't remember.
8 Q.   Were you reinstated to your aircraft
9 mechanic job after that?
10 A.   Yes, sir.
11 Q.   The Collective Bargaining Agreement we
12 referenced earlier, do you understand that
13 governed your employment at AFS?
14 A.   Yes.
15 Q.   Let me show you what I'm going to mark as
16 Defendant's Exhibit 19.
17         (Defendant's Exhibit No. 19 was
18         marked for identification and a
19         copy of the same is attached
20         hereto.)
21 Q.   Do you recognize that document marked as
22 Defendant's Exhibit 19?
23 A.   Yes, sir.

28 (Pages 109 to 112)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 113

1   Q.   And is that an e-mail that you sent to Bob
2   Whitney?
3   A.   Yes, sir.
4   Q.   Is that still your e-mail address,
5   Jollymon@cox.net?
6   A.   Yes, sir.
7   Q.   Okay. And earlier you discussed
8   conversation you had with Bob Whitney about
9   application for VA benefits, correct?
10  A.   Yes, sir.
11  Q.   And is this e-mail addressing that
12  discussion you had?
13  A.   Wait a minute. Let me read it.
14       (The witness examines the
15       document.)
16  A.   Yes.
17  Q.   And you testified earlier that Mr. Whitney
18  subsequently submitted a letter. And I take it,
19  from that, that you were able to qualify for VA
20  benefits after that?
21  A.   Yes, sir.
22  Q.   Let me hand you what I'm marking as
23  Defendant's Exhibit 20.

Page 114

1        (Defendant's Exhibit No. 20 was
2        marked for identification and a
3        copy of the same is attached
4        hereto.)
5   Q.   Do you recognize that document?
6   A.   Yes, sir.
7   Q.   Is Exhibit 20 a fax that you sent to AFS?
8   A.   Yes, sir.
9   Q.   And what was the purpose of this fax?
10  A.   To update my daughter on the dental plan.
11  Q.   Okay. And did they update your daughter on
12  the dental plan?
13  A.   Yes, sir.
14  Q.   Okay. You continued to receive benefits
15  from AFS even after March 14th, correct?
16  A.   Yes, sir.
17       (Defendant's Exhibit No. 21 was
18       marked for identification and a
19       copy of the same is attached
20       hereto.)
21  Q.   Let me show you what I've marked as
22  Defendant's Exhibit 21.
23       Do you recognize the document I've marked as

Page 115

1   Defendant's Exhibit 21?
2   A.   Yes, sir.
3   Q.   Is that your signature on the bottom left?
4   A.   Yes, sir.
5   Q.   And is Brigitte M. Houston your wife?
6   A.   Yes, sir.
7   Q.   And is this a form for all the insurance and
8   other benefits you were continuing to receive at
9   AFS?
10  A.   That I was paying for, yes, sir.
11  Q.   And it looks like it's dated March the 15th
12  of '05.
13       When you said you went and completed a form
14  on March the 15th, is this the form you completed?
15  A.   That was one of the forms. There was an
16  outprocessing form and this
17  paying-for-the-benefits form.
18  Q.   So there's some type of outprocessing form
19  that you also completed?
20  A.   Yes, sir.
21  Q.   I'm handing you what I'll mark as
22  Defendant's Exhibit 22.
23       (Defendant's Exhibit No. 22 was

Page 116

1        marked for identification and a
2        copy of the same is attached
3        hereto.)
4   Q.   Do you recognize the document marked as
5   Defendant's Exhibit 22?
6   A.   Yes, sir.
7   Q.   And what is that?
8   A.   Verification of my daughter's enrollment in
9   school full time.
10  Q.   Did AFS have some type of tuition
11  reimbursement plan or something of that nature?
12  A.   Not that I know of. I don't know.
13  Q.   Or was this for benefits purposes?
14  A.   This was for benefits purposes, for a dental
15  plan.
16  Q.   And it looks like —
17       (Defendant's Exhibit No. 23 was
18       marked for identification and a
19       copy of the same is attached
20       hereto.)
21  Q.   I'm handing you Defendant's Exhibit 23.
22  That appears to be the same issue, which is your
23  daughter being registered a full-time student for

29 (Pages 113 to 116)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

## Page 117

1  purposes of getting benefits for her?

2  A.  Yes, sir.

3  Q.  And is that a true and correct copy of what

4  appears to be a letter from Okaloosa-Walton

5  Community College?

6  A.  Yes, sir.

7  Q.  Now, after you were no longer actively

8  working at AFS in March of 2005, did you apply for

9  unemployment compensation?

10  A.  Yes, sir.

11  Q.  And as I understand it, initially the

12  unemployment agency ruled favorably to you, and

13  then it was appealed; is that correct?

14  A.  That's correct.

15  Q.  And ultimately you were denied unemployment?

16  A.  Yes, sir.

17  Q.  Do you understand the reason that you were

18  denied unemployment?

19  A.  The reason?  Could you rephrase the

20  question, please?

21  Q.  What was the reason provided by the State of

22  Alabama as to why you were ultimately denied

23  unemployment compensation?

## Page 118

1  A.  I do not remember.

2      (Defendant's Exhibit No. 24 was

3      marked for identification and a

4      copy of the same is attached

5      hereto.)

6  Q.  What I'm handing you is marked as

7  Defendant's Exhibit No. 24.

8      Do you recognize that document?

9  A.  Yes, sir, I do.

10  Q.  Is that the Decision of the Board of Appeals

11  for the Department of Industrial Relations on your

12  unemployment claim?

13  A.  Yes, sir.

14  Q.  Do you see on the second page where it says,

15  under "Decision," second sentence, "The claimant

16  has failed to comply with the terms of the Labor

17  Agreement.  He is disqualified under the

18  provisions of Section 25-4-77(a)(3) of the Law

19  effective March 13, 2005."

20  A.  Yes, sir.

21  Q.  Now, you attended an unemployment

22  compensation hearing as part of that unemployment

23  process, correct?

## Page 119

1  A.  Do you mean the hearing?  Yes, sir.

2  Q.  It was a hearing where you were sworn under

3  oath and you gave testimony, as well as others?

4  A.  Yes, sir.

5  Q.  And did you testify truthfully at that

6  hearing?

7  A.  Yes, sir.

8      (Defendant's Exhibit No. 25 was

9      marked for identification and a

10      copy of the same is attached

11      hereto.)

12  Q.  Let me hand you what I've marked as

13  Defendant's Exhibit 25.  I will advise you that

14  that is a copy of the transcript from the

15  unemployment hearing that we received from the

16  State of Alabama.

17      Have you seen that document before?

18  A.  Yes, sir.

19  Q.  Okay.  Does that appear to be a true and

20  correct copy of the transcript from the

21  unemployment hearing?

22  A.  It appears to be, yes, sir.

23  Q.  Look at page 9, if you would, Mr. Houston.

## Page 120

1  A.  Yes.

2  Q.  About halfway down, next to your name, it

3  says, "I was there on the morning and I asked very

4  politely to the HR representative if I could go

5  into my old career field for one day so I may be

6  allowed to reclassify, but they would not allow me

7  to go into my old career field due to my physical

8  limitations."

9      Is that a true statement as to your

10  recollection of what happened?

11  A.  Yes.  But you failed to read the last

12  sentence.

13  Q.  "They refused to accommodate those

14  limitations"?

15  A.  That is correct.

16  Q.  So is that a true recollection of what

17  happened that day?

18  A.  Yes, sir.

19  Q.  And is that referencing your meeting on

20  March the 14th of 2005?

21  A.  Yes, sir.

22  Q.  Did you ever receive any training from AFS

23  on discrimination or harassment policies?

30 (Pages 117 to 120)

Page 121

1  A.  Are you talking about, like, equal
2  treatment?
3  Q.  Equal employment.
4  A.  Equal employment?
5  Q.  Yes.
6  A.  Yes, sir, I believe there was. In the
7  introduction week, we had it at Knox Field.
8  Q.  Do you recall the nature of that type of
9  training?
10 A.  The nature?
11 Q.  What the training was about.
12 A.  What the training was about?  At Knox Field,
13 it was just an introduction training session into
14 what to expect working for DynCorp.
15 Q.  Did you receive any additional training when
16 AFS took over the contract?
17 A.  Not that I remember.
18 Q.  Did you receive a copy of the Collective
19 Bargaining Agreement when you first came on with
20 DynCorp?
21 A.  Yes.
22 Q.  And was the same agreement utilized after
23 AFS took over the contract?

Page 122

1  A.  There was negotiations for redoing the
2  contract, if that's what you're talking about,
3  with the CBA. Yes, there was a different CBA.
4  Q.  Did you receive whatever additional --
5  A.  Yes.
6  Q.  You did?
7  A.  Yes.
8  Q.  When did you decide to sue AFS in this case
9  that we are here for today?
10 A.  Sometime after April.
11 Q.  April of 2005?
12 A.  Yes.
13 Q.  Why after April of 2005?
14 A.  I believed that I was discriminated against.
15 Q.  In what way do you believe you were
16 discriminated against?
17 A.  Under the guidelines of the Americans with
18 Disabilities Act.
19 Q.  And what are the guidelines that you are
20 referring to?
21 A.  The employer has to make a reasonable
22 accommodation to the employee who has a
23 disability.

Page 123

1  Q.  You mean you considered yourself disabled?
2  A.  Yes.
3  Q.  What accommodation did you believe that AFS
4  owed you?
5  A.  Could you rephrase the question, please?
6  Q.  You testified that you filed suit because
7  you believe that AFS was obligated to make
8  reasonable accommodations to you, correct?
9  A.  That is correct.
10 Q.  And my question is:  What accommodations do
11 you believe AFS was obligated to provide to you?
12 A.  Reasonable accommodations to fit my
13 disabilities.
14 Q.  And can you tell me what those reasonable
15 accommodations are, or what those reasonable
16 accommodations should have been as of March of
17 2005?
18     MR. JACOBS:  I'm going to object to the
19 form of that, of what they should have been.
20     MR. STARLING:  Well, he's alleged them.
21 Q.  Okay.  What are the reasonable
22 accommodations you believe that AFS was obligated
23 to provide you but did not?

Page 124

1      MR. JACOBS:  I'll object again.  Answer
2  if you can.  But I just object to the question.
3  It's their obligation to accommodate; it's not his
4  to decide what they are.
5  A.  I'm still trying to figure out the question
6  again.  Could you say it again?
7  Q.  You have testified that you filed this
8  lawsuit because you believe that AFS did not make
9  reasonable accommodations to you, under the
10 Americans With Disabilities Act, correct?
11 A.  That is correct.
12 Q.  My question was:  When you say they did not
13 make reasonable accommodations, what reasonable
14 accommodations are you referring to?
15 A.  To accommodate my permanent restrictions
16 that Dr. Manski levied upon me in my
17 return-to-work slip.
18 Q.  What are you alleging they should have done?
19 A.  Provided me a chance to have a
20 sedentary-type job where I could have used my work
21 skills and my work experience for the company.
22 Q.  You're not aware of any position, other than
23 the aircraft scheduler position, that you believe

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

Page 125

1  you are qualified to perform, are you?
2  A.  There was no other -- to my knowledge, there
3  was no other jobs that I knew that I was able that
4  I could do at the time.
5  Q.  And how do you believe that they should have
6  accommodated you to allow you to perform the
7  aircraft scheduler position?
8  A.  Can you say that again, please?
9  Q.  Let's try it this way:  What do you think
10  they didn't do that they should have done?
11  A.  I don't believe they should have terminated
12  my employment.
13  Q.  And by that you mean you believe you were
14  terminated on March the 14th, 2005?
15  A.  Yes, sir.
16  Q.  Any other accommodation you believe that
17  they should have made for you?
18  A.  A reasonable accommodation to find me a job
19  I was -- I had the ability and qualifications to
20  do.
21  Q.  Now, you don't think they could have or
22  should have violated the Collective Bargaining
23  Agreement to do that, do you?

Page 126

1  A.  Could you please explain what you mean by
2  having they violate the Collective Bargaining
3  Agreement?  I'm not following what you mean.
4      Are you saying that they are supposed to
5  violate the CBA to accommodate me?  Is that what
6  you're saying?
7  Q.  Right.  Is that what you are suggesting?
8  A.  Well, how would they be violating the CBA if
9  they were complying with the federal law.
10  Q.  You agree the Collective Bargaining
11  Agreement is the agreement that governs the terms
12  and conditions for employees at AFS that are
13  covered by that bargaining agreement, right?
14  A.  Yes.
15  Q.  And there are provisions in that Collective
16  Bargaining Agreement addressing job
17  reclassification, seniority bidding rights, et
18  cetera, correct?
19  A.  This is correct.
20  Q.  And those terms in that Collective
21  Bargaining Agreement govern how AFS must address
22  employees who seek to reclassify, bid, et cetera,
23  right?

Page 127

1  A.  This is true.
2  Q.  So is your claim that AFS simply should have
3  put you in another position, namely an aircraft
4  scheduler, upon your request?
5  A.  Upon my -- upon me filling out a
6  reclassification form and getting it approved and
7  going through the channels that were the
8  procedures, yes.
9  Q.  And being qualified for that position?
10  A.  And being qualified for that position, or
11  any other position that I was qualified to do.
12  Q.  For example, having a record of being able
13  to type 30 words per minute?
14      MR. JACOBS:  Object to the form of the
15  question.
16  Q.  Being able to type 30 words per minute was a
17  requirement for the aircraft scheduler position,
18  right?
19  A.  That's correct, yes.
20  Q.  And you had to have a record on file of
21  being able to do that to be qualified for that
22  position?
23      MR. JACOBS:  Object to the form of the

Page 128

1  question.
2  Q.  Do you understand that to be the case?
3  A.  Yes.
4  Q.  You had to have documentation that you
5  qualified to meet the prerequisites of the
6  aircraft scheduler, correct?
7  A.  This is right.
8  Q.  Is there any reason that you believe
9  JobsPlus would not have a record of you ever being
10  there or applying there?
11  A.  Could you say that again, please?
12  Q.  If JobsPlus has no record of you having
13  submitted an application there or doing anything
14  there, would you have any explanation for that?
15  A.  No.  You would have to contact JobsPlus.
16  Q.  Now, did you seek help from the EEO office
17  at Eglin Air Force Base?
18  A.  Yes, I did.
19  Q.  Why did you decide to go there?
20  A.  Why did I decide to go there?  My Air Force
21  training told me that I had been terminated
22  without cause, and I wanted to see if there was
23  any kind of avenues I could follow or get some

1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 129

1  advice from the EEOC office on Eglin to pursue
2  this matter that I was -- the hand I was dealt by
3  AFS.
4  Q.  Did you go down to Eglin and fill out a
5  form?
6  A.  Yes, I did.
7  Q.  And what did you tell the person at Eglin
8  that you spoke with about your claim?
9  A.  I was involuntarily terminated.
10  Q.  Did you also complain to the Department of
11  Labor?
12  A.  Yes.  I wrote a letter to them too.
13  Q.  And did you fill out a form there also?
14  A.  Which Department of Labor are we talking
15  about?
16  Q.  Who all did you go to?
17  A.  Do you want all the names of the Department
18  of Labor offices I've wrote to?
19  Q.  Yeah.
20  A.  I'll have to go out to my truck and get a
21  spreadsheet.
22  Q.  Let's try as many as we can do here.  OFCCP?
23  A.  OFCCP was one, yes.

## Page 130

1  Q.  Who else do you recall complaining to?
2  A.  Numerous agencies.
3  Q.  Was your complaint of the same nature at
4  each agency that you complained to?
5  A.  Yes, sir.
6  Q.  Same claim about being involuntarily
7  terminated?
8  A.  Yes, sir.
9  Q.  Did you make any claims about lack of
10  reasonable accommodation?
11  A.  I just said that I was involuntarily
12  terminated.
13  Q.  When did you request an accommodation from
14  AFS?
15  A.  On the 14th.
16  Q.  March the 14th, 2005?
17  A.  Yes, sir.
18  Q.  And how did you make that request?
19  A.  I asked them.  I asked one of the lady
20  representatives at HR if I could have a
21  reclassification form, right then and there, to
22  fill out; and I was denied the appropriate
23  reclassification form to fill out.

## Page 131

1  Q.  Any other requests for accommodation that
2  you made?
3  A.  As to the reclassification form?
4  Q.  Or any other type of request for
5  accommodation?
6  A.  I don't believe so, no.
7  Q.  Are you aware of anyone else who has been
8  accommodated under similar circumstances as you?
9  A.  No.
10  Q.  Let me hand you what I'm going to mark as
11  Exhibit 26.
12       (Defendant's Exhibit No. 26 was
13       marked for identification and a
14       copy of the same is attached
15       hereto.)
16  Q.  Do you recognize the document I've marked as
17  Defendant's Exhibit 26?
18  A.  Yes, sir.
19  Q.  Is that a status change request form from
20  AFS?
21  A.  Yes, sir.
22  Q.  Is this the form that you complete to
23  request reclassification?

## Page 132

1  A.  Yes, sir.
2  Q.  You've seen this before?
3  A.  As for shift preferences, yes.
4  Q.  Have you filled it out for shift preferences
5  before?
6  A.  Yes, sir.
7  Q.  When did you do that?
8  A.  I do not remember, sir.  Early in my
9  employment with DynCorp.
10  Q.  Where did you get the form that time when
11  you did that?
12  A.  I don't remember.
13  Q.  I'm going to hand you what I'm going to mark
14  as Defendant's Exhibit 27.
15       (Defendant's Exhibit No. 27 was
16       marked for identification and a
17       copy of the same is attached
18       hereto.)
19  Q.  Do you recognize the document I've marked as
20  Defendant's Exhibit 27?
21  A.  Yes, sir.
22  Q.  Is that the Complaint in this lawsuit?
23  A.  Yes, sir.

33 (Pages 129 to 132)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 133

1   Q.   And as for the factual allegations in here,
2   are they true and correct?
3   A.   Yes, sir.
4   Q.   In paragraph 18, you allege that Fleet
5   Services unlawfully retaliated against you for
6   pursuing rights under the ADA following your
7   termination from employment by interference with
8   your right to qualify for and receive benefits
9   earned and due you.
10      What benefits are you talking about in that
11  paragraph?
12      MR. STARLING: Let's go off the record
13  for just a minute.
14      (An off-the-record discussion
15      was held.)
16  A.   Receive benefits earned and due to me, I
17  would think these benefits would be the
18  unemployment compensation benefits.
19  Q.   Any other benefits?
20  A.   No.
21  Q.   AFS has been helpful in your request for VA
22  benefits, right?
23  A.   On my second request, yes, they were, when I

Page 134

1   showed them that they made a mistake.
2       MR. STARLING: Why don't we take a
3   break here?
4       (A brief recess was taken.)
5       MR. STARLING: We're back on the
6   record. We're continuing to look at Exhibit No.
7   27, the Complaint in this matter.
8   Q.   If you'll go to paragraph 24 -- actually,
9   look down to paragraph 25, if you would, "Houston
10  was not given notice in writing before the leave
11  began that his paid time off leave and short-term
12  disability would be counted towards his maximum 12
13  weeks of leave allowed under the FMLA."
14      Did you not receive any notice, you're
15  claiming, that FMLA would be counted during the
16  time of your short-term disability?
17  A.   I don't remember.
18  Q.   Do you understand what your FMLA claim is in
19  this case?
20  A.   No.
21  Q.   Do you -- Strike that.
22      You don't have any idea what violation of
23  the FMLA you are claiming in this lawsuit?

Page 135

1   A.   I left that up to my attorney.
2   Q.   So you don't know then?
3   A.   I just know what the meaning of the
4   abbreviation is. As for the details, no, sir, I
5   don't know the details.
6   Q.   You are not claiming that you should be
7   entitled to an additional 12 weeks off of work, or
8   paid, or anything like that, are you?
9   A.   (No response.)
10  Q.   Paragraph 29 says, "Fleet Services
11  retaliated against Houston following his efforts
12  for redress of its discrimination against him by
13  interference with his right to qualify for and
14  receive benefits earned and due him."
15      Again, is that relating to your unemployment
16  compensation benefits?
17  A.   That would be one, yes, sir.
18  Q.   Any other benefits that you're claiming were
19  denied in retaliation for your making a claim?
20  A.   This document was drawn up by my attorney,
21  and I believe that you would have to refer to him
22  on those said benefits.
23  Q.   Let's try it this way: Other than

Page 136

1   unemployment benefits, what other benefits have
2   you been denied?
3   A.   Other than my unemployment benefits, I don't
4   recall any.
5       (Defendant's Exhibit No. 28 was
6       marked for identification and a
7       copy of the same is attached
8       hereto.)
9   Q.   I'm handing you what's been marked as
10  Defendant's Exhibit No. 28.
11      MR. STARLING: Let's go off the record.
12      (An off-the-record discussion
13      was held.)
14  (BY MR. STARLING)
15  Q.   We'll come back to 28 in just a minute. You
16  referenced earlier a spreadsheet. I'm sorry.
17  Here we go.
18      I've handed you what's been marked as
19  Defendant's Exhibit No. 28. Can you tell me what
20  this is?
21  A.   My spreadsheet.
22  Q.   Earlier you referenced a spreadsheet that
23  you said was in your vehicle outside, correct?

34 (Pages 133 to 136)

## Page 137

1  A.  And this is it.  This is a copy of it.
2  Q.  And you discussed that, in that spreadsheet,
3  you had listed all of the various organizations to
4  which you had complained about your treatment by
5  AFS.  Is that what this is?
6  A.  This is a spreadsheet that tracked the
7  number of packages I sent out to various
8  organizations in this country, yes, sir, to
9  complain about my treatment.
10  Q.  And did all of those organizations deny your
11  request?
12  A.  No, sir.  Some of them answered me and some
13  of them didn't.  I should say they responded and
14  some of them did not respond.
15  Q.  Did any of them take action on your behalf?
16  A.  Yes.
17  Q.  Which ones were those?
18  A.  Equality Opportunity and Treatment
19  Commission of Birmingham, Alabama; the National
20  Labor Relations Board; the Staff Judge Advocate or
21  the Army -- oh, here we go.
22  Q.  And just for the record, you're looking at
23  the second page of the spreadsheet, which has what

## Page 138

1  action was taken on it, it appears to be?
2  A.  Yes.
3  Q.  And does that correctly identify or explain
4  what action was taken?
5  A.  It does identify certain letters that I had
6  a response by organizations that I sent a package
7  to.  And some organizations failed to respond
8  whatsoever.
9  Q.  And that's set forth in column E of the
10  spreadsheet?
11  A.  Yes, sir.
12  Q.  Column A is the organization, correct?
13  A.  The name, yes, and the organization.
14  Q.  What is column B?
15  A.  The date.
16  Q.  That you originally --
17  A.  Sent the package off.
18  Q.  And what is column C?
19  A.  The date that I received a response.
20  Q.  Okay.  And then column F?
21  A.  Is a mistake.
22  Q.  Okay.  In your Complaint, you seek various
23  forms of damages in this lawsuit.  For example,

## Page 139

1  back pay.
2  How much back pay do you believe you are
3  entitled to?
4  A.  I would reference that answer to my lawyer.
5  He knows the specifics on that.
6  Q.  Let's put it in simple terms here.  If you
7  had received the aircraft scheduler position on
8  March the 14th --
9  A.  Yes.
10  Q.  -- do you know what your rate of pay would
11  have been for that position?
12  A.  I know it would not be as high as an
13  aircraft mechanic's.  That's all I know.  I know
14  it would be somewhat less, but still a living
15  wage.
16  Q.  And you are claiming that if the company had
17  accommodated you in some way, you would have had
18  that aircraft scheduler position, up until
19  December 2005, when you became eligible for the VA
20  benefits?
21  A.  I would still be working there if I was
22  allowed to have the aircraft scheduler job.
23  Q.  Today you would?

## Page 140

1  A.  Yes.
2  Q.  I thought you testified earlier that you
3  were completely disabled, as of --
4  A.  Yes, I am disabled.  But because of the
5  incident that I was thrown into, I applied through
6  the VA for disability and I was granted, for I saw
7  no job offer coming from Army Fleet Support at the
8  time.
9  And I said, Well, I've got to have an income
10  coming into my family, so I'll go to the VA and
11  see what they can do for me.
12  Q.  Now, as part of your application to the VA,
13  haven't you told them that you were unable to
14  perform any job?
15  A.  That was up to the VA's determination; that
16  wasn't up to me.  I just handed them the medical
17  evidence.
18  Q.  So as we sit here today, you think that you
19  are physically capable of performing an aircraft
20  scheduler position?
21  A.  If I was not already rated 100 percent
22  permanent and total by the VA, I would be able and
23  qualified to perform the job as an aircraft

35 (Pages 137 to 140)

**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trial Services

Page 141

1  scheduler, yes, sir.
2  Q.  Was that a yes or a no?
3  A.  Yes.
4  Q.  You would be able to perform your job?
5  Strike that.
6      As we sit here today, you are perfectly
7  capable of performing an aircraft scheduler
8  position?
9  A.  If I was given the job as an aircraft
10  scheduler, and the accommodations were made that I
11  could get up and move around every hour and a half
12  as needed for my back, yes, I don't see why I
13  could not be an aircraft scheduler.
14  Q.  And you also applied for Social Security
15  Disability, right?
16  A.  Yeah.  Because the VA rated me as 100
17  percent total and permanent.
18  Q.  And as we discussed earlier, you have not
19  received the determination from Social Security?
20  A.  That is still up in the air.
21  Q.  In your submission to Social Security for
22  those disability benefits, did you tell them that
23  you were unable to perform any and all jobs?

Page 142

1  A.  That's to be handled by my attorney down in
2  Tampa.
3  Q.  Did you sign a form?
4  A.  I signed a lot of forms with Bender &
5  Bender.
6  Q.  What do you recall the forms stating about
7  your capability of performing jobs?
8  A.  I don't remember.
9  Q.  What do you want out of this lawsuit?
10  A.  There is a principle, an ethical question
11  here that I want resolved.
12      When I was wronged, you know, when I was
13  refused to be allowed to reclassify, I want that
14  issue brought to justice for ethical reasons and
15  for my own personal integrity.
16      There was a question that was brought up
17  whether I — let me rephrase that — that I was
18  not allowed to continue my work with this company.
19  I was wondering why that the HR people took an
20  attitude or made a — not an attitude, but a
21  decision — that would violate the Americans With
22  Disabilities Act, when it was as blatant as this.
23  They — you know, I was shocked.  I just wanted to

Page 143

1  get some judicial satisfaction.
2  Q.  You don't want your job?  You don't want the
3  aircraft scheduler position now, do you?
4  A.  No.  Because I'm totally out of the
5  workforce now.
6  Q.  And you are content with that?
7  A.  Yes, I am.
8  Q.  So you just want money and the satisfaction,
9  is that it?
10  A.  I would rather have the personal
11  satisfaction that I righted a wrong.  And as for
12  the money, it would be nice, but it's not the main
13  reason why I'm going ahead and doing this.  I'm
14  not going through this for the money; I'm going
15  through it because I was wronged and I want
16  something righted.
17  Q.  Well, are you looking for some type of
18  apology from AFS?
19  A.  I would like them to abide by the federal
20  laws; you know, to do the right thing with people.
21  I'm looking not for myself, but somebody else down
22  the line that would hopefully never fall into the
23  same situation that I fell into; that, you know,

Page 144

1  that would not happen to them.
2  Q.  Is there anyone in particular at AFS that
3  you are mad at or you think was —
4  A.  No.  I'm not mad at anybody at AFS.
5  Q.  Just the system itself was —
6  A.  It was flawed.  It was a mistake in
7  somebody's judgment or a procedural mistake or an
8  oversight, or whatever you want to call it.  There
9  was something wrong, and it happened to me, and
10  I'd like to get that straightened out.
11  Q.  Because my sense is, even after March, I
12  mean, when you went back to an e-mail back to Bob
13  Whitney, I mean, he was trying to help you, at the
14  end of the day, get the benefits and stuff.  I
15  mean, it wasn't like he was out to get you.
16  A.  Oh, yeah, yeah.  Bob's a fine guy.  I have
17  no beef with Bob.  In fact, all the people were
18  very nice.  I just don't understand how it
19  happened to me.
20  Q.  I think there's some claims for emotional
21  distress and stuff in the lawsuit.  I'm sure
22  attorneys draft these things.
23      But what stress, if any, or other types of

36 (Pages 141 to 144)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

| Page 145 | Page 147 |
|---|---|

### Page 145

1  mental anguish have you had since March of 2005?
2  A.  Well, I'll put it to you this way:  When I
3  got hired on by DynCorp, I told Bill Warnick that
4  I was there for 20 years or better.  I was going
5  to make a career out of driving up the road from
6  Crestview, wearing out tires, burning up cars,
7  making a living.
8       There was another factor.  I'm retired
9  military.  This country is at war.  And I'm an old
10  warrior that got put out to pasture, so I was
11  doing my bit for this country, working for a
12  defense contractor in support of the United States
13  Army.
14       Now, I had a very hard time understanding
15  why all this occurred to me, why I was
16  involuntarily terminated; so I sought out mental
17  health counselors to find out what was going on,
18  you know, why all this -- I needed somebody to
19  talk to besides my wife.  It's not every day
20  you're middle-aged and you get fired, when you're
21  planning on riding it out for a good 20 years.
22  Q.  What did you tell the counselors?
23  A.  All sorts of stuff.

### Page 147

1  A.  30-06 9 mill.  Poking holes in paper.
2  Q.  That's good stress relief?
3  A.  Not bad.
4  Q.  Have there been any other events that have
5  caused you any type of depression or anxiety over
6  the last couple of years, other than work?
7  A.  This incident.  That's all.
8  Q.  Feel like you're almost back to normal now?
9  A.  Yeah.  Yes.
10  Q.  Maybe it's fair to ask:  Do you feel like
11  you are back to normal now?
12  A.  As normal as my body will let me be.
13  Q.  Have you given all the documents you have
14  related to this lawsuit to your attorney?
15  A.  Yes, sir.
16  Q.  Do you keep a diary or anything?
17  A.  No.
18  Q.  Any tape recordings, video or anything that
19  relate to this lawsuit in any way?
20  A.  Oh, no.  Only thing I video is my kids.
21  Q.  What doctors are you still -- are you still
22  seeing any doctors?
23  A.  Oh, yeah.

| Page 146 | Page 148 |
|---|---|

### Page 146

1  Q.  Things unrelated to the job as well?
2  A.  Well, things related to the job, things
3  unrelated to the job, how I felt about the whole
4  situation that occurred to me.  It's not
5  everything; it's one of those things.
6       I was doing my bit for the country and
7  making a living for my family, and making a pretty
8  good living at that; and this happens, this
9  incident in my life.
10  Q.  Are you still able to do other things in
11  your life? hobbies and stuff?
12  A.  Yeah.
13  Q.  What do you like to do?
14  A.  I like to go deep-sea fishing.
15  Q.  Been a good year?
16  A.  Well, yeah; not bad.
17  Q.  Where do you go fishing?
18  A.  Down in Destin.  Hop on a boat, go out, hit
19  some of the wrecks, drop a line, pull up a fish.
20       I also like going to the rifle club on
21  Herbert Field shooting a high-powered rifle and
22  pistol now and then.  Target shooting.
23  Q.  .308s, or what do you shoot?

### Page 148

1  Q.  Are you still seeing any mental health
2  providers?
3  A.  Yes.
4  Q.  Who do you see for that?
5  A.  I see a Dr. Kelley over in Pensacola in the
6  VA.
7  Q.  A VA doctor?
8  A.  VA clinic over there.
9  Q.  Is that where the Lexapro comes from?
10  A.  No.  My Lexapro was prescribed to me by my
11  physician on Eglin, Dr. Kosmatka.
12  Q.  Has Dr. Kelley prescribed any prescription
13  drugs?
14  A.  No.  No, he doesn't.
15  Q.  I believe there was a question in discovery
16  that asked something about your data, and you said
17  something about your computer hard drive had
18  crashed.
19  A.  Oh, yeah.  Yeah, my computer hard drive
20  crashed.
21  Q.  Did you lose anything related to this
22  lawsuit at all?
23  A.  That spreadsheet, everything.  Everything I

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

## Page 149

1  had was gone. This is the only thing I have a
2  copy of.
3  Q.  Was there anything else related to the
4  lawsuit?
5  A.  Everything that I had. All the letters that
6  I had typed up and had sent out, per this tracking
7  device, gone, other than the copies that were made
8  prior to the crash. Everything else is gone.
9        MR. STARLING:  Can we go off the record
10  for a second?
11        (An off-the-record discussion
12        was held.)
13        (Defendant's Exhibit No. 29 was
14        marked for identification and a
15        copy of the same is attached
16        hereto.)
17  (BY MR. STARLING)
18  Q.  I've handed you what's been marked as
19  Defendant's Exhibit No. 29. These are your
20  responses to Defendant's Request for Production of
21  Documents.
22        I believe you testified a minute ago that
23  you produced all the documents in your possession

## Page 150

1  which in any way relate to your lawsuit to your
2  attorney; is that correct?
3  A.  This is correct.
4  Q.  Have you reviewed this request for
5  production before?
6  A.  Yes, sir. My attorney e-mailed it to me,
7  and I printed it out and I responded accordingly
8  to the questions.
9  Q.  Is it your position that you have produced
10  all the documents responsive to these requests?
11  A.  Yes, sir.
12        (Defendant's Exhibit No. 30 was
13        marked for identification and a
14        copy of the same is attached
15        hereto.)
16  Q.  Let me hand you what has been marked as
17  Defendant's Exhibit 30.
18        Do you recognize the document I've marked as
19  Defendant's Exhibit 30?
20  A.  Yes, sir.
21  Q.  Is this a complaint that you filed with the
22  Department of Labor?
23  A.  I filed it with the OFCCP, yes, sir,

## Page 151

1  Department of Labor.
2  Q.  And on the second page, there is a box at
3  the bottom that appears that you typed in that
4  box; is that correct?  Did you type this up?
5  A.  Oh, yes, that's right.
6  Q.  Did you complete this or someone else?
7  A.  I completed it, yes.
8  Q.  So that is, you typed in what is in that box
9  on the bottom of the second page?
10  A.  Yes. It's missing part of the statement.
11  Q.  Is that it on the third page?
12  A.  Yes. Sorry.
13        (Defendant's Exhibit No. 31 was
14        marked for identification and a
15        copy of the same is attached
16        hereto.)
17  Q.  I'm handing you Defendant's Exhibit 31. Do
18  you recognize that document?
19  A.  Yes, sir, I certainly do.
20  Q.  Is that your handwriting on the document?
21  A.  Yes, sir.
22  Q.  Is that your signature on the bottom?
23  A.  Yes, sir.

## Page 152

1  Q.  And is this an NLRB charge you filed with --
2  or Charge of Discrimination you filed with the
3  NLRB?  Strike that. I apologize.
4        Is this a Charge you filed with the NLRB
5  against AFS?
6  A.  Yes, sir.
7  Q.  And ultimately did you withdraw this
8  complaint?
9  A.  Yes, sir. After I was -- I was under the
10  impression that the NLRB would work on my behalf.
11  But after a very lengthy telephone discussion with
12  the investigator on the other end, I found out how
13  the NLRB works, and I withdrew because it was not
14  the avenue I wanted to take.
15  Q.  Why was that?
16  A.  Why was that?
17  Q.  Why wasn't it the avenue you wanted to take?
18  A.  Because they didn't provide the service I
19  wanted. They didn't provide the service or action
20  or requested product or -- how can I describe it?
21  Q.  Remedy?
22  A.  There you go. Remedy is a very good word.
23  Q.  What were you looking for?

38 (Pages 149 to 152)

Page 153

1   A.   Having them take a look into this incident
2   for me. And I was misled by my understanding of
3   how the NLRB worked.
4        So once I found out what they did, then I
5   withdrew it. Because what I was wanting them to
6   do wasn't in their scope.
7   Q.   What did you want them to do?
8   A.   I wanted them to take a look and investigate
9   or determine any kind of wrongdoing on AFS's part.
10  But after I found out what their real mission was,
11  wrong agency.
12       (Defendant's Exhibit No. 32 was
13       marked for identification and a
14       copy of the same is attached
15       hereto.)
16  Q.   I've handed you what has been marked as
17  Defendant's Exhibit No. 32.
18  A.   Yes, sir.
19  Q.   Do you recognize that document?
20  A.   Yes, sir.
21  Q.   Is that the Charge of Discrimination you
22  filed with the EEOC?
23  A.   EEOC? Yes, sir.

Page 154

1   Q.   I'm sorry. Equal Employment Opportunity
2   Commission.
3   A.   That's correct, sir.
4   Q.   And did you receive a Right to Sue notice
5   from the Equal Employment Opportunity Commission?
6   A.   Yes, I did.
7   Q.   Did it advise you that they had found no
8   merit to the claim?
9   A.   This is correct, yes.
10       (Defendant's Exhibit No. 33 was
11       marked for identification and a
12       copy of the same is attached
13       hereto.)
14  Q.   I'll hand you what I've marked as
15  Defendant's Exhibit No. 33. Do you recognize that
16  document?
17  A.   Yes, sir.
18  Q.   Is that the notification of results that you
19  received from OFCCP?
20  A.   Yes, sir.
21       (Defendant's Exhibit No. 34 was
22       marked for identification and a
23       copy of the same is attached

Page 155

1        hereto.)
2   Q.   I'm handing you what has been marked as
3   Defendant's Exhibit No. 34. Do you recognize that
4   document?
5   A.   Yes, sir.
6   Q.   Is that a letter -- it appears to have been
7   sent to Darlene Whelan but also copied to you --
8   A.   Yeah. I got a courtesy copy.
9   Q.   -- stating that the matter had been
10  withdrawn from the NLRB?
11  A.   Yes, sir, that is correct.
12  Q.   Derek Cottrell was the NLRB agent that you
13  spoke with. Do you recall that?
14  A.   That name does sound familiar, yes, sir.
15       (Defendant's Exhibit No. 35 was
16       marked for identification and a
17       copy of the same is attached
18       hereto.)
19  Q.   I'll show you what's been marked as
20  Defendant's Exhibit 35. Do you recognize that
21  document?
22  A.   It's an e-mail. Yep.
23  Q.   It appears to be an e-mail -- a string of

Page 156

1   e-mails -- between you and Derek Cottrell at the
2   NLRB; is that correct?
3   A.   Yes, sir.
4   Q.   And is that a true and correct copy of the
5   e-mails back and forth between you and Mr.
6   Cottrell?
7   A.   Yes, sir.
8        (Defendant's Exhibit No. 36 was
9        marked for identification and a
10       copy of the same is attached
11       hereto.)
12  Q.   I'm handing you what's been marked as
13  Defendant's Exhibit No. 36.
14       Is that a true and correct copy of the
15  Dismissal and Notice of Rights you received from
16  the EEOC?
17  A.   Yes, sir.
18       (Defendant's Exhibit No. 37 was
19       marked for identification and a
20       copy of the same is attached
21       hereto.)
22  Q.   Let me hand you what has been marked as
23  Defendant's Exhibit No. 37. I will state to you

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

| Page 157 | Page 159 |
|---|---|

**Page 157**

1  that this is a pleading that has been filed in
2  this lawsuit that is identified as Plaintiff's
3  Initial Disclosures. This was filed by your
4  attorney.
5      I would just like to ask you a few questions
6  about some of the individuals listed on here.
7  No. 4 says "Heidi Houston." Who is that?
8      MR. JACOBS: That would be my error.
9  That should be Brigitte.
10  Q.  Brigitte Houston, your wife.
11  A.  Okay.
12  Q.  Thomas Manski is the --
13  A.  Thomas Manski is the neurosurgeon that
14  performed my last back surgery, to answer your
15  question.
16      (Defendant's Exhibit No. 38 was
17      marked for identification and a
18      copy of the same is attached
19      hereto.)
20  Q.  I'm handing you what has been marked as
21  Defendant's Exhibit No. 38.
22      Who is Dr. Leo Chen?
23  A.  Dr. Leo Chen is a surgeon who has repaired

**Page 159**

1  note on top of it?
2  A.  Yes. This is a draft of general work
3  requirements that were opposed during the contract
4  negotiations for the new CBA that they are
5  currently under. I was given this by Mr. Wilmer
6  Tharpe.
7  Q.  When was that?
8  A.  I do not remember.
9  Q.  More than a year ago?
10  A.  Most likely.
11  Q.  Who was -- who were you directing this note
12  to?
13  A.  Back to Wilmer.
14  Q.  That's your handwriting?
15  A.  Yes, it is. And that's my signature down
16  there.
17  Q.  Have your restrictions changed any since
18  March of 2005?
19  A.  No.
20  Q.  They've remained constant; they are truly
21  permanent?
22  A.  They are truly permanent, yes, sir.
23      MR. STARLING: Why don't we take a

**Page 158**

1  my rotator cuff, my left rotator cuff.
2  Q.  Do you recognize this letter from Dr. Chen
3  that's been marked as Defendant's Exhibit 38?
4  A.  Yes, sir.
5  Q.  Is this something that you had him prepare
6  for you?
7  A.  Yes, sir.
8  Q.  When was the last time you had surgery on
9  your shoulder?
10  A.  I'll have to look at this statement here.
11  It says here in the letter, "... September of 2005
12  the patient underwent his third left shoulder
13  surgery and rotator cuff repair."
14  Q.  Is that correct? Have you had one since
15  then?
16  A.  No.
17      (Defendant's Exhibit No. 39 was
18      marked for identification and a
19      copy of the same is attached
20      hereto.)
21  Q.  Let me hand you what's been marked as
22  Defendant's Exhibit No. 39. It looks like a page
23  from some printout at AFS maybe, and then a sticky

**Page 160**

1  break for a few minutes?
2      (A brief recess was taken.)
3  (BY MR. STARLING)
4  Q.  I've got a few more documents here to
5  authenticate.
6      (Defendant's Exhibit No. 40 was
7      marked for identification and a
8      copy of the same is attached
9      hereto.)
10  Q.  Let me hand you what I've marked as
11  Defendant's Exhibit No. 40. Do you recognize that
12  document?
13  A.  Yes, I do.
14  Q.  Is that a letter that you drafted to Senator
15  Richard Shelby?
16  A.  Yes, I did.
17      (Defendant's Exhibit No. 41 was
18      marked for identification and a
19      copy of the same is attached
20      hereto.)
21  Q.  I'm handing you what has been marked
22  Defendant's Exhibit No. 41. Do you recognize the
23  document marked Defendant's Exhibit 41?

40 (Pages 157 to 160)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

Page 161

1  A.  Yes, I do.
2  Q.  And what is that?
3  A.  I had to submit some document to this
4  Veterans Employment Training Service Agency, a
5  part of the Department of Labor, to Mr. Dewey and
6  Mr. Bolls, and establish my veteran status.
7        (Defendant's Exhibit No. 42 was
8        marked for identification and a
9        copy of the same is attached
10       hereto.)
11  Q.  I'll hand you what I've marked as
12  Defendant's Exhibit No. 42. Do you recognize that
13  document?
14  A.  Yes, I do.
15  Q.  Is that a letter you received from Kenneth
16  Manne at L-3?
17  A.  Yes, it is.
18  Q.  And L-3 is the parent corporation of AFS,
19  correct?
20  A.  This is correct.
21  Q.  And had you sent Mr. Manne some type of
22  complaint?  Was he responding to that?
23  A.  Yes.

---

Page 162

1        (Defendant's Exhibit No. 43 was
2        marked for identification and a
3        copy of the same is attached
4        hereto.)
5  Q.  I'm handing you what I've marked as
6  Defendant's Exhibit No. 43. Do you recognize that
7  document?
8  A.  Yes.
9  Q.  Can you tell us what this is?
10  A.  This is the package that I was talking about
11  on my spreadsheet. This is the package that I
12  mailed off to different organizations on that
13  spreadsheet.
14       (Defendant's Exhibit No. 44 was
15       marked for identification and a
16       copy of the same is attached
17       hereto.)
18  Q.  I'm handing you a document marked as
19  Defendant's Exhibit 44. Do you recognize this
20  document marked as Defendant's Exhibit 44?
21  A.  Yes, I do.
22  Q.  And is that a memo from you to Donald
23  Cirino?

---

Page 163

1  A.  Yes, it is.
2  Q.  Who is Donald Cirino?
3  A.  I'd have to check my spreadsheet.
4  Q.  This was another DOL or organization you
5  were filing a complaint with?
6  A.  Yes, sir.
7        (Defendant's Exhibit No. 45 was
8        marked for identification and a
9        copy of the same is attached
10       hereto.)
11  Q.  I'm handing you what I've marked as
12  Defendant's Exhibit 45. Do you recognize this
13  document?
14  A.  Yes, I do.
15  Q.  And that is a letter from a compliance
16  officer at the Department of Labor to you?
17  A.  Yes, sir.
18  Q.  It says in there, "... attached is a copy of
19  the statements that you provided to our office."
20      Do you have those statements?
21  A.  Interview statements you're referring to,
22  down here at the bottom?
23  Q.  Correct.

---

Page 164

1  A.  You would have to get ahold of Mr.
2  Christopher Williams for that.
3  Q.  When you wrote, "Signed and dated on
4  8/31/05," is that your handwriting?
5  A.  It is, yes, sir.
6  Q.  What did you mean by that?
7  A.  I don't remember.
8  Q.  I think you've answered this question, but I
9  want to make sure: If AFS offered you an aircraft
10  scheduler position tomorrow, would you accept it?
11  A.  I would have to go ahead and go through the
12  procedures with the Veterans Administration to
13  terminate my status as permanent disabled 100
14  percent with them to be able to accept a job with
15  AFS.
16      It would probably be a long and lengthy
17  process that I would have to go through with the
18  VA. There is a lot of paperwork involved.
19  Q.  Did you know whether there were certain
20  places that you had qualified for typing 30 words
21  per minute for AFS?
22  A.  Say that again, please.
23  Q.  I'm sorry. I'll strike that.

41 (Pages 161 to 164)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 165

1    Did anyone advise you to go to JobsPlus to
2    qualify for typing?
3    A.    I was told by a representative from the HR
4    department that I should brush up on my typing
5    skills, and then apply for the aircraft scheduler
6    position.
7    Q.    And which meeting was that?
8    A.    I believe it was on the 11th of March.
9    Q.    Do you believe you've been fully honest with
10    Social Security and the VA about your disability
11    status?
12    A.    Fully honest as to my abilities to work?
13    Q.    Correct.
14    A.    I am -- I have been fully honest, yes.
15    Q.    Have you answered the questions truthfully
16    here today?
17    A.    Yes, sir.
18    Q.    To the fullest extent of your knowledge?
19    A.    Yes, sir.
20    Q.    Any answers you wish to change at this point
21    in time?
22    A.    No, sir.
23    Q.    Were there any other people present in the

Page 166

1    Daleville office on any of the March meetings,
2    other than the HR people you've identified?
3    A.    Just the HR people; nobody else, other than
4    my wife.
5    Q.    She was at the Daleville office?
6    A.    Yes.
7    Q.    When you were there March the 11th?
8    A.    No.
9    Q.    March the -- which meeting was she present
10    at?
11    A.    The 15th.
12    Q.    The time when you went back and completed
13    the exit forms?
14    A.    Yes.  I had to outprocess.
15    Q.    She was not there on the 14th?
16    A.    No.
17    Q.    Nor the 11th nor the 7th, right?
18    A.    No, sir.
19    Q.    Is there anything else about your lawsuit
20    you wish to tell me today?
21    A.    No, sir.
22    Q.    All right.
23        MR. STARLING:  We are going to conclude

Page 167

1    the deposition for today.  The deposition does
2    remain open because there's some outstanding
3    subpoenaed documents, I guess, we're waiting on,
4    and one is the response to these requests.
5        We can see if there are any questions that
6    need to come after that; and if we need that, we
7    can do a quick finish-up, I assume.  There may not
8    be any questions, but I think we have to keep it
9    open just for purposes of those documents, if
10    that's okay with you.
11        MR. JACOBS:  Yeah, that will be all
12    right.  I have a few questions though.
13        MR. STARLING:  Oh, sure.
14    BY MR. JACOBS:
15    Q.    Mr. Houston, when you applied to the VA for
16    disability, did you give them any information
17    about your inability to work, other than the
18    medical documentation that we've seen so far
19    today?
20    A.    No.  I gave them all the medical
21    documentation that they had requested.
22    Q.    Do you recall if you were ever asked to
23    certify that you were unable to do any kind of

Page 168

1    work at all?
2    A.    No.
3    Q.    Okay.  Approximately when was the last time
4    you received a paycheck from AFS?
5    A.    September.
6    Q.    Of when?
7    A.    '04.
8    Q.    2004?  All right.  Did you start paying for
9    your insurance benefits in September of 2004?
10    A.    No.
11    Q.    Okay.  When did you have to start making
12    monthly payments on your insurance benefits?
13    A.    On the 15th of March, 2005.
14    Q.    Oh, that started in 2005?
15    A.    Yes.
16    Q.    Okay.  And do you currently still have that
17    insurance?
18    A.    Yes, I do.
19    Q.    And you are continuing to make the payments
20    yourself for it?
21    A.    Yes.
22    Q.    Okay.  When you were working at DynCorp and
23    then subsequently at AFS, in addition to your pay

42 (Pages 165 to 168)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

### Page 169

1  there, were you also receiving retirement benefits
2  from the Air Force?
3  A.  Yes.
4  Q.  Do you recall approximately how much those
5  retirement benefits were?
6  A.  In the neighborhood of $1800 a month.
7  Q.  All right.  Do you continue -- I believe you
8  answered this question, but just let me clarify
9  it:  Do you still receive those retirement
10  benefits from the Air Force?
11  A.  No, I don't.
12  Q.  Instead, you are receiving VA benefits; is
13  that correct?
14  A.  That is correct.
15  Q.  And then some supplemental payment that you
16  referred to?
17  A.  Yes, that's correct.
18  Q.  Okay.  Is your current income less than it
19  would have been were you still working for AFS and
20  receiving your Air Force retirement benefits?
21  A.  Yes.
22  Q.  You've mentioned two and possibly three
23  visits that you made to the HR office in Daleville

---

### Page 170

1  regarding your return to work.  And I'm going to
2  give you a lot of preface to this to try to
3  separate them.
4      On one of those visits, you took a
5  return-to-work form that didn't have a date on it;
6  is that correct?
7  A.  That is correct.
8  Q.  Was there any discussion between you and the
9  HR representative at that time about whether you
10  would be able to return to your job as an aircraft
11  mechanic?
12  A.  Yes, there was.
13  Q.  What was the gist of that discussion?
14  A.  Due to the restrictive nature of the medical
15  restrictions placed upon me by Dr. Manski, that I
16  would probably not be able to go back into the
17  aircraft mechanic's job.
18  Q.  Did anyone with AFS, or did the HR
19  representative, at that time discuss with you any
20  possible accommodation they could make that would
21  allow you to go back into the mechanic's job?
22  A.  No.
23  Q.  Did anyone with AFS ever discuss with you

---

### Page 171

1  whether there was any possible way that the
2  mechanic's job could be configured or arranged so
3  that you could continue to work in that position?
4  A.  No.
5  Q.  All right.  At that meeting, did anyone from
6  -- did the representative from AFS's HR department
7  discuss with you some other accommodation ASF
8  might have available to you?
9  A.  Yes.
10  Q.  What was that accommodation?
11  A.  The aircraft scheduler job.
12  Q.  All right.  Were you given an opportunity at
13  that time to apply for the scheduling job?
14  A.  No.
15  Q.  Were you given any instructions about
16  applying for the scheduling job?
17  A.  I was told to brush up on my typing skills
18  because I had a requirement to meet 30 words a
19  minute.
20  Q.  When you returned to the HR office on March
21  the 14th, you did have a correctly
22  completed/filled out return-to-work form, right?
23  A.  Yes, I did.

---

### Page 172

1  Q.  What date did it say you should be returned
2  to duty?
3  A.  That day.
4  Q.  All right.  Did anyone with the HR
5  department on that date discuss with you any
6  possible accommodation that could be made to the
7  aircraft mechanic job so that you could continue
8  to work in that position?
9  A.  No.
10  Q.  Did you accept that you were not going to be
11  able to continue to work as a mechanic at that
12  time?
13  A.  Yes.
14  Q.  Did you ask the HR person about applying for
15  the scheduling job?
16  A.  Yes.
17  Q.  Did you apply for the scheduling job?
18  A.  I asked for the form to reclassify, the
19  reclassification paperwork.
20  Q.  What response did you get?
21  A.  I was not given the paperwork.
22  Q.  Were you given a reason for not being given
23  the paperwork?

---

43 (Pages 169 to 172)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

---

Page 173

1  A.  Because I had to be in my old job as an
2  aircraft mechanic first to be allowed to
3  reclassify as an aircraft scheduler.
4  Q.  Were you given any justification for stating
5  that that was a requirement, that you had to be on
6  active status in order to reclassify?
7  A.  Say that again, please.
8  Q.  Were you given any justification, any reason
9  why HR said you had to be on active status to
10  reclassify?
11  A.  No.
12  Q.  Was there any mention at the previous
13  meeting that you had to be on active status to go
14  into the scheduling job?
15  A.  No.
16  Q.  In response to a question, you indicated
17  that the HR representative called one or more
18  persons to discuss your return to work.
19     Was this at the meeting on the 14th, when
20  you came back?
21  A.  (No response.)
22  Q.  And I'll try to remember. One of them, I
23  think, was a Donley or somebody.

---

Page 174

1  A.  Oh, Don Donley. Yes. The lady at the desk
2  called my ATTC manager and was reading the
3  restrictions. And he cut her off before she could
4  finish and said that I could not be accommodated.
5  Q.  Okay. Did the HR representative use those
6  words, you can't be accommodated?
7  A.  Yes.
8  Q.  Okay. Could you hear what Mr. Donley was
9  saying?
10  A.  No. I was sitting there next to the lady,
11  the HR lady, when she was talking on the phone to
12  Mr. Donley about my medical restrictions. And I
13  was quite surprised that he cut her off before she
14  actually finished reading all the medical
15  restrictions on the return-to-work slip.
16  Q.  Okay. Did anyone with AFS discuss with you
17  any other possible jobs that you might be able to
18  qualify to do?
19  A.  No.
20  Q.  Okay. Were you subsequently told that the
21  Collective Bargaining Agreement stated that you
22  had to be actively in your present classification
23  in order to reclassify to another job?

---

Page 175

1  A.  That's what I was told, yes.
2  Q.  Were you ever told where in the Collective
3  Bargaining Agreement that language was?
4  A.  No.
5  Q.  And had you ever been told that before by
6  anyone at AFS?
7  A.  No.
8  Q.  On the 14th, you did not complete your
9  outprocessing?
10  A.  Yes, that's correct.
11  Q.  Why did you not complete it?
12  A.  I was upset.
13  Q.  You answered, in response to a question, if
14  I recall correctly, that you returned the next day
15  on the 15th?
16  A.  Yes, I did.
17  Q.  Did you have any discussion with anyone on
18  that date in HR about trying to accommodate your
19  physical disabilities?
20  A.  I asked again if I could get a
21  reclassification sheet.
22     MR. STARLING: Object. Asked and
23  answered.

---

Page 176

1  Q.  What was the response?
2  A.  I was not given a sheet.
3  Q.  Were you given a reason for not being given
4  a sheet?
5  A.  I was given a reason that I had to be in my
6  old job as an aircraft mechanic before I could
7  reclassify into an aircraft scheduler job.
8  Q.  Okay. That's all I have.
9  BY MR. STARLING:
10  Q.  I've got two documents I need you to
11  authenticate real quickly.
12     (Defendant's Exhibit No. 46 was
13     marked for identification and a
14     copy of the same is attached
15     hereto.)
16  Q.  Let me hand you what I've marked as
17  Defendant's Exhibit 46 here. Do you recognize
18  what I've marked as Defendant's Exhibit 46?
19  A.  Yes, I do.
20  Q.  Is that a letter you wrote to Dr. Chen?
21  A.  Yes, it is.
22  Q.  And it appears to be in the nature of asking
23  him to support your claim with the VA?

---

**1933 Richard Arrington Jr. Blvd. S * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting * Legal Videography * Trial Services**

Page 177

1  A.  Yes, it is.
2  Q.  Chen was the surgeon for your shoulder?
3  A.  This is correct.
4      (Defendant's Exhibit No. 47 was
5      marked for identification and a
6      copy of the same is attached
7      hereto.)
8  Q.  Let me hand you what I've marked as
9  Defendant's Exhibit 47. This also appears to be a
10 similar letter to Dr. Chen; is that correct?
11 A.  This is correct.
12 Q.  And this is a letter from you to him?
13 A.  This is correct.
14 Q.  Does the aircraft mechanic job require you
15 to lift more than 25 pounds?
16 A.  Are you asking me about the official job
17 description or as an aircraft mechanic in general
18 going out and working on an aircraft?
19 Q.  As an aircraft mechanic in general going out
20 and working on an aircraft.
21 A.  Yes, it does.
22 Q.  What about climbing?
23 A.  Yes. You have to climb on a helicopter.

Page 178

1  Q.  Okay. What about standing more than an hour
2  and a half?
3  A.  True. I would say yes. You've got to do a
4  lot of standing.
5  Q.  What about prolonged sitting for more than
6  an hour and a half?
7  A.  If you're working inside the cockpit, yes.
8  Q.  You've got to do that?
9  A.  Yes, sir.
10 Q.  Do you have to be able to bend at the waist,
11 to lift, pull, twist, or push?
12 A.  Yes, sir.
13 Q.  This meeting on the 15th, where you say now
14 that you asked for the reclassification form
15 again, who did you ask for that?
16 A.  The HR representatives that were at the desk
17 with myself and my wife.
18 Q.  Okay.
19     MR. STARLING: Unless you have any
20 additional questions, I think that's it for the
21 day.
22     MR. DEMARKO: Do you happen to know
23 their names?

Page 179

1      THE WITNESS: No, I don't, sir.
2      MR. DEMARKO: Can I ask you if they're
3  black or white?
4      MR. STARLING: We've been down that
5  road. I think we are done for today, subject to
6  being open for the issues we've discussed earlier.
7      MR. JACOBS: Okay.
8
9
10     FURTHER THE DEPONENT SAITH NOT
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 180

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  BARBOUR COUNTY
5
6      I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription, and that the foregoing represents
11 a true and correct transcript of the testimony
12 given by said witness upon said hearing.
13     I further certify that I am neither of
14 counsel, nor kin to the parties to the action,
15 nor am I in anywise interested in the result of
16 said cause.
17
18
19
20
21     CYNTHIA M. NOAKES,
22     COURT REPORTER and
23     COMMISSIONER

45 (Pages 177 to 180)